UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LEISA YOUNG, in her Capacity as Administratrix of the Estate of Cornel Young, Jr. | : | |
| vs. | : | C.A. No. 01-288 S |
| CITY OF PROVIDENCE, by and through its Treasurer, STEPHEN NAPOLITANO, URBANO PRIGNANO, JR., individually and in his official capacity as Providence Chief of Police; RICHARD SULLIVAN, individually, JOHN RYAN, individually and KENNETH COHEN, individually | : | |

**DEFENDANTS URBANO PRIGNANO AND RICHARD SULLIVAN'S RULE 12.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants URBANO PRIGNANO, JR. ("Prignano") and RICHARD SULLIVAN submit the following Statement of Undisputed Facts in Support of their Motion for Summary Judgment as to Counts II and III of the First Amended Complaint (the "Complaint") of plaintiff, LEISA YOUNG, in her capacity as Administratrix of the Estate of Cornel Young, Jr.:

1. The shooting of Cornel Young Jr. was the first time in the history of the PPD that a PPD officer was shot by another PPD officer and prior to the Young incident of January 28, 2000, there were no "friendly fire incidents" in the entire history of the PPD.[1]

2. Defendant Urbano Prignano, Jr. was the PPD Chief of Police during the training academies attended by Saraiva and Solitro.

3. Facts pertaining to Defendant, Captain John Ryan's experience and qualifications to be in charge of the PPD academy prior to the Young incident of January 28, 2000:[2]

(a) Ryan developed the curriculum at the Academy.[3]

(b) Ryan received a law degree in 1994.[4]

(c) Ryan, attended an FBI course offered to Rhode Island Police Officers.[5]

(d) Ryan attended the Advanced Tactical Command School in Virginia.[6]

(e) Ryan attended the FBI's Instructor Development School.[7]

(f) Ryan did a "lot of training for the Public Agency Training Council." [8]

(g) Ryan has been an adjunct faculty member for nearly the past ten years at Salve Regina University where he taught a variety of courses, including an undergraduate course in criminal procedure, another course in advanced criminal procedure, a *graduate* course in police misconduct, and a graduate course in police management.[9]

(h) Ryan "spoke on the panel at the Georgetown Law Center ...on racial profiling". [10]

4. Facts pertaining to some of the training given PPD police officers prior to the Young incident of January 28, 2000:

(a) Off-duty training at the PPD academy included training that off-duty officers have their identification readily available, quickly identify themselves as a police officer, display their credentials and their weapon, and readily obey the commands of uniformed officers arriving at the scene who may not recognize the off-duty officer. (SM162L8-63L3; 63L18-64L5; 66L1-67L5).

(b) Post-Academy "in-service" training was provided via a "three pronged" approach requiring annual training at the live fire at the range, the Range 2000 video simulator, and the paint ball training sessions, all of which involved off-duty situations. (SM1 16L4-16; 65L4-24)

(c) Recruits at the Academy were given shoot/no shoot training at the firing range. (SB1 59L21-60L3; 61L6-8; 62L1-3; 64L5-9).

(c-1) The firing range had different types of paper "cut-out" targets - which were designated as either shoot or no shoot targets – that were used to train the recruits to

distinguish between shoot and no shoot situations. (SB1 60L21-24; 61L6-8; 62L1-3; 64L5-10)

(c-2) The paper cut-out targets were of different colors, were moved in different ways "behind several different targets" and one of the paper cut-outs was of a plain clothes police officer "with a badge". (SB1 61L17-23; 62L23-63L2) wherein the recruits were required to "make a determination as to whether to shoot or not (to) shoot" the target. (SB1 64L6-9)

(d) Classroom training – wherein off-duty issues were addressed - followed the target training. (SB1 65L6-17)

(e) Besides the firing range, recruits were put through shoot/no shoot and *off-duty* role playing scenarios at Camp Varnum (SB1 59L21-60L13; 68L1-7)

(f) Each of the recruits took part in 14 different role playing scenarios at Camp Varnum which was "set-up" like a "small city". (SB1 71L22-72L17; 70L16-71L19)

(g) A dispatcher at Camp Varnum would make a "call" and the recruit would respond by taking part in a particular scenario. (SB1 71L22-72L17)

(h) The role playing scenarios at Camp Varnum occurred over a two week period. (SB1 65L19-66L5; 70L16-71L3)

(i) The purpose of a number of the Camp Varnum scenarios - which were followed by a critiquing period - was to have the officer make a shoot/no shoot determination involving an *off duty* officer as well as to show the officer what not to do in an *off duty* situations. (SB1 69L10-22; 74L8-11; 76L4-6; 85L24-86L14; 87L23-88L12; 90L15-22; 84L21-85L6;)

(j) For example, during the critique following the scenario where the off duty officer too quickly reaches for his badge, the recruits are told that - rather than quickly reaching for his badge - the off duty officer should have put his hands on the steering wheel and waited for the recruit – whose role is that of the on duty officer - to give him orders as to what to do (SB1 93L18-94L8; 94L15-95L8; 97L16-21)

(j) There were two different *sets* of *off duty* role playing scenarios at Camp Varnum: One set was associated with what were referred to as "traffic" scenarios whereas another set was associated with what were referred to as "common call" scenarios; both sets employed off-duty role playing scenarios. (SB1 66L10-24) Approximately two (2) or three (3) different *off duty* traffic scenarios were used in conjunction with two (2) or three (3) different off duty common call scenarios for a grand total of five (5) or six (6) different off duty role playing scenarios.

(k) In one of the off duty *traffic* scenarios, as the recruit approaches an off duty officer who is seated in a car, the off duty officer quickly reaches inside the car's glove compartment containing the off duty officer's gun and his badge; in another off duty *traffic* scenario, the off duty officer comes "running out of the car towards the ...(recruit)" while *showing his badge* and "yelling (that) he's in a hurry".[11]

(l) In one of the *common call* scenarios, a neighborhood resident advises the recruit that "someone ...ran into his shed in the back of the house". As the recruit attempts to investigate the situation, an off duty officer comes out from the back yard holding a gun. The recruit is then to tell the off duty officer to "freeze" at which time the off duty officer says "*"I'm on the job; I'm on the job." The* off duty officer then follows the recruits orders. (SB1 83L13-22; 99L17-20). (The phrase "*"I'm on the job*" is used by off duty police officers to identify themselves a such.[12]

(m) In yet another of the common call scenarios, the recruits are "meeting with the complainant out in the front yard" when an off duty officer "comes running from across the street with a firearm ...stating that he's there to help and he's a police officer" In one version of that scenario the off duty officer has a badge in his hand and in the other version of that scenario the off duty officer does not have a badge in his hand[13] Once the off duty officer identifies himself as such the recruit is to tell him to "put the firearm down, get him away from the firearm, get him on the ground and check his credentials" [14]

5. Additional facts pertaining to the training given PPD police officers prior to the Young incident of January 28, 2000:

(a) "Paintball shooting" scenarios were used at the PPD firing range.[15]

(b) The PPD used a training device called a "Range 2000" where officers stand before a screen with a laser equipped gun to practice various computer controlled scenarios, including both *off-duty* and on-duty scenarios.[16]

6. All of the allegations in the First Amended Complaint against Defendant Sullivan have been dismissed.[17]

7. Defendant Sullivan was granted Summary Judgment on the failure to discipline claim and the negligent screening of Solitro for hiring with respect to the allegations involving Gregorio Small.[18]

8. The First Circuit has dismissed the hiring claim.[19]

DEFENDANTS,
RICHARD T. SULLIVAN and
URBANO PRIGNANO, JR.,

By their attorneys:
JOSEPH M. FERNANDEZ,
CITY SOLICITOR

Kevin F. McHugh, #3927
Anthony F. Cottone, #3922
Caroline Cole Cornwell, #3692
Michael Calise, #6715
City of Providence Department of Law
275 Westminster Street, Suite 200
Providence, RI 02903
(401) 421-7740, Ext. 333
(401) 351-7596 (Fax)

**CERTIFICATION**

I hereby certify that I mailed a true copy of the within to the Attorneys of Record as listed below on this 12th day of August, 2005.

Robert B. Mann, Esquire
Mann & Mitchell
501 Turks Head Building
Providence, Rhode Island 02903

Nick Brustin, Esquire
Cochran, Neufeld & Scheck, LLP
99 Hudson Street, 8th Floor
New York, NY 10013

Michael Colucci, Esquire
Olenn & Penza
530 Greenwich Avenue
Warwick, Rhode Island 02888

---

[1] See Melaragno's deposition at page 131-132.
[2] See generally, Captain Ryan's deposition: JR1 5-6.
[3] See Ryan's deposition at page 55.
[4] JR1 42L24 – 43L4.
[5] JR1 43L 9-11.
[6] JR1 43L21-45L2.
[7] JR1 44L13-16.
[8] JR1 51L9-10.
[9] JR1 50L4-24.
[10] JR1 51L21-23.
[11] SB1 68L8-18; 74L8-13; 75L17-19; 80L21-23; 81L9-13; 81L22-82L4; 96L19-24.
[12] SM1 233L20-234L12.
[13] SB1 84L8-15.
[14] SB98L15-23.
[15] UB1 40L5-8.
[16] UB1 42L1-43L10.
[17] See Young v. City of Providence, 404 F.3d 4, 31 (1st Cir. 2005).
[18] See Memorandum and Order of United States District Judge Mary M. Lisi, dated May 30, 2003.
[19] See Young, 404 F.3d at 31.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * * * *
LEISA YOUNG, INDIVIDUALLY AND IN *
HER CAPACITY AS ADMINISTRATRIX OF *
THE ESTATE OF CORNEL YOUNG *
*
VS. * CA NO 01-288M
*
CITY OF PROVIDENCE, by and through *
its treasurer, STEPHEN P. NAPOLITANO, *
MICHAEL SOLITRO, individually, and in *
his official capacity, CARLOS SARAIVA, *
individually and in his official *
capacity, JOHN and JANE DOES, 1 *
through 10, individually and in their *
official capacities *
* * * * * * * * * * * * * * * * * * * *

DEPOSITION OF LT. STEVEN MELARAGNO, a Witness in the above-entitled case, taken on behalf of the Plaintiff, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the Offices of the City Solicitor, 275 Westminster Street, Providence, Rhode Island on June 27, 2002, at 9:00 A.M.

any of the segments of the program.
Q. At that time in 1997 all of the trainers were responsible for all of the areas?
A. They're all certified. In order to reduce the boredom level, we'd skip, you know, I might teach one part of the program one day and another part the next day.
Q. Sure, okay. When you were the sergeant in charge of the weapons bureau, did you have any other assignments other than the teaching academy recruits?
THE WITNESS: Other job assignments in the police department?
MR. BRUSTIN: Yes.
A. Part of the State bomb squad, and we didn't have any other instructional duties. When the academy was in session, that time was blocked out just for that activity, unless there was an emergency. We were also on the SWAT team but, again, all of that stopped when the academy was in session because we had to devote all of our attention to training the recruits.
Q. You were also responsible for recertifying police officers?



A. Yes.
Q. Does that happen on a yearly basis?
A. Annually, yes.
Q. How much training do they have on the yearly basis, the non-recruit officers?
A. They get -- right now we have a three-pronged approach to training. They have live fire at the range, which will occupy usually a tour of duty, maybe four hours, four to six hours. Then there's the paint ball training simulation where we actually do role playing, and the Range 2000.
So their in-service training component in a year will incorporate all three facets of training.
Q. Okay. And you -- has that training you just described, the in-service training, has that been the same from 1997 through the Young shooting?
A. It hasn't been exactly the same. Again, when we purchased the Range 2000 simulator equipment we began using that, and that comes with videos that you can choose to put the recruit through for different resolutions in different scenarios.
Q. That was after the Young shooting?
A. No. That was before, and the paint ball was before.



Q. When was that?
A. It might have been about a year before. I don't know the exact date. I'd have to research when we actually purchased the equipment. But this is -- when you're trying to buy equipment with the city, sometimes it takes -- it's an 18-month process between the time you decide what you'd like to get and put the requisitions in and it goes out to bid.
Q. Is it fair to say that, to your knowledge, Officer Saraiva and Officer Young never received simulation training prior to the Young shooting?
A. No.
Q. It's not fair to say?
A. It's not fair to say.
Q. You think they may have?
A. I believe -- I don't have the written records. I believe Cornel Young went through a session that I was at with the simunition, and Saraiva, I'm confident I put him through the Range 2000. I did not put Cornel Young through the Range 2000 training. We all split up that responsibility also.
MR. McHUGH: Could you read the



answer?
(ANSWER READ)
Q. Mr. Ryan -- former Captain Ryan talked about the importance of documenting training. Do you concur with Mr. Ryan that it's essential to document training that officers and recruits receive?
A. Yes, it is.
Q. Why is that?
A. Well, for the reasons we're sitting here right today. If the documentation were readily available, it would be easy to pull it out and say a particular officer went through A, B, C and D training on a certain date.
Q. But aside from litigation, would you agree that it's important to document training for a number of other reasons?
A. Sure. You want to have training records because it helps you establish a profile of someone's ability or inability to perform a certain task. If they constantly do very well in a particular block of training, you can say they maintain a good level of proficiency on their own, and if they tend to fall off and need retraining, more often than not, you'd know they're not

at the scene, they may or may not recognize you, especially if you're out of town, they wouldn't know who you are.

We have people working in the drug unit not in uniform. We have out-of-town policemen working in Providence on DEA and ATF task forces, we don't know everybody. One of the scenarios you described in uniform on duty, you get a man with a gun call on Wood Street, and you approach -- you can hear people in the backyard, you approach making good use of cover. You see a man with a beard, an earring, dressed in shabby clothes, he has a gun pointed at somebody. What do you do? You announce yourself from a good position of cover, and tell them to put the gun down. He might very well and say, "I'm on the job; I'm with DEA." You know, and at that point we instruct them to still -- have them back up, put the gun down until you can verify what he -- who he is, because he might be lying. But you just don't go in and shoot the person who is holding the gun, you need to identify who they are.

The reverse lesson in that is if you're the plain clothes or off-duty officer and you're involved, when uniformed personnel arrive at the



scene, you need to obey whatever commands they're giving you because they in fact probably won't know who you are, and you might be out of town, you might be dressed, you know, working undercover or off-duty dressed differently.

We always hear when we run into people on the street -- I work in uniform all the time now, and when people run into me on the street, sometimes they don't recognize me right away because I don't have the uniform on. You know, so there's an ID issue there when you're out of your normal element.

Q. Okay. So you've given me some general tips that you give, you've given me a scenario, anything else? Again, I'm limiting these questions now to the Solitro and Young academy classes.

A. We do -- well, in the decision shooting, as I told you earlier, we mark some targets. Regarding off duty --

Q. That's all I want to know.

A. Whatever scenarios we're running --

Q. I'm sorry, off duty or plain clothes?

A. We would work an off duty or plain clothes scenario during the car stops, during man with a gun calls, and that would also involve the paint ball



training.

Q. Anything else?

A. No.

Q. Okay. How about in-service training prior to the Young shooting?

THE WITNESS: In-service training?

MR. BRUSTIN: On off-duty issues?

A. Would be the paint ball, simunition. We reinforce that. There is a three-prong approach to the firearms range, the live range where you get the actual shooting, simunition, which uses modified pistols. We'd do the store clerk, off-duty officer or just a person with a gun who doesn't pose a threat to you, how do you respond to that, and the Range 2000 video simmulator, which also has decisions built into that video program.

Q. In-service, what are the -- what is training that could touch on off duty, you said paint balls, anything else?

A. Paint ball and Range 2000.

Q. You do Range 2000 for each in-service training?

A. Yes. Everybody should go through Range 2000, paint ball and a live range once a year, one complete cycle.



Q. Let's go through each one. The first thing you talked about was you provide the officers, recruits training that when they're off duty or in plain clothes they need to identify themselves?

A. Yes.

Q. They need to call out that they're the police?

A. Yes.

Q. They need to display their credentials and firearm?

A. The phrase we teach them to use is, "We're on the job." That's a commonly understood phrase within the police circle.

Q. And when is that training given, in what format that you just described?

A. At the academy.

Q. Is that training provided at the range?

A. That's range training, and some of it would be in the classroom.

Q. Okay. I'm going to make sure we're on the same page. The issues you just described, identifying yourself, calling out "Police," displaying your credentials and firearms, you believe that some of that training happens in components --

A. In each component.

Q. -- components of the academy outside of your

Page 66

purview; is that right?
A. Yes.
Q. And you believe that that training happened under the purview of Mr. Ryan?
A. Yes. It also happens at the range.
Q. I'm trying to just make sure I understand. You believe some of that training happened under Mr. Ryan?
A. Yes.
Q. Do you know what courses that training came under outside of the range?
A. No.
Q. Okay. Now, at the range where the training you just described -- when was that done?
A. Within that two-week block that we had them at the range, probably towards the end when we do the officer survival, the car stops and the different scenarios.
Q. Did you have a specific lesson on the issues you just described, identifying yourself?
A. No.
Q. Was there a specific time when those issues would be raised?
A. It's topics covered during the off duty --

Page 67

officer survival in the second half of the training. Again, the first half is devoted to the mechanical skills.
Q. I want to make sure I understand. It could be covered in officers' survival?
A. Yes.
Q. Anything else?
A. Any component where we're discussing, decision shooting. Again, if we work in scenarios where they're an off-duty officer in that component of decision training, after we do the training, then we'll discuss it, what could the person have done differently, what did they do right, what did they do wrong. It could have come up in any number of different ways during the range training.
Q. Okay. Now, none of the issues you just described, identifying yourself while off duty, calling out "Police," displaying their credentials and firearms, are found anywhere in words or in substance in your training materials; is that right?
MR. McHUGH: Objection as to form. You can answer.
A. I'd have to look through the entire manual.
Q. Do you need to look through it to tell me that?

Page 68

THE WITNESS: Through the entire manual?
Q. I'm talking about your training materials. Nowhere in the training materials that was used at the range for recruits -- you were responsible for all of the training at the range, right?
A. Yes.
MR. McHUGH: Objection as to form.
Q. Is that correct?
A. Yes.
Q. None of the training materials that you used referred to the topics in any way that you just described?
A. Let me look through it.
Q. I'm happy to have you look through it, but do you believe it's in there?
A. I'm not sure. I'm not sure. I know we covered it. Again, if --
MR. McHUGH: The record should reflect that he's looking at one of the three volumes that I produced in the request for production of documents on academy training. He's looking at -- I believe you're looking at the firearms training.

Page 69

THE WITNESS: I'm looking at the firearms section.
A. I don't see any reference to that block of training.
Q. Just to make sure we're all on the same page. Other than the firearms training section, is there any other section that documents the training that provided under your purview to the Solitro or Young classes?
A. No.
Q. You don't see anything in there?
A. I don't see it here, no.
Q. You're confident from looking at it it's not there?
A. Right.
Q. Now, you only taught -- there were a number of classes during the two weeks that the Young class was at the range and the Solitro class was at the range that you didn't teach; is that right?
A. Yes.
Q. You didn't see them? They were taught by other instructors outside of your view?
A. Yes.
Q. Okay. And you can't say one way or the other whether or not -- withdrawn. Can you say one way or

Page 130

Q. Mr. Ryan made clear to you that he knew it had been covered in training?
A. Yeah.
Q. In what areas did he tell you?
A. No. I don't recall the specifics of the conversation. I recall that I went down there and spoke to him and that he was doing some research, but I can't tell you verbatim exactly what we talked about.
Q. Now, you had been providing training, as you said, for many years about identifying yourself off duty?
A. Yes.
Q. Because that's -- you knew based on your outside training there had been a number of incidents around the country where officers had been misidentified; is that right?
A. That's right, particularly in New York City.
Q. You knew it long before, right?
A. Yes.
Q. And when you talked to Mr. Ryan, was he clear he also knew it?
A. Yes.
Q. He knew long before the Young shooting there had been other incidents around the country?

Page 131

MR. McHUGH: Objection. You may answer.
A. I believe he did.
Q. He made it clear to you he did?
MR. McHUGH: Objection. You may answer.
A. I don't --
Q. In your conversation with him, it was clear that you were both on the same page in terms of knowing there had been friendly fire incidents before?
A. Yes.
Q. Although there hadn't been one in Providence, it was not a routine occurrence, but it was something that happened in large metropolitan police departments?
A. Yes.
Q. And it was clear to you from your conversation that you both understood that it had always been important that you take precautions to ensure that such misidentification wouldn't happen in Providence?
A. Yes.
Q. And when you spoke to him, it was clear to you that you were both on the same page in terms of what should happen in the future, that is, to simply be

Page 132

clarified?
A. Yes.
Q. But you both implied that you had been covering the issue of off-duty training adequately prior to the shooting; is that right?
A. Yes.
Q. Would you agree that there was no policy, procedure, regulation or guideline in place in Providence prior to the Young shooting that in any way addressed the identification issues that you covered in your training?
A. Well, this Plaintiff's Exhibit 3 mandates that --
Q. Where are you reading from?
A. 202.1, "Except when on annual leave, a member shall be armed while off duty and shall have on his person his police badge and police identification card." So knowing that, you're mandated to carry it, so you can identify yourself.
Q. Okay. Do you believe that that policy, 202.1 adequately addresses the training that you provided on identification?
A. No. We went into much greater detail about identification, off duty and on duty.

Page 133

Q. Would you agree that there's no policy in place, no regulation, no rule that provided any details whatsoever about identifying oneself while off duty?
A. Yes. This would have been the reference.
Q. That would have been the closest one?
A. Yes.
Q. That doesn't do that, does it?
MR. McHUGH: Objection as to form.
Q. That policy doesn't in any way spell out how an officer should identify himself while off duty; is that fair to say?
A. Yes.
Q. And it doesn't in any way spell out how an on-duty officer should approach an off-duty situation; is that right?
A. Yes.
Q. There are no policies on that?
A. No.
Q. Did you know prior to the Young shooting from your training and your knowledge of friendly fire incidents that other police departments had specific policies on off-duty/on-duty confrontations?
A. No.
Q. You didn't know that?

Page 230

Police Department of an on-duty officer shooting and killing an off-duty officer, right?
A. That's right.
Q. But you have no idea whether you had 100 experiences in which an on-duty officer misidentified an off-duty officer, right?
THE WITNESS: And didn't shoot?
MR. BRUSTIN: And didn't shoot.
A. I don't have any recollection of an incident -- I tend to think that an incident like that would have been spoken about because it's a very high stress situation. I think if it did happen, I would have heard about it, although I can't guarantee that I would have.
Q. You can't say one way or the other, right?
A. I can't say.
Q. And this lesson here that says, remember, you have no legal obligation in any jurisdiction to get involved. That wasn't part of your training, was it?
A. No.
Q. And if intervention requires that you behave recklessly, carelessly or suicidely, that wasn't part of your lesson, right?

Page 231

A. Not necessarily. Although, we didn't encourage anyone to act recklessly or suicidely.
Q. And you didn't necessarily tell officers that their obligation could be to take action could be fulfilled by simply calling the police and monitoring the situation, right?
A. Correct.
Q. And you never instructed officers that most survival-conscious officers have trained themselves to not intervene off duty unless their life or the life of another innocent party is imminently in danger; is that right?
A. Correct. Are we going to do this line-by-line, page-by-page?
MR. BRUSTIN: I think we might.
A. This document represents a re-examination of what our obligations are off duty and what the expectations are.
Q. Fair enough. Let's do it this way, make it very easy. Is there anything in this document that you should necessarily have trained officers on in the '97, '99 recruit classes?
MR. McHUGH: Objection as to form.
MS. PENZA: Objection. Does that

Page 232

refer --
Q. Let me rephrase it, it's getting late. On the first two pages here, Numbers 1 through 10, is there anything contained in these two pages that you necessarily covered with recruits during the 30-minute training, classroom training you provided in the '97 and '99 recruit classes?
A. Paragraph 8 where it says to repeatedly and loudly shout, "Police, don't shoot, off-duty officer," and 9, "When commands are issued follow them promptly and completely." Again, identify yourself and comply with the commands of the uniformed personnel at the scene.
Q. You didn't give them specifically this instruction, did you, Number 8? You never told them to say, "I'm an off-duty officer," did you?
A. I believe I testified earlier that we did.
Q. Didn't you testify earlier that you said to say, "I'm on the job"?
A. I told them to identify themselves. If semantics is, "I'm on the job" or, "I'm a police officer," the intended message is the same. I'm a good guy.
Q. Didn't you testify earlier that it's not a matter of

Page 233

semantics, but the terms you've always used is, "I'm on the job"?
A. Or "Police," yes.
Q. Well, which one is it?
A. I use both.
Q. Okay. Do you always use, "I'm on the job," as opposed to, "Off-duty officer"?
MS. PENZA: Objection.
MR. McHUGH: Objection.
Q. Is that right?
A. I like to use, "I'm on the job," because it's universally recognized.
Q. Anything else in here?
A. No.
Q. Would you agree, Lieutenant -- you've read this, these two pages?
A. Yes.
Q. To the extent that these issues were not covered at the range, you assumed prior to the Young shooting that all of these issues were being covered in other areas of the academy, in substance?
A. In substance.
Q. And you understood before the Young shooting that it was important to cover these issues in training;

Page 234

is that right?
A. Yes.
Q. And you assume that others, including Mr. Ryan, understood that as well?
A. Yes.
Q. And that's because although there have never been an incident of an on-duty officer shooting an off-duty officer, you understood that the potential for such an incident existed and the risk was so high you wanted to take precautionary measures?
A. Yes. Both with an off-duty officer or a plain clothes officer.
Q. You understood even though it never happened in Providence, it happened in other places, and it's obviously one of the worst things that could ever happen, right?
A. True.
Q. So you assumed that at least in substance all these things were going on already?
A. Yes.
Q. And you would agree that all of these things should have been going on already based on what you knew?
A. Yes.
Q. And based on what you knew from your training, from

Page 235

your experience and other trainings from your readings, would you agree that it would have been reckless for the department not to provide this type of training to recruits before sending them out on the job?
MR. McHUGH: Objection.
Q. Even before the Young shooting?
MR. McHUGH: Objection.
A. I think it's part of a complete program, yes, and it should be taught.
Q. And because of the grave consequences for failing to follow these procedures, would you agree it would have been reckless for the department not to train officers in this way?
MR. McHUGH: Objection. You may answer.
A. Yes.
Q. Now, other than the range, is there any other area of training that was not under the direct supervision of Captain Ryan in '97 and '99?
A. As the director of the academy, he would have been overseer for everything, every -- he would have had to know everything.
Q. Okay. When the Select Commission -- you know what

Page 236

the Rhode Island Select Commission is?
A. Yes.
Q. Was it your understanding that they were established to investigate the Young incident?
A. Yes.
Q. And did you understand that they were established to look at training and policy issues in connection with the Young incident?
A. Yes.
Q. Do you have any idea why no one ever came and talked to you about policy and training in connection with the Young incident from the Commission?
A. I don't know. I assumed that they were looking at training at a statewide level. I know they were looking at municipal training academy versus State Police training academy versus Providence Police academy, what the sum and substance of the training was and how it could be made better. So they would have spoken most likely to the academy directors rather than the individual instructors.
Q. Well, assuming they were actually looking very specifically at Providence training in connection with the Young incident, would you expect they would have talked to you, someone from the department

Page 237

would have talked to you?
MS. PENZA: Objection to form.
MR. McHUGH: Objection.
A. They could have spoken to Captain Ryan.
Q. Let me ask you this, assuming that the Commission made very specific recommendations about training deficiencies, policy deficiencies, would you expect that someone from the department would have brought those to your attention?
MS. PENZA: Objection.
MR. McHUGH: Objection. You may answer.
A. I would have expected it, although no one has.
Q. You would have expected it, though?
A. Yes.
Q. They should have, right?
MS. PENZA: Objection.
MR. McHUGH: Objection.
A. I would like -- I would have liked them to, especially if I was involved in some of the training that was being examined.
Q. I mean, other than Captain Ryan, is there anyone else in the department that -- withdrawn. Would you agree that other than Captain Ryan, prior to

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * * * *

LEISA YOUNG, INDIVIDUALLY AND IN HER CAPACITY AS ADMINISTRATRIX OF THE ESTATE OF CORNEL YOUNG

VS. CA NO 01-288M

CITY OF PROVIDENCE, by and through its treasurer, STEPHEN P. NAPOLITANO, MICHAEL SOLITRO, individually, and in his official capacity, CARLOS SARAIVA, individually and in his official capacity, JOHN and JANE DOES, 1 through 10, individually and in their official capacities

* * * * * * * * * * * * * * * * * * * *

DEPOSITION OF RETIRED CAPTAIN JOHN J. RYAN, a Witness in the above-entitled case, taken on behalf of the Plaintiff, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the Offices of the City Solicitor, 275 Westminster Street, Providence, Rhode Island on June 26, 2002, at 10:30 A.M.

APPEARANCES:
THE PLAINTIFF...........COCHRAN, NEUFELD & SCHECK
BY: NICK BRUSTIN, ESQ.
99 HUDSON STREET, 8TH FLOOR
NEW YORK, NY 10013
-and-
ROBERT B. MANN, ESQUIRE

FOR THE DEFENDANT.......OFFICE OF THE CITY SOLICITOR
(City of Prov.) BY: KEVIN McHUGH, ESQUIRE
275 WESTMINSTER STREET
PROVIDENCE, RI 02903

FOR THE DEFENDANTS........OLENN & PENZA
(Officers Solitro/ BY: JOSEPH F. PENZA, JR., ESQ.
Saraiva) 530 GREENWICH AVENUE
WARWICK, RI 02886

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
401/946-5500



INDEX

WITNESS PAGE
JOHN J. RYAN, RET.
EXAMINATION BY MR. BRUSTIN..............4

EXHIBITS

(PLAINTIFF'S)

NO. DESCRIPTION PAGE
1 IN-SERVICE TRAINING DOCUMENTS............53
2 NOTICE OF DEPOSITION....................224
3 RULES AND REGULATION, SECTION 202.......224
4 CAPTAIN'S TEST STUDY MATERIAL...........224
5 SECTION 202.............................226
6 TRAINING DOCUMENTS......................233
7 POLICE LIABILITY LIST...................234

FOR DOCUMENTS REQUESTED BY MR. BRUSTIN, SEE PAGES: 9, 16, 35, 43, 134, 140, 145, 148, 259

REPORTER'S NOTE: EXHIBITS RETAINED BY COUNSEL.



(DEPOSITION COMMENCED AT 10:15 A.M.)
CPT. JOHN J. RYAN (RETIRED)
Being duly sworn, deposes and testifies as follows:
THE REPORTER: Would you state your full name for the record, please.
THE WITNESS: John J. Ryan.
EXAMINATION BY MR. BRUSTIN
Q. Good morning, I'm one of the attorneys for Ms. Young in this case, the Plaintiff in this case, I will be taking your deposition today. I'm going to be asking you some questions, you will be answering them under oath. If at any time you don't understand any part of my question or all my question, just let me know, I'll try to rephrase it for you. If you do answer, I'm going to assume you understood it, okay?
A. That's fine.
Q. If you want to take a break at any time, that's fine. The only thing I would ask is that you answer the question pending before taking a break.
A. That's fine.
Q. 'And also that you, as you are doing now, make sure you answer all questions orally.
A. Absolutely.



Q. Mr. Ryan, are you currently employed?
A. I'm self-employed.
Q. What do you do?
A. I do consulting and training.
Q. On what?
A. Law enforcement.
Q. Have you formed some type of business entity in that regard?
A. Yes.
Q. What is that?
A. Law Enforcement Research & Consulting limited; it's a Rhode Island S Corp.
Q. When was that formed?
A. You know what, I don't know the exact date, to be honest with you, but it's a couple years ago.
Q. Do you have any employees?
A. Just myself.
Q. Is that your full-time job now?
A. Yes.
Q. And you were formerly employed by the Providence Police Department?
A. Correct.
Q. And when did that end?
A. June 9th.

Q. You retired?
A. Yes.
Q. As a captain?
A. Correct.
Q. And why did you retire?
A. For my own business. And I have 20 years on.
Q. Your retirement was effective June 9th?
A. Correct.
Q. Of '99?
A. No. 2002.
Q. When did you learn that you would be testifying here today on behalf of the Providence Police Department?
A. I would say probably the first week of June, maybe. The Chief of Police asked me to call Kevin relative to give testimony.
Q. That's Chief Sullivan?
A. Correct.
Q. And did you meet with, is it Chief Sullivan, is that how you refer to him?
A. Yes.
Q. Did you meet with Chief Sullivan in connection with your testimony here today?
A. No, I did not.



Q. He simply told you to call Mr. McHugh?
A. He called me by phone and told me to call Mr. McHugh.
Q. Did you meet with Mr. McHugh in connection with this deposition?
A. Yes I did.
Q. Okay. How many times did you meet?
A. Twice.
Q. Did you meet here in this office?
A. Yes.
Q. How long was each meeting?
A. Maybe an hour or so.
Q. You met with him a total of two hours?
A. I would say somewhere thereabouts, I didn't clock it, to be honest with you, but I don't think it was much more.
Q. Was anyone else present during those meetings?
A. No.
Q. Other than those two hours, approximately, of meetings, did you speak to Mr. McHugh again in regard to this deposition?
A. No.
Q. Did you speak to any other attorneys, including Mr. Penza, in connection with this deposition?



A. No.
Q. Did you speak to any representatives, any employees of the Providence Police Department in connection with this deposition?
A. No.
Q. Did you review any documents in preparation for this deposition?
A. Yes.
Q. What did you review?
A. I reviewed portions of the curriculum for the training academy, and I reviewed some of the documents filed in this case. I don't recall all the documents that I reviewed, but those were some of them.
Q. Okay. What kinds of documents did you review in connection with the case?
A. Again, training curriculum. I was able to provide Mr. McHugh with a couple of press releases that I had copies of.
Q. Other than training and curriculum, what other kinds of documents did you review in connection with the case?
A. I don't recall exactly what they were, but a couple of documents that were filed in the case that



were requesting production of certain documents.
Q. But the only thing you provided to Mr. McHugh were some press releases, no other documents?
A. No other documents, I don't believe. Although, I'm not certain, to be honest with you.
Q. Where were those press releases issued from?
A. The police department.
MR. BRUSTIN: To the extent we haven't received those, we would request those.
(SO NOTED)
MR. McHUGH: You should already have them. I sent them out in the supplemental response.
MR. BRUSTIN: Press releases?
MR. McHUGH: Yes. I have them all here. I'll check. Do you remember what number it would be in, off the record.
(OFF THE RECORD)
Q. Mr. Ryan, what is your understanding as to the subject matter of your testimony here today, what are you here to testify about?
A. Training, curriculum and policy.
Q. On what issues?
A. I guess that's up to you, as far as the

organizational structure of the police academy?
A. I think the SOP, which is at the start of those materials, would satisfy that.
Q. That would list all the staff members, chain of command?
A. It would, in all likelihood, list the chain of command. It wouldn't necessarily list each staff member because, obviously, that curriculum is used from school to school and staff may change.
Q. Will it describe the structure of the 22 weeks, the course work, number of hours in each course, that kind of thing?
A. Yes.
MR. BRUSTIN: Do we have that?
MR. McHUGH: Yes.
Q. Okay. Why don't you give me a brief rundown of your educational background, beginning with where you graduated from high school.
A. I graduated from LaSalle Academy High School in Providence. I received my Bachelor's of Science from Roger Williams University in Bristol, Rhode Island, received my Master's of Science from Salve Regina University in Newport, Rhode Island in administration of justice, and I received my J.D.



from Suffolk University Law School in Boston, Massachusetts.
Q. When did you receive your J.D.?
A. 1994.
Q. Have you ever practiced law?
A. Not very much.
Q. And you worked full time while getting your J.D.?
A. Yes, I did.
Q. Tell me, you mention that you went to an FBI course in regard to training that was provided to all law enforcement personnel in Rhode Island. What other training have you received from entities other than the Providence Police Department since you have been a police officer?
A. I should have brought a copy of my resume, it would have been easier.
MR. BRUSTIN: I would request that as well.
(SO NOTED)
Q. Would that list your training?
A. It would have a list on there. I've been to the Rights of Police Officers, that's done by police media relations. I've been to advance tactical command school.



Q. Which one?
A. It's put on by the IACP, it was in Virginia. I've been to -- I'm trying to run through them, I've been to crime prevention schools, I've been to use of force trainings. I've been to so many different schools, either as a speaker where I stayed also for the other components of it or where I was actually a participant.
Q. Can you give me the names of any other organizations or other departments that conducted the trainings that you attended?
A. I've been to some at the Rhode Island Municipal Police Academy. Again, I've been to the FBI Instructor Development School, the Media Relations School that I went to was in Virginia, it was in conjunction with Old Dominion University. I've been to portions of the International Association of Property and Evidence School. I've sat in on portions of that.
Q. You mentioned an IACP course?
A. Yes. I believe that the Advanced Tactical Command School, it was in conjunction with the IACP. That was down in Virginia as well. I don't remember exactly, but there was an affiliation to



the IACP with respect to that school.
Q. Any other courses at any other --
A. Again, I could provide you with a list.
Q. Any other courses at any other major metropolitan police departments?
A. You know, I can't recall off the top of my head right now. That's, again, some of that information that I just don't keep it on the screen.
Q. You don't remember whether or not you went to any training in New York or L.A or Philadelphia or anything like that?
A. No, I haven't. I've been to L.A. and to their police department numerous times on site visits and whatnot, but not for courses.
Q. You said you've been to the Los Angeles Police Department numerous times?
A. Yes.
Q. Tell me about that; when did you start doing that?
A. I've gone a couple of times. I'm trying to remember back a few years agó when we built the new police station, I went out, at my own expense, to look at some of their facilities or whatnot. I did a site visit back then.
Q. Did you meet with any of their training people?

A. No.
Q. Have you ever met with any of their training people, training people in L.A.?
A. No. I did go out to the training academy, but that was on my own.
Q. Have you ever met with any training people supervisory staff, trainers from any other departments around the country?
A. Oh, I'm sure I have. I don't recall exactly who, I've had them in my classes. I've taught a number of people over the years as well.
Q. Have you ever gone to specific departments around the country to meet with training people?
A. I went out to Burbank, California, met with Joe Latta who trains -- he's the executive director of the International Association of Property and Evidence, and I did go out and meet with him at one point in time to talk about property and evidence issues.
Q. Anybody else you remember?
A. I'm sure there has been, but off the top of my head --
Q. It sounds like you spent a lot of time in training courses?



A. I have spent a significant amount of time, both running training courses as well as coordinating them, as well as instructing them, as well as attending them.
Q. And is it fair to say that you've done that on your own -- of your own volition?
A. Some has been, some has been department, just one you asked about, national, that comes to mind, I just was out in -- again, I taught a portion of the course, but I also stayed for a good -- the whole course was the Public Agency Training Council Advanced Internal Affairs course out in Las Vegas in December of 2001.
Q. It sounds like you had a lot of both formal and -- withdrawn. It sounds like you've had a lot of formal education and training. Is it fair to say that when you became head of the training academy, you took it upon yourself to make yourself well-versed in what was going on around the country on training issues?
A. I think I certainly attempted to do that, yes.
Q. That was one of your goals?
A. Yes.
Q. And you understood that to be one of your



responsibilities to ensure that Providence was providing comparable or probably better training than other departments around the country, right?
A. That was certainly a goal.
Q. You felt that was your responsibility?
A. I don't know if anybody put it in terms of responsibility. It's something that I took on myself, my own initiative. Whether it was out of a sense of responsibility or a sense of pride, I don't know what it was out of.
Q. But certainly you understood that as head of the training academy, you were at least responsible for ensuring that Providence was providing comparable training in comparison to other metropolitan police departments around the country; is that fair to say?
MR. McHUGH: Objection as to form. You can answer.
A. I think that's fair to say.
Q. And one of the things you did to ensure that Providence Police was comparable or better -- Providence Police training was comparable or better than training at other departments was to attend training sessions yourself; is that right?
A. I would say that was a portion of it.



Q. Okay. And presumably, one of the things that you did was to read literature regarding training from around the country; is that fair to say?
A. I think more so cases. I read more cases than you could ever imagine.
Q. I'm sure you did. But did you also read literature that was put out, for example, by the IACP?
A. I have looked at other materials, yes, periodically.
Q. You did that to keep yourself abreast of what was going on in other departments around the country; is that right?
A. Certainly always tried to keep myself abreast through a variety of mechanisms.
Q. And that would be one of them, written literature?
A. Whatever I got my hands on.
Q. You said you also conducted training yourself; is that right?
A. Correct.
Q. What type of training did you conduct?
THE WITNESS: Are you talking about training programs or actually educating people? Like training in the sense of police training, or do you want to talk about at the university?

Page 50

MR. BRUSTIN: I'd like to talk about the training that you conducted outside of the police department.
A. Okay. Well, I'm also an adjunct faculty member and have been for almost ten years now at Salve University (sic), so I teach a variety of graduate courses there.
Q. What do you teach?
A. Undergraduate course in criminal procedure, I teach graduate courses, which has been the bulk of my teaching there, in police misconduct, which incorporates a lot of, you know, 42 USC 1983, as well as 18 USC 242 materials, as well as state tort law relating to law enforcement, Public Duty Doctrine, things of that nature, police officer/fire fighter role, all of that. I also teach a course in police management at the graduate level. Contemporary Issues in Administration of Justice. I've taught the mental health process, juvenile justice. I teach a course in business crime, and I teach a course that's an advanced criminal procedure course of sorts, it's Leading Constitutional Issues of Law Enforcement.
Q. Do you teach a misconduct course currently?

Page 51

A. Correct.
Q. Did you study with Michael Avery at Suffolk?
A. I know Mike very well. I studied very close with Karen Blum. I'm very close to Karen.
Q. Other than your teaching responsibilities, what other training have you provided outside of the police department?
A. Well, I've done a number of -- I do -- right now I'm doing an awful lot of training for the Public Agency Training Council, and I do, as I said, legal issues with respect to internal affairs. I also do a course on public school legal issues, it's largely related to police in the public schools. I also am currently developing a course, which I'll be starting to teach in August, on policy development for police officers in public safety.
In addition to that, I've done courses on civil liability, seminars at Salve, police use of force where I brought in a number of instructors, police media relations, Policemen's Bill of Rights.
I've also spoke on the panel at the Georgetown Law Center last year on racial profiling -- last year or the year before, for Karen Blum. That's to name some of them. I'm sure there may be a couple

Page 52

more that I may have missed.
Q. Okay. You said policy development for police officers. What --
A. That's a curriculum I'm working on right now.
Q. And have you provided any training to other police departments or other groups regarding training, training police officers?
A. I'm sure, for example, in the police civil liability area that I've provided training as a component of that, you know, working from Canton V. Harrison and talking about police training. I suspect that at times I've also done some police training issues, contemporary issues at the university. I don't know that -- I would say that I've actually provided them to a police department. However, largely the makeup of the graduate classes are police officers from departments, and in a great many cases executive positions in police departments.
So I don't know that it would be fair to say yes, but at the same time, I think there is components of my teaching that would answer that in the affirmative as opposed to the negative.
Q. Just a little more, could you tell me a little more

Page 53

specifically what the subject matter is of the policy development for police officer class?
A. It's not fully developed.
Q. What's the general area?
A. How do you begin to write policy.
Q. You're talking about policy, you mean the day-to-day procedures for police officers?
A. Correct.
Q. Are you working with anyone on that?
A. No.
Q. Is it fair to say that in connection with your outside training duties, you've also done -- to the best of your ability, you've attempted to read all the literature on those issues?
A. Yes.
Q. Keep yourself connected to the various networks around the country regarding policing?
A. Yes.
Q. Read all the literature that comes out?
A. I mean, it's impossible to read all. I read as much as I can on any topic that I'm going to try to tackle personally.
Q. I'm showing you what's not yet been marked yet -- let's mark it as Plaintiff's Exhibit 1 for

Page 66

approach is different, what they're most comfortable with. I think, generally, you begin with the law. You start with the U.S. Supreme Court, you look at the Federal rights and guarantees, whatever may be covered by Federal statute. Then you look locally. You look at your state law and state Supreme Court, see what kind of rulings they've made on a particular issue. And then you look at your city ordinances, your rules and regulations, see if there's anything on point.

My sense has always been that it's better to draft something based on those levels of authority first. Once you have it drafted, then you begin to call around to other departments, look at some of the progressive departments in the country, ask them for their policies and procedures. Once you do that, then you see what you've written as compared to what's out there, and you get I think in that sense, one, you test yourself but, two, you may see things in their policies that just aren't going to work for you that you might not otherwise see because it's -- unfortunately, there's 17,000 some - odd police departments in this country, and I think Patrick Murphy says no two do it exact from a policy

Page 67

standpoint.

Q. Okay. Have you had any training, either internally or from other sources, in regard to evaluating or drafting policy?

A. I guess that depends on how broadly you define training. Certainly within -- I've sat in on courses, for example, on internal affairs and administrative investigations that I've coordinated. I've sat in on courses on use of force that I've coordinated, et cetera.

As I told you about Las Vegas just a few moments ago. I would consider all of that training in policy development. I've sat in on the International Association of Property and Evidence course which Joe Latta -- I've reviewed all his materials, yes. Yes, in some sense I think -- do I have certificates necessarily to back up all that training, no, because I'm there sometimes speaking a portion of the course, and then I sit in and listen to what everybody else has to say. So, I've had the good fortune of listening to so many experts in the whole country on these issues.

Q. How about in terms of drafting policy, evaluating policy, any training on that?

Page 68

A. I think.

Q. Same thing?

A. Same thing. If, for example, Lou Reiter is talking about administrative investigations and how you handle them, certainly he talks about the policy development with respect to how your police department's mechanisms should work.

Steve Rothlein when he discussed early warning systems, he talked about how to develop an early warning system and policy development for your department.

Q. Sure. When you talked about creating policies generally for the department, you mentioned that everyone does things differently; is that right?

A. In many cases things are done differently.

Q. There are some things are not done differently. By that I mean, for example, would you agree that it would be irresponsible to draft an early warning system policy without at least looking at some of the other policies that are in place around the country?

MR. McHUGH: Objection as to form. You can answer.

A. I think at some point you should see what's out

Page 69

there.

Q. Would you agree it would be irresponsible not to?

MR. McHUGH: Objection as to form.

A. I guess it would depend upon your level of training with respect to that issue because sometimes what's out there isn't any good either. Maybe there's something better you can develop yourself.

Q. Would you agree, though, that you would have to at least look at what's out there to draft, responsibly, a policy. Would you agree in order to create -- withdrawn. Would you agree that in order to properly fulfill your responsibilities in creating a policy on an issue like early warning systems, an issue that you know has been addressed by a number of departments around the country, would you agree that you would have to at least look at those policies to properly draft a policy in Providence before finalizing it?

MR. McHUGH: Objection as to form. You can answer it.

A. I don't necessarily agree with the word "properly." However, I think it would be certainly sound practice to do so.

Page 74

State of Rhode Island?
A. I've been a member of the -- I'm trying to think of the acronym, National Public Information Officers -- I forget what it's called, NPIO, National Public Information Officers Association. I'm trying to think of any others. I think that's the main one that I was involved in for some time.
Q. Do you know whether or not beginning in '94 when you became head of the police academy, do you know whether or not the Chief of Police was a member of the International Association of Chiefs of Police?
A. It's my understanding that the chief of the City of Providence has been for many, many years.
Q. Is it your understanding that the chief of the department has been active in that organization beginning in '94?
A. I believe Chief Gannon used to go to the national convention. What other involvement he had, I don't know. I don't think that Chief Prignano ever went or got involved with the IACP.
Q. Chief who?
A. Chief Prignano.
Q. What year was Chief Prignano in?
A. He was from 1995, October of '95 until January

Page 75

2001.
Q. And any other -- what does membership, to your knowledge, in the IACP entail? What does the department get for that?
A. Well, I know they get a monthly magazine of some sort. I'm sure they get some kind of updates. I don't know if they're entitled to the model policies as a result of that or if there's an extra cost involved. I know we also have, and this is most recently, the IACP has put out actually a pretty good law enforcement database that has policies from around the country on it and it's very very helpful.
Q. When did that start?
A. I think that they just started it within the last year or so.
Q. Certainly after --
A. They approached us and sold it to us. There's a fee involved, but it's actually a very good mechanism.
Q. Certainly after the Young shooting; is that fair to say?
A. Oh, absolutely.
Q. Do you know whether or not the department at any

Page 76

time participated in the model policy program of the IACP?
A. I don't know.
Q. Did the magazine -- during the time when you were in charge of the police academy, did you have any involvement with the IACP?
A. No.
Q. Do you know whether or not any other members of the department did?
A. I don't know.
Q. Did the magazine, any literature that came from the IACP get filtered down to the training academy?
A. No, it did not.
Q. You've never seen anything from it?
A. No. Other than in trainings, there are certain trainings I've been to, for example, the public office information one where they incorporated some of the IACP material.
Q. It's never come from the chief to you?
A. No.
Q. And to the extent that the department participated in any model policy programs, you never saw them?
A. No.
Q. They were never forwarded to you?

Page 77

A. No.
Q. It's your understanding there is an extra charge for getting model policies?
A. I'm not certain. I believe there is, but I'm not certain of that.
Q. Have you ever seen an article -- withdrawn. Do you know someone named Kenneth Matulia?
A. No, I don't.
Q. Have you ever seen an article from the IACP called A Balance of Forces, Model Deadly Force Policy & Procedure?
A. No, I have not.
Q. Are you familiar with an organization called CALEA, Commission for Accreditation of Law Enforcement?
A. Yes, I am.
Q. Mr. Ryan, have you -- withdrawn. Do you know whether or not the Providence Police Department has ever participated with that organization?
A. I know that recently they have sent people, I believe to San Diego, a couple of officers. I don't know if it's investigate at this point, but to look at the CALEA process.
Q. Who was sent?
A. I think that's Lieutenant Cohen and Sergeant

Vierra. Again, this is within the last year or so. I think they've actually gone twice.
Q. After the Young shooting?
A. Yes.
Q. And prior to that, did the department have any involvement with CALEA?
A. I don't know, to be honest with you, I'm not sure.
Q. Okay. Do you know whether or not the department received any literature or other documents from CALEA prior to this last year?
A. I don't know. I know at times I have sought policies from CALEA departments to review what they're doing when I've written policies. I couldn't tell you exactly when that was, but I have, in fact, specifically looked to CALEA departments. I had kept a list -- at some point I had a list of CALEA departments to use them as a baseline if I reviewed policies.
Q. Is it fair to say that at least prior to 2000, you've never been tasked with the responsibility of looking at policies generally to see whether or not they should be updated, amended, changed; is that fair to say?



A. No, that's not fair to say.
Q. Explain, please.
A. Well, I remember -- and this goes back -- I was probably either a sergeant or a lieutenant, and it was under Chief Gannon's administration where I did, myself and Lieutenant Campbell, actually were called in, it was an overtime basis, we were night OIC, so we worked nights. We had to maintain our night schedule, but we were actually brought in to review all of the rules and regulations of the department, not general orders but the rules and regulations themselves in an attempt to update those. We did that for a number of weeks and turned them in.
Q. When was that?
A. Well, it pre-dated 1995.
Q. And you spent -- how many hours would you estimate you spent on that task?
A. I don't have any idea. We were doing it a couple days a week for weeks and weeks.
Q. Less than 100 hours?
A. I couldn't tell you. It's too long ago. I couldn't tell you how many hours.
Q. Okay. And what resources did you have at your disposal in connection with that project?



A. Oh, boy. I don't really remember, to be honest with you. I do remember that some of it was just so antiquated that it was -- that you didn't really need any resources. You didn't need any resources to know that policewomen didn't have to wear skirts anymore, for example.
Q. Were you tasked in connection with that assignment to make substantive changes to policy and procedure or to simply edit?
A. This was rules and regulations. There were some substantive changes made. Someone had already gone through them once -- my memory is becoming a little clearer. Somebody had already done it, and we were largely to go through it and make sure the substantive changes they made were consistent with what we were doing in the police department at the time, and I think that's why they wanted people from the patrol bureau. We largely focused on the patrol bureau materials. But it seems to me that we didn't make substance changes that somebody else had done that prior to us and then we were given it in more of a review fashion to make sure it was consistent, because whoever had done it was not in the patrol bureau.



Q. But you weren't asked to research the law, to look at other departments, do anything like that?
A. Not at that time.
Q. Okay. Was there any other time when you were asked to do that?
A. There were other times where I was asked for advice that I was asked to do that, sure.
Q. Okay. Any other times when you were asked to look at a set of policies and procedures and to make recommendations to be changed, modified or anything like that?
A. Yes.
Q. When were you asked to do that?
A. I know there were a lot of times where we were asked to look at the pursuit policies. I was asked to look at the most current case, most current statutes on pursuits. I recall a time, and this goes back a number of years, where I was asked about a policy prohibiting flashlights, the heavy flashlights, and whether or not such a policy would be a good idea, and I was asked to review the cases on that particular issue.
Q. Let me try it this way. Is it fair to say that you were never asked, at least prior to the shooting of

A. I forget if it was San Diego or San Francisco, I think we worked off one of theirs, we took a look at it after we started developing our curriculum.
Q. You looked at their patrol guide?
A. No, entry level training guide.
Q. You looked at their entire training?
A. It was in a binder, yes. That goes back a number of years.
Q. Certainly before the shooting?
A. Yes.
Q. And did you make any changes or modifications in your training as a result of the training you reviewed from San Francisco?
A. It may not have been San Francisco, it was San Diego, San Francisco, it was in California. I wouldn't say that we made any substantive changes, but I think we looked at -- we were looking at format and whatnot, and the number of hours and things like that. You know, number of hours was an increase in '95, and so I think I probably looked to some other departments to support the hours that I wanted to add to the training.
Q. Would it be fair to say that the training provided at the police academy, at least when you were there,



was largely limited to the policies and procedures, rules and regulations of the department?
A. No.
Q. Would you explain what you mean?
A. Well, I mean, for example, criminal procedure, it's the United States Constitution, the case is decided by the Supreme Court, not the rules and regulations of the Providence Police Department.
Q. The rules and regulations of the Providence Police Department obviously are drafted to conform with those laws, right?
A. Some are, and some had been antiquated and weren't and had to be corrected. So, certainly, you know, the criminal procedure was not taught from the standpoint of the rules and regulations of the police department. They were taught from the standpoint of the U.S. Supreme Court and the Rhode Island Supreme Court.
Q. Other than the law, any other areas where you provided training outside of the confines of established policy, procedure, rules and regulations?
A. I think, certainly, and, again, remember, that I oversee the training in that position. I oversaw



the training generally, but all of our, for example, our firearms instructors and our use of force instructors, they all have level of expertise outside of the Providence Police Department. They've been to all the different schools, either put on by the FBI or gun manufacturers or even some of them have gone to, for example, the Street Survival Seminar and some of those things. So they've got a variety -- they're certified in pressure point control tactics. They've got a variety of credentials that are certainly well outside the rules and regulations of Providence Police Department.
Q. Would you agree, though, that the vast majority of the training received by recruits is part of a set curriculum?
A. A set curriculum, yes.
Q. You don't allow, for example, trainers to simply ignore the curriculum and train officers on what they think is important?
A. No. They would come in and they would train, for example, defensive tactics, an instructor would provide a lesson plan, but the lesson plan would be consistent with his expertise.



Q. But it would certainly be consistent with the curriculum provided to the instructor; is that fair to say?
A. I think you've got it backwards. The instructor provides the lesson plan and curriculum. So he tells us what's important with respect to the particular training based upon his particular expertise and credentials.
Q. So, for example, in defensive tactics there might be ten different curriculum from ten different instructors all teaching different recruits?
A. No. Because the credentials are consistent and the people that have at least taught it since that time period have all worked together on the curriculum. In fact, you make sure you have someone in your chain of command who has taught each curriculum and each instructor is consistent.
Q. Any other involvement, to your knowledge, with other police department training academies?
A. Again, part of that would go to the individual instructor, and if we review their -- which most of them have a biographical sketch within the curriculum. If we went through each one, we would probably see where they've worked with other police

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * * * * *

LEISA YOUNG, INDIVIDUALLY AND IN *
HER CAPACITY AS ADMINISTRATRIX OF *
THE ESTATE OF CORNEL YOUNG *
*
VS. * CA NO 01-288M
*
CITY OF PROVIDENCE, by and through *
its treasurer, STEPHEN P. NAPOLITANO, *
MICHAEL SOLITRO, individually, and in *
his official capacity, CARLOS SARAIVA,*
individually and in his official *
capacity, JOHN and JANE DOES, 1 *
through 10, individually and in their *
official capacities *

* * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF SERGEANT ROBERT BOEHM, a Witness in the above-entitled case, taken on behalf of the Plaintiff, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the Offices of the City Solicitor, 275 Westminster Street, Providence, Rhode Island on November 27, 2002, at 9:00 A.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

scenario, they have the other three officers or two or three officers watching the scenario. And then at the end of the scenario, everyone has a point of being critiqued and throwing in their questions and getting their answers.
Q. Okay. I didn't ask a clear question. In each simunition training that officers attend, do they necessarily see an off-duty situation?
A. Yes.
Q. So, in each simunition training, all three or four of the scenarios are provided?
A. From my understanding, yes.
Q. But you never actually provided that training?
A. Not for that class, no.
Q. Okay. And the classes that you provided training for prior to -- withdrawn. Did you provide any simunition training prior to the Young shooting?
A. No.
Q. Is it fair to say that you don't know for sure whether or not prior to the Young shooting the simunition training necessarily in each one involved an off-duty situation?
MR. PENZA: Objection to form.
MR. McHUGH: Form.



A. After talking with the instructors that were doing it, I was told that what they were going through and part of it was off-duty scenario.
Q. And you were told that they gave the same instruction on off-duty issues that you gave; is that fair to say?
A. Yes.
Q. Who told you that?
A. I believe it was Lieutenant Melaragno who I believe was sergeant at the time.
Q. I take it now when you do in-service training you do simunition training, there is documentation that officers attended, correct?
A. Yes.
Q. Do you know if that happened before the Young shooting?
A. That I don't know.
Q. Tell me about the guidance that you provide now, after the Young shooting -- withdrawn. Let me get back to that. In the paint ball -- withdrawn again. The only shoot/no shoot training that Officer Saraiva and Officer Young received in the academy was target training; is that correct?
MR. PENZA: Objection to form.



A. I believe they also had the training at Camp Varnum in the scenario, the role playing that we did at Camp Varnum.
Q. Were you involved in that?
A. Yes.
Q. And were those shoot/no shoot situations?
A. Yes.
Q. Are you sure -- do you know for certain that they had that training?
A. Yes.
Q. Did that role play training involve an off-duty situation?
A. Yes.
Q. Did the target training involve an off-duty situation?
THE WITNESS: The actual target firing, is that what you're talking about?
MR. BRUSTIN: No, the shoot/don't shoot target training.
THE WITNESS: For simunition?
Q. In the academy class for Young and Saraiva wasn't there training that involved trainings with paper cutouts of different --
THE WITNESS: You're talking the



range, at the firing range?
MR. BRUSTIN: Yes.
A. They had shoot/don't shoot, yes.
Q. And the role plays at Camp Varnum were different?
A. Yes.
Q. But at the range, there were shoot/no shoot target training?
A. Yes.
Q. And how many targets were there?
A. Depending on the time that we're talking about, there were different training blocks.
Q. Okay. And one of the -- do you have any idea how many targets there were?
A. Again, trying to get me into a school, I'm trying to remember exactly what they particularly did. When we did the training, there were different blocks. Whether it be different colors they had to shoot at, different targets they had to shoot at, a moving target behind several different targets, and they were only allowed to shoot at the moving target or we'd flip it, and they were allowed to shoot at a target as long as the moving target wasn't at the background. We tried to break it up.
Q. One of the potential targets was a civilian with a

badge pasted over it?
A. Yes.
Q. Do you remember that one?
A. Yes.
Q. That was one of many, right?
A. Yes.
Q. And is it fair to say that during a particular exercise a recruit might or might not see that target?
A. Yes.
Q. Sometimes there would be just other targets, correct?
A. Yes.
Q. In connection with that training, that range training with the targets, was there any instruction from the prospective of the off-duty target?
MR. PENZA: Objection to form.
Q. Was there any instruction from the prospective of an officer off-duty?
A. Yes --
Q. -- necessarily?
MR. McHUGH: Objection to form.
Q. Withdrawn. Even if an officer -- even if a recruit didn't see a target with an off-duty officer, they



would still be instructed during that block on off-duty issues; is that what you're saying?
A. Okay. All of the recruits would go through and have a no-shoot situation.
Q. But it might not be an off-duty officer?
A. It could be a lady holding a garbage bag.
Q. My question is, in connection with that training and circumstances when it was the lady with the garbage bag and not the off-duty officer, would there necessarily be training in connection with that situation in connection with that lesson regarding off-duty issues?
MR. McHUGH: Objection as to form.
A. There was training for off-duty. Whether or not it was given ten minutes before they were about to shoot or after that, I don't recall.
Q. Was there necessary training in connection with that exercise on off-duty issues?
MR. PENZA: Objection to form.
MR. McHUGH: Objection as to form.
A. Yes.
Q. We're talking about a specific training block, a block on shoot/no shoot targets; do you understand what I'm referring to? Do you understand what I'm



referring to. Is there a block at the range where --
A. This is what we go back to the earlier question here. Was there an outline for it?
Q. I don't care about an outline, was there a block of training at the range where officers were shown targets and had to make a determination as to whether to shoot or not shoot?
A. Yes.
Q. How long was that block of training?
A. Couple of hours.
Q. Okay. During those few hours of training, some time during the range training, they were shown targets, and one, at least, was a no-shoot situation, correct?
A. At least one. It was more than that, but yes.
Q. And that no-shoot situation may have involved an off-duty officer, a civilian with a badge pasted over it, or it may have involved a number of other no-shoot scenarios, correct?
A. Yes.
Q. They could have gone through that two or three hours of training on looking at targets with no-shoot scenario that involved an off-duty officer, correct?



A. Unlikely, but it could be possible, yes.
Q. Now, I take it there was some classroom training associated directly tied to that target training; is that correct?
A. Yes.
Q. Now, is it your testimony that during that classroom training that's directly tied to the target training, off-duty issues were necessarily addressed?
MR. PENZA: Objection. Asked and answered.
MR. McHUGH: Objection. Form.
THE WITNESS: Did you say not to answer it?
MR. PENZA: I said asked and answered.
A. Yes.
Q. Now, I'm going to get back to that, but before I do, you also had role play at the Camp Varnum, correct?
A. Yes.
Q. How long was that training?
A. That was, for their academy, I believe two weeks.

Q. You're sure that was for the Young/Saraiva academy?
A. Yes. Because I was directly involved in that particular training.
Q. Two full weeks of role play training?
A. Yes.
Q. And how many scenarios involved off-duty issues?
A. Speaking for myself, because all the ones that we had done did involve some sort of off-duty.
Q. There was at least one role play?
A. There was at least one role play. Because we had broken -- the weapons bureau, when they did the scenarios, they broke it up into two parts, one for traffic violations and the other just for common calls, which were all used with the simunition at the time and both the traffic and the common calls had scenarios where there was a police officer who was off-duty.
Q. So there was at least one role play that involved an off-duty officer for both the traffic and what was the other part called?
A. Just common calls.
Q. Common calls in traffic?
A. Not in traffic, but they were two separate.
Q. And traffic?



A. Yes.
Q. So in connection with the traffic, there was at least one play that involved an off-duty officer?
A. Yes.
Q. I take it that at Camp Varnum those role plays were documented somewhere?
A. Yes.
Q. I take it that those role plays that involved an off-duty officer would document that; is that right?
A. I'm sorry?
Q. For the role plays where there was an off-duty officer involved, I take it that would be documented?
A. Yes.
Q. Have you ever seen that documentation?
A. Yes.
MR. BRUSTIN: We haven't gotten that.
MR. McHUGH: I've never seen it myself. If I have it, you have it.
MR. BRUSTIN: That's certainly subject to the first request.
MR. McHUGH: Fine.
Q. Tell me about the traffic role play that involves an



off-duty officer -- by the way, you're certain this was before the Young shooting?
A. Yes.
Q. There was at least two role plays at Camp Varnum during Saraiva and Young's academy that involved off-duty issues?
A. Yes.
Q. Tell me about the traffic role play.
A. The traffic role play would be any scenario to where the police officer may be inside -- this is just referring to the off-duty ones -- the officer may be inside his car, and as the officer approaches the window, he throws out a badge real quick, reaches inside the glove compartment where there is a gun and his badge; and another one where the officer will come running out of the car towards the police officer yelling he's in a hurry and would take out his badge. Those are the way the scenarios were run. Each -- depending on who was there, who was backing the person up -- in other words, again, as we get back to the simunition, the scenario training ran the same way. If you were my backup, you were also being trained, and once you went through the scenario, the next time you got called



for the scenario, you would either get a different scenario or you would be backing up somewhere and training in other scenario. You might get the same scenario two or three times and, then again, you might just get it once, depending how the dispatcher called up the backup for the officers.
Q. What's the purpose, the teaching purpose of the traffic scenarios you just described at Camp Varnum when training is basically finished and we're at the last couple weeks of the academy. What we do now is we allow them to end the role play? I just want to know what the specific teaching purpose was for the off-duty, what were you trying to teach them in the role play you just described?
A. Off-duty is we do all of them to be aware of what you can see. Again, make a determination if it's a shoot/don't shot situation.
Q. Shoot/don't shoot situation in traffic?
A. Yes.
Q. I'm asking you about the specific scenarios you just described?
A. Yes.
Q. None of them involved a shooting situation, did they?

A. Yes.
Q. Which of the three you just described involved a shooting situation?
A. I had said specifically that those were just for the off-duty, off-duty police officer in a scenario.
Q. I'm only asking about off-duty scenarios.
A. That's what I'm giving you, the off-duty scenarios.
Q. You've given me three off-duty scenarios for traffic and all three of those scenarios were given to Cornel Young?
A. I didn't say they were to given Cornel or Saraiva. I said as a class that's what they were taught.
Q. As a class, Cornel Young and Carlos Saraiva necessarily observed all three of the role plays you just described; is that correct?
MR. McHUGH: Objection to form.
A. That's what our goal was.
Q. I'm not interested in your goal. I'm asking you what they got and didn't get. Are you telling me that at Camp Varnum for the class involving Carlos Saraiva and Cornel Young they necessarily



observed three role plays, traffic role plays you just described?
A. They should have.
Q. Is there any reason you can think of why they wouldn't have?
A. Couldn't think of anything, other than that they weren't there at that particular point in time, whether they were talking with the director of the academy, whether or not they were tied up at another role play.
Q. All right. But everybody in the class, to your knowledge, unless they were sick or A.W.O.L. or something, everyone in the class saw the three role plays you just described, the three traffic role plays regarding off-duty issues?
A. Should have. I can't guarantee that all of them saw it. We didn't take attendance.
Q. You know all three were given?
A. All three were given at points in time, yes.
Q. You didn't take attendance at Camp Varnum for the academy?
A. We took attendance at Camp Varnum for each separate scenario. You had 14 different scenarios going on at the same time. Camp Varnum is set up as



a small city and you have a number of recruits that are out there and the dispatcher gives them calls, and now they had community police training out there, they had non-felony car stops, felony car stops, they had regular traffic violations, and they didn't know what they were going to get.
Q. They went from one to the next?
A. Not one to the next to see it. They were called, and as one scenario wasn't going on at the same time, they were 12 scenarios going on at the same time.
Q. The procedure was everybody had to be there and everybody would go through each of the scenarios, correct, or observe them?
A. Yes. As an observer, they would be part of the role play, they weren't just standing there watching.
Q. All right. So, assuming that there wasn't a gross deviation from procedure, Cornel Young and Carlos Saraiva would have seen or participated in the three role plays regarding traffic, off-duty traffic?
MR. McHUGH: Objection as to form.
Q. Is that right?



A. They should have, yes.
Q. I'm only talking about the three role plays you just described now. What was the -- withdrawn. In your training on -- providing training, you have learned that there are -- you have goals for each lesson, right?
A. Yes.
Q. Okay. What were the goals in regard to off-duty issues in the three role plays you just described?
A. The goal was to give the officer different scenarios in which different situations and different outcomes -- the situation is always there. The outcome depends on the officer. What we're trying to get the officer to do is make the right decision.
Q. Well, presumably, in regard to off-duty issues you wanted them to make a certain decision, right?
MR. McHUGH: Objection.
A. Correct decisions.
Q. What were the goals in regard to the off-duty issues, what were you trying to get them to do?
MR. McHUGH: Objection.
MR. PENZA: Objection.
MR. McHUGH: Asked and answered.

Q. Just in regard to off-duty conduct?
A. Trying to get the officers to use their best judgment, do as they were trained to do.
Q. Anything, other goals?
A. And have the outcome of the scenario be part of their -- within the scope of their training, decision making.
Q. Let's go through each of the scenarios, what's the first one?
A. First one would have been where the officer pulls out his badge very quickly
Q. From the car?
A. From the car, from sitting inside the car.
Q. Okay. Now, what is the goal in regard to do as you're trained to do in regard to that scenario; what are they trained to do in that scenario?
A. Depending on the situation.
Q. I'm talking about one situation.
A. Depending on this particular situation, we've had this happen where one officer would run behind the tree and get cover, and he's not necessarily wrong, he thinks he's being threatened where an officer just stood there and said, well, I saw the FOP badge on the plate of the car, and it just



happened that we had one of the officers using his car, and he had an FOP plate on it, he had the police hat in the back, so I assumed he was a police officer reaching for his wallet. So that is not necessarily wrong, but we're looking at them, watching them to see what they're paying attention to.
Q. So, the focus on that scenario was the on-duty officer reacting to the off-duty officer; is that what you're saying?
A. Yes.
Q. Was there any training goal, any training directed in that role play towards the actions of the off-duty officer, what their training taught them to do?
A. To the off-duty officer; no.
Q. The next scenario, what's that one?
A. When the officer jumps -- off-duty officer jumps out of the car.
Q. What is the training in that scenario, the training goal?
A. The same as the first one.
Q. Hold on. I want to know what the training goals are, the training directions are in regard to the



actions of the off-duty officer?
A. The role play was not a student, a recruit, so there are no goals for him.
Q. So, that role play, again, is focused on the actions of on-duty officers?
A. Yes.
Q. What are the on-duty officers supposed to take for that, what is the training lesson for them?
A. I'm sorry?
Q. What is the training goal for the on-duty officers in regard to the off-duty officer, what are they supposed to learn?
A. The same thing as the first one.
Q. Which is what?
A. To see what they're observing and why they're making the decisions they're making. It's more or less a goal for us to make sure we've trained them quickly, and once they take an action to say this is why I made the action. There are no covered blanket policies on how to act. So now we're pretty much letting them act out and say, okay, why did you make this particular decision. So the goal now is not necessarily for them, it is for us.
Q. All right. When the off-duty officers comes



charging out of his car towards them, what are they trained to do, what should they do?
A. What should they do is after they have observed what they've got, they seek cover, looking to see if the person has something in their hand, the officer, depending on the officer himself, he might decide if there is no car or can't get to his car, that they take the person down. Another officer might decide to use the baton. There is no set goal for us because each individual officer is different, and in training that's what you have to understand.
So, our goal is to see what they do and allow them to do what they want, and as long as they can justify everything they had done, then our goal is to say, okay, you did it, you reacted quickly under stress, you did a good job.
Q. All right. But aside from, you know -- withdrawn. In that scenario did the off-duty officer have a gun?
A. I couldn't tell you off the top of my head.
Q. Presumably, they wouldn't take cover unless they had a weapon?
A. Exactly. Sometimes the scenario where the officer just comes running out with the badge in

Page 82

A. No. They're supposed to take out the badge first because it's specifically to see what the officer is zoning in on, if the police officer is in fact watching. If he's reaching for the glove compartment, is he, you know, talking to somebody who is asking directions.
Q. So there is no specific protocols that are associated with any of those scenarios, it's simply an exercise for trainers to test the officer's observation skills, instincts, things of that nature.
A. And to evaluate --
MR. PENZA: Objection to form.
A. They will go through after that a critiquing after each scenario.
Q. But no specific procedural protocols are implicated by the role plays that you just described; is that fair to say?
MR. McHUGH: Objection to form.
Q. There is no step-by-step, you should do A, B, C and D?
A. No.
Q. Sometimes there is, but in this situation there is not?

Page 83

A. Yes, in a perfect world, there would be -- not.
Q. Not a perfect world, some police scenarios there are specific A, B, C, D things that you're always to do, correct?
A. Yes.
Q. All right. Those are the three scenarios for traffic. What are the three common call scenarios, what are the common call scenarios regarding off-duty?
A. I don't know if those were three. Those took a lot longer.
Q. Well, what were they?
A. One of the scenarios was a gentleman who said that someone had ran into his shed in the back of the house. As police go behind there, what they don't know is that an off-duty police officer talks to the neighbor and said, all right, I'll go check it for you, and he comes out with a gun and says -- you know, the police tell him to freeze. He says, "I'm on the job; I'm on the job." What he does now is basically whatever orders the police officer give him.
Q. And again, that training is designed solely to provide guidance on the reaction of the on-duty

Page 84

officer, correct?
MR. PENZA: Objection. Form.
MR. McHUGH: Objection to form.
A. Yes.
Q. In that scenario, the off-duty officer is holding a gun but not a badge, correct?
A. That particular one, yes.
Q. Next one?
A. The other one was where the officers are meeting with the complainant out in the front yard, someone comes running from across the street with a firearm out stating that he's there to help and he's a police officer. And that flipped, I believe back and forth to one he has a badge in his hand and the other one he doesn't.
Q. And again, that was designed to train officers strictly about the reaction of the on-duty officer, correct?
MR. McHUGH: Objection to form.
MR. PENZA: Objection to form.
A. It trains everybody and everything. In other words, you're also training the officer what not to do, such as when we talk about that in the critique, you know, now would you run out across the street

Page 85

with your gun out, do you see how scared you were. We talked to the officer, "See how you were scared during the scenario when he came running across the street with his gun out?" They say, "Yeah." "Do you also understand that's not the thing to do if you're off-duty?" So they're getting the --.
Q. The focus of that training, like the focus of the traffic training, though, was to focus on their observation skills and reactions in the role of the on-duty officer, correct?
MR. McHUGH: Objection to form.
MR. PENZA: Objection to form.
A. The training itself, the scenario, they didn't play the off-duty officer, because just the way THAT Camp Varnum is set up, they can't play the off-duty officer, they're playing the police officer. But during the critique, we're also telling them do you understand that what they're doing, how dangerous it is and why we don't do it. An example of that is even when we get stopped by the police in a car stop, no one has ever taught me to turn my light on and put my hands on the steering wheel, but we do it anyway.
Q. So you're certain that in a critique you necessarily

talked about what the off-duty officer had done wrong?
A. Yes. Yes.
Q. You're certain of that?
A. Yes. We would talk about what the off-duty officer, not necessarily what he did wrong but, yes, what he did wrong, and what the officer felt as the off-duty officer was doing it.
Q. I'm asking you solely about the off-duty officer now. Are you telling me that in every critique that was done for the role play you just described, including the traffic role plays you discussed what the off-duty officer did wrong?
A. Yes.
Q. And I take it that in the outlines from Camp Varnum regarding the instruction, there would be discussion points on the outline, correct?
MR. PENZA: Objection to form.
MR. McHUGH: Objection to form.
A. I'm not sure. On the outline, the plan itself, would have the scenarios, and after every scenario which was given on the -- I'm not sure if it was after every scenario or on the form that the lieutenant at the time gave out, but it would say



after every scenario all the officers are critiqued on their performance, and because I did the -- was overseeing the car stops --
Q. I'm asking you about the outlines. You said there are outlines for the scenarios for the role plays, correct?
A. Yes.
Q. On the outlines for the scenarios for role plays, did you also have an outline of what should be discussed during the critiques?
A. Those would be in the goals, yes.
Q. Okay. And I take that one of the goals would have been to discuss the conduct, discuss the action of the off-duty officer, correct?
MR. PENZA: Objection to form.
Q. You just --
A. Yes, and again --
Q. Let me back up --
MR. PENZA: You asked him a question, will you let him answer it.
MR. BRUSTIN: No, I'm going to withdraw it.
Q. You just told me in every one of the identification scenarios you described, in each critique you



necessarily discussed what the off-duty officer did wrong, correct?
A. Yes.
Q. It's your understanding that all of the trainers that provided critiques during the role play, particularly for the Saraiva and Young class also necessarily addressed what the off-duty officer did wrong in all six of those role plays; is that correct?
A. For the car stop and the common calls, yes.
Q. The five or six role plays?
A. Yes.
Q. Now, in the goal section, do you know whether or not there was necessarily a goal that related to the conduct of the off-duty officer?
MR. PENZA: Objection to form.
MR. McHUGH: Objection to form.
A. No.
Q. Do you think it's likely that there was not such a goal listed on the goals?
MR. PENZA: Objection to form.
MR. McHUGH: Objection. Form.
A. No.
Q. May have been, may not have been?



A. It may not have been.
Q. Why would that be?
A. Like with anything else with training, it's very difficult to put down -- I mean, the training manual would be this thick (indicating) for one scenario for everything we should be talking about. When the critique -- it's overall critique. The critique would be everything that the instructors themselves know for firearms instruction and officer survival, that that was going to be taught.
Q. So what kind of goals would be listed there for the different scenarios?
A. As we discussed earlier, the goals would be to see that the officers are making sound and prudent judgment, split-second decision making.
Q. That would be all written?
A. Yes.
Q. But what wouldn't be written is the decision-making process of the off-duty officer; is that right?
MR. PENZA: Objection to form.
MR. McHUGH: Objection to form.
A. Yes.
Q. But you're certain that you're not -- is it possible that perhaps you're remembering -- you're confusing

what was taught on these off-duty issues pre-and-post Young; is that possible?
MR. McHUGH: Objection to form.
A. No. Because Camp Varnum, they did go to Camp Varnum and they were set up the same.
Q. Is it possible the focus of the off-duty scenarios changed after the Young shooting and you're confusing the focus?
MR. McHUGH: Objection as to form.
MR. PENZA: Objection to form.
Q. Pre-and-post shooting?
A. I believe not, because my scenarios throughout the last scenarios I've done have always been the same. In fact, I always even have my own spot.
Q. You're certain that even before the Young shooting in every one of those scenarios, the five or six you mentioned off-duty, you necessarily discussed what the off-duty officer did right and wrong?
MR. PENZA: Objection. Asked and answered.
MR. McHUGH: Objection. Form.
A. Yes.
Q. I take it that Lieutenant Melaragno was also involved in the Camp Varnum exercises?



A. No.
Q. He wasn't?
A. No.
Q. I take it that that was also under the direction of Captain Ryan?
A. Yes.
MR. PENZA: Objection to form.
Q. And it was your understanding that Captain -- that Camp Varnum activities fell under Captain Ryan's direct chain of command?
MR. PENZA: Objection to form.
MR. McHUGH: Objection to form.
A. Yes.
Q. And was Captain Ryan present for some of the Camp Varnum activities that you participated in during the Saraiva/Young camp?
A. Yes.
Q. I take it he was certainly aware of what -- withdrawn. He certainly would have seen the outlines, correct?
MR. PENZA: Objection to form.
A. I believe he would have.
Q. Is it possible in your mind that he would not know that there were five or six specific off-duty



scenarios that were being taught at Camp Varnum?
MR. PENZA: Objection to form.
MR. McHUGH: Objection to form.
A. It's possible.
Q. How is it possible?
MR. PENZA: Objection.
MR. McHUGH: Objection.
A. You're asking me if it's possible. I don't know how it would be possible, but anything is possible.
Q. In regard to the first scenario, an officer pulls a badge from the car in traffic?
A. Yes.
Q. What was the training during the critique in regard to what the off-duty officer did wrong?
A. There would just be mention of what had happened there and what the officer felt when he went through that.
Q. I asked you specifically earlier whether or not in each of those scenarios there was specific training in regard to what the off-duty officer did wrong; do you remember that?
A. Yes.
Q. And you said yes, there was?



A. Yes.
Q. Now I'm asking you to go back to each one and tell me what the training was in regard to what each one did wrong, okay?
A. What the training was for --
Q. For the critique. You told me in the critique you necessarily discussed what the off-duty officer did wrong, correct?
A. Yes.
Q. There is five scenarios?
A. Yes.
Q. I want to go through each of those five and I want you to tell me what you told the recruits that off-duty officer did wrong, okay, in each one.
A. Okay.
Q. Can you do that?
A. Yes.
Q. Let's start with the first one. You talked about a role play where the officer pulls out his badge from the car?
A. Quickly, yes.
Q. What's the training that you necessarily provided, you're absolutely sure you provided in the context of that role play in regard to what the off-duty

Page 98

is the training during the critique that you provided during that class regarding specifically what the off-duty officer did right and what he did wrong?
THE WITNESS: We're talking about the one he was in the backyard?
MR. BRUSTIN: Yes.
A. That would be -- I think it was backwards. That one would be where the dangers of him in the backyard and not having -- having his gun out.
Q. The question is what is the training as to what that off-duty officer did right and what he did wrong, what he did wrong and what he should have done?
A. In that particular one, if I'm not mistaken, he does everything right in that particular scenario.
Q. What exactly does he do?
A. He turns to the police officer, says he's "Police" and they tell him to put the firearm down. Most of the recruits do, tell them to put the firearm down, get him away from the firearm, get him on the ground and check his credentials.
Q. He's holding a gun, correct?

Page 99

A. Yes.
Q. I take it he's holding it with two hands?
A. It depends on the player. It's not specific whether it's one or two or what.
Q. You just said he's doing everything right, right?
A. Yes.
Q. Unless he's holding something else, he would only be doing it right if he was holding it with two hands, right?
A. Yes.
Q. So, presumably, he's holding it with two hands, right?
A. Okay, yes.
Q. And when he hears the police, he turns toward them, correct?
A. No.
Q. What does he do?
A. He doesn't turn towards them. Stays there, says he's on the job, he's a police officer and does whatever the officer tells him to do.
Q. Okay. Anything else you tell the officers during that training as to what that officer is supposed to do in that situation?
A. No.

Page 100

Q. For example, you don't tell them he's supposed to drop his gun?
A. No.
Q. Did you necessarily tell them during that training he's not supposed to turn towards the officers?
A. No. Not that I remember, no.
Q. Is it possible during that training that during some of those scenarios the off-duty officer actually turns towards the officers?
MR. PENZA: Objection to form.
Q. Do you remember one way or the other as you sit here today?
A. As I sit here today, I remember that all the scenarios were specific and he was not supposed to turn around, the officer.
Q. I take it that would be in the outline for the role play, right, as to what he's supposed to do, so he would know?
A. No.
Q. How would the person playing the off-duty officer know not to turn towards?
A. Under my instruction --.
Q. Hold on. How would they know not to turn towards the on-duty officer if it wasn't in the outline?

Page 101

A. Under my instructions.
Q. Okay. I take it all the other officers who were doing role plays, all the other trainers who are running role plays gave the same instruction?
A. Yes.
Q. It wasn't documented anywhere, but they knew to do it?
A. Yes.
Q. How did they know to do it?
A. Under my instruction. Each scenario we had was played out the same every time another recruit came over. I don't think you understand what happened at Camp Varnum, but that's when a group came over, we would do the scenario, they're a back-up officer. When the back-up officer came to do the scenario, we would give them another scenario, but out of the scenario we did, they were pretty much the same.
Q. But there was an outline for the people -- I take it there was an outline that was given only to trainers, correct?
A. No. I drew the outline and I told the instructors what I wanted.
Q. Okay. In the final scenario you described badge in hand running across the street. What training did

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * * * * * * *
LEISA YOUNG, INDIVIDUALLY AND IN *
HER CAPACITY AS ADMINISTRATRIX OF *
THE ESTATE OF CORNEL YOUNG *
*
VS. * CA NO 01-288M
*
CITY OF PROVIDENCE, by and through *
its treasurer, STEPHEN P. NAPOLITANO, *
MICHAEL SOLITRO, individually, and in *
his official capacity, CARLOS SARAIVA,*
individually and in his official *
capacity, JOHN and JANE DOES, 1 *
through 10, individually and in their *
official capacities *
* * * * * * * * * * * * * * * * * * * *

DEPOSITION OF URBANO PRIGNANO, a Witness in the above-entitled case, taken on behalf of the Plaintiffs, before Linda L. Guglielmo, RPR-RMR, a Notary Public in and for the State of Rhode Island, at the Offices of the City Solicitor, 275 Westminster Street, Providence, Rhode Island on January 15, 2003, at 9:30 A.M.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RHODE ISLAND 02920
(401) 946-5500

A. Yes.
Q. Absolutely, why was that?
A. Because the city is very diverse. I mean, if you're going to run a police department and then you've got to do undercover work, you don't send a Chinese guy into a black area to do that. You don't send a Chinese guy into an Italo-American community to penetrate organized crime. You get an Italian, you get a black, and an Asian to penetrate the different groups.
Q. So, it was a priority for you to hire minorities?
A. Yes.
Q. It was a priority for you?
A. Yes.
Q. Was it a priority for anybody above you that you're aware of, the Mayor, the Commissioner?
A. The Mayor wanted to bring the police department up to par as far as minorities.
Q. So, you spent a lot of time on recruiting minorities?
A. Right.
Q. Now, you testified earlier in substance and I don't -- tell me if I'm getting it wrong, but I believe you testified that in the hiring process you



had a Major who was in charge who had many years experience on the job and you had the trust he was doing what he was supposed be doing?
A. Correct.
Q. I take it it was the same with training, is that fair to say?
A. Yes.
Q. Who was in charge of training for you during the years that you were Chief?
A. There could have been two. One was Captain Ryan, and I think maybe Major Verrecchia at one time, but he left right away, he went to Brown University.
Q. Wasn't Lieutenant Cohen also in charge of --
A. He wasn't completely in charge. He fell under Ryan's supervision.
Q. So --
A. Ryan was the chief honcho and all the other ones were assistants to Ryan, except for Verrecchia, then Ryan would fall under Major Verrecchia.
Q. Between '95 and your retirement, approximately what period of time was Verrecchia in charge?
A. I don't know. Maybe a year, year and a half.
Q. Is it fair to say that during the academy classes



for Solitro, Saraiva and Young, the two classes, 57 and 58, for the 57th and 58th, is it fair to say that Ryan, Captain Ryan was in charge --
A. I don't know, you would have to check the records.
Q. Do you know whether or not Major Verrecchia ever supervised a class, an academy class?
A. Of course, he did. He had all kinds of degrees.
Q. I'm not questioning his qualifications. There is only a certain --
A. Of course, he taught certain classes.
Q. I'm talking about he -- that wasn't a good question, I'm sorry. In terms of the person who was ultimately in charge of training for you, you said for most of the time during '95 to 2000 it was Captain Ryan, correct?
A. Right, most of the time.
Q. The question is --
A. They teach.
Q. Okay. Was Verrecchia in charge of training?
A. He wasn't there. He moved on to a better -- he moved on to Brown University.
Q. When?



A. See, that I don't know the date on that.
Q. Was it before Saraiva's class?
A. It could be.
MR. BRUSTIN: Would that be something easy to check -- not for you anymore, let's make a request on the record. I'm making it for myself basically, if you could find that out for me easily it would make it easier.
Q. Now, I take it then that during the time when you were Chief you trusted that Captain Ryan, based on his many years of experience, was properly and adequately training all of the men in your chain of command; is that correct?
MR. McHUGH: Objection as to form.
A. Yes.
Q. Okay. You didn't feel like you had to micromanage what Ryan did, because you trusted that he would provide all training that was necessary, correct?
A. Those were the programs you inherit down the line. It's not a brand new police department and starting tomorrow that we have a new academy and they never had an academy before and you have to draw up a curriculum. These are curriculums that have been handed down throughout the years and only

Page 42

improved upon.
Q. Okay. So, you trusted, for example, that Captain Ryan would ensure that the curriculums that had been handed down from year to year were being properly taught?
A. Right, and improved.
Q. And that was the second question. You trusted to the extent there were any modifications that needed to be --
A. Yes, there was a lot of modifications.
Q. You've got to let me finish.
A. I know the question.
Q. But for the court reporter, you trusted that to the extent there was a need for any modification or any change, you trusted that based on his experience Captain Ryan would make sure that happened?
A. And my input.
Q. Well, did you have -- would you say you had more or less input in the training process as opposed to the hiring process?
MR. McHUGH: Objection to the form.
A. I had more input in the training.
Q. Aside from your input in regard to your areas of specialization, narcotics, and the other areas you

Page 43

mentioned, did you have input in other areas of training?
A. What other areas are there in training? You don't make sense. Training is training.
Q. Well, for example, did you have input in regard to range training?
A. That's training, that's all part of training.
Q. I'm just trying to find out your input.
A. When you say training, it's from an officer making an arrest to firing his weapon, to going to court and knowing how to testify, it's all in training. Did I make improvements in range, yes, I made improvements in range.
I brought in the paint ball shootings, the scenarios, the scenarios were put down inside the gym of the police department where we built rooms like a bar and we built a room where an officer was killed, and then we would take our recruits and our other police officers, other police officers dressed them up in paint ball gear and make them go through the scenario. And this was done 365 days a year to show them the vulnerability of when they got into a gunfight because, you know what, repetition in doing something when the incident happens, you fall

Page 44

back on that repetition and you know exactly what to do. I'm trying to think of the officer's name that we lost -- Shaw, Steven Shaw was ambushed in a room, shot in the head with a 44 caliber. I knew that person very well. He used to come over my house and play with my daughters.
So, we built that room and we sent officers in and we duplicated what would happen to show our officers what could happen and this was done all the time. From the paint ball I went out and I purchased the Range 2000, I don't know if you know what Range 2000 is.
MR. BRUSTIN: I do from testimony in this case.
A. It cost me $80,000, it's like a visual TV, your officer goes in front of it, there is an officer that controls the computer, speaks back to you, it fires, they put a laser beam in your weapon and you go into the scenario. Now, they give you all different kinds of scenarios, off-duty, on-duty and you have to perform. When you draw your weapon and fire it, there is a red dot that goes on the screen, and if your weapon fires and it sounds just like a gun that went off, that was done 365 days when I was

Page 45

there, a constant rotation going through with different scenarios. That was to prepare them for the streets and what they would encounter. Not only does it prepare you for your weapon, it prepares you for spraying pepper gas and use of your nightstick. You might have a woman come out holding a baby with a gun and you're in that scenario, you get marked accordingly, what you should and shouldn't do. You might have a guy getting out of the car reach in his back pocket, pull out a handkerchief, you might have a guy pull out a gun and behind him is two little kids, so it's to shoot/not shoot, take cover and know what you're doing.
Then I broke down a wall in the training academy, a whole wall and I brought in a police car, we took the engine out of it, we took the muffler system out of it. Now we got the officer to sit in the car and answer the radio so he knows how to answer the radio, get out of the car and play bad guy where he would learn how to handcuff somebody properly and put them in the back seat of the car. That was done. Now, some of these ideas I would read in I --
Q. International Chief?