UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LEISA YOUNG, In her Capacity as Administratrix of the Estate of Cornel Young, Jr. | ) | |
| v. | ) | No. C.A. No. 01-288 S |
| CITY OF PROVIDENCE by and through its treasurer, Stephen Napolitano, et al | ) | |

PLAINTIFF'S OBJECTION AND RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS COHEN AND RYAN AND PRIGNANO AND SULLIVAN

Now comes the plaintiff and objects and responds to the motions for summary judgment filed by defendants Cohen and Ryan and Prignano and Sullivan. In support of said objection and response, the plaintiff submits two Statements of Disputed Facts and one memorandum of law. Each statement of disputed facts incorporates by reference the other.

LEISA YOUNG, in her capacity as
Administratrix of the Estate of
Cornel Young Jr.,
By her Attorneys

Robert B. Mann #0153
Mann & Mitchell
One Turks Head Pl., Ste. 501
Providence, RI 02903
(401) 351-5770

Barry Scheck, Esq. #4612
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9084

Nick Brustin, Esq. #0605
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9084

**Certification**

I hereby certify that a copy of the within document was mailed or delivered to the person or offices of Kevin McHugh, Esq., City Solicitors Office, 275 Westminster St., Suite 200, Providence, R.I. 02903 and Michael Colucci, Esq., Olenn & Penza, LLP, 530 Greenwich Ave., Warwick, RI 02886 on the 2nd day of September, 2005.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **LEISA YOUNG, In her Capacity as** | ) | |
| **Administratrix of the Estate of Cornel Young, Jr.** | ) | |
| | ) | |
| **v.** | ) | **No. C.A. No. 01-288 S** |
| | ) | |
| **CITY OF PROVIDENCE by and through** | ) | |
| **its treasurer, Stephen Napolitano, et al** | ) | |

## PLAINTIFF'S MEMORDANDUM OF LAW IN SUPPORT OF OBJECTION TO DEFENDANT RYAN, COHEN, AND PRIGNANO'S RENEWED MOTIONS FOR SUMMARY JUDGMENT

Because the standards for holding a municipality liable under 42 U.S.C. § 1983 are particularly stringent, Monell claims rarely survive summary judgement. In this case, the First Circuit has already determined that plaintiff has met these stringent standards and that the claim that the City acted with deliberate indifference in failing to adequately regulate and train officers concerning high risk on-duty/off-duty confrontations is valid and should be presented to a jury. The Circuit stated, for example,

> Beyond Dr. Fyfe, the statements of Commissioner Partington and Ryan could support a view that the City knew its training program to be seriously deficient. We think, in short, that the jury could find that the department knew that a friendly fire shooting in violation of the Fourth Amendment was a predictable consequence of the PPD's failure to train on on-duty/off-duty interactions, and therefore that the department was deliberately indifferent to Cornel's constitutional rights. Young v. City of Providence, 404 F.3d 4 at 29 (1st Cir. 2005).

Plaintiff's supervisory liability claims against defendants Prignano, Ryan and Cohen are grounded in precisely the same factual and legal theories, and the standards of proof for a Monell failure to train and an individual supervisor's failure to train are virtually identical. If

anything, a municipality is given even greater protection than an individual supervisor since a municipality is typically held responsible only when a "policy or custom" of unconstitutional behavior is attributable to the City, whereas a supervisor may be individually liable for isolated constitutional violations when the supervisor acts with deliberate indifference. *See, e.g.*, Silva v. Worden, 130 F.3d 26, 31-32 (1st Cir. 1997).[1]

In the section titled "Supervisory Liability and Qualified Immunity," the First Circuit further found that the Monell findings in this case are directly relevant to supervisory liability stating,

> We have reversed entry of summary judgment against Providence on the failure to train claim, a consideration pertinent to qualified immunity analysis. Young v. City of Providence, 404 F.3d 4, 32 (1st Cir. 2005).

In fact, the First Circuit's findings on the Monell training claims create insurmountable hurdles for these supervisors seeking qualified immunity on the same theories of liability. Rather than address these obstacles, Defendants Prignano, Ryan and Cohen each chose to completely ignore the Circuit's findings in their renewed motions for qualified immunity. Instead, each defendant largely regurgitates prior legal arguments and evidence that the First Circuit rejected. For example, in support of their motions, defendants Ryan, Cohen and Prignano provided precisely the same statement of undisputed facts as in previous

---

1 *See also* City of Oklahoma v. Tuttle, 471 U.S. 808 (1985); Guitierrez-Rodriguez v. Cartagena, 882 F.2d 553, 567 (1st Cir. 1989) ("An inquiry into whether there has been a pattern of past abuses...is only required when a plaintiff has sued a municipality. Where...the plaintiff has brought suit against the [supervisory] defendants as individuals, plaintiff need only establish that the defendants' acts or omissions were the product of reckless or callous indifference...and that they, in fact, cause his constitutional deprivation.")

motions[2] and simply ignore the fact that each of their alleged undisputed facts was rejected as undisputed by the Circuit in connection with the Monell training claim.

The Circuit has already found, based upon the specific actions and inactions of these defendant supervisors, that plaintiff has demonstrated the City's deliberate indifference. Defendants could only prevail on this motion if the evidence, considered in the light most favorable to Plaintiff, places Defendants in the (presumably narrow) category of government actors whose deliberate indifference is the moving force behind a constitutional violation but whose same actions could nonetheless be pronounced those of a "reasonable" official in their position. As the First Circuit emphasized, Commissioner Partington admitted that on-duty/off-duty confrontations were a well known risk of urban policing long before Officer Young's death and that it was equally well known that when police departments fail to provide comprehensive training and protocols on these issues, police officers die. Young, 404 F.3d at 18-19. Defendants cannot demonstrate that it is objectively reasonable for a police administrator to ignore these life and death risks.

In fact, Defendants do not seriously address these standards. Prignano, Cohen and Ryan make no effort to demonstrate that they fall into this narrow category of deliberately indifferent conduct that nevertheless enjoys immunity. Much of the evidence establishes that Defendants departed grossly from what any reasonable supervisor would have done – and that their indifference to the rights of citizens in Officer Young's position was "deliberate" in the strongest, most unforgivable sense of that word. This defense does not

[2] Prignano provides the same statement of undisputed facts submitted in response to the City's motion for summary judgement, a motion which was specifically denied by the Circuit.

apply where, as here, it is obvious that no reasonably competent supervisor would have believed it lawful to act or fail to act as defendants Prignano, Cohen and Ryan did in completely abdicating their duty to train officers regarding dangerous on-duty/off-duty confrontations which were bound to occur. Indeed, even on Defendants' preferred formulation, whereby protection is offered to all but "the plainly incompetent or those who knowingly violate the law," summary judgment would be inappropriate. Prignano and Sullivan Motion at 16-17; Ryan and Cohen Motion at 6 (both quoting *Hegarty*, 53 F.3d at 1373). Rather, Commissioner Partington testified that Prignano should have been fired and could not possibly lead the PPD and that he had relieved Ryan of supervisory responsibilities, including his position directing the Training Academy. PdfPrignano 1A; PdfRyan 2

As discussed below, Plaintiff respectfully submits that Defendants are not entitled to qualified immunity.

## I. The Qualified Immunity Standard for Supervisory Liability

In the decision in this case under the heading "Supervisory Liability and Qualified Immunity," the First Circuit provides Defendants the applicable standard for qualified immunity in a supervisory claim. Young, 404 F.3d at 32 *citing* Camilo-Robles v. Santiago-Gonzalez, 151 F.3d 1 (1st Cir. 1998).

The first prong, which was established in the first phase of the trial, is the violation of an underlying constitutional right. The jury finding that Officer Solitro violated Officer Young's constitutional rights satisfied this prong. Defendant Prignano acknowledges that

the first prong of the qualified immunity test is satisfied. Prignano and Sullivan Motion at 9. Defendants Cohen and Ryan do not address the issue. With the existence of a constitutional violation established, the second question is "whether both the underlying constitutional violation of Solitro and the basis for liability of the various supervisors were clearly established..." Young, 404 F.3d at 32. The third prong is "whether the supervisors' actions were otherwise objectively reasonable." *Id* citing Camilo-Robles, 151 F.3d at 6-8.

Here, the District Court ruled, and the First Circuit did not disturb the finding, that the underlying constitutional violation committed by Solitro was clearly established. Young v. City of Providence, Memorandum and Order, C.A. No. 01-288ML, dated May, 30 2003 ("District Court Order") at 10. Although the District Court found there were triable factual disputes concerning the third prong of the excessive force qualified immunity analysis - whether the constitutional violation was objectively reasonable in light of clearly established law - as described below, this inquiry is not relevant to supervisory liability. *Id*. Similarly, the First Circuit has already found that there is a triable issue as to whether the City exhibited deliberate indifference based primarily on the actions and failures to act of these supervisory defendants. Although the Circuit did not make a specific finding that these supervisors exhibited deliberate indifference, the Circuit's detailed findings concerning these supervisors make clear that there is more than sufficient evidence to prove that these supervisors acted with deliberate indifference that was anything but objectively reasonable.[3]

---

[3] Defendant Prignano cites Savard v. State of Rhode Island, 338 F.3d 23 (1st Cir. 2003) as the basis of his qualified immunity analysis. Savard, however, was neither a supervisory liability nor an excessive force case, and Defendant

## II. Argument

### A. Solitro's Predicate Constitutional Violation was Clearly Established Pursuant to the District Court's Decision

It is well established that supervisors may be liable for their failure to train even when their subordinates are entitled to qualified immunity. *See* Hegarty v. Somerset County, 53 F.3d 1367, 1380 (1st Cir. 1995)("The determination that a subordinate law enforcement officer is entitled to qualified immunity from suit under section 1983 is not necessarily dispositive of the supervisor's immunity claim."); Seekamp v. Michaud, 109 F.3d 802 (1st Cir. 1997) (Finding subordinates not liable on the merits, then independently examining supervisory actions). The appropriate inquiry is to ask only if the subordinates committed a violation of clearly established constitutional law. Camilo-Robles v. Hoyos, 151 F.3d at 6.[4] Plaintiff need not show that the subordinates had "fair warning" that their conduct was unconstitutional. Pre-Saucier First Circuit cases make clear that a supervisor may be held liable even if qualified immunity is granted to subordinates. *See* Hegarty, 53 F.3d at 1380-81 (Although the Court found summary judgment appropriate for the individual officers, the Court, as in Seekamp, then examined whether supervisory liability was appropriate, asking whether a lack of relevant training caused plaintiff's death and whether the

---

Prignano needlessly complicates and wrongly interprets its holding in a misguided attempt to suggest it creates a heightened standard for supervisory liability claims. (*See* Prignano and Sullivan's Motion at 9, arguing, mistakenly, that the two prongs of the Camilo-Robles test are merely restatements of the second and third prongs of the Savard test.)

[4] "When a supervisor seeks qualified immunity in a section 1983 action...there must be a bifurcated 'clearly established' inquiry--one branch probing the underlying violation, and the other probing the supervisor's potential liability." Id. Once the underlying constitutional deprivation is established, "[t]he question, then, reduces to the test of objective legal reasonableness." Id.

supervisor was on notice).[5] Post- Saucier First Circuit cases continue to follow the holding of Camilo-Robles[6] and other Circuits adopt a similar approach, which follows from the nature of causation under Section 1983. "While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights." Sweaney v. Ada County, 119 F.3d 1385, 1392 (9th Cir. 1997) *citing* Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994). If this were not the rule, then the troubling result could arise that a person could be killed because police officers lacked critical training, their inadequate training might be held to excuse their actions for qualified immunity purposes, and then the supervisors would be excused as well. This, of course, would be totally contrary to the purposes of Section 1983, where the supervisor's deliberately indifferent training was the moving force behind the deprivation of life. Thus, when an injury is attributable to a supervisor or municipality's indifference, while the subordinate officer may be immune, the deliberate indifference of supervisors or policymakers is actionable.

The District Court ruled and the First Circuit did not disturb the finding that Solitro violated a clearly established constitutional right when he shot and killed Officer Young.

---

[5] Thus, even if the individual officers are found not liable, the supervisors may be liable. Carapellucci v. Town of Winchester, 707 F. Supp. 611, 618 (D. Mass. 1989) (despite exoneration of individual defendants, the town and officials may "be liable directly for their implementation of procedures and the provision of or failure to provide facilities, if their conduct in this respect is constitutionally inadequate"); Simmons v. City of Philadelphia, 947 F.2d 1042, 1063 (3d Cir.1991) (policymakers were individually liable under § 1983 for prisoner suicide, though factfinder determined officer had not violated prisoner's constitutional rights); Anderson v. City of Atlanta, 778 F.2d 678 (11th Cir. 1985).

[6] See Forbis v. City of Portland, 2003 WL 21250675 *27 (D.Me.) ("When a supervisor seeks qualified immunity in a section 1983 action, the 'clearly established' prong of the qualified immunity inquiry is satisfied when (1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context."); McDermott v. Town of Windham, 204 F.Supp.2d 54 (D.Me. 2002) (quoting Camilo-Robles). See also Shabazz v. Cole, 69 F.Supp.2d 177 (D.Mass. 1999) (the requirement for supervisory liability is that "the subordinate must have committed a constitutional violation.")

District Court Decision at 9-10.[7] Reasonableness, and not whether the right was clearly established, was the only issue left for the jury after the District Court's ruling.

In denying Solitro and Saraiva's motion for summary judgment based on qualified immunity, the District Court stated that plaintiff had made out a "clearly established Fourth Amendment right to remain free from the use of excessive force" and that the only issue for the jury was whether an objectively reasonable officer would have understood he was violating this clearly established right. District Court Decision at 9-10. The right that needed to be clearly established in order to deny Solitro and Saraiva qualified immunity is the same as the underlying right that needs to be clearly established in order to hold a supervisor liable. This court need look no further than Judge Lisi's previous rulings in order to hold that the constitutional rights of Officer Young which Officer Solitro violated were clearly established for qualified immunity purposes.

Defendants ignore the District Court's binding decision which remains the law of the case. Instead, Defendants contend that, in order to show the underlying constitutional right in this case was clearly established, Plaintiff must show a clearly established "right to be free from friendly fire." Prignano and Sullivan's Motion at 15. If the Court determines that the District Court's ruling left undisturbed by the Circuit is somehow not binding on

---

[7]The First Circuit notes that "The district court never dealt with qualified immunity issues–it made no rulings on the second prong of qualified immunity analysis, whether both the underlying constitutional violation of Solitro and the basis for liability of the various supervisors were clearly established, nor did it make any rulings on the third prong, whether the supervisors' actions were otherwise objectively reasonable." Young, 404 F.3d at 32. The First Circuit correctly notes that the district court never dealt with the qualified immunity issues in regards to Prignano, Ryan and Cohen. The District Court *did,* however, address qualified immunity in regards to Solitro and Saraiva and, in so doing, ruled the right was clearly established. The likely reason that the First Circuit failed to take note of the District Court's ruling on this issue is because Solitro's and Saraiva's qualified immunity rulings were not challenged on appeal, and defendants Prignano, Ryan, and Cohen did not adequately raise their own claims of qualified immunity in the district court. *Id* at FN 23.

Defendants here, Defendants' claims regarding the underlying constitutional right are wrong for two additional reasons. First, framing the issue as one of 'friendly fire' implies that the Fourth Amendment right in this case is somehow less well established because a police officer, and not a regular citizen, was shot. The underlying constitutional right in this case is no different than the underlying constitutional right in any other straight-forward excessive force case. The Supreme Court has firmly established that police officers "are not relegated to a watered-down version of constitutional rights." Garrity v. New Jersey, 385 U.S. 493, 500 (1967) (emphasis added). Moreover, "it has long since been established that police officers" have a right to be free from use of excessive force. Jensen v. City of Oxnard, 145 F.3d 1078, 1085-86 (9th Cir. 1998); see, e.g., Cerrone v. Brown, 246 F.3d 194, 199-200 (2nd Cir. 2001) ("The fact that the person seized was a police officer does not alter a Fourth Amendment analysis"); Jackson v. Gates, 975 F.2d 648, 652-53 (9th Cir. 1992); Graham v. Davis, 880 F.2d 1414, 1418-19 (D.C.Cir. 1989); Los Angeles Police Protective League v. Gates, 907 F.2d 879, 885 (9th Cir. 1990); Kirkpatrick v. City of Los Angeles, 803 F.2d 485, 488-89 (9th Cir. 1986).

Second, the Defendants selectively quote Savard to suggest that Plaintiff must show a nearly identical case on point in order to establish a constitutional right. The Defendants failed to give the proper context in Savard, which held:

> "The court must canvass controlling authority in its own jurisdiction and, if none exists, attempt to fathom whether there is a consensus of persuasive authority elsewhere. *See Wilson v. Layne,* 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *Brady v. Dill,* 187 F.3d 104, 116 (1st Cir.1999). This exploration is not limited to cases directly on point. Because "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope,* 536 U.S. at 741, 122 S.Ct. 2508, overcoming a qualified immunity defense does not

> require a plaintiff to show that either the particular conduct complained of or some materially indistinguishable conduct has previously been found unlawful. *See United States v. Lanier,* 520 U.S. 259, 268-71, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997); *Mitchell v. Forsyth,* 472 U.S. 511, 535 n. 12, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Still, the relevant legal rights and obligations must be particularized enough that a reasonable official can be expected to extrapolate from them and conclude that a certain course of conduct will violate the law. *Saucier,* 533 U.S. at 201-02, 121 S.Ct. 2151." 338 F.3d at 28.

The Supreme Court has noted that "general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful,'" *See* United States v. Lanier, 520 U.S. 259, 271 (1997) *citing* Anderson v. Creighton, 483 U.S. 635, 640 (1987).

The First Circuit determined that the jury could have found "that an objectively reasonable officer would have recognized Officer Young as an officer, and thus would have recognized that he was not a threat and would not have shot him." Young, 404 F.3d at 23. The underlying constitutional right violated in this case is "the right to be free from the use of deadly force when a person does not pose a reasonable threat." This right is one of the oldest and longest established of the 'clearly established' rights. The First Circuit has established some rights for qualified immunity purposes at a relatively high level of generality. "The right to be free from unreasonable seizure (and, by extension, unjustified arrest and detention) is clearly established in the jurisprudence of the Fourteenth Amendment (through which the Fourth Amendment constrains state action)." Camilo-Robles, 151 F.3d at 6.

The Supreme Court itself has accepted that the right to be free from the use of deadly force when one does not reasonably pose a threat is a clearly established right for qualified immunity purposes. In Brosseau v. Hagen, 125 S.Ct. 596 (2004) the Supreme Court wrote that "with regard to deadly force, we explained in *Garner* that it is unreasonable for an officer to 'seize an unarmed, nondangerous suspect by shooting him dead.' 471 U.S., at 11, 105 S.Ct. 1694. But '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.' *Id.*, 125 S.Ct. at 598. The Court in Brosseau connected the right at least as far back as Tennessee v. Garner, 471 U.S. 1 (1985).

Brousseau is not a supervisory liability case. Brousseau stands for the unremarkable proposition that a police officer may be entitled to qualified immunity when her mistaken belief that a suspect posed a serious threat was reasonable. Unlike Brousseau, Plaintiff already has had a jury decide that Officer Solitro's conduct was unreasonable. Nevertheless, defendant Prignano mistakenly cites Brousseau for the proposition that there is no clearly established right to be free from the use of deadly force even when one does not reasonably pose a serious threat. Defendants ignore that, in Brousseau, it was the reasonableness of the "officer's *actions*" and "the *conduct* in question" which the Supreme Court addressed and not the underlying constitutional right. Prignano and Sullivan Motion at 12 (emphasis added). Defendants are attempting to make the reasonableness of Solitro's conduct relevant to supervisory liability and then disregard the first jury's finding that his conduct was unreasonable. Defendants claim that, because

the Supreme Court upheld qualified immunity in Brousseau, there was no clearly established right. If Defendants were allowed to use Brousseau in this manner, no supervisor could ever be liable if a subordinate were entitled to qualified immunity. As noted above, this is clearly not the law. *See* Hegarty, 53 F.3d at 1380; Seekamp, 109 F.3d 802; Camilo-Robles, 151 F.3d at 6.

Furthermore, as every Circuit court which has addressed Brousseau has determined, Brousseau presented a case in which none of the facts alleged were capable of proving that the victim was not a threat at the time Officer Brousseau shot him. In all three Circuit cases addressing Brousseau, each has determined that, when the facts are capable of showing that the person seized was not reasonably posing a threat, the right to be free from deadly force was clearly established.[8]

Here, a jury has already decided that Officer Young did not pose a threat to Officer Solitro or to anyone else, nor could Officer Solitro reasonably have believed otherwise. The jury was instructed that "a police officer has lawful authority to use deadly force when that officer has reasonable grounds to believe that an individual or the officer himself is threatened with the infliction of serious bodily harm or death." *Trial Transcript* dated 10/30/03, at 20L5. Thus the jury necessarily found that, at the time Solitro shot Officer

[8]*See* Craighead v. Lee, 399 F.3d 954, 962 (8th Cir. 2005)(Stating that Brousseau is distinguishable when the facts are capable of proving that the victim was not a reasonable threat.); Harris v. Coweta Co, GA., 406 F.3d 1307, 1320 (11th Cir. 2005)(Claiming Brousseau was a case in which "persons in the immediate area at risk from...flight" but distinguishing it in cases where the facts can demonstrate there was no serious risk of harm.); Sample v. Bailey, 409 F.3d 689, 698-99 (6th Cir. 2005)(also distinguishing Brousseau on the grounds that it was a case about persons at risk in immediate flight, but that when the facts are capable of showing no reasonable threat of serious harm Brousseau does not apply).

Young, he, unlike Brousseau, did not have reasonable grounds to believe that Officer Young posed or threatened a risk of serious injury or death.[9]

In light of Judge Lisi's ruling, the verdict, the decision of the First Circuit, Supreme Court precedent, and the facts of this case, there is no question that the constitutional right of which Officer Young was deprived was clearly established.

**B. Supervisory Liability for a Failure to Train is Clearly Established**

In order to satisfy the burden imposed by the second part of the qualified immunity test, Plaintiff need only show that it is clearly established that a supervisor may be responsible for the constitutional violations of a subordinate when those violations are caused, at least in part, by the failure to train. As the First Circuit has noted, "it is...well settled that a deliberately indifferent police supervisor may be held liable for the constitutional violations of subordinates." Camilo-Robles, 151 F.3d at 6 *citing* Diaz v. Diaz Martinez, 112 F.3d 1, 4 (1st Cir. 1997). Furthermore, it is clearly established in City of Canton v. Harris that a supervisor can be liable for the failure to train subordinates. In Harris, the Court recognized that the need to provide training would be "obvious" where there were foreseeable serious consequences that could result from the lack of instruction. 489 U.S. at 390, n. 10. First Circuit precedent also puts all Defendants on notice that they can be held liable for a failure to train that leads to a constitutional violation. In Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87 (1st Cir. 1994), this Circuit explicitly

[9]Defendants independently assert that the fact that a jury found Officer Saraiva did not violate Officer Young's constitutional rights is relevant to the "clearly established" prong of the qualified immunity test. Prignano and Sullivan's Motion at 9; Ryan and Cohen's Motion at 12. Defendants don't cite a single case to support, even indirectly, the proposition that because one officer did not violate a constitutional right the right was somehow not clearly established for another officer who did. The fact that a jury found Saraiva did not violate Officer Young's constitutional right is irrelevant to whether or not the rights that Solitro violated were clearly established.

indicated that supervisors can be liable for a training program when they exhibit reckless or callous indifference to constitutional rights. Febus-Rodriguez, 14 F.3d at 92. *See also* Dirico v. City of Quincy, 404 F.3d 464, 469 (1st Cir. 2005).[10]

As the court in Camilo-Robles indicated, once the supervisor's potential liability is established, the "question, then, reduces to the test of objective legal reasonableness." This is the third prong of the qualified immunity test.

### 1. A Reasonable Officer Would Have Known His Conduct Fell Far Below Constitutional Standards

Plaintiff must show that a jury could find Defendants' failure to train was, in part, the cause of the violation of Officer Young's constitutional rights and that Defendants "would have known of it but for [their] deliberate indifference or willful blindness," Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994), and that their deliberate indifference was not otherwise objectively reasonable. Defendants do not cite any case where a supervisor's deliberate indifference was determined to be objectively reasonable. Because the notice and intent requirements (willful blindness) are so strict, it is hard to imagine such a case. This case is clearly not one of them.

---

[10] Brown v. Gray, 227 F.3d 1278 (10th Cir. 2000), indicates that the PPD's policy itself provides conclusive evidence of notice that off duty action was to be expected, and thus creates an obvious need for training on off-duty issues and policy delineating the manner that off duty action should be taken. *Id* 227 F.3d at 1288. Brown held, following clear language in Canton, that to show notice of risk, plaintiff need only show the general "situation" the officer faced was "predictable." *Id*. At 1288-89. The plaintiff need only show that the "situation" "was 'common' (or at least not 'uncommon'), 'likel[y],' 'foreseeable,' or 'predictable.'" *Id* at 1288 (citations omitted). "The situation need not be frequent or constant; it must merely be of the type that officers can reasonably expect to confront." *Id*. In Brown, "an off-shift police officer witnesses what he believed was criminal activity and felt he was required to intervene because of the always armed/always on-duty policy. Evidence at trial demonstrated that Denver officers are often alerted to suspected criminal behavior at some point when they are off shift. In fact, the existence of the always armed/always on-duty policy itself indicates that the likelihood was at least common enough to warrant a policy regarding it." *Id*. at 1290.

In regards to causation, the First Circuit has already decided that "any proper allegation of failure to train…must allege that Solitro's lack of training caused him to take actions that were objectively unreasonable and constituted excessive force on the night he shot Cornel. Such a theory, when the evidence is looked at most favorably to the plaintiff, can be made out in this case." Young, 404 F.3d at 26-27. Furthermore, the First Circuit determined that "a jury could find that Solitro made such mistakes because of the PPD's lack of training on on-duty/off-duty interactions, avoiding misidentifications of off-duty officers and other issues relating to the City's always armed/always on-duty policy." *Id*.

Most importantly, the First Circuit reversed the District Court's grant of summary judgment to the City on plaintiff's Monell training claim. In so doing, the First Circuit ruled that Plaintiff had alleged enough facts so that "a jury could find that [the] training deficiency constituted deliberate indifference to Cornel's right." *Id*. The standard for deliberate indifference in regards to a Monell claim and the standard for deliberate indifference in regards to supervisory liability are the same. Defendants have not cited, and plaintiff has not found, a single case in which a plaintiff proffered sufficient evidence to satisfy the stringent Monell standards for deliberate indifference, yet a court ruled that the responsible supervisors enjoyed qualified immunity. That is because the stringent notice and state of mind requirements for a Monell claim necessarily satisfy the requirements for supervisory liability.

Here, the First Circuit has already found that, if the facts alleged are proven, the City of Providence was deliberately indifferent to the constitutional rights of Officer Young. In so doing, the Circuit further rejected, at least indirectly, defendants' arguments

that neither Prignano, Cohen nor Ryan had actual authority or responsibility regarding training. Not only do Ryan, Prignano and Cohen freely acknowledge their responsibility and authority concerning training (*See* PrdfRyan 17-18, 38, 42; PadfPrignano 3), the First Circuit has left open the possibility that Prignano may have enjoyed such substantial responsibility over training, he actually shared policy-making authority with Partington. [11] More specifically, in reversing the grant of summary judgement to the City on the same training theories, the Circuit specifically relies on the damning admission of these defendants. For example, the Circuit specifically emphasized Ryan's testimony that he knew of no training other than his own inconsistent training, Young, 404 F.3d at 28, Cohen's testimony that he provided no training and knew of no training on on-duty/off-duty confrontations, Young, 404 F.3d at 29, and Prignano's remarkable testimony that all of these issues are just common sense and don't require training. Young, 404 F.3d at 29-30.[12] Thus, Defendants' argument that the Training Academy was actually a free floating entity and that none of these defendants had actual supervisory responsibility is, at best, misguided.

Moreover, the Circuit specifically rejected as undisputed or dispositive virtually every piece of evidence provided by defendants in support of their renewed motions for qualified immunity. For example, each defendant's statement of undisputed facts focuses largely on alleged training provided by Lt. Melaragno and Sgt. Boehm, evidence that the

---

11 The Circuit found that although it is unclear whether Chief Prignano was a final policymaker for the municipality on PPD training issues, Commissioner Partington clearly was such a final policymaker: as Commissioner of Public Safety he had been delegated broad policymaking authority over PPD procedures by the municipality. Young, 404 F.3d n 21.

12 Cohen shared Prignano's irresponsible view that training on these issues was a matter of common sense. PrdfRyan 38.

First Circuit squarely rejected as undisputed and as a basis for summary judgement. Young, 404 F.3d at 27-28. The Circuit similarly rejected each defendant's oft repeated argument (Prignano and Sullivan Motion at 2) that there were no prior friendly fire incidents and thus these defendants could not have received fair warning prior to the incident, stating:

> Although there was no evidence of a prior friendly fire shooting, a jury could find from the testimony of Commissioner Partington, Melaragno, and Boehm that the department knew that there was a high risk that absent particularized training on avoiding off-duty misidentifications, and given the department's always armed/always on-duty policy, friendly fire shootings were likely to occur. A jury could conclude that the severity of the consequences of a friendly fire shooting forced the department to take notice of the high risk despite the rarity of such an incident.
>
> and
>
> A jury could conclude that the severity of the consequences of a friendly fire shooting forced the department to take notice of the high risk despite the rarity of such an incident. Dr. Fyfe's report could lead the jury to conclude that it was common knowledge within the police community that the risk of friendly fire shootings with an always armed/always on-duty policy was substantial, and it was also common knowledge that particularized training on on-duty/off-duty interactions (and particularly on the risk of misidentifications) was required to lessen this risk. Young, 404 F.3d at 28-29.

The Circuit specifically found that there was a question of fact as to whether the City had fair warning despite the absence of prior friendly fire incidents in Providence and thus no question that those primarily responsible for training had fair warning. In fact, the Court found that "Ryan['s] [statements] could support a view that the City knew its training program to be seriously deficient." Young, 404 F.3d at 29.

Thus based solely upon the finding of the First Circuit, there is no question that plaintiff has presented sufficient evidence to demonstrate that Prignano, Ryan and Cohen were deliberately indifferent to training on the well known risks of on-duty/off-duty confrontation. Defendants do not seriously argue, because there is no real argument, that ignoring these well known risks was somehow objectively reasonable.

**2. Prignano, Ryan, and Cohen Each Demonstrated Deliberate Indifference to Well Known Risks and Such Indifference was Not Objectively Reasonable.**

To the extent that the Court disagrees, and determines that there must be an independent examination concerning deliberate indifference and objective reasonableness, there is no question that for each Defendant, Plaintiff has proffered overwhelming evidence. See both disputed facts. As with Monell liability, to prove deliberate indifference by a supervisor, Plaintiff must demonstrate 1) a grave risk of harm, 2) the Defendants' actual or constructive knowledge of that harm, and 3) the failure to take easily available measures to address the risk. Manarite v. City of Springfield, 957 F.2d 953, 956 (1st Cir. 1992); Camilo-Robles, 151 F.3d at 7. As the First Circuit made clear in this case and others, plaintiff need not demonstrate another friendly fire case to demonstrate notice, rather plaintiff need only demonstrate that the need to provide training would be "obvious" where there were foreseeable serious consequences that could result from the lack of instruction. Young, 404 F.3d at 28; City of Canton, 489 U.S. at 390 n. 10; Comfort, 924 F.Supp. at 1231-32.

Long before 1999 when Solitro was in the academy, no reasonable officer could have believed that maintaining an always-armed/always on-duty policy and providing grossly inadequate or no training on the issue did not pose a grave risk of harm. The risk of such a policy was widely known and widely addressed, and no reasonable officer could have been unaware of the risk.

The PPD maintained an outdated and extremely dangerous policy that required officers to carry a weapon and take direct action at all times there was a threat to life or property when in the City of Providence, including when off-duty. (PrdfRyan 32, PdfRyan 3). No training was documented, in any of the PPD's materials, reflecting any training concerning on-duty/off-duty confrontations, despite clear requirements that all training be documented. PrdfRyan 17-18; PrdfPrignano 4-5.

Despite their dangerous policy, the PPD provided no meaningful training on off-duty action. A jury would be entitled to infer, based on the existing record, not just that grossly inadequate training was provided, but that no meaningful or relevant training was provided. Young, 404 F.3d at 28-29; PrdfRyan 17-18; PrdfPrignano 4-5. Dr. Fyfe found that especially in light of the City's policy requiring off-duty action, the training provided was grossly inadequate. PdfRyan 3. Identical findings by Dr. Fyfe on inadequate training were held sufficient for summary judgment by the First Circuit.[13] A jury is entitled to infer, based solely on the circumstances of Young's shooting, that it was caused by

[13] Voutour v. Vitale, 761 F.2d 812, 821-22 (1st Cir. 1985) (finding summary judgment improper where "James J. Fyfe, a putative expert witness for plaintiff in police training and procedure, testified that the in-service firearms training ws inadequate at this time, because it was limited to the mechanics of firearms use and handling, approaching the arrested, and to target practice. He concluded that '[t]he failure of the Saugus Police Department to provide Officers Vitale and Wheeler with job relevant in-service training was reckless, violative of generally accepted police practice, and a direct cause of the reckless and unjustifiable shooting of Mr. Voutour.'").

unconstitutionally inadequate training of Young, Saraiva and Solitro.[14] As the First Circuit explained in Voutour v. Vitale, 761 F.2d at 822, "it could be inferred that the arrest culminating in Vitale's shooting of Voutour, and the shooting itself, were so mishandled in their various details as to indicate that trained police officers would not have acted in this manner."

**i. Prignano, Ryan and Cohen Shared Supervisory Authority Over Training**

Prignano acknowledged that as Chief he was responsible for training and for the off-duty policy. PadfPrignano 4, 5. Partington delegated responsibility and authority for policymaking and training to Prignano, and in particular enforcing and training on off duty issues. *Id*.

Ryan and Cohen's responsibility for off-duty training is equally clear. After the shooting of Officer Young, Ryan initiated and designed a new policy and training program on off-duty issues, though he failed to implement it until long after the shooting. PrdfRyan 32, 41. Ryan and Cohen were personally involved in providing supervision in the form of training for Saraiva, Solitro and Young. Ryan and Cohen, as directors of training, were directly responsible for ensuring that officers were properly trained. PrdfRyan 42. Ryan also conducted in service training, continued to have supervisory responsibility over the Training Academy, and conducted training, all after he was promoted to Director of Administration and ceased serving as Academy Director. *Id*.

---

[14]Young and Saraiva's lack of training, though irrelevant to causation, provides further evidence of the City's deliberate indifference. *See* Young v. City of Providence, 404 F.3d 4, 27 n.19 (1st Cir. 2005). Where, as here, plaintiff is claiming systemic deficiencies in the training concerning on-duty/off-duty confrontations rather than an otherwise sound program on off-duty issues that was negligently administered in this case, such evidence is critical and admissible to demonstrate deliberate indifference.. Id., citing Canton v. Harris, 489 U.S. 378, 391 (1989).

Despite acknowledging their responsibility concerning training, each defendant claims that the other was the more responsible party. For example, Cohen acknowledges that he was the head of Solitro's training academy, but claims he reported indirectly to Ryan and that it was Ryan and not Cohen who was responsible for supervising Solitro's training academy. PadfRyan 1. Moreover, according to Cohen, Ryan and Prignano were really responsible for deciding who would be on the academy training staff and when Cohen asked to pick his own staff Prignano refused him. _Id_. Ryan acknowledged that he retained some supervisory authority, continued to oversee the academy and continued to teach during Solitro's class, but alleged Cohen was in charge of Solitro's academy. _Id_. Prignano admitted that ultimately, he was responsible for ensuring that all the men and women in the chain of command were properly trained and supervised and that he retained supervisory responsibilities including reviewing the written training curriculum for each class. _Id_. However, according to Prignano, Ryan maintained training duties even after he was reassigned, Ryan had the responsibility to determine whether training instructors had discretion concerning the course of their instruction, and that Cohen was never completely in charge of training, because Ryan remained the "chief honcho." _Id_. The only thing that is clear from the inconsistent testimony of these defendants is that there is substantial evidence demonstrating that each enjoyed significant supervisory responsibility over Solitro's training academy.

**ii. Prignano, Ryan, and Cohen were Deliberately Indifferent to Their Responsibilities to Train Officers on On-Duty/Off-Duty Confrontation**

In addition to sharing responsibility for training officers on issues of on-duty/off-duty confrontation, all three Defendants, both collectively and independently, demonstrate utter indifference towards their training responsibilities. As the First Circuit emphasized, "Prignano, the PPD police chief during the relevant period, stated that in his view, off-duty officers are taught at the academy to identify themselves by showing their badge, but at any rate, this identification protocol is 'common sense,' and '[you] can't teach common sense.' Chief Prignano's testimony could be understood to mean that there was no pertinent training because no training was needed, as identification issues were simply a matter of common sense." Young, 404 F.3d at 18. This exemplifies Prignano's deliberate indifference, irresponsibility, and severe incompetence. As Dr. Fyfe, Commissioner Partington, and other supervisors in the PPD all recognize, off-duty conduct is a critical subject which can and must be trained – in high stress and potentially deadly situations, officers cannot safely rely on "common sense," seat-of-the-pants decisions, but must be able to rely on protocols and training. PrdfRyan 38; PadfRyan 3, 4; PadfPrignano 2, 3.

The PPD maintained an outdated and extremely dangerous policy that required officers to carry a weapon and take direct action at all times there was a threat to life or property when in the City of Providence, including when off-duty. PrdfRyan 32, 41, 34-35; PadfRyan 3; PadfPrignano 2) Prignano acknowledged that as Chief he was responsible for training and for the off-duty policy. PadfPrignano 5, 6. Prignano's policy required off-duty action, but at the same time contained no procedures or protocols on how to go about taking off-duty action. PadfPrignano 2, 3, 4; PrdfRyan 17-18, 38; Padf Ryan 5. At minimum, the PPD, when it required dangerous off-duty action, was obligated to

provide protocols for taking such action as well as comprehensive training. PrdfRyan 38; PadfRyan 5. For this reason, numerous PPD officers testified that off-duty action is particularly dangerous and that training on off-duty action is critical to prevent grave consequences of friendly fire death. PrdfRyan 32, 41, 38; PadfRyan 3, 4, 5; PadfPrignano 2, 3, 4. Despite the clear dangers associated with the policy, Prignano refused to change the policy even after officer Young was shot and killed. The policy was changed only after he retired one and a half years later. PadfPrignano 3.

Ryan and Cohen were similarly indifferent. To the extent that there was any training provided that instructed officers on off-duty action, it was provided by Ryan and was inconsistent with the PPD's written policy. According to Ryan, since 1994 he trained officers to ignore PPD off-duty policy and generally not take direct police action. PrdfRyan 17-18. Although Ryan testified that the purpose of training is to make sure that officers understand the ramifications for misconduct and failure to follow PPD rules *Id*, he trained officers to ignore Prignano's off-duty action policy. *Id*. Ryan testified that he trained officers in his civil liability training, since 1994, not to take any police action off-duty at all, not because it was dangerous but because it opened them up to civil liability. *Id*. Yet, Ryan understood training inconsistent with policy could be a recipe for disaster and is like "throw[ing] the written directive out the window." *Id*.

Ryan failed to ensure even a minimal training program on off-duty identification before the Young shooting despite the fact that PPD policymakers and supervisors acknowledged they knew of risks of off-duty action, that it is an "essential" and "particularly critical" subject for training because of "potentially tragic" consequences for

an unrecognized off-duty officer (PrdfRyan 32, 41) and potentially "grave consequences" of poor off-duty policy and training. Id.

At the same time that Ryan was training some officers to ignore the PPD always armed/always on-duty policy, officers were being reprimanded for failing to follow the policy. Shortly before his death, Officer Young was verbally reprimanded for failing to take action off-duty at a restaurant where shots were fired. PrdfRyan 36. Defendants agree that Ryan must have been intimately familiar with the generally accepted practices of other departments around the country. PrdfRyan 38. These Departments and recognized international police organizations like the International Association of Chiefs of Police, for years have recognized the critical importance of clear policy and training on these off-duty issues. Id. Ryan's involvement with these agencies and organizations is evidence of his notice of and deliberate indifference to these off-duty issues, that would be recognized by any reasonably competent police administrator, because failure to adopt such practices and training could lead to the death of an officer. Id.

In fact, Ryan understood that off-duty action was a critical and potentially dangerous task for which a professional police department must be particularly careful to provide clear, consistent training as part of its core, documented curriculum, based on written directives, Id; his training was admittedly inconsistent. PrdfRyan 17-18. Although Ryan by his own admission had authority to recommend changes in policy, as he did after the shooting, none of these changes were implemented until a year and a half after the shooting. PrdfRyan 32, 41.

Cohen, who was the name in charge of the training academy, had no idea what

training was being provided on issues related to on-duty/off-duty confrontations. Cohen took the position that training on off-duty identification issues did not need to be taught because it was a matter of common sense. Furthermore, he maintained this position even after Officer Young was shot and killed by police officers from Cohen's own training class. PrdfRyan 38.

**iii. Defendants Knowingly Violated the Law and Were Incompetent**

Defendant maintains that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Defendant's Motion at 16. Even if this lenient interpretation were the actual standard, as opposed to the three part test for qualified immunity laid out above, there is ample evidence that the Defendants both are plainly incompetent and knowingly violated the law.

Chief Prignano, for example, admitted that he gave advance copies of source documents for promotional exams to officers including to Ryan for his Captain's exam. PadfRyan 2. In other words, Ryan, the administrator that Prignano touts as imminently qualified and responsible, received his promotion to Captain only after Prignano helped him cheat on his captains exam. Ryan, on the other hand, admitted that he secured advance copies of source materials for a captains exam and a sergeants exam, and made them available to two candidates, for promotional exams, in order to assist them in taking the test. _Id._[15] Chief Prignano, Ryan stated, instructed him to do so. _Id._ Ryan had access to

15. It was earlier discovered in former Mayor Cianci's criminal trial, that Prignano told the F.B.I. he gave, and testified he could have given, Ryan advance copies of source materials for a promotional exam. PadfRyan 2.

the material because it was his job to check it to make sure the exam was fair. *Id*. Ryan attempted to justify his actions, explaining that these promotions were foregone conclusions; regarding the captains promotion he stated that everyone knew the promotions were political rather than based on merit or hard work, and that despite contract provisions to the contrary as to captains, that this candidate would be promoted regardless. Remarkably, he stated that he saw nothing improper with giving them testing material to help them receive high scores, so as to hide the "appearance of impropriety to the system." *Id*.

These facts are relevant because, as a defense, each Defendant tries to escape liability by suggesting that their only responsibilities concerning training were to ensure that qualified men and women were in place. For Prignano and Ryan in particular, that meant helping officers who had been chosen for political reasons rather than qualifications cheat in their promotion exams to ensure their promotion.

**iv. Defendants Deliberate Indifference Was Not Objectively Reasonable**

Finally, Defendants present no case in which a supervisor was found to be deliberately indifferent in regards to their clearly established responsibilities and was still entitled to qualified immunity because their actions were still objectively reasonable. This is because deliberate indifference, which requires at a minimum recklessness, cannot be objectively reasonable. Because the Defendants were deliberately indifferent, they were necessarily unreasonable, and all three prongs of the qualified immunity test are established against them.

**B. The Chief of Police is a Final Policy-Maker for the Purposes of Monell Liability**

Although Prignano's policy making role is irrelevant to qualified immunity, plaintiff will nevertheless address Prignano's policy making responsibilities because they reinforce the scope of his supervisory responsibilities and because plaintiff will be requesting an instruction that, as a matter of law, both Prignano and Partington are policy makers who bind the city on issues of off-duty policy and training. The Providence Chief of Police is a final policy maker for the purpose of Monell liability on training under §1983. Defendants claim that "the Mayor and the City Council are the only final policy makers with respect to relevant Police Department policies." *See* Prignano and Sullivan Motion at 20. This assertion, however, is undermined by the defendant's own brief, Supreme Court precedent, and the First Circuit opinion in this case. Furthermore, the facts demonstrate that both the letter and spirit of the law require the Chief of Police to be considered a final policy-maker for purposes of Monell liability.

Defendants are correct in stating that "whether an official ha[s] final policymaking authority is a question of state law." Pembaur v. City of Cincinnati, 475 US 469, 483 (1986). They then cite the City of Providence charter for the proposition that state law invests only the Mayor and City Council with final policy-making authority. The charter, however, explicitly vests "authority to make all rules and regulations" for the Police Department in the hands of the Commissioner of Public Safety. *See* Providence Home Rule Charter §1001(a)(4) and Defendant's Brief at 20. The breadth of power granted to the Commissioner implicitly gives him the power to delegate policy making to other

officials, and even explicitly makes his power concurrent, not subject to, the power of the mayor. *See* Home Rule Charter §1001(a)(5). The First Circuit explicitly found that Commissioner Partington was a final policymaker for purposes of Monell liability and reserved the question of whether the Chief of Police also qualified. *See* Young, 404 F.3d at 30, fn 21.

The Home Rule Charter makes the Chief of Police the Chief Executive of the Police Department. *See* Home Rule Charter §1001(a). As the Supreme Court noted in Pembaur, "[a]uthority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority," 475 US at 483. In this case, legislation implicitly grants the Chief of Police policy-making power as the Chief Executive of the police department. Regardless of whether the charter alone creates final police making authority in the Chief of Police, the Commissioner of the Department of Public Safety, an individual with indisputable final policy-making authority and the ability to delegate that authority, has testified that he did, indeed, delegate policy-making power to the Chief of Police.

Partington and Prignano both testified that Partington delegated responsibility and authority for policymaking and training to Prignano, and in particular delegated enforcing and training on off duty issues. PadfPrignano 5. Prignano's policy making authority is perhaps best evidence by his stubborn but successful effort at preventing a change in the PPD's dangerous off-duty policy even after Officer Young's death. The policy was not changed until Prignano retired eighteen months later. PrdfRyan 32, 41; PrdfPrignano 3.

These delegations of authority are not the kind of discretionary matters which the Court is concerned would be "indistinguishable from *respondeat superior* liability." City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988). The Court was concerned that municipalities would be liable for specific discretionary acts. Plaintiff is not attempting to hold the City of Providence responsible for individual discretionary decisions made by the Chief of Police. Rather, Plaintiff is attempting to hold the City of Providence responsible for policies created by the Chief of Police under authority vested in him by the Home Rule Charter and delegated to him by the Commissioner of Public Safety. Furthermore, the municipality, in failing to ever correct these longstanding policies, "could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official." City of Saint Louis, 485 U.S. at 130.

Sean Patrick, Inc. v. City of Providence, C.A. No. 96-689 L (D.R.I. April 24, 1998), which the Defendant cites for support, actually supports the Plaintiff's contentions. In Sean Patrick, Inc., Judge Lagueux ruled that the Chief of Police was not a final policy-maker with regards to a single discretionary decision to place officers outside an adult establishment. The discretionary decision in that case, though arguably unconstitutional, was not made pursuant to an unconstitutional policy. Rather, it was a single decision which did not give rise to municipal liability. In no way does Sean Patrick, Inc. stand for the proposition that the Chief of Police is *never* a final policy-maker.

Sean Patrick, Inc. highlights the difference between that case and the present case, and neatly illustrates what the Supreme Court is concerned about in Pembaur and City of St. Louis. In the present case, Plaintiff is not attempting to hold the municipality liable for

an isolated discretionary act made by the Chief of Police. That might be the case, if the Chief of Police had decided, in this single instance, to violate municipal policy and deliberately failed to train a single Police Academy class. Instead, Plaintiff is attempting to hold the municipality responsible for a *policy* of failing to train police officers—a policy over which the Chief of Police exercised control. This is not the isolated discretionary act which would be indistinguishable from *respondeat superior* liability. Allowing the municipality to be free from liability for the policies created by the Chief of Police would be allowing "a city's lawful policymakers [to] insulate the government from liability simply by delegating their policymaking authority to others" and in that case "section 1983 could not serve its intended purpose." City of Saint Louis, 485 U.S. at 126. The Chief of Police is a final policy maker pursuant to legislation, delegation, and practice.

### C. Plaintiff Concedes that the First Circuit Decision Requires this Court to Grant Defendant Sullivan Summary Judgment

Defendant Sullivan maintains that the First Circuit's decision to uphold the granting of summary judgment in regards to the "screening and hiring claims" eliminates all the claims made against Sullivan. *See* Prignano and Sullivan's Motion at 21. Plaintiff agrees that the effect of granting summary judgment to the City of Providence on the hiring claims effectively eliminates claims against Sullivan on the same theory. Plaintiff disagrees with the Circuit's factual and legal findings on the hiring claim, but agrees this Court is bound to dismiss Sullivan here based on the Circuit's findings.

Ironically, defendant Sullivan's argument makes clear that counsel for Defendant

Prignano understand the significance of the Circuit's ruling on the Monell training claims. As Defendant Prignano acknowledges, the Circuit's decision on Monell claims (both hiring and training) is largely determinative of the individual Defendant's claims.

LEISA YOUNG, in her capacity as
Administratrix of the Estate of
Cornel Young Jr.,
By her Attorneys

Robert Mann

Robert B. Mann #0153
Mann & Mitchell
One Turks Head Pl., Ste. 501
Providence, RI 02903
(401) 351-5770

Robert Mann for

Barry Scheck, Esq. #4612
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9084

Robert Mann for

Nick Brustin, Esq. #0605
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9084

**Certification**

I hereby certify that a copy of the within document was mailed or delivered to the person or offices of Kevin McHugh, Esq., City Solicitors Office, 275 Westminster St., Suite 200, Providence, R.I. 02903 and Michael Colucci, Esq., Olenn & Penza, LLP, 530 Greenwich Ave., Warwick, RI 02886 on the 2nd day of September, 2005.