UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LEISA YOUNG, In her Capacity as Administratrix of the Estate of Cornel Young, Jr. | ) | |
| v. | ) | No. C.A. No. 01-288 S |
| CITY OF PROVIDENCE by and through its treasurer, Stephen Napolitano, et al | ) | |

**PLAINTIFF'S RESPONSE TO DISPUTED FACTS FROM DEFENDANTS PRIGNANO AND SULLIVAN**

**4-5. Disputed.** *See Plaintiff's Response to Disputed Material Facts from Defendants Ryan and Cohen* at ¶17-18 ("*Ryan & Cohen Facts*").[1] Nothing was documented in any of the PPD's voluminous materials reflecting training concerning on-duty/off-duty confrontations. (Dep. John J. Ryan, June 26, 2002, 32-4, 27-41, 96, 211-212 ("Ryan"); Dep. Steven Melaragno, June 27, 2002, 17-21, 54-56, 69, 101-104, 112, 116, 150-51, 154-6 ("Melaragno").) Commissioner John Partington and Ryan testified they were aware of little or no off-duty training. (Dep. John J. Partington, May 27, 2003 77 ("Partington"); Ryan 62-3, 236-7; *Ryan & Cohen Facts* ¶17-18, 22-25, 26-31, 32, 41, 33, 34-35). There is no documentation that Solitro, Saraiva, or Young received any of this Range 2000, paintball Camp Varnum scenario training or decisional shooting exercises, nor that any of this training included any off-duty related issues; moreover, even if it was provided none of it provided protocols or instruction to off-duty officers on how to act. (Dep. Fred Taylor, June 4, 2003, 168, 235-36 ("Taylor"), Melaragno 16-17, 55-56, 60 183, 188-90; *Ryan & Cohen Facts* ¶22-31.)

Line officers–including Officers Wajda, Harris, Lee, Solitro, and Romano–remember little or no training or policy on off-duty situations, little or no training on how to identify themselves when off-duty, and little or no discussion about requiring them to carry a badge. (Glavin GJT 138; Dep. of Tabitha Glavin, Feb. 24, 2002, 7-8; Elizabeth Wajda, GJT, 290; Shane Romano GJT 31, 35; Dep. of Shane

---

[1] In light of page limitations and the duplicative nature of the alleged undisputed facts, plaintiff incorporates facts submitted in support of her opposition to Ryan and Cohen's Motion for Summary Judgment, and to Prignano and Sullivan's Motion for Summary Judgment.

Romano, February 25, 2003, 6-7, 16-17 ("Romano"); Timothy Lee, GJT, 125, 137; Dep. of Michael Solitro, December 12, 2002 at 200-01 ("Solitro")). Boehm testified that Young and Saraiva were not trained on the requirement to carry a badge, or off-duty identification generally; if they learned how they did so indirectly or inferentially. (Boehm GJT 87.)

Even assuming that Melaragno provided some training on off-duty issues, he had assumed that there was follow-up training at the academy on off-duty conduct and the dangers of misidentification; he testified that it would be reckless not to provide such training due to the potential for a friendly fire incident. (Melaragno 233-5.) Melaragno acknowledged that his training included none of the protocols provided in the new training that was put into place after Young's death, and that had Young complied with the steps provided in those protocols his death could have been prevented. (Id. at 134-6, 228-34, Dep. of Carlos Saraiva, September 5, 2002 at 145-6 ("Saraiva")). It was not until a year and a half after the Young shooting that a new PPD policy (Gen. Order #22 attached) made a series of changes, implicated factors that caused Young's death, and for the first time provided policy and training that instructed officers on how to conduct themselves off-duty. (*Ryan and Cohen Facts* at ¶32, 41, Melaragno 134-5, 228-34; Saraiva 135-42, 152; Dep. of Martin Hames, February 24, 2003 at 23 ("Hames")).

In addition, as the City's expert acknowledges, professional police departments use discipline as a means of training officers to avoid making the same mistakes in the future (Taylor 175-76.)

**6. Disputed.** Misstatement of the law and not a statement of fact. The First Circuit did not specifically rule on the supervisory liability claims. However, because the standard for *Monell* liability is as stringent or more so than the standard for supervisory liability, plaintiff agrees that the *Monell* findings effectively eliminate findings against Sullivan.

**7. Disputed.** Misstatement of the law and not a statement of fact.

**8. Disputed.** Misstatement of the law and not a statement of fact. Because the standard for *Monell* liability is as stringent or more so than the standard for supervisory liability, plaintiff agrees that the *Monell* findings effectively eliminate findings against Sullivan although the court never ruled on those claims.

**Plaintiff's Additional Disputed Facts**

**1.** Additional evidence of deliberate indifference by Prignano includes the following:

**A.** Chief Prignano admitted that he flagrantly and notoriously violated PPD rules and regulations, beginning years before the Young shooting, by giving advance copies of the source documents for promotional exams to officers and also admitted that he told the F.B.I. he had given Ryan such copies. (Testimony of Urbano Prignano in *U. S. v. Cianci*, May 13, 2002, at 143-6 ("Cianci Trial".) In other words, Ryan, the supposedly qualified, experienced law school graduate who Prignano "justifiably relied upon," received his promotion only after Prignano helped him cheat on his promotional exam. Prignano then conspired with Ryan to help other "qualified" officers get promotions through cheating. Ryan testified that he secured advance copies of source materials for a captain's exam and a sergeant's exam, and made them available to two candidates for promotional exams, by leaving them on his desk and telling the candidates that he would be away, in order to assist them in taking the test. (Dep. John Ryan, July 21, 2003, at 165-73, 174-95 (Hereinafter "Ryan II".)) Chief Prignano, Ryan stated, instructed him to do so. (*Id.* at 170-77, 183-5, 210.) These allegations of serious misconduct were common knowledge in the chain of command for years prior to Young's shooting (Dep. of Robert Boehm, November 27, 2002 at 181-4 ("Boehm"), Dep. of Timothy Lee, January 27, 2003 at 86-93 ("Lee"), Dep. of Dennis Simoneau, May 28, 2003 at 50-51 ("Simoneau")). Ryan described "everybody in the command staff" knowing of his conduct, and that many people in the department were upset by rumors of this preferential treatment. (Ryan II 227-28); *See Ryan & Cohen Facts* at ¶1.

Partington testified that he believed Prignano and Ryan each lied to him about their involvement in the promotions scandal. (Partington 67-70.) Partington stated that Prignano's admissions that he assisted officers in cheating on promotion exams violated PPD rules and regulations, compromised the integrity of the department, and went to the core of his supervisory responsibilities; that the Chief leads by example and if he is lying and cheating, he can not expect other officers to act differently; that such misconduct negatively impacted all of his supervisory responsibilities and can not be compartmentalized, that Prignano's conduct was shocking, "the bottom of the barrel,"

and that Prignano should have been fired and could not possibly lead the PPD. (*Id.* at 67-70, 208-9 (agreeing in substance with Report of James Fyfe, Ph.D., January 20, 2003 at 2-3 ("Fyfe Report")). Partington later removed Ryan's supervisory responsibilities including his position directing the training academy. (*Id.* 56-57.) . Prignano repeatedly asserted Fifth Amendment privilege when asked questions regarding the misconduct and its effect on his ability to supervise the PPD. (Dep. of Urbano Prignano, Jan. 15, 2003, at 92-102, 125-26 ("Prignano")).

**B.** Outside of the grand jury process, neither Solitro nor Saraiva was investigated by the PPD. There was no independent investigation by the PPD concerning the Young shooting to determine whether administrative action was appropriate or whether it resulted from failures of policy, procedure, or training. (Prignano 75-6.) Prignano stated that he had no responsibility to investigate the incident outside of the grand jury process, based on his policy of refusing to investigate or discipline officers in cases serious enough for the Attorney General's Office to become involved. (Prignano 75-6, 146; Fyfe Report 10.)

Hames confirmed much of the above. Hames testified that he never examined whether any lapses in training or policy resulted in Young's shooting. (Hames 20-21.) Hames stated that he did not recall speaking to Prignano regarding whether Solitro and Saraiva violated PPD rules, nor did he form any opinions on the matter during his one to two week investigation. (*Id.*18-19.) He made no findings or recommendations as to whether the officers engaged in misconduct and simply forwarded evidence to the grand jury. (*Id.*15-16.) There was no investigation following the grand jury result. (*Id.* at 10.) Hames made no recommendations or findings regarding the Young shooting; that was Prignano's job. (*Id.* at 17.) Partington testified that the PPD was responsible to ensure, and that it was essential to promptly ensure, that there were no violations of rules and regulations and no gaps in policy and training (Partington 122.)

**2.** Partington knew that the PPD, as well as any responsible police department, should provide training on the well-recognized hazards of off-duty conduct, including a written protocol designed to avoid friendly fire tragedies; both experts agree. (Partington 209-11, Taylor 159, 168, Dep. of James Fyfe, Ph.D., June 9, 2003 at 4-8 ("Fyfe"), Ryan II 283-84.) Partington also understood that the PPD's policy requiring 24-hour direct

action made it particularly critical that officers receive specific guidance on the risks of misidentification and on how to avoid misidentifying off-duty officers (Partington 208-12, Taylor 159-60.) Indeed, Partington agreed that the PPD's policy requiring 24 hour direct action places officers in great danger, because of the danger of armed off-duty action; such policies have been "long-discredited." (Fyfe Report 7, 18, Partington 208-12.) PPD officers received no such guidance on off-duty action, (Fyfe Report 6-7), and as described in *Ryan and Cohen Facts* at ¶2-4, even if at best, the PPD provided minimal training on off-duty issues, it was not supported by or consistent with Department policy. (Melaragno 78-9, 133; Taylor 60, 159-62, 165-6; City Resp to Request for Admissions, Nos. 28, 32.)

**3.** Partington, knowing of the dangers of the PPD's policy and the need for clear, comprehensive training and written protocols on off-duty action, had mistakenly thought that Prignano had reformed the policy six years before. (Partington 100-06, 108-10.) Prignano, however, refused to alter PPD policy and training at any time through his retirement over a year after the Young shooting. (Prignano at 164-5,170, 179-80). Prignano did not believe there were any deficiencies in PPD training that had contributed to Young's death; he further believed that issues relating to off-duty conduct are "common sense," do not require training, and cannot be trained. (Prignano 48, 78, 91-2, 165-66, Fyfe Report 7.) Partington added that even after the Young shooting, Prignano was hostile to recommendations of outsiders, such as independent commissions that were convened; Prignano's attitude was an obstacle to reform. (Partington 197-200.) Thus, PPD policymakers, knowing years before the Young shooting of the grave risks their policy and training caused, took no action to reform either.

**4.** Though Partington had assumed that off-duty issues had been trained by the PPD for years, in fact, none of the steps in the new protocol instituted a year and a half after the Young shooting were trained before the Young shooting. The lack of training was true despite the fact that PPD policymakers and supervisors acknowledged that they themselves knew that minimally adequate policies include such written protocols, <u>supra</u>, that they knew of the risks of off-duty action, that off-duty identification is an "essential" and "particularly critical" subject for training, because of "potentially tragic" consequences for an off-duty officer failing to identify properly (Melaragno 88-89,

Partington 81-2, 209), and that potentially "grave consequences" could result from poor off-duty policy and training. (Dep. of Michael Harris, November 26, 2002 at 91 ("Harris"), Boehm 154, Prig. 168-70.); *See Ryan & Cohen Facts* at ¶32, 41, 2-4.

**5.** Partington and Prignano were both policymakers of the PPD concerning the areas of training and policy. Partington and Prignano have testified that Partington delegated responsibility for PPD discipline to Prignano (Partington 37, Prig. 21-23.) The First Circuit found that Partington was a policy-maker. Young v. City of Providence, 404 F.3d 4 at 30 fn 21 (1st Cir. 2005). Partington was the civilian head of the police department, responsible for PPD discipline and administration, including all rules and regulations, which he signed off on. (Partington 11, 15, 20.) Partington delegated and generally shared responsibility and authority for policymaking and training with Prignano, and in particular he delegated enforcing and training on off duty issues. (*Id.* at 23, 27-28, 32.)

**6.** Prignano had authority to make, and did make, final PPD decisions regarding training and understood it was his responsibility to ensure that all PPD recruits are properly trained. Prignano 20, 22, 65, 171-2; Dep. of Richard Sullivan, Jan. 16, 2003, at 25-27 (hereinafter "Sullivan").); (City Response to Plaintiff's Third Set of Interrog., Nos. 2-3., Dep. of Kenneth Cohen, June 28, 2002, at 41-2, 72 (hereinafter "Cohen").) As chief, Prignano was responsible for ensuring that officers who violated rules and regulations were properly investigated and disciplined. (Sullivan 25-27.)

**7.** As a matter of policy, Prignano failed to investigate or discipline officers in all cases serious enough for the Attorney General to become involved. (Prignano 146.)

**8.** Neither Solitro nor Saraiva was investigated internally outside of the grand jury process. There was no independent investigation by the PPD concerning the Young shooting to determine whether administrative action was appropriate or whether it resulted from failures of policy, procedure, or training. (Prignano 75-6.)

9. Prignano stated he had no responsibility to investigate the incident, outside of the grand jury process. (Prignano 75-6; Fyfe Report at 10).

**10.** The PPD required all police academy training to be documented. (Ryan 156-8, Prignano 62.) There was no documentation reflecting any training concerning on-duty/off-duty confrontations. (Ryan 32-34, 37-41, 96, 211-12; Melaragno 17-21, 54-55, 69, 101-104, 112, 116, 150-51, 154-56.). Ryan did not know of any substantial training

on these issues, and stated that had it been substantial, he would know of it. (Ryan 62-63, 236-37.) Line officers remember little or no off-duty training - including Officers Wajda, Harris, Lee, Solitro, and Romano. (Tabitha Glavin, GJT, 138; Glavin 7-8; Elizabeth Wajda, GJT, 290; Shane Romano, GJT, 31, 35; Dep. of Shane Romano, February 25, 2003, rough edit, at 6-7, 16-17 (hereinafter "Romano"); Timothy Lee, GJT, 125, 37; Solitro 200-01.)

LEISA YOUNG, in her capacity as
Administratrix of the Estate of
Cornel Young Jr.,
By her Attorneys

Robert B. Mann #0153
Mann & Mitchell
One Turks Head Pl., Ste. 501
Providence, RI 02903
(401) 351-5770

Barry Scheck, Esq. #4612
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9084

Nick Brustin, Esq. #0605
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9084

**Certification**

I hereby certify that a copy of the within document was mailed or delivered to the person or offices of Kevin McHugh, Esq., City Solicitors Office, 275 Westminster St., Suite 200, Providence, R.I. 02903 and Michael Colucci, Esq., Olenn & Penza, LLP, 530 Greenwich Ave., Warwick, RI 02886 on the 2nd day of September, 2005.