UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

LEISA YOUNG, In her Capacity as Administratrix of the Estate of Cornel Young, Jr.

v. — No. C.A. No. 01-288 S

CITY OF PROVIDENCE by and through its treasurer, Stephen Napolitano, et al

**PLAINTIFF'S RESPONSE TO DISPUTED FACTS FROM DEFENDANTS RYAN AND COHEN**[1]

**3-16. Disputed.** Each of the factual disputes as to these facts has been previously set forth in Plaintiff's response to Defendants Solitro and Saraiva's Motion for Summary Judgment, which Judge Lisi denied; the first trial in which the jury determined Solitro violated Officer Young's constitutional rights; the appellate briefs; and the First Circuit's decision upholding the verdict and emphasizing precisely these facts which Defendants still claim remain undisputed .[2]

**17-18. Disputed.** These course outlines contain no reference, in any of the 1000 hours of training detailed, to any training concerning on-duty/off-duty confrontations; that is, interacting with off-duty officers, avoiding misidentifying off-duty officers, and procedures for off-duty action.

No training was documented, in any of the PPD's materials, reflecting any training concerning on-duty/off-duty confrontations. (Dep. John J. Ryan, June 26, 2002 at 32-34, 37-41, 96, 211-12 ("Ryan"); Dep. Steven Melaragno, June 27, 2002 at 17-21, 54-55, 69, 101-104, 112, 116, 150-51, 154-6 ("Melaragno"). The PPD required all police academy training to be documented. (Ryan 156-8, Dep. of Urbano Prignano, Jan. 15, 2003, at 62 ("Prignano")). The City's expert agrees that there is no documentation of any

[1] In light of page limitations and the duplicative nature of the alleged undisputed facts, plaintiff incorporates facts submitted in support of her opposition to Ryan and Cohen's Motion for Summary Judgment, and to Prignano and Sullivan's Motion for Summary Judgment.

[2] *See, e.g.*, the Court's Memorandum and Order, July 1, 2003; Plaintiff's Response to Disputed Material Facts from Defendants Solitro and Saraiva and Plaintiff Leisa Young's Disputed Facts.

specific course concerning on-duty/off-duty confrontations. (Dep. Fred Taylor, June 4, 2003 at 160-62 ("Taylor")). Commissioner Partington testified that the only training concerning on-duty/off-duty confrontations of which he was aware instructed officers *not* to take action except when life was threatened; he was unaware that PPD policy was directly contradictory. (Dep. John J. Partington, May 28, 2003 at 77 ("Partington"), see ¶34-5).

To the extent that there was any training instructing officers to avoid off-duty action, it was provided by Ryan and was inconsistent with the PPD's written policy before the Young shooting that directed off-duty action, without directing any steps to avoid friendly fire incidents. According to Ryan, since 1994 he trained officers to ignore PPD off-duty policy, and generally not take direct police action. (Ryan 214-9). Although Ryan testified that the purpose of training is to make sure that officers understand the ramifications for misconduct and failure to follow PPD rules (Ryan 41), he trained officers to ignore Prignano's off-duty action policy. (Taylor 223-4). Ryan testified that, starting in 1994, he trained officers in his civil liability training not to take any police action off-duty at all, not because it was dangerous but because it opened them up to civil liability. (Ryan 214-19, Taylor 226-7). Yet, Ryan understood training inconsistent with policy could be a recipe for disaster and is like "throw[ing] the written directive out the window." (Dep. John Ryan, July 21, 2003 at 45, 47 ("Ryan II").

Moreover, line officers and supervisors–including officers Wajda, Glavin, Harris, Lee, Solitro, and Romano–remember little or no training concerning on-duty/off-duty confrontations. (Tabitha Glavin, GJT, 138; Glavin 7-8; Elizabeth Wajda, GJT, 290; Shane Romano, GJT, 31, 35; Dep. of Shane Romano, February 25, 2003, at 6-7, 16-18 ("Romano"); Timothy Lee, GJT, 125, 37; Lee 127-130; Dep. of Michael Solitro, December 12, 2002 at 200-01 ("Solitro")). Glavin testified at the grand jury that there was no requirement to carry a badge and that she did not carry one. (Glavin GJT 138). Lee testified that there was no protocol for who was in charge at the scene of an off-duty incident. (Lee GJT 137). Boehm testified that Young and Saraiva were not trained on

the requirement to carry a badge, or off-duty identification generally; if they learned how to identify themselves off-duty, they did so indirectly or inferentially. (Boehm GJT 87).

**22-25. Disputed.** There is no evidence that Young received Range 2000 training, and Melaragno testified that he believed Young may or may not have received it. (Melaragno 16-17, 183, 188-90.) There is no documentation Saraiva and Solitro received Range 2000 Training, and only Solitro recalled it. (Melaragno 17, 183). Boehm testified that Young and Saraiva did not receive it at the Academy. (Boehm GJT 70). There is no documentation of any training concerning on-duty/off-duty confrontations during paintball simunition, nor is there documentation that Solitro, Saraiva or Young received it. (Melaragno 56, 60).

Regardless, the paint ball and Range 2000 training provided no guidance whatsoever regarding the primary friendly fire issues in this case. (Partington 77, Dep. of Carlos Saraiva, September 5, 2002, at 111-12 ("Saraiva"), Report of James Fyfe, Ph.d., January 20, 2003, at ¶s 14, 15 ("Fyfe Report")). The only evidence of on-duty/off-duty confrontations being addressed at all was in testimony of one officer who stated that there was a one in four chance that the paintball training Solitro, Saraiva or Young allegedly received included an off-duty situation of some kind. (Melaragno 16-17, 56, 60, 183, 188-90.) Range 2000 presents five or six short scenarios in half an hour and none involve off-duty conduct or encountering off-duty officers. (Id. at 194-5). At most, Range 2000 included a target of an officer in plainclothes holding a badge, or some such target, where the officer has to decide whether to shoot or not. (Taylor 168-9). Range 2000 and paintball training were simply split second decision training on whether to use deadly force, and included no protocols on how to avoid misidentification or how and when to take action off-duty; it incorporates none of the decisions during the approach and leading up to a situation in which deadly force may or may not become necessary. (Dep. of James Fyfe, June 9, 2003 at 69-70, 209 ("Fyfe"), Ryan II 308-9). Ryan testified that Range 2000 poses the danger of including too many shoot decisions, which may be

dangerous by accustoming officers to using deadly force or for giving officers the faulty impression that deadly force should be used more commonly (Ryan II 305-8).

**26-31. Disputed.** There is no documentation that Solitro, Saraiva, or Young received any of this Camp Varnum scenario training or decisional shooting exercises, nor that any of this training included any related issues concerning on-duty/off-duty confrontations. (Taylor 168, 235-36, Melaragno 55-56). The only documentation of any kind relating to Camp Varnum is an undated document that indicates that no training concerning on-duty/off-duty confrontations was provided there. Def. Exhibit 1 & 2 and the testimony of Ryan and others demonstrate that the PPD understood its responsibility to document training and did in fact document training, see ¶17-8, thus, the absence of any suggestion of off-duty training is telling. (Defense Exhibits 1 & 2 were attached to the defense motion. They are exhibits 6 and 7 of the plaintiff's exhibits.)

The Camp Varnum training, as described in Defendants' Exhibit 2, is designed to reflect a day in the life of a working police officer. That document, attached to defendant's motion, describes scenarios in which recruits practice being on-duty; they attend roll calls and respond to radio calls involving "scenarios ranging from dog bites and alarm bells to disturbances, domestic violence cases and homicides." In none of the scenarios documented are officers off-duty, nor do they encounter off-duty officers. Ryan, who directed the Camp Varnum training and spent the majority of the week on site, recalled no off-duty training for recruits other than his inconsistent civil liability training. (Supra ¶17-8, Ryan II 5-8, Ryan 233-6).

Ryan testified for the city as a 30(b)6 witness on training that he was aware of no other training concerning on-duty/off-duty confrontations, and that although Melaragno may have provided some off-duty training at the range, if it was substantial, he would know of it. (Ryan 62-3, 236-7, Ryan II 281-2)[3]. Boehm's testimony is contrary to the

[3]Exhibit 2 further states that "scenarios are developed by the police academy staff which raise issues which have been taught through core curriculum." Because the core curriculum includes only documented training, and because there is no documented training on off-duty issues, (Ryan II 15-18, Taylor 229-30) these scenarios should not have involved off-duty issues.

above documentation and to the testimony of Ryan, and many others, who remember little or no training. See ¶17-8. Even what he described would be inadequate for the same reasons as the paintball and Range 2000 scenarios; Boehm stated the training provided no specific training goals on how off-duty officers should act. (Boehm 73-77). The PPD had no such protocols or policies; see padf, *infra*, ¶ 3-5.

**32, 41. Disputed.** While there is no documented training on off-duty action, Melaragno recalls, and is the only one to recall, a specific training block in Officer Survival Training concerning on-duty/off-duty confrontations. Initially, Melaragno testified that off-duty training was built into the seven block officer survival training. (Melaragno 87-91). Later, he testified that he was mistaken and that there was in fact an eighth separate block on off-duty identification (Id. at 96), a "specifically designed training course" on off-duty conduct. (Id. at 224-25). Boehm testified that there was "no specific course" on off-duty procedures or action. (Boehm GJT 58-60). Melaragno's testimony is contrary to the above documentation and to the testimony of Ryan, and many others, who remember little or no training, see ¶17-18, (Ryan 62-3, 236-7, Ryan II 281-2).[4] What Melaragno described would be inadequate, regardless. As with Range 2000, decisional shooting presents a shoot/don't shoot exercise; for example a man jumps out and says "I'm a cop," or "I'm off-duty," (Melaragno 57), and the officer has to decide whether to shoot. No training provides protocols or guidance on how to handle the situation, nor does the exercise address what the off-duty officer should do.

Even assuming that class was given, Melaragno had assumed that there was follow up training at the academy on off-duty conduct and dangers of misidentification, and that it would be reckless not to provide such training due to the potential for a friendly fire incident. (Melaragno 233-5). Moreover, Melaragno acknowledged that his

[4]Def. Exhibits 1 & 2 includes the documented blocks of training for defensive tactics and officer survival. The only block not documented is the specific off-duty training course allegedly taught by Melaragno. Even more remarkably, Melaragno testified he taught the course to seven academy classes over 14 years, yet those seven sets of documents relating to off-duty identification must have been destroyed or lost -- although none of the training outline records as to all of the other seven training blocks for those 14 years were lost. (Melaragno 156-7).

training included none of the protocols provided in new training put into place after Young's death, and that had Young complied with the steps provided in those protocols his death could have been prevented. (Id. at 134-6, 228-34).

It was not until a year and a half after the Young shooting that a new PPD policy (Gen. Order #22 attached) made a series of changes, implicated factors that caused Young's death, and, for the first time, provided policy and training instructions to officers that:

- Makes optional carrying a firearm off-duty, where it had been mandatory;
- Warns against taking off-duty action in circumstances that all apply directly to the Young shooting, and requires that off-duty officers call 911 before taking action;
- Off-duty action when taken can include calling 911 to report the incident;
- Officers should first go to a safe location, call 911, assess the situation to decide whether involvement is necessary, and observe as a witness until on-duty officers arrive;
- Off-duty action, aside from calling 911, permitted only when there is a danger to life;
- Off-duty action poses serious dangers, including lack of proper equipment, danger of misidentification by on-duty officers, and lack of cover.

(Gen. Order #22 attached, Melaragno 134-35, 228-234; Saraiva 135-42, 152; Dep. of Martin Hames, February 24, 2003, at 23 ("Hames")). Young's death might have been prevented had that policy and training been in place. (Saraiva 145-46). Ryan stated that he designed and wrote this policy after the Young shooting, that it was new and had not been trained before, and he could not explain why it did not take effect until a year and a half after the Young shooting. (Ryan II at 272-3, 290-1, 293, 296-7). None of those steps were trained before the Young shooting despite the fact that PPD policymakers and supervisors acknowledged that they knew of the risks of off-duty action, that it is an "essential" and "particularly critical" subject for training, because of "potentially tragic" consequences for an unrecognized off-duty officer (Melaragno 88-89, Partington 81-2, 209) and because potentially "grave consequences" could occur as a result of poor off-duty policy and training. (Dep. of Michael Harris, November 26, 2002, at 91

("Harris"), Boehm 154, Prignano 168-70; Partington 211-2 (agreeing in substance with Fyfe Report at 6-7)).

**33. Disputed.** The training provided by the New York City Police Department is nothing like the training provided by the PPD on off-duty issues. The NYPD provides substantial training on the NYPD policy, including detailed written protocol for off-duty conduct and avoiding misidentification of off-duty officers, courses on those protocols, written commands and instruction guides, and then scenario training based on those protocols. **(NYCHPD protocol attached, Fyfe at 70-71)**. The NYPD's training involves scenarios that are not just shoot/don't shoot, but portray a complete range of off-duty encounters with off-duty officers. (Id. at 66-67). Further, in these scenarios, the NYPD, as any minimally adequate department would, provides training on comprehensive, written protocols designed to minimize the risk of off-duty misidentification; additionally, the NYPD provides training sensitizing officers to that risk, to the additional considerations relevant to using equipment off-duty, and on the policy. (Fyfe at 13-14, Fyfe Report at 6-8). Indeed, the NYPD has been training on this written protocol—which it includes in its training materials, patrol guide, and legal bulletins—for 28-30 years. (Fyfe 14-15). All of the training the PPD instituted after the Young shooting, and much more, had been provided by the NYPD long before Officer Young was killed.

**34-35. Disputed.** See ¶17-18. Defendants' description is also contrary to the clear text of the PPD's written policy, which provides no such guidance; PPD policymakers and defendants themselves understood that instant, direct action was required 24 hours a day in the City of Providence. (Dep. Rule 201.3 attached, Ryan II 317-18, Partington 100-103, Saraiva 72-9, 105-6, Dep. of Kenneth Cohen, November 25, 2002, at 65-67 ("Cohen II"), Hames 135-36, Dep. of Robert Bennett, September 4, 2002 at 179-80 ("Bennett II")). More importantly, Ryan and Cohen's admission that training is inconsistent with the written policy is further evidence of the chaos and confusion concerning these critical issues.

**36. Disputed.** Officer Young was verbally reprimanded shortly before his death for failing to take action off-duty at a restaurant where shots were fired. (Dep. of Michael Figueiredo, January 14, 2003, at 24-25 ("Figueiredo")). Young was at a restaurant, on foot, when shots were fired from a passing car. Figueiredo was clear that while the situation for which Young was reprimanded would have required only a call to the police station, whether he was on or off-duty, Young was more generally required to take off-duty action as the situation required, as an on duty officer would. (Id. at 25-8). Where there was a threat to life, it was not sufficient to call for help; officers were required to effectuate an arrest. (Saraiva 72-79, 80-83 105-106; Deposition of Greg Small, November 26, 2002 at 67 (hereinafter "Small"). Officers, including the former head of Internal Affairs, agreed that based on PPD policy, Young could have been disciplined for failing to take direct action, beyond just calling in to the station, once he witnessed Diaz brandishing a weapon and threatening people's lives. (Bennett II 180, 184; Saraiva 80-84).

**37. Disputed.** The "three volume set (several inches thick)" of curriculum does not contain any references to training or policies concerning on-duty/off-duty confrontations. Like Def. Exhibits 1 & 2, it demonstrates that training on what the PPD believed to be important should have been and was documented.

**38. Disputed**. Plaintiff agrees that Ryan must have been intimately familiar with the generally accepted practices of other departments around the country. (Ryan II 248) For years, these Departments and recognized international police organizations, like the International Association of Chiefs of Police, have recognized the critical importance of clear policy and training on these off-duty issues. (Fyfe Report at 5-7, IACP Model Policy, NYCHDP policy attached, Ryan II 245-7). His involvement in these organizations put him on notice that the failure to adopt such practices and training could lead to the death of an officer; the fact that Ryan was involved with these agencies and organizations and still failed completely to train his officers on off-duty issues is further evidence of his deliberate indifference to the issues, which would be recognized by any

reasonably competent police administrator. Partington 208-11, agreeing in substance with Fyfe Report 6-7. Ryan understood that off-duty action was a critical and potentially dangerous task for which a professional police department must be particularly careful to provide clear, consistent training as part of its core, documented curriculum, based on written directives, (Ryan II 30-1, 41, 44, 56-7, 321-2); his training was admittedly inconsistent. See ¶17-18. Although Ryan, by his own admission, had authority to recommend changes in policy, no changes were implemented until a year and a half after the shooting.

Defendant Cohen also understood the dangers of off-duty conduct and understood what officers should know about off-duty conduct. Despite this understanding, he could not recall any training on off-duty action and never kept up to date with other policies or ensured that there was any off-duty training because he felt the issue was just common sense (Dep. of Kenneth Cohen, June 28, 2002 at 21 ("Cohen"), Cohen II 93-95). However, any reasonable police administrator understands that common sense is insufficient to guide officers engaging in critical tasks and high stress situations, such as engaging in off-duty action; for that reason officers must be drilled to follow policy and fall back on their training. (Taylor 89-92, 195; Partington 81, Fyfe Report 7-8).

**39. Disputed.** Officers testified to numerous examples of off-duty misidentifications and off-duty actions. (Figueiredo 14-19, Dep. of Cornel Young, Sr., Jan. 14, 2003, at 55-57, 77-83 (hereinafter "Young", Boehm 266-69, Small 71-81, 86-90; Dep. of Timothy Lee, January 27, 2003 at 147-50 ("Lee"), 154-60, Harris at 92-3.)

**42. Disputed.** Ryan and Cohen were personally involved in providing supervision in the form of training for Saraiva, Solitro and Young. Ryan and Cohen, as directors of training, were directly responsible for ensuring that officers were properly trained. (Ryan II 243-4, Ryan 12-14, 54-57, Cohen II 7-10). Ryan also conducted in service training, and continued to have supervisory responsibility over, and conduct training at, the Training Academy after he was promoted to Director of Administration and ceased serving as Academy Director. (Ryan 14-15).

**43. Disputed.** Informal father-son conversation is no substitute for the proper training, off-duty policy and protocols, and scenario training on that policy that the PPD lacked. As Cornel Young Sr. testified, he never gave his son training, or received training, on any of the protocols set out in Gen. Order #22. (Young 51, 75-6). Major Young simply told his son that he had been misidentified because of his race while off-duty and that identifying oneself off-duty is important (Id. at 67-8).

**Plaintiff's Additional Disputed Facts**

**1.** Ryan, Cohen and Prignano each acknowledge substantial supervisory responsibility for training over Solitro's academy class. Alternatively, each blames the other as the more responsible party concerning training. For example, Cohen acknowledges that he was the head of Solitro's training academy but claims he reported indirectly to Ryan and that Ryan and not Cohen was responsible for supervising Melaragno and Solitro's training academy. (Cohen at 11; Cohen II at 15, 29-30). Moreover, Cohen alleged that Ryan and Prignano were responsible for deciding who would be on the academy training staff and when Cohen asked to pick his own staff, Prignano refused to allow him. (Cohen II at 51). Ryan acknowledged that he retained some supervisory authority, continued to oversee the academy, and continued to teach during Solitro's class; but he claimed that Cohen was in charge of Solitro's academy. (Ryan at 13-15). Prignano admitted that, he was ultimately responsible for ensuring that all the men and women in the chain of command were properly trained and supervised; and he further admitted that he retained supervisory responsibilities including reviewing the written training curriculum for each class. (Prignano at 18, 52). According to Prignano, even after he was reassigned, Ryan maintained training duties including the responsibility to determine whether training instructors had discretion concerning the course of their instruction. Prignano also testified that Cohen was never completely in charge of training because Ryan remained the "chief honcho". (Dep. of Urbano Prignano, September 5, 2003 at 247, 250-51, 280 ("Prignano II"), Prignano I at 39-40).

The only thing that is clear from the inconsistent testimony of these defendants is that there is substantial evidence demonstrating that each enjoyed significant supervisory responsibility over Solitro's training academy.

**2.** Defendant Ryan's deliberate indifference towards supervision in general, and in training recruits concerning the rules and regulations of the Department in particular, is shown by Ryan's admissions and other evidence of misconduct that went to the core of his supervisory responsibilities. Chief Prignano admitted to F.B.I. investigators that he gave advance copies of the source documents for promotional exams to officers, including Ryan. (Testimony of Urbano Prignano in *U. S. v. Cianci*, May 13, 2002, at 143-6 ("Cianci Trial".) Ryan testified he secured advance copies of source materials for a captain's exam and a sergeant's exam and made them available to two candidates for promotional exams, in order to assist them in taking the test. (Ryan II 166-73, 74-95).[5] Chief Prignano, Ryan stated, instructed him to do so. (Id. at 170-77, 183-5, 210). Ryan was Prignano's primary adviser and was and is an attorney. (Partington 61). Ryan had access to the material because it was his job to check it to make sure the exam was fair. (Ryan II 208-10). Instead, he made the exam material available to selected officers, by leaving it on his desk and then telling the candidates that they could look at the materials in his office during a time that he knew he would be away from his desk. (Id. at 175-6, 200-02). Ryan explained that his actions were not improper as these promotions were foregone conclusions; regarding the captain's promotion, Ryan stated that everyone knew the promotions were political rather than based on merit or hard work, and, despite contract provisions to the contrary as to captains, that this candidate would be promoted regardless. Remarkably, he stated that he saw nothing improper with giving them testing material to help them receive high scores, so as to hide the "appearance of impropriety to the system." (Id. at 63-64, 69, 184-86, 191-94).

---

[5]It was earlier discovered in former Mayor Cianci's criminal trial, that Prignano told the F.B.I. he gave, and testified he could have given, Ryan advance copies of source materials for a promotional exam. Testimony of Urbano Prignano in *U. S. v. Cianci*, May 13, 2002, at 106-08, 118, 143-6 (hereinafter "Cianci trial").

These allegations of serious misconduct were common knowledge in the chain of command for years prior to Young's shooting (Boehm 181-4, Lee 86-93, Dep. of Dennis Simoneau, May 28, 2003 at 50-51 ("Simoneau")). Ryan said "everybody in the command staff" knew of his conduct and that many people in the department were upset by rumors of this preferential treatment. (Ryan II at 202, 204, 223).

Furthermore, Ryan had a general reputation for untruthfulness. Partington, Simoneau, Searles, Lee, Boehm and Harris testified that Ryan either had a reputation for being untruthful, and/or that he lied to them in the course of his official responsibilities. (Partington 67-8, Simoneau 62-8, Dep. of Donna Searles, May 27, 2003 at 51-4 ("Searles"), Boehm 181-4, Lee 86-93, Harris 107-110).

Partington, Simoneau, and Searles, also had concerns regarding Ryan's overall supervision with regard to training and hiring. (Simoneau 63-64, 69-72, Boehm 181-4, Searles 51). Partington testified that Ryan had lied to him; that similar misconduct committed by Prignano violated the PPD's rules and regulations, compromised the integrity of the department, and went to the core of his supervisory responsibilities; Partington later removed Ryan from his position directing the training academy due to concerns with his supervision. (Partington 56-57, 67-68, 208-9 (agreeing in substance with Fyfe Report at 2-3)). In order to maintain the integrity of a training academy, it would be essential that any such misconduct by its director be investigated immediately (Taylor 171-5, Lee 90); however, Ryan never received any discipline, nor was he even questioned by the PPD (Ryan II 162-3, 227-8).

**3.** Even if at best, minimal training concerning on-duty/off-duty confrontations was provided, it was not supported by or consistent with Department policy. Because of the danger of armed off-duty action, the PPD's policy requiring 24 hour direct action places officers in great danger; such policies have been "long-discredited." (Fyfe Report 7, 18, Partington 208-12). While any responsible police department should provide training on the well-recognized hazards of off-duty conduct, (Taylor 168, Partington 209, Fyfe 4-5), a policy requiring 24 hour direct action makes it particularly critical that officers receive

specific guidance regarding the risks of misidentification and how to avoid misidentifying off-duty officers (Partington 208-12, Taylor 159-60); PPD officers received no such guidance. (Fyfe Report 6-7).

**4.** Commissioner Partington, a policymaker for the City, the City's expert, Taylor, and defendant Ryan agree that the six features of minimally adequate policies that Dr. Fyfe set out are steps that must be taken by a police department acting in good faith to protect its officers. (Partington 209-11, Taylor 187-92, Ryan II 280-84). The six features dictate that a police department must:

1. Distinguish between officers' off-duty and on-duty responsibilities;
2. Carefully train and equip off-duty officers to identify themselves when taking action.
3. Provide instruction on the risks associated with encountering other law enforcement personnel while taking off-duty action.
4. Sensitize officers to the possibility that, while taking on-duty action, they may encounter off-duty personnel.
5. Develop a protocol so that these risks may be avoided or minimized.
6. Require prompt and objective investigation of off-duty conduct and of on-duty officers' responses to it, so that future mistakes and violence may be avoided.

(Fyfe Report 6). Defendants did not provide training on any of those steps. (Fyfe Report 6-7).

**5.** Both Plaintiff's and the City's experts, Partington and defendant Ryan, agree that minimally adequate policies also include a written protocol designed to avoid misidentification and friendly fire tragedies, with steps for both on duty and off-duty officers to follow, and which is the subject of comprehensive training. (Fyfe Report 6, Taylor 159, Ryan II 284, Partington 209-11). The PPD, however, had no policy or protocol regarding identifying oneself off-duty, or how to take off-duty action or distinguishing between on and off-duty responsibilities (Melaragno 78-9, 133, Taylor 60). The PPD did not have any written policies concerning identification of off-duty or plainclothes PPD officers. (City Resp to Requests to Admit. Nos. 28, 32). The City's

expert agrees there is no documentation of protocols for avoiding off-duty misidentification (Taylor 159-62, 165-6).

LEISA YOUNG, in her capacity as
Administratrix of the Estate of
Cornel Young Jr.,
By her Attorneys

Robert B. Mann #0153
Mann & Mitchell
One Turks Head Pl., Ste. 501
Providence, RI 02903
(401) 351-5770

Barry Scheck, Esq. #4612
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9084

Nick Brustin, Esq. #0605
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9084

**Certification**

I hereby certify that a copy of the within document was mailed or delivered to the person or offices of Kevin McHugh, Esq., City Solicitors Office, 275 Westminster St., Suite 200, Providence, R.I. 02903 and Michael Colucci, Esq., Olenn & Penza, LLP, 530 Greenwich Ave., Warwick, RI 02886 on the 2nd day of September, 2005.