UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LEISA YOUNG, In her Capacity as Administratrix of the Estate of Cornel Young, Jr. | ) ) | |
| v. | ) ) ) | No. C.A. No. 01-288 S |
| CITY OF PROVIDENCE by and through its treasurer, Stephen Napolitano, et al | ) ) | |

PLAINTIFF'S MEMORANDUM REGARDING THE SCOPE OF THE FIRST TRIAL FINDINGS ON THE PENDING TRIAL

**Introduction**

On January 28th, 2000, two on-duty Providence Police Department ("PPD") police officers, Michael Solitro and Carlos Saraiva, while responding to a call, shot and killed an off-duty PPD officer, Cornel Young, Jr., who was attempting to respond to the same incident under a PPD policy of "always armed/always on-duty" that required him to directly intervene despite being off-duty and out of uniform. The two on-duty officers, who are white, mistook Officer Young, an African-American, for a deadly threat.

Leisa Young, as administratrix of her son's estate, filed suit in federal district court against numerous defendants, including claims against Solitro and Saraiva for use of excessive force during the course of a seizure in violation of the Fourth Amendment. Subsequently, plaintiff dismissed Officers Solitro and Saraiva as parties to the case seeking instead to proceed solely against the more responsible parties, the high level administrators and policy-makers who failed to properly supervise them. Just before the first trial in this case, upon motion by the City and individual defendants, Judge Lisi

bifurcated the trial even after Solitro and Saraiva were voluntarily dismissed as defendants. Then, after the first jury reached a verdict holding that Solitro violated Officer Young's constitutional rights, the Court again upon renewed motion from the City and defendants Prignano and Sullivan revisited the prior summary judgment rulings and dismissed claims against all remaining defendants.[1] The First Circuit subsequently reversed Judge Lisi's grant of summary judgment for the City on the off-duty policy and training claim, remanding for jury trial on these issues. *Young v. City of Providence*, 404 F.3d 4 (1st Cir. 2005).

The above actions, all upon motion of defendants, caused maximum prejudice to the plaintiff. She now finds herself in the grossly unfair position of having to risk revisiting issues already decided in her favor by the first jury. In addition to the verdict, causation is the only issue for which we need to look to the first trial and the relevant evidence on this issue is quite narrow. Moreover, the method of presentation of that evidence and its scope should be restricted so as to work the least prejudice practicable under these highly unusual circumstances. The defendants should not be afforded an opportunity to retry the findings of the first jury directly or indirectly. They should not be permitted to suggest, directly or indirectly, that the Phase I jury's verdict was wrong and should not be permitted to argue that the first jury credited certain evidence and rejected other evidence. Moreover, in the interest of expediency and economy of both judicial and party resources, recalling witnesses who may be near impossible to locate and may not remember relevant details merely to reproduce testimony that has already

---

[1] The Court addressed Ryan and Cohen's motions for summary judgment for the first time after the phase I trial, the motions were fully submitted before the trial.

been given in court and tested by cross-examination should be avoided to the extent possible.

Most importantly, under these unusual circumstances, we respectfully request that defendants be required to comprehensively detail and demonstrate the necessity of any evidence they seek to introduce from the first trial.

## I. **The Phase I Verdict**

Judge Lisi instructed the jurors in Phase I that if they "find that the Plaintiff has proven by a preponderance of the evidence that ... Solitro's shooting of Cornel Young, Jr., was unreasonable in light of the circumstances confronting [him], then the seizure was unreasonable under the Fourth Amendment." *Trial Transcript*, dated 10/30/03, at 40L18.[2] Judge Lisi further charged that "[i]n order to prove that the seizure was unreasonable under the Fourth Amendment, the Plaintiff must prove that ... Solitro's actions were not objectively reasonable." *Id.* at 39L18. The Phase I jury deliberated and found that the plaintiff had proved that "Solitro's actions deprived Cornel Young, Jr., of his federal constitutional right to be free from an unreasonable seizure of his person...." *Id.* at 18L17.

These jury findings of fact cannot be challenged, relitigated, revisited, interpreted or unpacked before the Phase II jury without running afoul of the Seventh Amendment and its right to trial by jury. That Fed. R. Civ. P. 42(b) empowers a trial court in its discretion to order a separate trial of any issue is beyond question. However, that very Rule requires "preserving inviolate the right of trial by jury as declared by the Seventh Amendment." Issues may be tried separately, but a single issue may not be tried by different, successive juries. *See Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494,

[2] The trial transcript pages from the jury charge, which are referenced in this memorandum, are attached.

500 (1931) (partial trial may not be resorted to unless issues in later trial "distinct and separable" from previous issues).

In addition to raising constitutional problems, allowing the defendants a second bite at the apple by permitting them to retry – however indirectly – issues decided by the first phase jury would be deeply unfair and prejudicial to the plaintiff. After all, the defendants are the ones who requested bifurcation even after Solitro and Saraiva were dismissed and before the Court ruled - or ruled again for Prignano, Sullivan and the City - on their motions for summary judgment, which led to the jury being discharged instead of remaining on through Phase II as planned.

The Phase II jury's role is not to reconsider its predecessor's verdict. The new jury's focus should be entirely on whether defendants' inadequate training in the face of the most dangerous off-duty policy possible constituted deliberate indifference and was in part a force behind Solitro's violation of Officer Young's constitutional rights.

## II. <u>The Proper Focus for Phase II</u>

Phase I answered whether a constitutional violation occurred when Cornel Young, Jr., was shot by fellow PPD officers in January of 2000. Now that a jury has found that a constitutional violation did in fact occur, Phase II should be about whether that violation can be ascribed *at least in part* to the training offered by the PPD to Solitro regarding its off-duty policy.

Plaintiff will show defendants' deliberate indifference through proof of their actual and constructive notice of a deadly risk which they ignored by not providing adequate policies, protocols and training to officer Solitro. Young and Saraiva's lack of training, though irrelevant to causation, provides further evidence of the City's deliberate

indifference. *See Young v. City of Providence*, 404 F.3d 4, 27 n.19 (1st Cir. 2005). Where, as here, plaintiff is claiming systemic deficiencies in the training concerning on-duty/off-duty confrontations rather than an otherwise sound program on off-duty issues that was negligently administered in this case, such evidence is critical and admissible to demonstrate deliberate indifference.. Id., citing Canton v. Harris, 489 U.S. 378, 391 (1989). To establish the defendants' deliberate indifference as a force behind the constitutional violation, plaintiff does not have to prove that it was the sole cause of the constitutional violation found in Phase I; rather, our burden is to show that it was *a* cause. The First Circuit confirmed the nature of plaintiff's burden of proof going forward with its recent holding that "[t]he actions taken by Solitro that constituted excessive force must somehow have been caused – at least in part – by the City's failure to train ... Solitro." *Young*, 404 F.3d at 26. Plaintiff certainly does *not* have to prove that there weren't other causes also resulting in the same violation and defendants should be precluded from attempting to prove or arguing that the first jury based their determination that Solitro violated Officer Young's right on a particular fact or facts. To do so would clearly run afoul of the 7th Amendment.

## III. Plaintiff's Case in Phase II

At trial, plaintiff will show that Providence fell far short of universally accepted standards in the law enforcement community for police departments with an always-armed always-on-duty policy. Such policies are unanimously considered so dangerous as to require extensive and specific training. As plaintiff's expert Dr. James J. Fyfe, a preeminent expert on police practices and present Deputy Commissioner in charge of

training at the New York City Police Department ("NYPD") has stated, "off-duty encounters, and the risk that they might be interrupted by on-duty police, are a well-recognized hazard of urban policing for which officers must be carefully schooled by policy and training." *Expert James J. Fyfe's Report*, Jan. 20, 2003, at 4-5 (hereinafter "*Fyfe Report*" ).[3] Providence policymakers and supervisors recognized these risks as well, but unlike their peers in other police departments – the vast majority of which had far less radical and dangerous off-duty action policies - they failed to institute the protocol and training necessary to avoid jeopardizing police officers in precisely the way that cost Cornel Young his life.

As Dr. Fyfe and Commissioner Partington make clear, thorough, specific and consistent training is an indispensable corollary to any always-armed always-on-duty policy. Perhaps most importantly, any department that requires any off-duty intervention, let alone a policy that requires 24 hour a day direct action, must have a comprehensive protocol that addresses each stage of the encounter between on-duty and off-duty officers and comprehensive classroom and hands-on training on these protocols so that the actions of on-duty and off-duty officers become instinctual. This protocol and training must include, for example, clear requirements that officers preface each command with police, only utilize specifically designated commands and warnings that are known to all officers and that one officer take the lead in every high risk encounter. Contrary to the remarkable assertions of Defendants Prignano and Cohen, these matters are anything but "common sense." In fact as Dr. Fyfe will explain, the common sense

---

[3] The Fyfe report was an exhibit attached to the plaintiff's objections to the motions for summary judgment. The objections and exhibits were filed on September 2, 2005.

reaction in these encounters often leads to tragedy and thus officers have to be closely trained so they instinctively respond pursuant to protocol.

Officers must also be sensitized to expect that while taking on-duty action, they will likely encounter off-duty personnel. *Id.* at 6. It is critical that on-duty officers are trained to expect seeing off-duty officers at any time and to expect that under a variety of circumstances these officers will be directly intervening in police incidents. That expectation alone can forestall tragedies such as the one that claimed Officer Young's life here. As defendants argued repeatedly during phase I of the trial, the on-duty officers had to make split second life and death decisions. When split second decisions are involved, an additional second or two makes the difference between life and death and comprehensive training and protocols provide additional vital seconds for sound decision-making.

Rather than train officers concerning the above, the PPD provided no training or grossly inadequate training on protocols and then inconsistent training on the requirements of the policy itself. Dr. Fyfe will explain and the defendants have conceded through the testimony of Partington that inconsistent training on policy is worse than no training at all and is a recipe for disaster. When officers and supervisors have differing expectations about appropriate police conduct during high stress, life and death encounters officers make the wrong split second decisions.

Moreover, in an urban police department like the PPD, there is a heightened, well known risk that minority officers, particularly African-American officers will be misidentified and shot. For many years responsible police administrators have recognized this risk and trained officers to be particularly careful to expect and identify

off-duty African-American officers. That two-tiered expectation for on-duty cops combined with the inculcation of standard commands that would enable officers to quickly recognize one another could have bought vital seconds on that January night and spared Cornel Young's life.

A significant part of the training should also be aimed at the off-duty officer called upon to intervene in a given situation. Officers who might have to intervene while off-duty should be trained to first direct a bystander "that 911 should be advised that he is on the scene." *Fyfe Report* at 20. Through "strong role play and scenario components," potential intervening off-duty officers should be taught to expect the possible presence of other officers on the scene. *Id.* The training must be so comprehensive as to cover the most minute details of an intervention, including distinct methods of displaying one's badge while holding a firearm with both hands. *Id.* at 20. Additionally, all officers in whatever capacity, whether intervening while on-duty or off-duty, "must be provided with a standard challenge for confronting suspects; with a protocol for identifying each other; and with tactical instruction that teaches them how to avoid shooting each other...." *Id.* at 18-19

Although the PPD had an off-duty action policy, even going so far as to admonish Cornel Young for not abiding by it in a separate incident, and although "[such] policies must be accompanied by training," the department offered no training at all to its officers on how to safely implement the policy. *Id.* at 3, 7. Statements by Providence policymakers show that the absence of training on this dangerous policy was no accident as police officers were supposed to negotiate the complex and life-threatening situations that the policy brought about aided by nothing more than their "common sense." *Id.* at 7,

19. Dr. Fyfe noted that while the bulk of testimony indicated no training at all on off-duty action issues and procedures, different, undocumented testimony by two witnesses to the contrary hardly altered his conclusions. Even if the training those witnesses described had actually occurred – "a half-day or less unguided by any policy" – such a regimen "is simply inadequate for such a volatile subject." *Id.* at 18.

Compounding the glaring inadequacies plaguing Providence's policy was the fact that instead of real training on how to carry out the policy in the field, training *contrary* to the policy was actually dispensed to candidate officers at the Police Academy. Indeed, Defendant Ryan, now retired but previously in charge of training, taught recruits that "they're better off leaving police action to on-duty police officers." Dep. at 199. He acknowledged that his teaching ran against official department policy mandating intervention by off-duty officers, but explained that he was motivated by a desire to shield recruits from future liability. Dep. at 218-20. Far from supporting the policy, the training offered on off-duty conduct actually conflicted with it, setting the stage for tragedy. Not only did such training likely confuse recruits as to which course of action to adopt while off-duty and facing a developing situation, but it doubtless also diluted however small an expectation on-duty officers might have had of encountering off-duty personnel as a result of their knowledge of the policy alone.

The fact that Solitro was not trained to handle encounters with off-duty officers despite the existence of a policy mandating the intervention of such officers was the direct result of a policy of not training on on-duty/off-duty interactions. Evidence of Saraiva's and Cornel Young's lack of training on the same issues is equally relevant to plaintiff's *Monell* claim as further illustration of the department's policy and practice of

foregoing training on certain issues. *See Young*, 404 F.3d at 27 n.19 ("[S]uch evidence might be relevant to show that Solitro's lack of training was part of a policy of not training on on-duty/off-duty interactions ... .").

## IV. Relevant Evidence From Phase I

While plaintiff understands that evidence pertaining to issues from the first trial must be brought into this trial to inform the Phase II jury's decision, it is imperative that the Seventh Amendment right of trial by jury be preserved and that any backdoor effort to revisit the decided issue of the underlying constitutional violation be forestalled. So as not to tread on the exclusive province of the Phase I jury, the Phase II jury should be allowed to hear only that relevant evidence from the first phase of the trial that is absolutely essential to their decision-making process. Moreover, in the interest of expediency and economy of both judicial and party resources, recalling witnesses who may be near impossible to locate and may not remember relevant details merely to reproduce testimony that has already been given in court and tested by cross-examination should be avoided to the extent possible. Courts may, in their discretion, limit trial testimony and do so frequently for various reasons. *See, e.g., U.S. v. Tierney*, 760 F.2d 382, 388 (1st Cir. 1985) (in evidentiary matters trial judge's "considerable discretion must be respected so long as he does not stray entirely beyond the pale"). Avoidance of redundant expenses and unnecessary complication in this case calls for the exercise of that judicial power.

With these goals in mind we propose the following regarding Phase I evidence. The relevant evidence from the first trial is very limited. The Court should summarize relevant undisputed facts regarding the shooting and instruct the new jury on the Phase I

verdict and its implications before explaining what their circumscribed role is in Phase II.[4]

There are many areas with no factual disputes. For example, neither Solitro nor Saraiva verbally identified themselves as police officers, they were both shouting the same commands at the same time, Diaz was not even holding a gun at the time Solitro shot Young and there was no direction from Saraiva to Solitro from the moment they arrived at the scene up to and through the shooting. Many details regarding events or sequences are either undisputed or irrelevant.

Contested relevant facts pertain mostly if not exclusively to Young's actions and words on the scene and Solitro's. Even Young's most relevant actions, however, may be beyond question in Phase II, considering the logical implications of the jury's verdict in Phase I. Indeed, some of these questions of fact were necessarily ruled upon by the Phase I jury. Those jurors could not have concluded that a constitutional violation occurred if they believed that Young had been walking towards the on-duty officers with his gun held sideways, gangster-style. If the Phase I jury had adopted defendants' version of events, then a finding of no constitutional violation would have been inescapable. Under that hypothesis, the issue of cover notwithstanding, the jury would have had to conclude that Solitro and Saraiva had to shoot Young, either to protect themselves or to prevent harm to bystanders. The Phase I jury was, after all, instructed that "a police officer has the lawful authority to use deadly force when that officer has reasonable grounds to believe that an individual or the officer himself is threatened with the infliction of serious bodily harm or death." *Trial Transcript*, dated 10/30/03, at 20L5.

[4] The plaintiff will seek to present a joint instruction with the defendants and if agreement cannot be reached as to a complete joint instruction, plaintiff will submit requests to which there is not agreement.

The phase I jury necessarily rejected Solitro's contention that Young was walking towards him, pointing the gun at him or Diaz, and ignoring his commands before he shot him, because under this scenario Officer Young would clearly pose an immediate deadly threat. At a minimum, the Phase II Jury should be instructed, as suggested above, that the Phase I jury determined when Solitro shot Officer Young, Solitro did not have reasonable grounds to believe that Officer Young posed a threat of serious injury or death to him or anybody else. Thus, defendants should be prohibited from presenting any evidence that Officer Young was walking towards and pointing his guns in the direction of Solitro just before Solitro shot and killed him.

Plaintiff proposes to read to the jury very narrow testimony from only a few of the witnesses who testified during Phase I. Plaintiff intends to read the following testimony from the following witnesses:

* Manuel Jiminian - Officer Young yelled "Police" loudly and clearly as he was leaving Fidas and that it was clear to Jiminian by Officer Young's words and demeanor that he was a police officer.

* Joseph Hayman - As Officer Young left the restaurant, he held his gun with two hands pointed in Hayman's direction; he told Hayman to "freeze" in a loud commanding voice; it was clear to Hayman by Officer Young's words and demeanor that he was a police officer; as Young was issuing commands to Hayman, Saraiva and Solitro appeared to be issuing commands to Diaz and Young was shot as he was turning towards Solitro without warning and before he took any steps in Solitro's direction

* Diaz - it was clear to Diaz by Officer Young's words and demeanor that he was a police officer; Officer Young was not pointing his gun at Diaz or Solitro when Solitro shot him; Diaz dropped his weapon before Officer Young turned towards him and Diaz was already on the ground in a non threatening position.

* Michael Solitro - Diaz had dropped his weapon, was complying with his commands and was out of his car before he even saw Officer Young; Saraiva provided him no direction during the encounter nor was he

required to do so pursuant to training or policy; Saraiva did not take the lead during the encounter nor was he required to do so pursuant to training or policy; he and Saraiva were yelling commands at the same time; neither he nor Saraiva verbally identified themselves as police officers at any time during the encounter

* Carlos Saraiva - He provided Solitro no verbal or other direction during the encounter nor was he required to do so; Saraiva did not take the lead during the encounter nor was he required to do so pursuant to training or policy; he and Solitro were yelling commands at the same time; neither he nor Saraiva verbally identified themselves as police officers at any time during the encounter

Finally, in the event the Court permits defendants, over plaintiff's objection, to argue that Solitro's leaving cover was his sole indiscretion and the sole basis for the Phase I jury's decision, plaintiff's intend to read admissions from defendants' closing arguments, in which defendants argued that Solitro acted appropriately when he left cover. Testimony pertaining to any other aspects of this incident would either be undisputed and therefore unnecessary or outright irrelevant to the question at hand. The production of witnesses for purposes of rendering such testimony would therefore be redundant and wasteful of judicial – and party – time and resources.

LEISA YOUNG, in her capacity as
Administratrix of the Estate of
Cornel Young Jr.,

By her Attorneys

Robert B. Mann #0153
Mann & Mitchell
One Turks Head Pl., Ste. 501
Providence, RI 02903
(401) 351-5770

Barry Scheck, Esq. #4612
COCHRAN, NEUFELD, &
SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9084

Nick Brustin, Esq. #0605
COCHRAN, NEUFELD, &
SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9084

**Certification**

I hereby certify that a copy of the within document was mailed or delivered to the person or offices of Kevin McHugh, Esq., City Solicitors Office, 275 Westminster St., Suite 200, Providence, R.I. 02903 and Michael Colucci, Esq., Olenn & Penza, LLP, 530 Greenwich Ave., Warwick, RI 02886 on the 7th day of September, 2005.

ATTACHMENTS

Pages from the jury charge to the Phase 1 jury.