MJC:jlb 95306 \pleading\95306memorandum

SCANNED

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| LEISA YOUNG | ) | |
| | ) | |
| VS. | ) | C.A. NO. 01-288S |
| | ) | |
| CITY OF PROVIDENCE, ET AL | ) | |

**DEFENDANTS, COHEN AND RYAN'S MOTION FOR SUMMARY JUDGMENT**

Now come the defendants, Kenneth Cohen and John Ryan, and hereby move for summary judgment based on Qualified Immunity and with respect to the remaining issues of the plaintiff's complaint.

In support of said motion, your defendants have attached a Statement of Undisputed Facts and a Memorandum of Law. Additionally, counsel has provided the Court with copies of those cases referred to in the memorandum.

DEFENDANTS, Cohen and Ryan
By Their Attorney,

Michael J. Colucci, Esq. #3302
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

**CERTIFICATION**

I certify that I sent a true copy of the within on 8/12/05 to:

Kevin F. McHugh, Esq.
CITY SOLICITOR'S OFFICE
275 Westminster Street, Suite 200
Providence, RI 02903-1845

438

Nick Brustin, Esq.
Cochran, Neufeld & Scheck, LP
99 Hudson Street, 8th Floor
New York, NY 10013

Robert B. Mann, Esq.
501 Turks Head Place
Providence, RI 02903

Jessica Beaudry

MJC:jlb 95306 \pleading\95306cover

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| LEISA YOUNG | ) | |
| | ) | |
| VS. | ) | C.A. NO. 01-288S |
| | ) | |
| CITY OF PROVIDENCE, ET AL | ) | |

**DEFENDANTS' (COHEN AND RYAN) MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Michael J. Colucci, Esq. #3302
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I. DESCRIPTION OF MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IV. TRAVEL OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

V. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Craighton,* 483 U.S. 635, 638 (1987) . . . . . . . . . . . . . . . . . . . . 6, 11

*City of Canton v. Harris,* 489 U.S. 378 (1989) . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

*Febus-Rodriguez v. Bettencourt-Lebron,*
14 F.3d 87, 92 1st Cir. (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Hegarty v. Somerset County*, 53 F.3d 1367 (1st Cir. 1995) [6] . . . . . . . . . . . . . . . 6

*Lowinger v. Broderick*, 50 F.3d 61 (1st Cir. 1995) [4] . . . . . . . . . . . . . . . . . . . 1, 2

*Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576 . . . . . . . . . . . . . . . . . . . . 9

*Manarite v. Springfield*, 957 F.2d 953 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . 9

*Saucier v. Katz*, 121 S.Ct.2151 (2001) . . . . . . . . . . . . . . . . . . . . . . . . 2-6, 8, 11

*Young v. City of Providence*, 404 F.3d 4 (1st Cir. 2005) [25]
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

## STATUTES

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## I. DESCRIPTION OF MOTION

This is a motion filed by defendants, Kenneth Cohen and John Ryan. Cohen is presently a lieutenant in the Providence Police Department and was so at the time of this incident. Ryan is a retired captain from said department. They have been named as party defendants in their individual capacities. Ryan was the Director of the the Training Academy through which Saraiva and Young participated. (The 57th training academy). Cohen was the Director of the 58th Academy, through which defendant Solitro attended. The plaintiff's allegations against them focus solely on their supervisory responsibilities for training.

Cohen and Ryan now seek summary judgment to address their entitlement to Qualified Immunity in light of the Circuit Court's ruling that the issue of Qualified Immunity would be better addressed in this Court, *Young v. City of Providence*, 404 F.3d 4, 32 (1st Cir. 2005) [25].[1] Defendant Ryan also seeks summary judgment, on the additional ground that the appellate court affirmed the jury's finding that Saraiva had not violated Young's constitutional rights and that the grants of summary judgment in favor of Providence based on Saraiva and Young's training were also affirmed, *Id.*

## II. STANDARD OF REVIEW

The inquiry for a District Court's resolution of a summary judgment motion brought by an official seeking Qualified Immunity is whether a reasonable official could have believed that his actions were lawful in light of clearly established law and the information he possessed at the time of his allegedly unlawful conduct, *Lowinger v.*

---

[1] Page citations in [ ] are in reference to the "West Law" printed case page numbers.

*Broderick*, 50 F.3d 61, 65 (1st Cir. 1995) [4]. Although the non moving party still gets the benefit of having facts and reasonable inferences construed in her favor, the analysis used to determine whether an official is entitled to summary judgment is "quite generous", *Id.* Reasonable but mistaken conclusions about the lawfulness of one's conduct does not subject a government official to personal liability, *Id.* This Circuit has long observed that the Qualified Immunity standard allows for ample room for mistaken judgments in order to protect all but the plainly incompetent or those who knowingly violate the law, *Id.* Hence, since even erroneous decisions by officials may entitle them to Qualified Immunity. The analysis employed to determine entitlement to the same warrants an entirely different approach from that employed to evaluate the merits of the plaintiff's underlying claims, *Id.* See also *Saucier v. Katz*, 121 S.Ct.2151 (2001).

## III. STATEMENT OF FACTS

In the early morning hours of January 28, 2000, Young was present at a late night eatery known as Fida's Restaurant. Young was there as a customer, off duty and in civilian clothes. While there, a disturbance developed inside of the restaurant between two opposing groups, one of which was associated with one Aldrin Diaz (Diaz). A Fida's employee called the Providence Police Department to report the disturbance. Officers Saraiva and Solitro were in a fully marked police cruiser less than a mile away when the disturbance call came over the radio. Saraiva was the driver, Solitro was the passenger. Meanwhile, the disturbance spilled out into the parking lot of Fida's and at one point, Diaz brandished a handgun, presumably to thwart the efforts of his opposing combatants.

According to Saraiva, as he pulled up on scene, he saw a male (Diaz) outside of

a Camaro. Diaz appeared to be arguing with someone inside the restaurant. Saraiva observed a number of people who were looking out from the restaurant. Diaz then entered the Camaro, started to back up, and while doing so, leaned out of the window, pointing the gun toward the entrance of Fida's. Saraiva was just pulling the police car behind the Camaro at that point, Tr. 10/10/03[2] p. 30-35 and 43. Observing the weapon, Saraiva and Solitro quickly exited their patrol car, took positions of cover and ordered, at gunpoint, for Diaz to drop his weapon. Saraiva took cover behind two telephone poles and yelled to Diaz to "Drop the gun, drop the gun," *Id.* at p. 44. Solitro took cover behind the right front fender and engine block of the police car, Tr. 10/17/03 p. 55. Although just an eight day rookie, Solitro testified that he knew to take such cover through training he received at the academy, *Id.* Like Saraiva, he gave loud verbal commands for Diaz to "Drop the gun, drop the gun," *Id* at p. 57.

Diaz then pulled the gun back into the Camaro and raised both empty hands through the window. He was then ordered to "Get out of the car" and to "Get on the ground," Tr. 10/10/03 p. 45-47. As Diaz was getting out of the Camaro, Saraiva noticed him pointing toward the restaurant and attempting to say something, which Saraiva could not hear, *Id.* at p. 48. Saraiva looked in the direction of the entrance to Fida's (where Diaz was pointing to) and saw a man pointing a gun at and heading in the direction of Diaz, *Id.* at p. 49-50. This man turned out to be Young. Neither Saraiva nor Solitro recognized Young. He was dressed in dark, baggy clothes with a winter coat and some type of hat/baseball cap on, *Id.* at p. 51. Saraiva began shouting commands at Young for him to "Drop the gun, drop the gun," and Solitro did likewise, *Id.* at p. 50-51. When Young did not stop or drop his gun, Saraiva shot him, *Id.* at p. 52-55. Saraiva was the first to fire at Young, *Id.* at page 56. Although Saraiva felt that Solitro could have been in the line of Young's fire, it was Diaz who Saraiva felt

---

[2] Reference is to the morning session unless otherwise indicated.

was in immediate danger from Young, Tr. 10/9/03 p. 100-101.

Solitro testified that as Diaz was beginning to exit the Camaro, Solitro left his position of cover behind the police car and began moving toward Diaz. Solitro had noticed persons in the backseat of the Camaro and no longer felt safe in his position of cover, Tr. 10/17/03 p. 60-62. As he was moving toward Diaz, Solitro heard Saraiva yelling for someone to "Drop the gun," *Id.* at p. 62. He then looked to his left and noticed Young in the area of the approximate front left fender of the Camaro. He noticed the gun in Young's hand and ordered him to drop it three times, *Id.* at p. 64-65. As Young continued toward the Camaro, without dropping the weapon, Solitro also fired upon him, *Id.* at p. 66.

## IV. TRAVEL OF THE CASE

This matter was originally tried in the Fall of 2003. Prior to the start of trial, the plaintiff dismissed, with prejudice, all claims against defendants, Saraiva and Solitro. The trial was divided into two phases. The first phase was to determine whether or not Saraiva and/or Solitro's conduct violated Young's constitutional rights (a necessary predicate before liability could be had against the City and/or various supervisory officials). At the completion of Phase I, a jury found that Saraiva had not violated Young's rights but Solitro did. Those findings were affirmed by the appellate court, 404 F.3d at 32 [26]. Prior to the start of Phase II, the District Court granted pending summary judgment motions of the City and the supervisory defendants thereby dismissing all of the plaintiff's claims based on deficient training of Saraiva, Young and Solitro; deficient hiring/discipline of defendant Solitro along with various state law claims that were alleged. All of those findings were affirmed by the appellate court with the exception of the plaintiff's training claim as it pertained to the training of

Solitro.

## V. ARGUMENT

The recent Supreme Court case of *Saucier v. Katz* clarified the current approach to be taken for the determination of whether or not Qualified Immunity shall apply. It noted that the requisites of a Qualified Immunity defense must be considered in the proper sequence, 121 S.Ct. at 2155 [6]. The first question is whether or not a constitutional right would have been violated from the facts alleged, i.e. whether there is a constitutional violation on the merits, *Id.* at 2156 [6]. If no constitutional violation could be shown, then there is no need for further inquiries concerning Qualified Immunity, *Id.* [7]. In the case at bar, the appellate court ruled that it was a factual question as to whether or not constitutionally inadequate training could be established, noting that a jury could find in favor of the plaintiff or the defendant on this issue, *Young,* 404 F.3d at 10 [6].

As such, the next sequential step, per *Saucier*, is to ask whether the right was clearly established, 121 S.Ct. at 2156 [7]. "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition", *Id.* The right allegedly violated must have been clearly established in a more particularized, and hence more relevant sense, *Id.* The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right, *Id.* The relevant dispositive inquiry to determine whether the right was clearly established is as to ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted, *Id.*

The goal of the Qualified Immunity Doctrine must be kept in mind, for it exists to protect government officials performing discretionary functions from constant second

guessing and exposure to liability for damages. Indeed, municipalities might be hard pressed to fill such positions if there were not some level of protection for the decisions that have to be made. The goal of Qualified Immunity is to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment", *Saucier* at 2156 [7] citing *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

> "When government officials abuse their offices, actions for damages may offer the only realistic avenue for vindication of constitutional guarantees...on the other hand, permmitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. Our cases have accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a Qualified Immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Hegarty v. Somerset County*, 53 F.3d 1367, 1373 (1st Cir. 1995) [6], citing *Anderson v. Craighton,* 483 U.S. 635, 638 (1987).

The Qualified Immunity inquiry does not depend on whether the alleged conduct was, in actuality, found to be constitutional but, rather, allows for the "inevitable reality" that law enforcement officials will sometimes reasonably but mistakenly conclude that their conduct is constitutional and they, like other officials who act in ways they reasonably believe to be lawful, should not be held personally liable, *Id.* at 1373 [6]. Qualified Immunity sweeps "so broadly at all but the plainly incompetent or those who knowingly violate the law are protected from civil right suits for money damages", *Id.*

Solitro's training academy lasted for approximately 6 months and employed 1000

hours of training. Of that, 148 hours were devoted to patrol operations, 296 hours for physical training and defensive tactics and 80 were devoted to the officer "street survival" program, *St. U Facts at 17.* The course breakdown is included as *Exhibit 1* in the defendants' appendix of exhibits and can readily be seen to involve a wide array of training to prepare the candidates to be patrol officers. The street survival program includes topics such as principals of street survival and survival shooting, use of deadly force and gun fight techniques, close quarters firing, unknown threats and vehicle stops, firearms training (including day and night stress firing obstacle course training).

Neither Cohen nor Ryan actually taught the defensive tactics/firearms training/officer survival portions of the program. The same was taught by the department's certified instructors on such matters, Lieutenant Steven Melaragno, Sergeant Robert Boehm and Sergeant Kenneth Vinacco, *St. U Facts 1t 20.* Cohen was the director of Solitro's (i.e. the 58th) training academy. At that time, Ryan was the director of administration which involved general administrative oversight (i.e. personnel decisions, overtime, scheduling) of 12 different units of the police department, only one of which was training, *see Affidavit of John Ryan included as Exhibit 3 of the defendant's Appendix of Exhibits*.

The sworn deposition testimony of instructors Melaragno and Boehm (Vinacco was never deposed) confirms an extensive training program which prepared officers to make proper decisions in shoot/don't shoot situations while using appropriate verbal commands and cover. The training included instruction, computer simulators and scenario role play of which, off-duty and/or plain clothes/undercover officers were injected into the scenarios as potential suspects. Critique sessions would follow for the purpose of discussing what the recruit did right and wrong, including what they should do if they were the off duty officer in the scenario. This included instruction that when in confrontations involving off-duty officers on scene, the off-duty officer must obey all

commands of the on-duty officer and not make any sudden movements toward him. They are instructed to display their badge, holding it near their firearm (if their firearm is out), to give loud verbal commands to identify themselves, to say the on-duty officer's name if they know it. They are also instructed as to the benefits of just being a witness and collecting information rather than "jumping in on the action", *see generally defendants' St. U Facts 22-35.*

The plaintiff has raised a dispute as to whether all of that training actually took place. However, that is not a material factual dispute for purposes of Ryan and Cohen's entitlement to Qualified Immunity. As noted, neither were the actual instructors of these training procedures. That was left to the department's experts. As director of the academy, Cohen was merely an administrator of the program. As director of administration, Ryan was even farther removed from the actual instruction. While the plaintiff may have raised a factual dispute as to what the instructors actually taught (an allegation that your defendants in no way agree to) there has never been a suggestion that Melaragno, Boehm and/or Vinacco was somehow unqualified to teach such procedures. That distinction is significant because, at best, Cohen's (and Ryans) pertinent conduct is their selection of and/or permitted use of/reliance upon those instructors to teach the recruits such tactics. That is of great import to the Qualified Immunity Analysis because ultimately the question must be asked as to just what <u>their</u> unlawful conduct is alleged to be. They were not the shooters of Young nor were they the instructors of Solitro. As directors of their respective academies, they had a supervisory role in the administration of the training programs.

Hence, that leads to the second step of the *Saucier* analysis. That is, assuming a constitutional violation could be established—in this context that would be constitutionally deficient training so that Solitro was not prepared for the situation he faced, then the next sequential step is to ask whether the right to such training was

clearly established. To answer the question, one must first look at the substantive law governing supervisory liability for deficient training.

A superior officer cannot be held vicariously liable under 42 U.S.C. §1983 on a respondeat superior theory, *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581. The supervisor may only be found liable on the basis of his own acts or omissions, *Id.* at 582. Beyond deliberate indifference, there is also a causational element, i.e. a nexus, that must be shown as well. In addition to deliberate indifference, the plaintiff must affirmatively connect the supervisor's conduct to the subordinate's violative act or omission, *Id.* A causal link may be shown where there exists a known history of widespread abuse, sufficient to alert a supervisor to ongoing violations, coupled with his failure to take any action to correct the same, *Id.*

The 1st Circuit was careful to note, however, that "we hasten to add that isolated instances of unconstitutional activity ordinarily are insufficient to establish a supervisor's policy or custom, or otherwise to show deliberate indifference," *Id.* Additionally, and "by like token," proof of mere negligence without more, is inadequate to ground supervisory liability," *Id.*

This Circuit has further stated that to establish reckless or careless indifference on the part of a supervisor, it must be shown that it would be manifest to any reasonable supervisor that his conduct was **very likely** to violate an individual's constitutional rights, *Febus-Rodriguez v. Bettencourt-Lebron*, 14 F.3d 87, 92 1st Cir. (1994).

With regard to supervisory liability in an "inadequate training"type case, this Circuit has pointed to the seminal case of *City of Canton v. Harris,* 489 U.S. 378 (1989), see *Manarite v. Springfield*, 957 F.2d 953 (1st Cir. 1992).

In *Canton*, the Supreme Court held that under certain limited circumstances, a municipality may be held liable under §1983 for constitutional violations resulting from

its failure to train employees. The court made it clear that liability may only be had where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact with, *Id* at 388. Furthermore, the failure to train must reflect a deliberate or conscious choice, *Id.* at 389. Regarding the necessary causal link/nexus, the identified training deficiency must be closely related to the ultimate injury, *Id.* at 391.

Certain language of the *Canton* case is particularly noteworthy to quote as it relates to this case:

> That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program . . . it may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations which they must deal. Plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable. *Id.* at 390-391.

The above standards lay out the "clearly established" rights that the citizenry has to constitutionally adequate training of police officers. Certainly there is a high standard to be met before a constitutional violation could be shown. For purposes of Qualified Immunity however, the pertinent question, in a general sense, is whether or not any reasonable supervisor of the training program, could have believed that the program comported with these standards. Said another way, would it be clear, to all but the plainly incompetent, that the training program could not meet these standards.

In the specific context of this case, the relevant, dispositive inquiry then becomes whether it would have been clear to a reasonable supervisor that Cohen's and/or Ryan's conduct was unlawful in the situation they confronted. Cohen's conduct was to supervise/administer a training program which employed the curriculum as outlined in these proceedings and utilized certified instructors to implement the training in a city where there had never been a friendly fire incident or any suggestion of improper shootings of innocent persons.

Referring to *Anderson v. Craighton,* the *Saucier* court notes that the contours of the right (allegedly violated) must be sufficiently clear that a reasonable official would understand that what he is doing violates that right, 121 S. Ct. at 2156 [7]. Given the standards set out in *Canton* and its progeny, how can it be said that a training supervisor, such as Cohen and/or Ryan, in the context of this case and their conduct, would clearly know that his conduct was unlawful, or, said another way, no supervisor in their position, other than the plainly incompetent, could have believed that he was lawfully supervising the training of the 58th Police Academy.

It really becomes an academic question when we add a couple of additional factors to the equation. That is, a learned and experienced judge of this Court (Judge Lisi) ruled as a matter of law that, on the merits, the plaintiff's could not show that this training program was constitutionally deficient. Although overturned by the appellate court, that does not change the fact that the ruling was made, and made with the benefit of extensive briefing by multiple lawyers and no doubt the Court's own research and analysis. Compare that to a police lieutenant and/or captain, without the benefit of such research, briefing and argument. How could it be said that they would clearly know they were violating the constitution.

Moreover, while it reversed Judge Lisi's ruling, the appellate court did not rule that the training was constitutionally deficient, it merely stated that a jury might find

that it is or, a jury may find that it is not. As did the District Court, the Circuit Court had the benefit of voluminous briefing by multiple lawyers and it could not conclude that the program was constitutionally deficient. How can the police officials in this case be charged with the knowledge, for Qualified Immunity purposes, that it was so deficient.

Additionally, and in like context, it cannot be overlooked that while the jury found Solitro's conduct to have violated Young's rights, that same jury found that Saraiva did not violate his rights. The training curriculum as well as the instructors were the same for both the 57th and the 58th police academies. This fact, like Judge Lisi's ruling that the training was not unconstitutional along with the appellate court's non-decision on the issue, clearly suggests that the decision as to whether or not Qualified Immunity applies is really an academic one. The Qualified Immunity Doctrine recognizes that government officials, in this case police officials, are not judges and lawyers. Yet they are charged to make discretionary decisions and thus must be afforded a high degree of protection so that as long as they are not plainly incompetent and/or knowingly violating the law, they will be entitled to Qualified Immunity protection.

## DEFENDANT, RYAN'S POSITION Viz Viz<br>THE 57TH POLICE ACADEMY

Ryan was the director of the 57th Police Academy, attended by Saraiva. Saraiva was found not to have violated Young's rights and that finding was affirmed by the appellate court. As such, and as a matter of law, Ryan could have no supervisory liability since his "subordinate" (Saraiva) did not commit a constitutional violation. At some point after the 57th academy and prior to the 58th, Ryan assumed the position of

director of administration. In that capacity he was responsible, in a general oversight manner, for 12 units of the department, one of which was training. His duties were more related to budgetary and personnel matters as opposed to the implementation of the day to day goings on of those units. As such, Ryan would assert this as an additional ground for his entitlement to summary judgment.

Respectfully Submitted;

DEFENDANTS, Cohen and Ryan
By Their Attorney,

Michael J. Colucci, Esq. #3302
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

**CERTIFICATION**

I certify that I sent a true copy of the within on 8/12/05 to:

Kevin F. McHugh, Esq.
CITY SOLICITOR'S OFFICE
275 Westminster Street, Suite 200
Providence, RI 02903-1845

Robert B. Mann, Esq.
501 Turks Head Place
Providence, RI 02903

Nick Brustin, Esq.
Cochran, Neufeld & Scheck, LP
99 Hudson Street, 8th Floor
New York, NY 10013

14