MJC:jlb 95306 \pleading\95306undisputed.wpd

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SCANNED

| | | |
|---|---|---|
| LEISA YOUNG | ) | |
| | ) | |
| VS. | ) | C.A. NO. 01-288S |
| | ) | |
| CITY OF PROVIDENCE, ET AL | ) | |

**DEFENDANTS, COHEN AND RYAN'S STATEMENT OF UNDISPUTED FACTS**

1. The Plaintiff's decedent, Cornel Young, Jr. (Young) was a member of the Providence Police Department on January 28, 2000 as were defendants, Carlos Saraiva (Saraiva) and Michael Solitro (Solitro). Young, Saraiva and Solitro were all employed by the City of Providence on said date.

2. Captain (retired) John Ryan was the Director of the 57th Training Academy—this academy was attended by Saraiva and Young. Lieutenant Kenneth Cohen was the Director of the 58th Training Academy—the academy that Solitro attended.

3. On the evening in question, Young was off duty, wearing plain clothes consisting of dark pants, dark jacket, and a baseball hat. Young was in attendance at the eatery in question, Fidas Restaurant, shortly before the sued upon incident.

4. Saraiva and Solitro were on duty in the full inform of the Providence Police Department. Both arrived on the scene, riding together in a fully marked Providence Police Patrol car.

5. In the early morning hours of January 29, 2000, Saraiva and Solitro were dispatched for a disturbance at Fidas Restaurant.

6. The disturbance involved competing groups of individuals. One of the groups included a man named Aldrin Diaz (Diaz).

7. The disturbance initiated inside of the restaurant between female members of the Diaz group and the opposing group. Young was present inside of the restaurant at the time although he did not get involved in the disturbance in any manner.

8. Said disturbance caused the cook of the establishment to call the police which lead to the dispatch of Saraiva and Solitro.

439

9. Subsequent to the call for police, the disturbance spilled out into the parking lot and eventually lead to the introduction of a hand gun into the situation by Diaz as he displayed and pointed the weapon at his opponents. Diaz then entered his vehicle and was about to leave the area when Saraiva/Solitro pulled up at the scene behind him.

10. Saraiva and Solitro observed Diaz with the weapon. They quickly exited the patrol car, drew their weapons on Diaz and ordered him to drop the weapon and get on the ground.

11. Diaz complied with the orders of Saraiva and Solitro and was in the process of laying on the ground when Young emerged from the restaurant, gun in hand, and headed straight for Diaz.

12. Neither Saraiva nor Solitro recognized Young as a police officer nor did Young do or say anything that caused Saraiva or Solitro to believe he was a police officer.

13. Young did not display his badge or any police credentials. He did not shout out that he was a police officer as he approached Diaz, Saraiva and Solitro. Neither Saraiva nor Solitro heard Young say anything as he approached.

14. As Young approached, both Saraiva and Solitro drew their weapons on him and yelled/ordered for him to drop his weapon. They both repeated the commands for Young to drop the weapon but he continued approaching without doing so and began to turn toward them, at which time both Saraiva and Solitro shot Young.

15. When they initially exited their patrol car, Saraiva took cover behind two telephone poles and Solitro took cover behind the engine block of the police vehicle. From this position they challenged Diaz. As Diaz began to get on the ground, Solitro began to move toward Diaz while his partner, Saraiva, remained behind the telephone poles with his weapon drawn on Diaz. It was at that point that Young exited the restaurant and began his approach toward the scene.

16. The plaintiff does not allege or claim that either Saraiva or Solitro knew Young was a police officer at any time before they shot him.

17. The 57th and 58th Training Academies employed 1000 hours of training over the course of approximately 25 weeks. Of that, 148 hours are devoted to patrol operations, 296 hours are devoted to physical training and defensive tactics and 80 hours are devoted to the officer "street survival"

program. The entire breakdown of the 1000 hours is exhibited in the following charts.[1] (Full size copies are attached as *Exhibit 1* in the Appendix.)

Engaging in improper conduct. This would include the use of profanity in the presence of any members or non-members of the department, quarreling with non-members of the department, directing or making any improper gestures to any non-member of the department, while on duty, while in uniform or while acting as an agent of the Providence Police Department. NOTE: Second offense – three(3) demerits.

Recruits will not associate or speak with any members of the Providence Police Department excluding the staff unless circumstances demand it and the staff is immediately notified.

ONE (1) DEMERIT

Willfully misuse any equipment, tools or devices at any time which may endanger life or property.

NOTE: Unless noted, all demerits will double in value with the second offense. If any offense is repeated for a third time it will be the Directors decision to triple the demerits or call for dismissal of the academy.

CHAPTER 3

PROVIDENCE POLICE RECRUIT CURRICULUM

SECTION 1 - INTRODUCTION

A. The following information is a syllabus of the training conducted at the Providence Police Academy in preparation for your appointment as a Providence Police Officer.

B. The academic and practical field training segments of the Providence Police Recruit training syllabus are designated with a balance of Police science and procedure, law and proficiency skills. Officers must deal effectively with all members of the community in a manner which will maintain their support and confidence. The curriculum contains the basic police foundation needed by police officers to perform their assigned tasks while protecting life, personal liberty and property. Emphasis is placed on Federal, State, Municipal Law and patrol operations.

| | |
|---|---|
| 1. OVERVIEW (7HRS) | |
| a. Curriculum overview | 1hr |
| b. P.P.D. Organization and History | 1hr |
| c. Recruit Stress | 2hrs |
| d. Ethics | 2hrs |
| e. Recruit Biography | 1 hr |
| Total | 7hrs |
| 2. PATROL OPERATIONS | |
| a. Patrol techniques | 4hrs |
| b. Arrest /Booking Procedures | 4hrs |
| c. Beat/Post responsibilities | 6hrs |
| d. Communication Procedures | 7hrs |
| e. Roll Call Procedures | 2hrs |
| f. Police report Writing Lecture practical application on a continual basis. | 16hrs |
| h. Crime Scene Management BCI | 6hrs |
| i. C/F Package | 1hr |
| j. Affidavit/Warrants | 1hr |
| k. Courtroom Demeanor | 2hrs |
| l. Fire Department Arson | 2hrs |
| m. Hazmat | 4hrs |
| n. Bloodborne Pathogens | 1hr |
| o. Domestic Violence Unit | 2hrs |
| p. Mounted Command | 2hrs |
| q. K-9 Unit | 2hrs |
| r. Animal Control | 1hr |
| s. Rules and Regulations | 2hrs |
| t. General Orders, Deadly Force, Pursuit policy, Response | 3hrs |
| u. Drivers Training | 6hrs |
| v. Computer Training/Hands on with Staff Members | 6hrs |
| w. Introduction to Spanish | 6hrs |
| x. Stress Management | 16hrs |
| y. LoJack | 4hrs |
| z. Riot Control | 4hrs |
| aa. Community Policing/Current Perspectives in Policing Problem Oriented Policing | 36hrs |
| Total | 140hrs |
| 3. TRAFFIC OPERATIONS | |
| a. Role of Traffic Officer/G.O. pertaining to traffic | 1hr |
| b. Traffic Scene Management | 2hrs |
| c. Practical / Misc. Traffic Issues | 2hrs |
| d. Accident Investigation | 4hrs |
| e. Field Sobriety Testing | 11hrs |
| f. Overview of EVOC Training | 3hrs |
| g. RI Motor Vehicle Code | 4hrs |
| h. DWI/Refusals | 3hrs |
| Total | 30hrs |
| 4. ADMINSTRATION OF JUSTICE | 13hrs |
| Total | 13hrs |
| 5. SUBSTANTIVE CRIMINAL LAW | 20hrs. |
| a. Criminology | 5hrs |
| b. Scenario Education/Camp Varnum | 40hrs |
| c. Domestic Violence | 8hrs |
| d. Juvenile Law | 8hrs |
| e. Courtroom Testimony | 22hrs |
| Total | 103-hrs |
| 6. CRIMINAL PROCEDURE | |
| a. Search and Seizure | 20hrs |
| b. Arrest/Deadly Force | 14hrs |
| c. Civil Liability | 2hrs |
| d. Mental Health Legal Issues | 2hrs |
| e. C.I.F/Grand Jury.-Legal Issues | 2hrs |
| Total | 40hrs |
| 7. INVESTIGATIVE BRANCH | |
| a. Role of the investigative Division | 4hrs |
| b. Gangs | 2hrs |
| c. Narcotics/S.S.D. | 2hrs |
| d. Organized Crime | 2hrs |
| e. Internal Affairs | 2hrs |
| f. Juvenile Division | 5hrs |
| g. Role of the Medical Examiner | 4hrs |
| h. Sex Crime Unit | 1hr |
| i. Auto Squad | 1hr |
| j. FBI | 1hr |
| k. DEA | 1hr |
| l. Immigration | 1hr |
| m. ATF | 1hr |
| n. DCYF | 1hr |
| o. Secret Service | 1hr |
| Total | 29hrs |
| 8. MUTLTICULTURAL DIVERSITY PROGRAM 40hrs class work 60hrs field work | 100hrs |
| 9. RHODE ISLAND DISABLITIES COUNCIL | 3hrs |
| 10. PROVIDENCE MENTAL HEALTH | 3hrs |
| Total | 106hrs |
| 9. PHYSICAL TRAINING AND DEFENSIVE TACTICS | |
| a. Verbal Judo | 32hrs |
| b. Drill and Ceremony | 24hrs |
| c. Defensive Tactics | 120hrs |
| 1. Skill Drills | |
| 2. Boxing | |
| 3. Handgun Retention | |
| 4. Handcuffing | |
| 5. Searching of suspects | |
| 6. Nightstick Techniques | |
| 7. Cap Stun Training | |
| d. Physical Conditioning | 120hrs |
| Total | 296hrs |
| 10. OFFICER " STREET SURVIVAL " PROGRAM | |
| a. Principals of Street Survival | |
| b. Principals of Survival Shooting | |
| c. Use of Deadly Force | |
| d. Gunfight Techniques | |
| e. Handgun retention | |
| f. Handcuffing | |
| g. Close Quarters Firing | |
| h. Handling of Domestic Disputes | |
| i. Unknown Threat/Vehicle Stops | |
| j. Building Approaches | |
| k. Active Counter measures | |
| l. High Risk Vehicle Stops | |
| m. Day Stress Firing Obstacle Course | |
| n. Night Stress Firing Course | |
| o. Firearms Training | |
| Total | 80hrs |
| 11. EVOC EMERGENCY VEHICLE OPERATION CLASS | Total 40hrs |
| 12. WATER SAFETY | Total 4hrs |
| 13. CPR FIRST AID | Total 10hrs |
| 14. STAFF/ADMIN TIME | Total 94hrs |
| TOTAL HOURS | 1000hrs |

---

[1] Reproduced from the Providence Police Training Academy Manuals, "introduction" section as contained in co-defendant city's response to plaintiff's initial request for production. All aspects of training in this motion involve training employed during the academies of and in-service training of Saraiva, Solitro and Young.

18. Contained in *Exhibit 2* of the Appendix are the course overviews/outlines relating to firearms training, defensive tactics/officer survival and Camp Varnum, as found in Sections L, K, and E of said training academy manuals.

19. The Training Academy for the New York City Police Department, of which plaintiff's expert James Fyfe is the Deputy Commissioner of, also consists of 1000 hours.[2]

20. Neither Cohen nor Ryan actually taught the defensive tactics/firearms training/officer survival portions of the program. The same was taught by the department's certified instructors on such matters, Lieutenant Steven Melaragno, Sergeant Boehm and Sergeant Kenneth Vignacco.[3]

21. Recruits are trained to be patrol officers.[4]

22. After graduation from the academy, officers also get in-service training.[5] All police officers must also be re-certified each year with regard to firearms training. This includes live firing, paint ball training and Range 2000 Simulator Training.[6]

23. Both Saraiva and Solitro received Range 2000 Training.[7]

24. Range 2000 Training is a computer simulator with several different scenarios involving decisional/shoot don't shoot situations and also require the recruits to give correct verbal commands and take appropriate cover.[8]

25. Paint ball training (simunition training) involves at lease four different scenarios, one of which involves an off duty officer. The other scenarios include a store owner, a private citizen and

---

[2] Deposition, James Fyfe, (Fyfe) 6/9/03—at page 72.

[3] See generally deposition of Kenneth Cohen, 11/25/02 (Cohen 2) at pages 18, 23, 40, 53, 147, 150, 151 as well as the depositions of Lieutenant Melaragno (Melaragno) at pages 12-14 and Sergeant Boehm (Boehm).

[4] Deposition of John Ryan (Ryan) at page 56.

[5] Ryan at page 62.

[6] Deposition of Steven Melaragno (Melaragno) at page 15.

[7] Melaragno at page 16 and 183 and deposition of Michael Solitro at page 200.

[8] Melaragno at pages 193-195 and at page 63.

an armed robber as well as searching for a suspect and it involves a decisional shooting concept, i.e. shoot/don't shoot option. A critical part of this training is to make sure that the officers are issuing appropriate commands.[9]

26. Academy recruits also go through a program known as Camp Varnum. A small city is set up and recruits are dispatched to various calls. Fourteen different scenarios are set up which include decisional shooting components as well as off duty/plain clothes officer scenarios. The goal of the program is to evaluate the decision making process of the recruits and to make sure that they are making sound, split second decisions.[10]

27. Decisional shooting scenarios could include an off duty officer or a "lady holding a garbage bag".[11]

28. Examples include an off duty officer stopped in a traffic stop who has a gun and badge in his compartment and reaches for it. Another includes an off duty officer running out of the car toward the officer yelling that he is in a hurry holding his badge.[12] Another scenario includes a call for a person in a citizen's backyard and responding recruits, come upon an off-duty officer who approaches with a gun and the recruits are told to challenge the officer and react to his compliance with their verbal commands.[13]

29. Scenario training can cover situations involving off duty officers, out of town police, undercover/drug unit people, in confrontations with the uniform officer—all under the broad heading of decisional shooting.[14] One such scenario includes a man-with-a-gun-call. Responding recruits are met by a man with a beard dressed in shabby clothes who is pointing a weapon. The recruits are

---

[9] Melaragno at pages 177-179, 182-183, 186-188.

[10] Deposition of Sergeant Boehm (Boehm) at pages 60-63, 71-72, 76-79, and page 89.

[11] Boehm at page 63.

[12] Boehm at page 68.

[13] Boehm at page 83-84.

[14] Melaragno at page 55.

taught to announce themselves from a good position of cover and order the person to put the gun down. The man will give a response such as "I'm on the job" or I'm with the DEA" and the recruits are instructed to have the person back up, and put the gun down until their identity is verified.[15]

30. Discussions with the recruits and critique of the scenario always follow such scenario training. Discussions are had regarding what the persons did right and wrong.[16]

31. Recruits do not play the role of off duty or plain clothes officers. The instructors use five or six persons from the SWAT team to assist them with instruction and role play for such matters.[17] During the critique/discussion sessions, recruits are also instructed as to what they should not do if they were the off duty officer.[18] Recruits are instructed not to make any sudden movements toward the uniformed offer, to hold their badge near their firearm, to give loud verbal commands, to identify themselves, to say the on-duty officer's name if they know it, and they are instructed that the uniform officer is in charge and that they must do as the uniformed officer says, without making any sudden movements toward him.[19]

32. Officer Survival Training included issues such as the use of cover and concealment, approaching a vehicle, entering a room, covering a building, each of which would include an off duty and/or undercover decisional shooting component to it.[20] At the end of the session, recruits would all be brought back into the classroom where discussions were held as to what took place.[21]

33. At the time of this incident, the New York City Police Department's Training Academy (which expert Fyfe is now the deputy commissioner of) similarly uses scenario training but, unlike

---

15 Melaragno at page 61-62.

16 Melaragno at page 67.

17 Melaragno at page 108-109.

18 Boehm at page 83-85.

19 Boehm at page 137-138, also at page 106, 107 and page 120.

20 Melaragno at page 83.

21 Melaragno at page 83-85.

Providence, because their recruit classes are so large, only four or five recruits are actually allowed to participate in the scenario while upwards of fifty recruits sit and watch. Discussion and critique then takes place following the scenario so they all can benefit therefrom.[22]

34. Recruits (Providence) are instructed that when an on-duty officer gets involved in police action that responding uniformed officers are in charge and that the off-duty officer must obey the commands of the uniformed officer and not make any sudden movements toward him and to realize the stress that the responding officer may be going through. They are also instructed as to the benefits of just being a witness in collecting information rather than jumping in on the action.[23]

35. With respect to the department's policy for off-duty officers to take action upon witnessing certain criminal activity, recruits are instructed that such action may very well be different than what they might do on duty and would depend on the circumstances confronting them. They are not to pretend that they are in uniform and in possession of all of the equipment of the uniformed officer and that the requirement for taking action can take many forms and can be satisfied by calling the crime in on a phone so that on-duty officers can handle it and/or by waiting for back up officers to arrive.[24]

36. On a prior occasion, while off-duty, Young was in the vicinity of an incident in downtown Providence wherein shots were fired from a group of young men in a car. Young took no action as a police officer and was reprimanded by his sergeant, Michael Figueiredo. Sergeant Figueiredo advised him that he should have called the situation in to the station so that if a uniformed officer had stopped the vehicle, they might have a better chance of knowing that there was a gun inside. Figueiredo emphasized that the action he expected Young to take was to call the situation in to the station.[25]

37. Written materials for the recruits at the training academy consist of a three volume set

---

[22] Fyfe deposition (6/9/03) at page 68.

[23] Boehm at page 107-108.

[24] Melaragno at page 26, 39-46 and page 51.

[25] Deposition of Michael Figueiredo at pages 22-28.

(several inches thick) of curriculum material. The academy is staffed by a lieutenant, a sergeant and four or five staff members. Numerous instructors are also used to teach the individual courses and outside agencies, such as mental health, domestic violence organizations, are also brought in to teach in their particular areas.[26] Firearms and use of force instructors are qualified and certified by national outside organizations such as the FBI, various gun manufacturers and street survival course/seminar/programs.[27]

38. To keep updated with training techniques etc., Ryan met with training and supervisory staff from other departments around the country. Melaragno would keep current by reading periodicals and training materials.[28]

39. There has never been a "friendly fire" incident in the history of the Providence Police Department whereby an on-duty officer shot and killed an off-duty officer.[29] Additionally, off-duty police action seldom occurs.[30]

40. Excluding dog attacks, Providence Police Officers discharge their weapons less than ten times per year on average. Civilians are shot no more than once or twice per year.[31]

41. Since 1987, and aside from scenario training and follow up discussions/critique, etc., academy instruction included a thirty minute lecture on off-duty identification issues when taking police action. These included identifying oneself, calling out that they are the police, displaying credentials and obeying commands of the uniform officers on scene.[32]

42. Neither Cohen nor Ryan directly supervised Saraiva, Solitro or Young during their

---

26 Ryan at page 27-30, 35, city response to plaintiff's request for production.

27 Ryan at 96-97.

28 Ryan at page 46-47 and Melaragno at page 12.

29 Ryan at page 153 and 104.

30 Ryan at 184-186.

31 Ryan at page 190.

32 Melaragno page 163-164.

careers with the Providence Police Department.

43. Major Cornel Young, Sr., the father of Young, is a retired Major of the Providence Police Department. Major Young testified that he saw his son often (2-3 times/week) and he never sensed that his son was deficient in any areas of police work. He reminded Young about the dangers of misidentification of off-duty officers (especially African-Americans) and of the importance of identifying yourself and showing your badge.[33]

DEFENDANTS, Cohen and Ryan
By Their Attorney,

Michael J. Colucci, Esq. #3302
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

**CERTIFICATION**

I certify that I sent a true copy of the within on 8/12/05 to:

Robert B. Mann, Esq.
501 Turks Head Place
Providence, RI 02903

Kevin F. McHugh, Esq.
CITY SOLICITOR'S OFFICE
275 Westminster Street, Suite 200
Providence, RI 02903-1845

Nick Brustin, Esq.
Cochran, Neufeld & Scheck, LP
99 Hudson Street, 8th Floor
New York, NY 10013

Jessica Beaudry

[33] Deposition of Major Cornel Young, Sr., at page 17-18, 21, 24-26, 28, 49.