UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LEISA YOUNG, In her Capacity as Administratrix of the Estate of Cornel Young, Jr. | ) ) ) | |
| v. | ) | No. C.A. No. 01-288 S |
| CITY OF PROVIDENCE by and through its treasurer, Stephen Napolitano, et al | ) ) ) | |

PLAINTIFF'S OBJECTION TO MOTION OF DEFENDANTS CITY OF PROVIDENCE AND URBANO PRIGNANO, JR. TO EXCLUDE ALL EVIDENCE OF AND REFERENCE TO THE "PLUNDER DOME' MATTER THE "PROMOTIONAL SCANDAL" AND OTHER SUCH MATTERS PERTAINING TO PLAINTIFF'S SO-CALLED EVIDENCE OF "SYSTEMIC DEFICIENCIES

Now comes the plaintiff and objects and responds to the motion of defendants City of Providence and Urbano Prignano, Jr. to exclude all evidence of and reference to the "Plunder Dome' matter the "Promotional Scandal" and other such matters pertaining to plaintiff's so-called evidence of "Systemic Deficiencies. In support of said objection the plaintiff submits the attached memorandum of law.

LEISA YOUNG, in her capacity as
Administratrix of the Estate of
Cornel Young Jr.,
By her Attorneys

Robert B. Mann #0153
Mann & Mitchell
One Turks Head Pl., Ste. 501
Providence, RI 02903
(401) 351-5770

Barry Scheck, Esq. #4612
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9084

Nick Brustin, Esq. #0605
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9084

**Certification**

I hereby certify that a copy of the within document was mailed or delivered to the person or offices of Kevin McHugh, Esq., City Solicitors Office, 275 Westminster St., Suite 200, Providence, R.I. 02903 and Michael Colucci, Esq., Olenn & Penza, LLP, 530 Greenwich Ave., Warwick, RI 02886 on the 18 day of October, 2005.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LEISA YOUNG, In her Capacity as<br>Administratrix of the Estate of Cornel Young, Jr. | )<br>)<br>) | |
| v. | ) | No. C.A. No. 01-288 S |
| | ) | |
| CITY OF PROVIDENCE by and through<br>its treasurer, Stephen Napolitano, et al | )<br>) | |

PLAINTIFF'S RESPONSE TO DEFENDANTS CITY OF PROVIDENCE, AND URBANO PRIGNANO, JR.'S MOTIONS IN LIMINETO EXCLUDE EVIDENCE OF AND REFERENCE TO THE "PLUNDERDOME" MATTER, THE "PROMOTIONAL SCANDAL" AND OTHERSUCH MATTERS PERTAINING TO PLAINTIFF'S SO-CALLED SYSTEMIC DEFICIENCIES"

I. The Evidence of Ryan and Prignano's Involvement in Cheating and Helping Officers Cheat on Promotional Exams is Directly Admissible and Relevant on the Issue of Deliberate Indifference

Defendants seek to exclude all evidence of and reference to the "promotional scandal" within the Providence Police Department under a theory that such evidence would be barred by Fed. R. Evid. 404(b) which prohibits evidence of prior bad acts. They also seek to exclude evidence of then Commissioner Partington's prior testimony on the basis that he was never qualified as an expert to render opinions.. First, the acts that Defendants have already admitted to occurred during and in the course of their supervision and policy making as to the training program in place during the years prior to Mr. Young's death-- they are not prior bad acts and not within the realm of evidence that falls under 404(b). And, to now label Commissioner Partington's sworn testimony about his beliefs about the effect that misconduct by high-ranking officers under his direct command had on the department, is an attempt to keep essential

evidence from the jury. Partington saw a critical need for, and thought that the PPD provided training on, off-duty issues The subject matter of Partington's testimony is no different from that of Prignano, Ryan, or any other witnesses who describe their understanding of policy and actions of PPD officials during the relevant time periods. These areas of testimony relate to his supervision of PPD, the actions of his subordinates, and to the training provided. They demonstrate Partington's actual or constructive notice of the deficiencies and deliberate indifference as a policy maker. . See Memorandun in support of objection to motion in limine to exclude all evidence of and reference to Partington's opinion testimony contained in his deposition, which memorandum is incorporated herein.

In remanding this case for trial, the Court of Appeals held "that there is enough evidence that the City was deliberately indifferent in its training and lack of protocols in this area and that the training deficiencies and absence of protocols were causally linked to Solitro's use of excessive force..." Young v. City of Providence, 404 F.3d 4, 11 (1st Cir. 2005). In order to establish whether the City was deliberately indifferent in its training and lack of protocols in this area a jury must determine whether the training was adequate and if not, "whether such inadequate training can justifiably be said to represent 'city policy'". Bordanaro v. McLeod, 871 F.2d 1151, 1159 (1st Cir. 1989). In Bordanaro, the Court of Appeals suggested that this determination could be evinced by looking at the adequacy of the training program vis a vis the performance of those responsible for implementing the program i.e. training. Id. Thus, in determining whether the policymakers and defendants supervisors acted with deliberate indifference on off-duty training, the quality and scope of their supervision of training is critically relevant.

For example, and as described more fully below, both Partington and Prignano openly delegated their training responsibilities to subordinates (Partington to Prignano and Prignano to Ryan) and then admittedly provided them almost no oversight. In fact, one of the primary defenses argued by the individual defendants on the issue of qualified immunity is that they were simply administrators who selected highly qualified subordinates and then trusted them to do their jobs. Prignano, for example, testified that Ryan was one of the officers, who because of his rank and title, did not need supervision. Prignano Dep at 32, 38 Thus, by his own admission in defense of his conduct, Prignano argues that his only job as a supervisor was to select qualified candidates. Plaintiff intends to introduce evidence that the manner in which Prignano selected qualified candidates was to help them cheat on their promotional exams. More specifically, the manner in which Prignano supervised training was to help Ryan cheat on his promotional exam and then give him unfettered discretion due to the rank he obtained illegally. Thus, plaintiff intends to introduce admissions, solely from the testimony of defendants and policy-makers themselves, concerning their involvement in helping officers, including Ryan, cheat on promotional exams as a means of supervision. In fact , defendants' method of supervision - helping officers cheat on promotional exams - is directly relevant to deliberate indifference in supervision.

Allowing certain officers, indeed Ryan himself, the opportunity to view source materials containing the answers to upcoming promotional exams certainly would demonstrate that the supervisors acted with deliberate indifference. In making this determination the jury is entitled to hear the part that these Defendants played in the misconduct and, to assess the validity of their claim that their only responsibilities concerning training were to ensure that qualified men and women were in place. This evidence while obviously damaging to Prignano is extremely

probative and is not unfairly prejudicial. Because the quality and scope of Prignano's supervision is centrally at issue, there is no danger of the jury drawing an unfair inference from these acts as they are directly related to his supervision of training.

A. Deliberate Indifference Standard Concerning Supervision

Both the Monell and supervisory claims are based on a "deliberate indifference" standard and state of mind is the central element of that claim, Canton v. Harris, 489 U.S. 378, 388-90 (1989); Camilo-Robles v. Zapata, 175 F.3d 41,44 (1st Cir. 1999). Evidence of a policy maker's or supervisor's supervision generally can be telling as to their state of mind as to a particular act. Defendants claim that the "promotional exam misconduct" is unfair "propensity evidence under Rule 404(b). In fact, the case Defendants rely upon, Gutierrez-Rodriguez v. Cartegena, 882 F.2d 553 (1st Cir. 1989) indicates that directly relevant evidence is whether a department's system was"wholly inadequate and impotent" Id., at 566. That is, the lack of supervision is significant in addition to the failure to train. Partington agreed in substance with Plaintiff's expert, Dr. James Fyfe's findings that this misconduct rendered the PPD a "broken" department." (Fyfe Rpt. 2,3) Misconduct at the highest levels sends a dangerous message that misconduct is not taken seriously, that rule breaking is not only tolerated, but is practiced, by the leadership. Id.

B. Prignano's Efforts to Help Officers Cheat on Promotional Exams Demonstrates his Deliberate Indifference to the Supervision of Training

Prignano's role in facilitating the cheating goes to his state of mind, and his deliberate indifference to supervision. Commissioner John Partington testified that Prignano's admissions about assisting officers cheat on promotional exams violated the PPD rules and regulations;

compromised the integrity of the department and went to the core of his supervisory responsibilities. He agreed that the Chief leads by example and if he is lying and cheating, he cannot expect other officers to act differently; that such misconduct negatively impacted all of his supervisory responsibilities; that Prignano should have been fired; and, that he could not possible lead the PPD. (Partington Dep. At 67-70, 209-9). This evidence, while it may be damaging, goes directly to Prignano's state of mind about his job responsibilities and duties.

Indeed, Prignano admitted to FBI investigators that he gave advance copies of the source documents for promotional exams to certain officers, including Ryan (Testimony of Urbano Prignano in U.S. v. Cianci, May 13, 2002, at 143-6). He further agreed that it was important to set an example by his own conduct ( Pg.71 Ln19) and, that Ryan was one of the officers, because of his rank and title, that did not need supervision (Pg32 Ln5, Pg 38 Ln22). The fact that Ryan himself viewed source materials for his own promotion to Captain and Director of Administration over training, made available to him by Prignano, is central to the jury's determination on deliberate indifference. Prignano did not supervise by putting in place and relying upon the most qualified people. Instead, he engaged in misconduct to promote candidates who, for whatever reason, Prignano was concerned would not score high enough on the PPD's prescribed qualifying examination. In so doing he violated the PPD's own rules and regulations, (Exhibit 8, Sect 303 Promotion, 303.2, 303.3, attached hereto) and as Partington and Fyfe both agree, disregarded the most basic tenants of police administration.

B. Ryan's Cheating and Helping Other Officers Cheat on Promotional Exams Demonstrates his Deliberate Indifference to the Supervision of Training

Ryan's admissions in his depositions regarding his involvement in the "promotional exam misconduct" clearly demonstrate his supervisory deficiencies and state of mind and again,

is central to assessing deliberate indifference. Ryan testified that he gave advance copies of source materials to candidates taking the promotional exams at the behest of Chief Prignano. Ryan told these officers that he was leaving the materials on his desk and told the candidates that the materials were available for them to review when he was away from his desk In fact, the reason Ryan had access to the source materials was that he was the person in the PPD charged with reviewing the source materials to ensure that the exams were fair. Ryan II at 210. Remarkably, Ryan testified that he did not violate any PPD rules or regulations, <u>but see</u> Exh. 8 Sect. 303, and that leaving the test materials on his desk for candidates to review in his absence rather than providing them directly, in no way suggested that he understood what he was doing was improper. (Ryan II 165-73, 174-95, 63-4, 69, 184-5, 191-4).

As the Director of Training and later as the Director of Administration over training, Ryan was responsible for ensuring that police recruits and officers understood rules and regulations of the PPD and that they follow those rules. Ryan at 56. By openly flouting them, Ryan sent a clear message that the rules, regulations and training need not be followed. Partington testified that he later removed Ryan from his position directing the training academy due to concerns with his supervision generally. Partington agreed with the Fyfe findings that such conduct indicated the the PPD had systemically corrupt leadership, especially given that Ryan was the "second most influential policy maker and supervisor in the department" (Partington Dep. 56-7, 67-8, 208-9).

More specifically, Ryan testified that he trained officers to ignore the PPD's written off-duty policy and generally not get involved off-duty and not take direct police action. His rational for such training was not to protect officers but to shield the officers and the PPD from civil liability. (Ryan 214-19) Yet, Ryan understood that a policy that is not followed or trained is

worse than no policy at all. (Ryan at 253). As evidenced by his blatant disregard for the rules concerning promotions and investigations (see Plaintiff's memorandum on Post Incident Matters concerning Ryan's involvement with Lt. Lee's statements to the press), Ryan's training of officers to disregard the written rule on off-duty action was apart of a pattern of disregard for the rules and regulations which defined his mode of supervision in all areas including training.

Finally, given that Ryan himself had access to the source materials for his own promotional exam for Captain, it is hardly surprising that he was confused about the PPD policies requiring officers to act in their official capacity regardless of whether they are on or off duty, if an incident requires police action. For example, Ryan, unlike every other officer who testified, stated that exhibits 3 and 4, the PPD's written directives on off-duty action, may or may not have both been in effect, were inconsistent and at least exhibit 4 provided officers discretion concerning when and how to take action off-duty.(Ryan 254-55, Ryan II at 265). His purported lack of knowledge about the PPD policies in effect at the time of Officer Young's death may well be related to his having access to the source materials. He had all the answers for his exam. The off-duty policy for which Ryan expressed confusion, Exhibit 4 attached hereto, was part of the study material package for the Captains exam, the promotional exam which Prignano told the FBI he helped Ryan cheat on. Ryan never had to study Exhibit 4 because he, unlike the other officers who took the exam, had the answers or at least the source materials in advance. Remarkably, Ryan indicated that he saw nothing improper about making the source materials available to help certain officers receive high scores in order hide the "appearance of impropriety to the system." (Ryan II 185, 191-94)

To exclude evidence of the "promotional scandal", particularly as to Prignano and Ryan, would leave the jury without critical information about the supervision of training in the PPD

and would limit their ability to make an informed judgment on the deliberate indifference standard.

II. The Evidence is Admissible Under 404(b)

Not only is the evidence relating to the "promotional scandal" directly admissible on the substantive claims, it is also admissible under 404(b) because involvement in potentially criminal misconduct gives Defendants a motive to be untruthful regarding any misconduct generally in order to avoid criminal liability or other sanction. It is evidence of bias or interest that provides a continuing motive to be untruthful. While Defendants assert that no criminal convictions have resulted against them, at a minimum there are internal investigations pending. Providence Mayor David N. Cicilline promised to do 'everything in my power to repair the broken trust in the department by getting to the bottom of the testing and promotion scandal..."
(Press Release, January 23, 2004, attached) In this statement he announced that he would pursue the revocation of pension benefits and, he would present the information gathered in the investigation to the Attorney General for review. A year later, in another release, he indicated that as a result of the investigation "the City will move to the second phase of prosecutions,,,Lawyers will now actively pursue pension revocation proceedings for former senior officers Urbano Prignano, John Ryan, and Martin Hames." (Press Release, March 11, 2005)

Now more than ever before, Prignano and Ryan have a continuing motive to cover-up any other misconduct which might negatively impact their reputation in the eyes of investigators and to be untruthful about their conduct as high ranking supervisors of the PPD. Prignano has previously asserted his Fifth Amendment privilege.. In so doing, the jury is entitled to draw

adverse inferences regarding the subject matter of questions to which a party refuses to testify. See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment 'does not preclude the inference where the privilege is claimed by a party to a Civil cause' (citations omitted)). In Kelly v. Ward, 1994 WL 1631041 (S.D. Ohio), the court found that prior disciplinary problems were relevant to credibility because past violations might give the officer, "additional incentive not to relate those events fully and accurately if, by doing so, he would inculpate himself."

Similarly, Defendants past misconduct goes to a continuing motive to avoid truthfully describing misconduct that stemmed from their supervision of the PPD, which might further inculpate them in ongoing investigations including their attempts to thwart the efforts to revoke their pensions. Defendants reliance on Aguilar-Aranceta, 58 F.3d 796, (1st Cir. 1995) that the "promotional exam misconduct" is unfair "propensity" evidence is misplaced. That case involved a prior conviction and the court concluded that the prior conduct was admissible as to knowledge, given the significant similarities of the circumstances.

Evidence of the "promotional scandal" as the Defendants refer to the then practice of allowing certain officers source materials prior to taking promotional exams, is inextricably intertwined with the questions before the jury. It is not an irrelevant and unrelated matter as Defendants contend, nor is it causally unconnected. Prignano gave source materials to Ryan. Ryan was then promoted to captain and became Director of Administration over training, where he proceeded to train new police officers to ignore the rules and regulations about off-duty requirements. He did not know the rules and regulations never having had to study them. Ryan's

confusion about the regulations in Plaintiff's 3 and 4 only underscores how interrelated this issue is to deliberate indifference.

III. "Promotional Exam Misconduct" is Admissible under Fed. R. Evid. 608

The Defendants never address that the misconduct is directly admissible as impeachment under 608, regardless of prejudice. Credibility is centrally at issue, where "deliberate indifference" requires that the jury evaluate Ryan and Prignano's state of mind with regard to supervisory responsibilities. See Sherfield v. Matheny, 820 F.2d 1225 (6th Cir. 1987)("primary 'issue' for the jury" as to supervisory liability, was "one of credibility").Ryan had a general reputation for untruthfulness. (Partington 67-8, Simoneau 62-8, Searles 51-4, Boehm 181-4, Lee 86-93, Harris 107-110) Rule 608 is designed to address the situation in which the conduct of the witness in and of itself calls into question his credibility. In Deary v. City of Gloucester, 9 F.3d 191,196 (1st Cir. 1993) the Court recognized that Rule 608 does not limit "introducing evidence about the untruthfulness of a witness." The Rule allows cross-examination of a witness about specific instances of conduct that may be probative of the untruthfulness of a witness about whose character the witness has testified. There is no question that cheating on a promotional exam and helping other officers to cheat on promotional exams is conduct which is probative of truthfulness, as is Ryan and Prignano's lying to Partington concerning their involvement in these matters. Partington at 67. Pursuant to Rule 608, plaintiff would, after laying proper foundations, ask a witness such as Partington, who believed Prignano and Ryan lied to him regarding this misconduct, about their reputation for untruthfulness, and then as to the specific instance of untruthfulness pursuant to 608(b). See Hynes v. Coughlin, 79 F.3d 285,293 (2nd Cir. 1996) (judgment for the defendants was vacated, in part because the District Court ruled the defendant

corrections officer in a civil rights suit could not be cross-examined about two instances of making false statements.)

IV. Conclusion

Prignano and Ryan's involvement in cheating and helping other cheat on promotional exams as a mode of supervision is directly relevant to defendants' state of mind and the specific allegations of deliberate indifference in supervising training. Their involvement in such matters and the City's reaction to their involvement also provides them a clear incentive to misrepresent or sanitize their prior misconduct to protect their pensions and avoid other potential penalties. Finally, no matter how defendants attempt to minimize or frame their conduct, cheating on promotional exams is evidence of untruthfulness. Although such evidence is prejudicial in the sense that it shows defendants and their method of supervision in a negative light, for all of the above reasons, the evidence is highly probative and there is no danger of improper inference or unfair prejudice.

LEISA YOUNG, in her capacity as
Administratrix of the Estate of
Cornel Young Jr.,
By her Attorneys

Robert B. Mann #0153
Mann & Mitchell
One Turks Head Pl., Ste. 610
Providence, RI 02903
(401) 351-5770

Barry Scheck, Esq. #4612
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081

Nick Brustin, Esq. #0605
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081

**Certification**

I hereby certify that a copy of the within document was mailed or delivered to the person or offices of Kevin McHugh, Esq., City Solicitors Office, 275 Westminster St., Suite 200, Providence, R.I. 02903 and Michael Colucci, Esq., Olenn & Penza, LLP, 530 Greenwich Ave., Warwick, RI 02886 on the 18 day of October, 2005.

SEC. 302. -ASSIGNMENTS, DETAILS AND TRANSFERS

302.1 AUTHORITY- TRANSFER, DUTY OR DETAIL ASSIGNMENT OF MEMBERS OR EMPLOYEES OF THE DEPARTMENT SHALL BE MADE BY THE COMMISSIONER OF PUBLIC SAFETY OR BY THE CHIEF OF POLICE WITH THE APPROVAL OF THE COMMISSIONER, EXCEPT, THAT IN EMERGENCIES PRECLUDING SUCH APPROVAL, THE CHIEF MAY DETAIL A MEMBER OR EMPLOYEE TO ANY PROPER DUTY. IN SUCH CASE THE CHIEF SHALL IMMEDIATELY SUBMIT A WRITTEN REPORT OF HIS ACTION TO THE COMMISSIONER.

302.2 DUTY BEYOND CITY LIMITS- UPON THE APPLICATION OF THE PROPER AUTHORITIES OF ANOTHER COMMUNITY, THE CHIEF OF POLICE MAY DETAIL MEMBERS OF THE FORCE TO PERFORM DUTIES BEYOND THE LIMITS OF THE CITY OF PROVIDENCE IN ORDER TO ASSIST THE AUTHORITIES OF SAID COMMUNITY TO SUPPRESS DISORDER OR PRESERVE THE PEACE.

SEC. 303 -PROMOTIONS

303.1 AUTHORITY- THE PROMOTION OF MEMBERS OF THE DEPARTMENT IS VESTED BY LAW IN THE COMMISSIONER OF PUBLIC SAFETY.

303.2 POLICY- THE PEOPLE OF PROVIDENCE HAVE A BASIC RIGHT TO THE BEST POSSIBLE POLICE PROTECTION, UNDER THE BEST POSSIBLE LEADERSHIP. EVERY MEMBER OF THE POLICE FORCE HAS A FUNDAMENTAL RIGHT TO EQUAL OPPORTUNITY WITH EVERY OTHER MEMBER IN DEMONSTRATING HIS FITNESS FOR LEADERSHIP. ANY PROMOTION POLICY WORTHY OF THE NAME MUST ENSURE, AS FAR AS IS HUMANLY POSSIBLE, THAT THE BEST QUALIFIED MEN BE APPOINTED TO SUPERIOR RANK. THIS MEANS THAT CHARACTER, ABILITY, PERFORMANCE, APTITUDE AND DEPTH OF EXPERIENCE MUST DETERMINE WHO IS TO BE PROMOTED. TO ENSURE THAT EVERY WORTHY POLICEMAN IS AFFORDED THAT OPPORTUNITY, EVERYONE MUST BE INFORMED ABOUT, AND THOROUGHLY UNDERSTAND, THE REQUIREMENTS FOR PROMOTION WELL IN ADVANCE OF ANNOUNCED PROMOTION DATES.

303.3 ELIGIBLE LIST- SELECTION OF CANDIDATES FOR PROMOTION SHALL TAKE PLACE AS NEEDED. THE NAMES OF SUCCESSFUL CANDIDATES SHALL BE PLACED ON AN ELIGIBLE LIST AND PROMOTED IN THE ORDER OF THEIR FINAL STANDING IN THE QUALIFYING PROCEDURES. ELIGIBILITY SHALL STAND FOR WHATEVER PERIOD IS DESIGNATED BY GENERAL ORDER FOR EACH LIST. AN ELIGIBLE LIST IN FORCE FOR PROMOTION TO ANY GIVEN RANK SHALL TERMINATE ON THE DATE OF ISSUANCE OF A GENERAL ORDER ANNOUNCING THE START OF PROCEDURES FOR THE CREATION OF A NEW ELIGIBLE LIST FOR PROMOTION TO THAT SPECIFIC RANK.

303.4 GENERAL REQUIREMENTS-

A. ELIGIBILITY. CANDIDATES FOR PROMOTION MUST HAVE SERVED IN THEIR PRESENT GRADES FOR THE PERIODS SHOWN BELOW TO BE ELIGIBLE TO APPLY. THE SERVICE MUST DATE BACK FROM THE DATE OF THE ANNOUNCEMENT ORDER. FOR PROMOTION TO:

SERGEANT - FIVE YEARS AS A PATROLMAN
LIEUTENANT - TWO YEARS AS A SERGEANT
CAPTAIN - ONE YEAR AS A LIEUTENANT

B. PHYSICAL. CANDIDATES MUST QUALIFY IN A PHYSICAL EXAMINATION AND PHYSICAL AGILITY TESTS. DETAILS OF THESE TESTS WILL BE PUBLISHED FROM TIME TO TIME.

C. INTELLECTUAL:

(1) INTELLIGENCE AND APTITUDE TESTS: CANDIDATES MUST QUALIFY IN THESE REQUIRED PSYCHOLOGICAL TESTS. HOWEVER, THE FIRST INTELLIGENCE TEST WILL SUFFICE FOR ALL SUBSEQUENT TESTS.

(2) EDUCATION: ALL CANDIDATES FOR PROMOTION TO ALL RANKS MUST HAVE COMPLETED THE TWELFTH GRADE AND HAVE GRADUATED FROM AN APPROVED HIGH SCHOOL, OR AN ACCEPTABLE EQUIVALENT.

(3) EVALUATION: ALL CANDIDATES MUST BE RATED BY AN EVALUATION BOARD ON A MAN-TO-MAN COMPARISON BASIS. FACTORS TO BE EVALUATED ARE: PHYSICAL QUALITIES, INTELLECTUAL CAPACITY, EMOTIONAL STABILITY, STRENGTH OF CHARACTER, AND LEADERSHIP ABILITY.

D. SERVICE CREDITS FOR SENIORITY AND COMMENDATIONS WILL BE ALLOWED AS SET FORTH IN THE GENERAL ORDER ANNOUNCING PROCEDURES ESTABLISHING EACH ELIGIBLE LIST.

E. PROFESSIONAL KNOWLEDGE SHALL BE DETERMINED BY A WRITTEN EXAMINATION SUITABLE FOR THE RANK INVOLVED AND COVERING POLICE TACTICS AND OPERATIONS, SUPERVISORY TECHNIQUES, STAFF PROCEDURES, INTELLIGENCE OPERATIONS, TRAINING METHODS, PERSONNEL MANAGEMENT, VERBAL AND WRITTEN LANGUAGE COMPREHENSION, SOCIAL AND HUMAN RELATION PROBLEMS, ADMINISTRATION, LAW, COURT PROCEDURE AND EVIDENCE.

303.5 PROMOTIONAL CREDIT POINTS- ALL CREDIT POINTS ACCRUED BY A MEMBER OF THE FORCE SHALL REMAIN IN EFFECT AND MAY BE CONTINUALLY USED IN PROMOTIONAL PROCEDURES UNTIL THE MEMBER IS ELEVATED TO THE NEXT HIGHER RANK. ANY EFFECTIVE DEMERIT POINTS ACCRUED BY A MEMBER OF THE FORCE SHALL BE SUBTRACTED FROM HIS ATTAINED CREDIT POINTS IN ANY PROMOTIONAL PROCEDURE.

**CAPTAIN'S TEST STUDY MATERIAL**

May 6, 1986

**GENERAL ORDER # 16**
**Series of 1986**

To: Commanding Officers

This General Order supersedes all pervious General Orders relative to this topic which have been issued by this department.

Effective immediately, the following shall be the procedure and policy of the Providence Police Department relative to the arrest and detention of individuals while.

I. On duty in the City of Providence

II. On duty outside of the City of Providence

III. Detail Status in the City of Providence

IV. Off duty in the City of Providence

V. Off duty outside of the City of Providence

VI. Police Officer who is victim whether in or out of City of Providence

*I.* ***ON DUTY IN THE CITY OF PROVIDENCE***

A police officer is mandated by the General Laws of the State of Rhode Island to enforce all laws to apprehend individuals for a violation of such.

A. **In Cases of Misdemeanor**

Police Officers are permitted to issue a summons whenever he has reason to believe that a person has committed or is committing a misdemeanor . The Police Officer may arrest without warrant when in addition to the above, he has reasonable grounds to believe that harm may result to person or property it the person is not arrested, or if he has reasonable grounds to believe that the person will not be apprehended if not arrested, The intended result is that in misdemeanor cases the summons will normally be used, with the police officer having the power to arrest without a warrant in cases where such arrest is needed whether or not the misdemeanor is committed in the officers presence.

PLAINTIFF'S EXHIBIT
Ryan 4
6-26-02

L00313

The requirement that the officer have reasonable grounds to believe that immediate arrest is necessary, to prevent non-apprehension or damage to person or property, is extended even to misdemeanors or petty misdemeanors not committed in the presence of the officer. Where this requirement is not met, issuance of a summons is proper pursuant to Section 12-17-11.

B. <u>In Cases of a Felony</u>

A Police officer may make a warrant-less arrest for a felony whenever he had reasonable grounds to believe that a felony has been or is being committed and that the person he is going to arrest has committed or is committing the felony.

In the case of a misdemeanor or a felony when an arrest is made, the police officer shall notify and fully apprise a supervisor of the arrest.

## II. *On Duty Outside Of The City of Providence*

A. <u>Hot Pursuit</u>

While on-duty, a police officer may make an arrest out of his jurisdiction under the "Hot Pursuit" doctrine, however; once the arrest is effected, the local police in that particular jurisdiction must be notified and will take custody of the party/s apprehended. The officer will remain at the scene until the arrival of the local police and will turn over the subject/s to their control.

Immediately, the officer who was involved in the "Hot Pursuit" is to notify his/her supervisor and that supervisor is to respond to the scene.

## III. *Detail Status in the City of Providence*

The exact same policy as making an arrest while on duty in the City of Providence relative to felonies and misdemeanor's. The arresting officer, however, shall contact the Commanding Officer of the Patrol Bureau and appraise him of the circumstances of the arrest.

## IV. *Off Duty In The City Of Providence*

A. The exact same policy as making an arrest while on duty in the City of Providence relative to felonies and misdemeanor's.

B. If an individual is apprehended by a Providence Police Officer in the City of Providence while in an off-duty status, the police officer is to immediately notify a Commanding Officer of the situation and on-duty personnel shall take

custody of the prisoner. The off-duty officer is to immediately leave a witness statement.

C. If a felony or misdemeanor occurs ***not*** in the presence of the off-duty Providence police officer in the City of Providence, the police officer is to immediately notify a Commanding Officer of the situation and on-duty personnel will then take control of the criminal investigation.

## V. *Off Duty Outside The City Of Providence*

**NOTE:** Statutes and case law does not support out of town arrest power except in hot-pursuit situations ( as described previously). If an officer is outside of his jurisdiction, and is not in hot-pursuit, the "Citizens Arrest" doctrine is the governing factor for making a criminal investigation.

A. Citizens arrest is authorized for a felony which has been committed, whether or not in the citizens presence......or

B. for a "breach of the peace" misdemeanor which occurs in the presence of the citizen.

C. It should be understood that it is not always clear as to what constitutes a "breach of the peace" but, generally it must involve an act or threat of violence. An example would be simple assault, while shoplifting and other minor thefts are not.

D. When affecting a citizens arrest the following guidelines are to be adhered to:

1. One may utilize the same force as if making an official arrest.
2. Once the subject/s is in under control, the local police authorities with jurisdiction must be notified.
3. The subject/s will be turned over to the law enforcement body with jurisdiction.
4. The officer will remain with the arrested subject until the arrival of police.
5. The appropriate Commanding Officer of the officer involved will be notified as soon as possible as to the activity of the arresting officer.

## VI. *Victim In Or Outside Of The City Of Providence*

A. If a police officer is a victim of a crime in or outside of the City of Providence, he is to immediately report the incident to the Commanding Officer of Patrol Bureau.

Commanding Officers are to read this General Order at all roll-calls for a period of five (5) days and then post in a conspicuous location.

**CAPTAIN'S TEST STUDY MATERIAL**

Commanding Officers are strictly accountable for the enforcement of the contents of this General Order.

Back - Print This Page

ProvidenceRI.com

## PRESS RELEASE

City of Providence - David N. Cicilline, Mayor
January 23, 2004
For Immediate Release
Contact: Karen Southern, Press Secretary - (401) 421-2489 x752
ksouthern@providenceri.com

# NEWS RELEASE

## MAYOR CICILLINE TAKES ACTION IN POLICE TESTING INVESTIGATION

**Mayor Cicilline Takes Action In Police Testing Investigation Chief Esserman concludes "1st-phase" of review; City Solicitor files request to revoke pensions of former Chief Urbano Prignano and former director of administration Captain Jack Ryan**

**Providence** - Mayor David N. Cicilline told a crowded gathering of media, police officers, attorneys and staff today, "This only marks the beginning," of the City's investigation and prosecution of wrongdoing in the testing and promotions' process within the Police Department.

Mayor Cicilline made those comments today at a news conference about steps the City is taking as a result of an on-going investigation into the past practices of the Department's testing and promotions.

He applauded the efforts of Police Chief Dean Esserman in "rooting out the remnants of the past" regarding the testing and promotions misconduct within the City's police force, and that he was there to "honor the dedicated men and women of the Providence Police Department… who have devoted their careers to serving us with character and courage."

The Mayor said he had promised to do "everything in my power to repair the broken trust in the department by getting to the bottom of the testing and promotion misconduct. Today, we are keeping our word."

The Mayor announced progress in the yearlong investigation of the Department's testing and promotions' scandal, which includes:

• pursuing the revocation or reduction of City of Providence pension benefits for former Chief Prignano and retired Captain Jack Ryan for "dishonorable service"

• and the presentation of all information gathered in the investigation to the Rhode Island Attorney General's office for review and action

Cicilline said that the investigation he directed Chief Esserman to conduct "is underway and will continue to proceed," and that he anticipates the investigation to spur other possible investigations.

Members of the Police Department who are under investigation and are currently serving on the force, cannot be named because of protections afforded by the *RI Law Enforcement Officers Bill of Rights*.

Chief Esserman and his senior command staff, City Solicitor Joseph Fernandez and members of the Solicitor's office, and members of the Providence Police Department were on hand for the morning news conference.

The Mayor said testing and promotion irregularities were raised during the course of the *PlunderDome* trial of the previous mayor and administration. Mayor Cicilline directed Chief Esserman to launch this investigation into the Police Department's testing and promotion practices upon taking office last year.

"During the campaign, nearly every day, police officers would stop me on the street and ask how it was allowed to go on, and could someone get to the bottom of the testing and promotion improprieties, and we have," the Mayor said.

The City Solicitor explained the limitations and parameters of the legal investigation and the *Law Enforcement Officers Bill of Rights.*

"Collectively, we hold that this violation of trust in testing and promotions cannot be ignored, nor will it go unpunished. Neither will this be the end of this investigation or prosecutions. Today only marks the beginning," said Mayor Cicilline.

#####

Back - Send To Printer

back Print This Page

Executive Office, City of Providence, Rhode Island

DAVID N. CICILLINE
MAYOR

Date: March 11th, 2005
For Immediate Release
Contact: Karen Southern, Press Secretary
(401) 421-2489 x 752
ksouthern@providenceri.com

# PRESS RELEASE

## DISCIPLINARY BOARD TAKES ACTION AGAINST TWO PROVIDENCE POLICE OFFICERS

**Mayor Cicilline says now his administration will focus on revoking the pensions of three former high-ranking Police Department officials**

**Providence** – Mayor David N. Cicilline and Police Chief Dean M. Esserman announced today that two Law Enforcement Officers Bill of Right's Hearing Boards have taken action against two members of the Providence Police Department.

At the conclusion of an investigation led by the Police Department, the a three-member Hearing Board, which is a panel of the officers' peers, terminated Sergeant Tonya Harris after finding her guilty of seven departmental charges in connection with cheating on the Department's promotions exam.

A separate Board demoted Sergeant Rhonda Kessler and suspended her without pay for six months after she was found guilty of nine counts of wrongdoing in connection with the promotions and testing process.

The Boards consist of a police officer named by the police chief, an officer named by the accused, and a neutral officer, who is agreed upon by the two sides. If the parties cannot agree, the Presiding Justice of the Superior Court selects the chairman.

The Mayor said testing and promotions irregularities, which were raised during the course of

the Federal corruption trial of the previous mayor and administration, shed a "dark cloud" over the Providence Police Department.

"I consider cheating on a promotions exam to be extremely serious, and I want to make it perfectly clear, this type of behavior will not be tolerated," said Mayor Cicilline. "The vast majority of the men and women on the Providence Police Department serve with extraordinary professionalism and integrity and have worked hard to restore the public's trust."

"It was extremely important to keep our promise to the men and women of the Police Department and to get to the bottom of the testing scandal by seeking the truth," said Chief Esserman.

"With these findings in hand, the City will move to the second phase of prosecutions," said Mayor Cicilline. "Lawyers will now actively pursue pension revocation proceedings for former senior officers Urbano Prignano, John Ryan, and Martin Hames.

In the 29-page written decision in the Tonya Harris case, the board stated that it was well established "that the higher echelon of the Providence Police Department and City Hall were corrupt." The Board went on to say "promotions in the Providence Police Department were 'rigged' so that certain persons would score well, on the Captain's oral board for instance, and thus get promoted."

"The promotions scandal is a lingering shadow from a darker time, but fortunately, it is one that stands in stark contrast to the Providence Police Department of today," said the Mayor.

RSS REX

#####

More Press Releases

copyright and disclaimer -- privacy and security policy -- back