UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LEISA YOUNG, In her Capacity as Administratrix of the Estate of Cornel Young, Jr. | ) | |
| v. | ) | No. C.A. No. 01-288 S |
| CITY OF PROVIDENCE by and through its treasurer, Stephen Napolitano, et al | ) | |

PLAINTIFF'S OBJECTION TO MOTION OF DEFENDANTS CITY OF PROVIDENCE AND URBANO PRIGNANO, JR. TO EXCLUDE ALL EVIDENCE OF AND REFERENCE TO POST-INCIDENT GENERAL ORDER ON OFF-DUTY CONDUCT (GENERAL ORDER 2001-22 SERIES) AND THE LACK OF A POST-INCIDENT POLICY AND PROCEDURES' INVESTIGATION

Now comes the plaintiff and objects and responds to the motion of defendants City of Providence and Urbano Prignano, Jr. to exclude all evidence of and reference to post-incident General Order on off-duty conduct (General Order 2001-22 Series) and the lack of a post-incident policy and procedures' investigation. In support of said objection the plaintiff submits the attached memorandum of law.

LEISA YOUNG, in her capacity as
Administratrix of the Estate of
Cornel Young Jr.,
By her Attorneys

Robert B. Mann #0153
Mann & Mitchell
One Turks Head Pl., Ste. 501
Providence, RI 02903
(401) 351-5770

Barry Scheck, Esq. #4612
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9084

Nick Brustin, Esq. #0605
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9084

**Certification**

I hereby certify that a copy of the within document was mailed or delivered to the person or offices of Kevin McHugh, Esq., City Solicitors Office, 275 Westminster St., Suite 200, Providence, R.I. 02903 and Michael Colucci, Esq., Olenn & Penza, LLP, 530 Greenwich Ave., Warwick, RI 02886 on the 18 day of October, 2005.

OCT 18 2005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

LEISA YOUNG, in her Capacity as Administratrix of the Estate of Cornel Young, Jr.

v.

CITY OF PROVIDENCE, et al.

No. C.A. No. 01-288S

**PLAINTIFF'S RESPONSE TO DEFENDANTS CITY OF PROVIDENCE AND URBANO PRIGNANO, Jr. MOTION TO EXCLUDE ALL EVIDENCE OF AND REFERENCE TO POST-INCIDENT GENERAL ORDER ON OFF DUTY CONDUCT (GENERAL ORDER 2001-22 SERIES) AND THE LACK OF A POST-INCIDENT POLICE AND PROCEDURES INVESTIGATION**

Defendants seek to exclude post-shooting evidence regarding the change in the PPD's off duty policy and training. The plaintiff opposes defendants' motion as such post-incident evidence is admissible and proves core elements of her constitutional claims. For the same reasons, plaintiff intends to introduce evidence of the City's post-shooting off-duty training and of the post-shooting public statements made by PPD Lieutenant Timothy Lee. Although not specifically addressed by defendants in their motion, plaintiff includes the specific basis for admissibility of this additional post-shooting evidence in her response.

## I. Post-incident Evidence is Routinely Admitted in Monell and Supervisory Liability Actions to Prove Specific Elements of the Claims

Defendants' motion should be denied based on the well established principles that post-incident evidence of reforms or failure to make reforms is admissible, and indeed may be probative evidence of notice, a key element of deliberate indifference, and/or may help to prove the contours of the pre-existing custom, policy or practice . See Bordanaro v. McLeod, 871 F.2d 1151, 1166 (1st Cir. 1989) (holding that "the subsequent acceptance of dangerous recklessness

by the policymaker tends to prove his preexisting disposition and policy"); Grandstaff v. City of Borger, 767 F.2d 161, 171 (5th Cir. 1985) (reaction of police chief after the violation "says more about the existing disposition of the City's policymaker than would a dozen incidents where individual officers employed excessive force"). Defendants fail to discuss Bordanaro, but Bordanaro explains its reasoning in detail, and clearly states that what the court found particularly relevant was post-incident policy:

> The Grandstaff "court emphasized that the police chief's failure to make changes in practice in the aftermath of this incident allowed an inference that the officers' actions were 'the way things are done and have been done in the City of Borger,' and thus reflected city policy." Kibbe, 777 F.2d at 806 (quoting Grandstaff, 767 F.2d at 171) (citation omitted). Contrary to the defendant's contention, the Supreme Court's recent opinion in City of St. Louis v. Praprotnik, 108 S.Ct. 915, does not foreclose such use of post-event evidence. In Praprotnik, a plurality of the Justices determined that to be actionable under § 1983, a municipal policy or custom must have been adopted or acquiesced in by an actor with "'final policymaking authority.'" Id. at 924. The Court has never held that inferences about what customs or policies existed in a city before an event could not be drawn from subsequent actions. Post-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right. We thus affirm the lower court's decision that any possible unfair prejudice resulting to the defendant from the introduction of this evidence is outweighed by the probative value it possesses.

Id. at 1166-67.

Here, the Circuit described the alleged policy or custom at issue in this case stating:

> A jury could also conclude from the testimony of Commissioner Partington that there was a Providence policy or custom of not training PPD officers on the inherent risks of the always armed/always on-duty policy (and how to avoid them) in a way that was deliberately indifferent and caused the violation of Cornel's constitutional rights.

Young v. City of Providence, 404 F.3d 4, at 30, n. 21 (lst Cir. 2005).

A primary question to be answered in proving this custom or practice is whether defendants were deliberately indifferent to the obvious risks of off-duty action. In other words, the question is whether the City's policymakers and supervisors had notice and acted with indifference. On

these points, courts have long recognized that the subsequent conduct of supervisors and policy-makers is both admissible and often – as here – highly probative. See *Grandstaff v. City of Borger, supra.* *Sharp v. City of Houston* 164 F.3d 923, 935 (5th Cir. 1999) ("the failure of Sharp's supervisors all the way up the chain of command * * * to take any real action * * * supports a finding that HPD, * * * exhibited deliberate indifference to her constitutional rights"); *cf. Britton v. Maloney*, 901 F. Supp. 444, 449-50 (D. Mass. 1995) ("the liability of the municipality for customary constitutional violations derives not from its creation of the custom, but from its tolerance of or acquiescence in it"); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("The personal involvement of a supervisory defendant may be shown by evidence that . . . (6) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring").

For example, here, the evidence will show that even after the worst dangers came to pass and an officer was shot and killed, Defendant Prignano stubbornly refused to make any of the changes plainly necessary, and that his policy prevailed, until his retirement, some 18 months after Young was killed. *See Grandstaff v. City of Borger* 767 F.2d 161, 171 (5th Cir. 1985) (official's failure to respond "sa[id] more about the existing disposition of the City's policymaker than would a dozen [prior] incidents where individual officers employed excessive force"); *accord Bordanaro*, 871 F.2d at 1166–67 ("subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy").

Defendants ignore the above relevant authority and further misinterpret Foley v. City of Lowell, 948 F.2d 10, 14 n.3 (1st Cir. 1991). Foley, reaffirms, at length, the holding in Bordanaro. Defendants' contention seems to be that because Foley happened to involve post-incident

misconduct by officers, that only such post-event evidence is admissible. However, as Bordanaro and Grandstaff make clear, any post-event evidence that goes to the state of mind of the supervisors and policymakers is relevant. Indeed, Foley does not limit in any way the type of post-event evidence that can be used. Foley is clear that "actions taken subsequent to an event are admissible if, and to the extent that, they provide reliable insight into the policy in force at the time of the incident." 948 F.2d at 14. Indeed, while the court in Foley described subsequent incidents of misconduct, it did so in the explicit context of whether those incidents suggested "the existence of an official policy." Id. The court also noted that there was "no evidence of any policy revision or other change in course during the subsequent interval." Id. Foley does not bar post-event evidence of policy change; rather that is precisely evidence the Foley Court admitted under the circumstances of that case and made clear is admissible in a variety of circumstances, following Bordanaro.

Finally, Fed. R. Evid. 407 does not act as a bar to post-incident evidence, where, as here, the evidence is offered for a non-prohibited purpose. The primary purpose of Rule 407 is to prevent "evidence of subsequent remedial measures as proof of an admission of fault." Advisory Committee Notes, 1972 Proposed Rules. This is the rare case where the subsequent acts of the defendants and policymakers are the least probative evidence of an admission of fault. Here, the City's policymaker Partington has admitted that he understood long before the Young shooting that the City was obligated to provide more extensive training and protocols than the PPD actually provided more than a year and a half after the shooting. (Partington II at 210) Partington understood long before the shooting, that any minimally competent police administrator acting in good faith to protect their officers concerning off-duty action knows they must do the following:

1. Distinguish between officers' off-duty and on-duty responsibilities.

2. Carefully train and equip off-duty officers to identify themselves when taking action.

3. Provide instruction on the risks associated with encountering other law enforcement personnel while taking off-duty action.

4. Sensitize officers to the possibility that, while taking on-duty action, they may encounter off-duty personnel.

5. Develop a protocol so that these risks may be avoided or minimized.

6. Require prompt and objective investigation of off-duty conduct and of on-duty officers' responses to it, so that future mistakes and violence may be avoided.

(Partington II 209-21). The post-shooting changes in policy and training provided far less training than Partington knew was required. Partington has already admitted fault; as described in greater detail below, the post-incident evidence is being offered solely to prove the contours of the policy or custom in place before the shooting and specific elements of the civil rights claims.

II. The New Policy and Training Provide Direct Evidence of the City Pre-existing Customs and Policy and Direct Evidence of Notice and Indifference

**A. The PPD's Failure to Change the Off-Duty Action Policy for More Than a Year and a Half and the New Policy Itself Prove that Defendants had Notice and that the Policy in Place in 2000 Required Instant Direct Intervention**

Defendants seek to exclude evidence that subsequent to Cornel Young's shooting, the PPD's off duty policy was changed, more than a year and a half later, to provide certain protocols and training regarding the dangers of off duty misidentification. Specifically, more than a year and a half after the Young shooting, a new PPD policy, General Order #22, made a series of changes implicating factors that caused Young's death and providing a protocol and training

instructing officers, concerning, among other things, the following:

- Policy makes optional carrying a firearm off duty, where it had been mandatory;
- Warns against taking off-duty action in circumstances that all apply directly to the Young shooting, and requires that off duty officers call 911 before taking action;
- Off duty action when taken can include calling 911 to report the incident;
- Officers should first go to a safe location, call 911, assess the situation to decide whether involvement is necessary, and observe as a witness until on-duty officers arrive;
- Off duty action, aside from calling 911, permitted only when there is a danger to life;
- Off duty action poses serious dangers, including lack of proper equipment, danger of misidentification by on-duty officers, and lack of cover.

(Gen. Order #22, attached hereto referred to as Exh. 6; Melaragno 134-5, 228-234; Saraiva 135-42, 152; Hames 23).

The PPD's pre-shooting off-duty policies (exhibits 3, 4 and 8 attached hereto) themselves, as Brown v. Gray holds, provide evidence of notice that off duty action was to be expected, and thus creates an obvious need for training on off duty issues and policy delineating the manner that off duty action should be taken – "the existence of the always armed/always on duty policy itself indicates that the likelihood [of off duty action] was at least common enough to warrant a policy regarding it."[1] Section 202.1 and 202.2 of the pre-shooting policy state in relevant part as follows:

> **202.1 Weapons, Badge and Identification Card:** Except when on annual leave, a member shall be armed at all times while off duty and shall have on his person his police badge and his police identification card. It shall not be necessary that a member carry his service weapon while off duty, but he shall be armed with a weapon that has been

---

[1] 227 F.3d 1278, 1288 (10th Cir. 2000). Brown held, following clear language in Canton, that to show notice of risk, plaintiff need only show the general "situation" the officer faced was "predictable." Id. at 1288-89. The plaintiff need show only that the "situation" "was 'common' (or at least not 'uncommon'), 'likel[y],' 'foreseeable,' or 'predictable.'" Id. at 1288 (citations omitted). "The situation need not be frequent or constant; it must merely be of the type that officers can reasonably expect to confront." Id. In Brown, "an off-shift police officer witnessed what he believed was criminal activity and felt he was required to intervene because of the always armed/always on duty policy. Evidence at trial demonstrated that Denver officers are often alerted to suspected criminal behavior at some point when they are off-shift. In fact, the existence of the always armed/always on duty policy itself indicates that the likelihood was at least common enough to warrant a policy regarding it." Id. at 1290.

> inspected, approved and registered by the Armorer. No member who is of duty, or on duty dressed in civilian attire, shall wear his weapon, badge or other authorized equipment in such a manner that shall attract attention or be in open view of the public. He shall wear it concealed in a manner as to be inconspicuous.
>
> **202.2 Police Action:**
>
> A. A member shall act in his official capacity if he becomes aware of an incident which requires immediate police action and time is of the essence to safeguard life or property. While off duty, a member who takes police action in response to a violation of law shall be considered to be in an on-duty status.
>
> B. Should an off-duty member become aware of an incident which requires police action, and life or property is not endangered, he shall report the incident to the appropriate police agency for action.

Despite this seemingly clear language requiring instant, direct intervention as if on-duty, defendants maintain that the pre-shooting policy provided officers great discretion regarding off-duty action, did not require direct intervention and simply required the officer to report the incident by telephone. In other words, defendants contend that the pre-shooting policy was not dangerous and thus did not provide notice of any risk.

For example, Lt. Melaragno, one of the City's 30(b)(6) witnesses on training, testified that the PPD's policy in place before the Young shooting did not require off-duty officers to do anything other than call in and report crimes they observed. (Melaragno at 39, 46, 49).[2] Despite

---

[2] Q. Sure. Again, let's put training aside. It's your
belief that prior to the Young shooting the policies
and procedures that were in place made it clear to
recruits and to police officers that the 24-hour a
day armed and on-duty policy simply meant that they
were required to call for assistance when confronted
with a police situation; is that right?
A. What it meant is they were required to take
some type of action, yes.
Q. And it was clear to them that that action -- it was
clear to them through the policies you just looked

the seemingly clear language of the off-duty policy which required that officers be armed 24 hours per day in Providence and assume an on-duty status anytime there was even a threat to property, Melaragno maintained that the policy required no more than a phone call to the station. Id. Melaragno even maintained that the PPD's off-duty policy never really changed, rather "it's simply been more clearly defined." (Melaragno at 40). Similarly, Captain Ryan, the City's other 30(b)(6) witness on off-duty training and policy testified that at least one version of the PPD's pre-shooting off-duty policy (exh 4) provides officers discretion concerning whether and what kind of action to take off-duty and that officers are simply required to call the police. (Ryan 246-47). Ryan further used this interpretation of the policy to justify his inconsistent civil liability training where he instructed officers to avoid off-duty action not because of safety issues, but to avoid civil liability. In light of Melaragno and Ryan's testimony, the new policy, which on its face obviously and completely alters the old policy, provides dramatic evidence that the

---

at, the only action they need take was to call for assistance; is that right?
THE WITNESS: Are we talking about training or policy?
MR. BRUSTIN: Policy.
A. I think it's clear.

Melaragno at 47.

PPD's pre-shooting policy required direct dangerous action and that the old policy, in and of itself, provided notice to defendants concerning the risks to their officers. Brown v. Gray, 227 F.3d 1278 (10th Cir. 2000). Here, the changes in the policy "provide reliable insight into the policy in force at the time of the incident." (Foley at 14).

Similarly, the new policy helps prove that former Chief Prignano, both a supervisory defendant and final policymaker, had notice of the grave risks to his officers and that he was completely indifferent to these risks. Even after the most tragic incident in the history of the PPD, Prignano adamantly refused to change this dangerous policy, at any time through his retirement over a year after the Young shooting. (Prignano 164-5,170, 179-80, 184). Prignano maintained that these off-duty issues were common sense and if **always armed always on duty policy** was good enough for his forefathers in the PPD 100 years before, it was good enough for him. (Prignano 48, 78, 91-2, 163, 165-66, Fyfe Report 7 attached, hereto referred to as Exhibit 24). "The subsequent acceptance of dangerous recklessness" by Prignano even after the shooting demonstrated not only that he was indifferent to obvious risks but that he was oblivious to the most direct notice imaginable, the death of one of his officers and "tends to prove his preexisting disposition and policy." See Bordanaro, 871 F.2d at 1166.

The new policy also helps to prove that former Commissioner Partington, another final policy-maker, had notice of the grave risks to his officers and that he was completely indifferent to these risks. Commissioner Partington testified that he was well aware of the dangers of the **always/armed always/on-duty policy** long before the Young shooting and that he understood that the best way to prevent friendly fire incidents was to modify the policy and limit the opportunities for officers to take action off-duty. (Partington 98, 116). In fact, Partington

testified that he directed that the off-duty policy be modified six years before the Young shooting and that he mistakenly thought Prignano had corrected the policy and that the comprehensive protocols put in place one and a half years after the shooting had been in place years before. (Partington 100-06, 108-10) To the extent that the jury has any question as to whether Partington's omissions constituted deliberate indifference to obvious risks, Partington's post-shooting conduct is instructive to say the least. Partington's failure to ascertain that his direction to change the policy many years before the shooting was ignored for almost 2 years after the shooting, provides overwhelming evidence of notice and indifference to notice.

### B. The PPD's Post-Shooting Policy and Training Provide Direct Evidence of the Nature and Extent of the Training Provided Before the Shooting

As the Circuit noted,

> ...there are substantial unresolved issues of fact with respect to the amount of training that the PPD actually gave to officers, including Solitro, on avoiding misidentifications of off-duty officers. The jury could find that there was, at best, very minimal training on these issues, and no real program of training on them at all.

Young v. City of Providence, 404 F.3d at 28.

Although there is currently no documentation of pre-shooting off-duty training other than Ryan's inconsistent civil liability training, certain defendants and defendant employees have testified that other training on off-duty issues was provided to employees. As the Circuit makes clear, the scope and contours of the pre-shooting training on off-duty issues is obviously one of the most important and hotly contested issues in this case. The content and genesis of the new policy and training (Exhibit 1and 6) is relevant to show that protocols and guidance contained in the new policy and training were not provided prior to Young's shooting. As such, they are being offered

to the prove what was trained before or the absence of training previously (Exhibit 1 attached).

Ryan has testified that he developed the training contained in exhibit 1 on his own, this training was provided after the Young shooting and not before and that had such training been provided before the Young shooting he would have known of it. (Ryan 30b6 at p.54, 137-38, Ryan II at 272-3, 290-1, 293, 296-7). Contrary to Ryan's admissions, both Boehm and Melaragno maintain that much if not all the training described in exhibit 1 was not new training; rather Ryan was simply documenting training that had already been provided for many years at the Range. (Boehm at 174, Melaragno at 227-28). Thus exhibit 1, the detailed outlined training course created only after the shooting, combined with Ryan's admissions that this training was new, provides powerful evidence that the undocumented pre-shooting training described by Melaragno and Boehm either never took place or was greatly exaggerated.

Similarly, the new policy, exhibit 6, is further instructive of the PPD's training on and enforcement of the policy that officers carry a badge off-duty. Indeed, section III(C)(5) of General Order #22 instructs intervening off duty officers to display their badges "if [they] carry [their] shield while off-duty, some officers carry only their photo credentials." Considering the unanimous testimony from PPD agents that the policy was to always carry their shield, this part of the new policy can only be read as an implicit admission that the old policy mandating carrying a badge at all times was not enforced. This statement further contradicts Boehm and Melaragno's unsupported testimony that they provided PPD officers, including Solitro, specific instructions on how to show your badge while off-duty and while carrying a gun.

## II. Lieutenant Lee's Statements to the Press Following the Shooting Demonstrate the Department's Pre-existing Practice of Failing to Train and Defendants' Practice of Providing Inconsistent Training

The other category of post-incident evidence that plaintiff seeks to introduce is evidence that the PPD conducted no investigation to determine whether Solitro and Saraiva violated any internal regulations or training and whether any inadequacies in training or protocols contributed to the shooting. As described above, Partington understood before the Young shooting that "prompt and objective investigation of off-duty conduct and of on-duty officers' responses to it, so that future mistakes and violence may be avoided," was an important part of any minimally adequate off-duty training program. (Partington II at 210). Despite the acknowledgment of these obligations by Partington and others, including Prignano, there was substantial testimony that no such investigation was ever conducted or even contemplated. (Prignano at 73-74). Indeed, defendants' persistent claims that, by their lights, Solitro did nothing wrong provides strong evidence that the actions he took – determined to have been objectively unreasonable as a matter of constitutional law – were authorized. *See, e.g., Kuha v. Minnetonk*, 365 F.3d 590, 606-07 (8th Cir. 2003) (finding police chief's testimony that the officer's conduct was "in accordance with Department policy" ratified the officer's conduct and undermined the city's defense to training and policy claims).

Perhaps the most striking evidence of this lapse by the PPD is Lieutenant Timothy Lee's statements to the press in the weeks following the shooting. A few days after the shooting and despite the existence of a PPD policy forbidding employees from making unauthorized public statements about department business such as the then-ongoing investigation of the Young shooting (PPD Regulations Sec. 200.4, attached as part of Exh. 8) Lee contributed an article to the online edition of the Providence Journal in which he defended Solitro and Saraiva, stating in substance that they acted appropriately on the night in question. (Lee 29:17-22, 31:16-22, 33:13-

34:2).

At the time he wrote and published that article, Lee knew that he was violating department regulations as he did not have proper authorization to make a public statement on an ongoing investigation. (Lee 27:24-28:18, 39:14-17). Around the date of the article's publication, the PPD issued a press release bearing both Prignano and Ryan's names and disavowing any statement expressing an opinion regarding the outcome of the investigation. (PPD Press Release, dated 02/11/00, attached as Exh. 105). In that press release, Prignano and Ryan emphasize that they are "directing all ... officers and affiliates to refrain from making statements regarding the evidence or outcome of the case." Prignano and Ryan, however, ignored their own press release.

Prignano and Ryan became aware of Lee's article shortly after its publication. (Prignano II 279:21-280:18; Ryan II 334:5-14). Although they recognized that, in publishing his article, Lee violated department policy, Prignano and Ryan failed to discipline him in any way. In fact, instead of punishing him for disregarding established PPD policy, his superiors, Prignano and Ryan, flouted that policy as well as their more recent order forbidding all statements on the matter and actually authorized Lee to make further statements to the press, which he did. (Prignano II 279:21-280:18; Ryan II 330:4-11; Lee 27:24-28:18, 45:3-22, 46:17-47:10).

By inviting Lee to repeat his statements that Solitro and Saraiva did nothing wrong through more media outlets, Prignano and Ryan undermined the integrity of an open and ongoing investigation, completely disregarding a firmly established departmental policy designed to protect such investigations from undue influence – a policy they had recently restated to their subordinates themselves. More importantly, at the time Lee made these statements, the criminal investigation was just beginning and the internal investigation that Partington and Prignano knew

was required had not even begun. In fact, although Prignano concluded there was no lapse in policy or training, he could not remember if he ever directed that an internal investigation concerning protocols and training even be conducted. (Prignano 78, 85-86). Thus, when Prignano and Ryan invited Lee to publicly and repeatedly state that Solitro and Saraiva had done nothing wrong absent any investigation, they demonstrated their complete indifference to properly evaluating the incident and their own internal protocols and training and sent a message to the chain of command that any subsequent investigation was meaningless as the issues had already been predetermined. Lt. Harris, for example, testified that he and other officers were concerned that these comments suggested that there would be no independent investigation. (Harris at 124-25). Commissioner Partington admitted that it was "totally improper" for Prignano and Ryan to authorize Lee to make those public statements in violation of policy, (Partington 144:7-145:6), yet, years after the incident, Ryan still sees nothing wrong with his subordinate making those declarations at that time. (Ryan II 334:5-14).

These facts are post-event evidence of a glaring lack of proper training protocols. Providence policymakers Prignano and Ryan not only abstained from launching an internal investigation into the Young shooting (Prignano 80:11-17, 85:23-86:9), they endeavored to sabotage an external process probing that incident. Commissioner Partington himself knew about the improper authorization of Lee's statements yet failed to intervene in any way to prevent interference with the investigation or to ensure a proper internal review of PPD policies and procedures in the wake of the Young shooting. (Partington 144:7-145:6, 145:23-146:4). Further, Prignano and Ryan's actions and attitude in connection with Lee's statements demonstrate complete disdain for set policy and constitute further evidence of precisely the kind of deliberate

indifference that led Prignano to disregard training on off-duty issues and Ryan to instruct recruits to disregard the written protocols of the department.[3] The First Circuit has held that admission of such "post-event evidence of the lack of proper internal investigation and the failure [to] take strong disciplinary action" was appropriate to prove the existence of a policy of deliberate indifference. Bordanaro, 871 F.2d at 1166.

While the above evidence is certainly prejudicial in the sense that it demonstrates a brazen indifference to commonly accepted police practice, there is no unfair prejudice, and this evidence is highly probative of the pre-existing state of mind of the individual defendants, policy-makers and the other officers and supervisors they relied upon.

LEISA YOUNG, in her capacity as
Administratrix of the Estate of
Cornel Young Jr.,
By her Attorneys

Robert B. Mann #0153
Mann & Mitchell
One Turks Head Pl., Ste. 610
Providence, RI 02903
(401) 351-5770

---

[3] Ryan's utter disregard for rules and regulations and willingness to instruct younger officers to do the same is further evidenced by his own cheating and efforts to help other cheat on promotional exams years before the Young shooting. See Plaintiff's Memorandum in Response to Defendants' Motion in Limine for the Exclusion of All Evidence of and Reference to the "Plunder Dome" Matter, the "Promotional Scandal" and Other Such Matters Pertaining to Plaintiff's So-Called Evidence of "Systemic Deficiencies".

Barry Scheck, Esq. #4612
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081

Nick Brustin, Esq. #0605
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081

**Certification**

I hereby certify that a copy of the within document was mailed or delivered to the person or offices of Kevin McHugh, Esq., City Solicitors Office, 275 Westminster St., Suite 200, Providence, R.I. 02903 and Michael Colucci, Esq., Olenn & Penza, LLP, 530 Greenwich Ave., Warwick, RI 02886 on the 18 day of October, 2005.