UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LEISA YOUNG, in her Capacity as Administratrix of the Estate of Cornel Young, Jr., Plaintiff, v. CITY OF PROVIDENCE, by and through its Treasurer, STEPHEN NAPOLITANO, URBANO PRIGNANO JR., individually and in his official capacity as Providence Chief of Police; RICHARD SULLIVAN, individually, JOHN RYAN, individually, and KENNETH COHEN, individually, Defendants. | C.A. No. 01-288S |

**DECISION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

This case is before the Court upon remand by the First Circuit Court of Appeals for trial on several issues as to which summary judgment was previously granted. Before trial, which will begin on November 7, 2005, various motions for summary judgment require this Court's attention. Defendants Urbano Prignano ("Prignano"), Richard Sullivan, Kenneth Cohen ("Cohen") and John Ryan ("Ryan") have each moved for summary judgment on qualified immunity grounds, Prignano has moved for summary judgment on the Monell claim against him, and Ryan asserts an additional ground for summary judgment tied to the jury's prior verdict. Plaintiff Leisa Young ("Plaintiff" or "Young") objects to all of the motions. This Court

heard oral argument on September 19, 2005.[1] For the reasons set forth below, all of these motions are denied.

I. Background[2]

In the early morning hours of January 28, 2000, Cornel Young Jr. ("Cornel") was fatally shot by two of his fellow Providence Police Department ("PPD") officers, Carlos Saraiva ("Saraiva") and Michael Solitro ("Solitro"). Young v. City of Providence, 301 F. Supp. 2d 163, 166 (D.R.I. 2004), aff'd in part; rev'd in part, 404 F.3d 4 (1st Cir. 2005). At the time of the shooting, Solitro and Saraiva were on-duty and Cornel was off-duty. Id. at 9. PPD regulations at the time of Cornel's death required PPD officers to be armed "at all times while off duty," "[e]xcept when on annual leave," and further required PPD officers to "act in [their] official capacity if [they] become[] aware of an incident which requires immediate police action and time is of the essence to safeguard life or property." Young, 404 F.3d at 16 (quoting PPD Regs. §§ 202.1, 202.2). Additional regulations mandated that PPD

---

[1] At both oral argument and in her memorandum, Plaintiff concurred that summary judgment for Defendant Richard Sullivan was in order. This Court agreed. An Order, signed on September 22, 2005, granted Defendant Richard Sullivan's Motion for Summary Judgment and ordered judgment to enter on Defendant Richard Sullivan's behalf. Accordingly, the portion of the summary judgment motion pertaining to Defendant Richard Sullivan warrants no further discussion.

[2] This Court will only set forth the limited facts necessary to dispose of the present motions; a comprehensive recitation of the events is set forth in the Court of Appeals' opinion. See Young v. City of Providence, 404 F.3d 4 (1st Cir. 2005).

members "be prepared at all times and under all circumstances to perform immediately a police duty whether or not the member is in uniform or off workday duty whenever the member is cognizant of a need for police." Young, 404 F.3d at 16 (quoting PPD Reg. §201.3).[3]

In 2003, Judge Mary Lisi, of this Court, presided over the first phase of a bifurcated trial concerning the events related to Cornel's death. 301 F. Supp. 2d at 168-169. Phase one required "the jury to determine whether Solitro and/or Saraiva had violated [Cornel's] Fourth Amendment right to be free from an unreasonable seizure of his person." Id. at 168. At the end of phase one, the jury found that (1) Solitro violated Cornel's constitutional rights, and (2) Saraiva did not violate his constitutional rights. Id. at 169. Judge Lisi then denied defendants' Rule 50 motions and granted summary judgment on "all supervisory and municipal liability claims . . . that were premised on Saraiva's actions," "all supervisory and municipal liability claims that were related to Solitro's unconstitutional conduct," all of Young's claims related to Cornel's right to training (because Cornel had no such right), and all state law claims. Id. at 170. Appeals followed.

---

[3] For purposes of the motions now before this Court, PPD Regs. §§ 202.1, 202.2, and 201.3, collectively, shall be known as the "always armed/always on-duty policy." While this characterization is disputed by the City in several pre-trial motions, the label is consistent with the Court of Appeals' decision, and for consistency's sake will be used here. See, e.g., Young, 404 F.3d at 16, 18, 28.

In April 2005, the Court of Appeals issued its decision. The Court (1) affirmed the jury's verdict that Solitro violated Cornel's constitutional rights but that Saraiva did not, (2) affirmed summary judgment "against Young on a claim that Providence's screening of Solitro before hiring him constituted deliberate indifference by the City to Cornel's constitutional rights," and (3) reversed "summary judgment for the City on a claim that it is responsible for inadequately training Solitro on how to avoid on-duty/off-duty misidentification in light of the department's policy that officers are always armed, and always on-duty." Young v. City of Providence, 404 F.3d 4, 9-10 (1st Cir. 2005). In addition, the District Court's grant of summary judgment against Young on the "supervisory claims," which was premised upon the grant of summary judgment on the municipal claims, was vacated and remanded to this Court. Therefore, remanded to this Court for trial is "Young's claim that the City [and Prignano, Ryan, and Cohen] violated 42 U.S.C. § 1983 by failing to adequately train Solitro on issues relating to on-duty/off-duty interactions in a manner that was both causally related to Solitro's deprivation of Cornel's constitutional rights and deliberately indifferent to those constitutional rights." Id. at 10.

The First Circuit's opinion frames the issues now before this Court for resolution:

> We have reversed entry of summary judgment against Providence on the failure to train claim, a consideration

> pertinent to qualified immunity analysis. The district court never dealt with qualified immunity issues-it made no rulings on the second prong of qualified immunity analysis, whether both the underlying constitutional violation of Solitro and the basis for liability of the various supervisors were clearly established, nor did it make any rulings on the third prong, whether the supervisors' actions were otherwise objectively reasonable. Further, the record on qualified immunity issues is not well developed and the briefing on appeal is inadequate. Thus, the most prudent course is to vacate the grant of summary judgment in favor of the four supervisory defendants, premised on the erroneous grant of summary judgment to Providence, and remand. We do not address the issue of supervisory liability here.

Id. at 32 (citation omitted). Prignano, Cohen, and Ryan (collectively, "Defendants") now seek summary judgment on qualified immunity grounds, as well as on other grounds.

## II. Standard of Review

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Where a qualified immunity defense is advanced by pretrial motion, 'normal summary judgment standards' control. Amsden v. Moran, 904 F.2d 748, 752 (1st Cir. 1990) (quoting Rogers v. Fair, 902 F.2d 140, 142 (1st Cir.1990)). This Court must "review the record in a light most favorable to the party opposing the summary judgment and . . . indulge in all reasonable inferences in that party's favor." Sheehy v. Town of Plymouth, 191 F.3d 15, 18-19 (1st Cir. 1999).

The burden of demonstrating the absence of a genuine issue of material fact rests with the moving party. National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). If the moving party meets this burden, then "the nonmovant must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). In other words, the nonmovant must establish that sufficient evidence exists for a jury to find in its favor. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (citing Celotex, 477 U.S. at 322-325).

III. Qualified Immunity and Supervisory Liability

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" Saucier v. Katz, 533 U.S. 194, 200 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Thus, courts must consider questions of qualified immunity early in the proceedings "so that the costs and expenses of trial are avoided where the defense is dispositive." Saucier, 533 U.S. at 200. Generally speaking, qualified immunity exists to protect public officials performing discretionary functions "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Hegarty v. Somerset County, 53 F.3d 1367, 1373 (1st Cir. 1995). Here, Prignano, Ryan, and Cohen all maintain that the doctrine of qualified immunity renders them immune from suit.

Courts considering qualified immunity claims follow a three pronged approach, and must analyze the issues in a particular order. Savard v. Rhode Island, 338 F.3d 23, 27 (1st Cir. 2003); Saucier, 533 U.S. at 200. First, the court inquires whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at 201. If the answer is affirmative, the court must then determine if the right allegedly violated was "clearly established" at the time. Brosseau v. Haugen, 125 S. Ct. 596, 599 (2004). If the right was clearly established, then the court reaches the final query: "whether a reasonable official, situated similarly to the defendant(s), would have understood that the conduct at issue contravened the clearly established law." Savard, 338 F.3d at 27 (citing Saucier, 533 U.S. at 202). Even if an official is mistaken regarding whether his conduct violated clearly established law, qualified immunity protects the official when his "mistake as to what the law requires is reasonable."[4] Saucier, 533 U.S. at 205.

Qualified immunity protects "supervisory officials from suit when they could not reasonably anticipate liability." Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1998). Here, Young seeks to hold Prignano, Ryan, and Cohen accountable for their respective

---

[4] This third prong will be referred to as "objective legal reasonableness."

roles in supervising the training of Solitro. Specifically, Prignano's supervisory role was as Chief of the PPD, the person in overall charge of the PPD training program. Young, 404 F.3d at 15. Ryan's supervisory role stems from his position as the Director of Administration, as a training instructor, and because of his involvement with developing the PPD training curriculum. See, e.g., Young Mem. at 20. And Cohen's supervisory role was as director of the 58th Police Training Academy ("Academy" or "Training Academy"), attended by Solitro as a new recruit. Young, 404 F.3d at 16.

When defendants seek qualified immunity in the supervisory liability context, two prongs of the traditional three-pronged inquiry become more particularized. First, within the "clearly established" prong, the court must answer two distinct questions. In order "for a supervisor to be liable there must be a bifurcated 'clearly established' inquiry - one branch probing the underlying violation, and the other probing the supervisor's potential liability." Camilo-Robles, 151 F.3d at 6.[5] More specifically, "the 'clearly established' prong of the qualified immunity inquiry is satisfied when (1) the subordinate's actions violated a clearly

---

[5] The First Circuit specifically noted this when it discussed the qualified immunity issue remanded to this Court: "The district court . . . made no rulings on the second prong of qualified immunity analysis, whether both the underlying constitutional violation . . . and the basis for [supervisory liability] were clearly established." Young, 404 F.3d at 32 (emphasis added).

established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context." Id. (citing Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 456 (5th Cir. 1994); Shaw v. Stroud, 13 F.3d 791, 801 (4th Cir. 1994)).

The second change to the traditional qualified immunity inquiry occurs in the third prong, "objective legal reasonableness." When the underlying claim involves supervisory liability, a court must ask whether the supervisor "should reasonably have understood that his conduct jeopardized [the plaintiff's clearly established constitutional] rights. Camilo-Robles, 151 F.3d at 7. Although courts generally keep the qualified immunity analysis distinct from the merits analysis, the supervisory liability "test of objective legal reasonableness to some extent collapses the separate 'qualified immunity' and 'merits' inquiries into a single analytic unit." Id. So it is here: this Court's examination into objective legal reasonableness necessarily involves application of the deliberate indifference standard commonly reserved for merits inquiries. See id. at 8.

Usually, examination of the qualified immunity defense occurs early in the proceeding, without the benefit of a prior trial, let alone subsequent circuit court review. Here, the Court has both. The trial record and the First Circuit's review of the record and

the law provide substantial assistance to this Court for performing the task at hand.

A. The First Prong: Violation of a Constitutional Right

In order to satisfy the first prong of the qualified immunity analysis, Young need only demonstrate that "the facts alleged show the officer's conduct violated a constitutional right[.]" Saucier, 533 U.S. at 201. This burden is easily met in this case. Phase one of this trial returned the unanimous verdict that "Solitro had violated Cornel Young Jr.'s constitutional rights." Young v. City of Providence, 301 F. Supp. 2d at 169. The First Circuit upheld this verdict. Young, 404 F.3d at 25. Young, therefore, has exceeded her burden by proving the merits of the underlying constitutional violation.

Ryan and Cohen, however, contend that the first prong requirement is not so simply satisfied. They maintain that the constitutional violation considered in prong one is not whether the shooting of Cornel violated his fourth amendment right to be free of unreasonable seizure (which is what the jury found), but rather whether the training provided to Solitro was constitutionally inadequate or constitutionally deficient. Ryan & Cohen Mem. at 2-3, 5, 8.

Not surprisingly, this contention lacks citation to any supporting case law, and it is not for this Court to search the

legal haystacks for a needle of authority.[6] The inquiry under the first prong does not change simply because the action is a claim of failure to train against both the City and the supervisors. See Camilo-Robles, 151 F.3d at 6-7 (discussing that the changes to the traditional qualified immunity analysis for supervisory liability occur in prong two and prong three). Accordingly, Young has clearly met her burden under the first prong.

---

[6] "A litigant cannot ignore [his] burden of developed pleading and expect the district court to ferret out small needles from diffuse haystacks." United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992). Ryan and Cohen also overlook the Court of Appeals implicit endorsement of the view that this first prong already has been addressed. When discussing the qualified immunity analysis, the Court of Appeals noted that the district court made no rulings on either the second prong or the third prong of the qualified immunity analysis, implying satisfaction of the first prong. Young, 404 F.3d at 32. Finally, Ryan and Cohen's contention is directly contradicted by Prignano's assertion concerning prong one. In his Memorandum, Prignano states that "the jury's phase-one verdict finding that Providence police officer Michael Solitro ('Solitro') violated Cornel's constitutional rights effectively answers the first part of the Savard algorithm in a manner favorable to the plaintiff," and later he adds that "the answer to the 'threshold question' in Savard is in the affirmative. The jury in phase-one found that Solitro has in fact violated Cornel's constitutional rights, and that verdict was upheld on appeal." Prignano & Sullivan Mem. at 2, 9. Again, in his Reply, he states that "Prignano [has] conceded that the first part of the algorithm, i.e., whether Cornel's constitutional rights had been violated, was effectively decided by the jury, below[.]" Prignano & Sullivan Rep. Mem. at 3 n.1.

B. The Second Prong: Clearly Established Law

The second prong of the qualified immunity analysis "deals with fair warning; it asks whether the law was clearly established at the time of the constitutional violation." Savard, 338 F.3d at 27. In the supervisory liability context, this prong divides into two distinct queries. As the Court of Appeals noted, this Court must determine "whether both the underlying constitutional violation of Solitro and the basis for liability of the various supervisors were clearly established[.]" Young, 404 F.3d at 32 (emphasis added) (citing Camilo-Robles, 151 F.3d at 6-8).

First, this Court must discern if the constitutional right violated in prong one, by the subordinate Solitro, was a clearly established constitutional right. See Camilo-Robles, 151 F.3d at 6. This right must have been clearly established at the time Cornel was shot. See Savard, 338 F.3d at 27. Only if the answer is yes, does the Court move on to the second inquiry regarding whether it was clearly established that a supervisor could be held liable for the failure to train officers in how to avoid such situations.

Although their arguments are not entirely clear on this point,[7] Defendants collectively seem to suggest that the initial

[7] Prignano maintains that "neither the right to be free from friendly fire or the failure of a supervisor to train in the area of friendly fire was 'clearly established' at the time of the shooting here." Prignano & Sullivan Mem. at 15. Ryan and Cohen

question must be framed narrowly to ask whether there is a clearly established right to be free from friendly fire in on-duty/off-duty confrontations arising out of always armed/always on-duty policies.

By narrowing the inquiries in this way, Defendants hope to raise the bar so high that Young will fail to clear it. The Supreme Court's holding in Anderson v. Creighton, 483 U.S. 635, 640 (1987), suggests the need for a particularized statement of the right violated:

> It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell v Forsyth, 472 U.S. 511, 535, n.12 (1985); but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Anderson sought to prevent the use of overly generalized allegations to satisfy the clearly established prong and thereby defeat the defense of qualified immunity. And some cases since Anderson have required plaintiffs to show that a more particularized right was in fact clearly established law. See, e.g., Napier v. Town of Windham, 187 F.3d 177, 188-89 (1st Cir.

---

refer, incorrectly, to the underlying constitutional violation as "constitutionally deficient training so that Solitro was not prepared for the situation he faced," and then frame the inquiry here as whether "the right to such training was clearly established." Ryan & Cohen Mem. at 8-9.

1999) (characterization of right as "whether the duty to avoid creating situations which increase the risk of the use of violence was clearly established" too broad). But while it is true that Justice Scalia, in Anderson, suggested a more particularized articulation of the right violated, and required that the contours of the right be sufficiently clear that a reasonable official would understand what he is doing violated the right, the Court also made clear that the standard did not require plaintiffs to demonstrate that the very action at issue in the case had previously been found unlawful. See Anderson, 483 U.S. at 640; Savard, 338 F.3d at 28 (plaintiff need not show that "materially indistinguishable conduct has previously been found unlawful"); Limone v. Condon, 372 F.3d 39, 48 (1st Cir. 2004) ("[t]here is no requirement that the facts of previous cases be materially similar to the facts sub judice").

In Tennessee v. Garner, 471 U.S. 1 (1985), "the Supreme Court stated: 'Whenever an officer restrains the freedom of a person to walk away, he has seized that person. . . . *[T]here can be no question* that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.'" Fernandez v. Leonard, 784 F.2d 1209, 1217 (1st Cir. 1986) (internal citations omitted) (emphasis in original). Here, "[t]he right to be free from unreasonable seizure . . . is clearly established in the jurisprudence of the Fourteenth Amendment (through which the Fourth Amendment constrains state action)."

Camilo-Robles, 151 F.3d at 6. Accordingly, the fatal shooting of Cornel, in January of 2000, was a violation of a clearly established constitutional right, the right to be free from unreasonable seizure by police use of deadly force.

The second inquiry within the clearly established prong asks whether "it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in [this] context." Camilo-Robles, 151 F.3d at 6; see also Young, 404 F.3d at 32 (whether "the basis for liability of the various supervisors [was] clearly established"). "[T]he relevant legal rights and obligations must be particularized enough that a reasonable official can be expected to extrapolate from them and conclude that a certain course of conduct will violate the law." Savard, 338 F.3d at 28 (citing Saucier, 533 U.S. at 201-02). However, "overcoming a qualified immunity defense does not require a plaintiff to show that either the particular conduct complained of or some materially indistinguishable conduct has previously been found unlawful." Savard, 338 F.3d at 28; see also Anderson, 483 U.S. at 640. Therefore, this Court must ascertain whether, at the time Cornel was shot, a reasonable police supervisor would have understood that his alleged conduct – the failure to provide adequate training regarding on-duty/off-duty confrontations where the City has an always armed/always on-duty policy – could subject

him to liability for an unconstitutional seizure by his subordinate.

Defendants argue that Young's failure to cite to a "a single case involving so-called friendly fire where supervisory liability was imposed under § 1983 as a result of an alleged failure to train" demonstrates that a reasonable supervisor could not have been aware that his own conduct was "clearly unlawful." Prignano & Sullivan Mem. at 2. Young counters that she need only show that the law "is clearly established that a supervisor may be responsible for the constitutional violations of a subordinate when those violations are caused, at least in part, by the failure to train." Young Mem. at 13.

Once again, Defendants attempt to raise the bar too high. It is "well settled that a deliberately indifferent police supervisor may be held liable for the constitutional violations of his subordinates." Camilo-Robles 151 F.3d at 6; Diaz v. Martinez, 112 F.3d 1, 4 (1st Cir. 1997). Furthermore, it is also clearly established that police supervisors may be held liable for the failure to properly train officers. See City of Canton v. Harris, 489 U.S. 378, 380 (1989); Seekamp v. Michaud, 109 F.3d 802, 808 (1st Cir. 1997) (supervisor liability explained almost a decade ago); Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 92 (1st Cir. 1994) (supervisors may be liable for "claims of lack of proper police training"); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d

576, 581-83 (1st Cir. 1994) (explaining contours of supervisor liability); Voutour v. Vitale, 761 F.2d 812, 820-22 (1st Cir. 1985) (claim of inadequate police training asserted against police chief). For example, in Diaz v. Martinez, the Court of Appeals described as "baseless" a police supervisor's contention that law was not clearly established regarding whether a reasonable police supervisor would know that he could be held constitutionally liable for failing to take action regarding a troubled officer. Diaz, 112 F.3d at 4. Here, Defendants' contention that a reasonable police supervisor would not know that he could be liable for his own failure to train an officer whose training deficiency leads (it is alleged) to a friendly fire incident and a constitutional violation is similarly baseless.

Defendants' argument concerning the dearth of specific cases involving friendly fire is flawed both legally and logically. First, the Supreme Court has made "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances" and further has "expressly rejected a requirement that previous cases be 'fundamentally similar.'" Hope v. Pelzer, 536 U.S. 730, 741-42 (2002) (citation omitted) (discussing "the danger of a rigid, over reliance on factual similarity" and holding that "the salient question that the Court of Appeals ought to have asked is whether the state of the law in

1995 gave respondents fair warning that their alleged treatment [] was unconstitutional").

Second, the contention that the absence of other friendly fire cases insulates Defendants from liability implies that the only cases capable of surviving under the clearly established prong are ones involving the exact same conduct litigated in a previous case. Not only does this argument contradict Anderson,[8] but the logical flaw in this argument is also obvious. If this were the law, then a plaintiff would face the heavy burden of having to cite to prior cases involving that supervisor's exact conduct to defeat a claim of qualified immunity, a nearly impossible task.

Moreover, Prignano's erroneous proposition is belied by two specific statements of the Court of Appeals in this case. First, the Court found that "[a]lthough there was no evidence of a prior friendly fire shooting, a jury could find . . . that the department knew that there was a high risk that absent particularized training on avoiding off-duty misidentifications, and given the department's always armed/always on-duty policy, friendly fire shootings were likely to occur." Young, 404 F.3d at 28-29. Further, the Court noted that expert testimony "could lead the jury to conclude that

---

[8] See Anderson, 483 U.S. at 640 ("very action in question [need not have] previously been held unlawful"); Savard, 338 F.3d at 28 ("plaintiff [not required] to show that either the particular conduct complained of or some materially indistinguishable conduct has previously been found unlawful").

it was common knowledge within the police community that the risk of friendly fire shootings with an always armed/always on-duty policy was substantial, and it was also common knowledge that particularized training on on-duty/off-duty interactions (and particularly on the risk of misidentifications) was required to lessen this risk." Id. at 29. Second, the Court of Appeals referenced Young's presentation of "numerous reports from police officers of past misidentifications of off-duty personnel in Providence, particularly involving minority officers, and thus, presented evidence that the department was on notice of a misidentification problem." Id. at 19. Their observations, while made in the context of discussing municipal liability, are equally applicable to the supervisory liability question.

Therefore, when Cornel was shot, it was clearly established that supervisors may be held liable for failing to adequately train officers on avoiding misidentifications in on-duty/off-duty armed confrontations, when an officer's conduct results in an unconstitutional seizure. Accordingly, Young has met her burden under the second prong of the qualified immunity analysis.

C. The Third Prong: Objective Legal Reasonableness

Young's final obstacle in overcoming Defendants' claims of qualified immunity requires her to establish at least a material issue of disputed fact as to whether each defendant acted in an objectively unreasonable manner. See Camilo-Robles, 151 F.3d at 8;

Hegarty, 53 F.3d at 1375-76. In order for conduct to be unprotected by qualified immunity, it must rise to the level of deliberate indifference. Camilo-Robles, 151 F.3d at 7. Proof of deliberate indifference requires that Young show "(1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk." Id. But officers remain protected by qualified immunity when they make reasonable mistakes regarding the constitutionality of their conduct. Saucier, 533 U.S. at 206. Therefore, qualified immunity provides "protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Thus, Young faces a fairly tall order: she must demonstrate that there are material factual disputes regarding whether each individual defendant was deliberately indifferent to the risk.

Young's burden is lessened some because the conduct at issue here - the failure to provide adequate training - does not invoke the "comparatively generous" reasonableness standard applicable "to the police where potential danger, emergency conditions or other exigent circumstances are present." Hegarty, 53 F.3d at 1373 (quoting Roy v. City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)). The alleged failure to provide constitutionally adequate training resulted from determinations made by supervisors over the course of a considerable period of time, not from split-second

decisions made in the line of fire, and with full knowledge of the always armed/always on-duty policy.

Young hopes to vault over the third prong by contending that the Court of Appeals' reversal of summary judgment on the Monell claim against the City effectively requires this Court to deny qualified immunity for each defendant because the same deliberate indifference standard applies to both the Monell claim and the supervisory liability claims. Young Mem. at 15. While there clearly is overlap between the two theories, the qualified immunity analysis must focus laser-like on each Defendant's relationship to Solitro's training (or lack thereof). It must consider whether, as to each supervisor, a jury could find that he acted in an objectively unreasonable manner. The question is reduced to this: could a jury find that a similarly situated supervisor should have recognized that his conduct regarding the training of Solitro jeopardized Cornel's constitutional rights?

1. Prignano

Young alleges that Prignano, PPD's Chief at all relevant times, bore supervisory responsibility for ensuring proper training for all PPD recruits, failed to ensure necessary training regarding on-duty/off-duty interactions, and further ensured that the always armed/always on-duty policy remained in effect during his tenure as Chief even when he knew or should have known it could lead to disaster. Young Mem. at 20, 22-23. Young's allegations are well

supported in the record before this Court, when viewed in the light most favorable to her. For example, Prignano admitted, during his deposition, that he was ultimately responsible for ensuring proper training of the PPD and for the continued implementation of the always armed/always on-duty policy. Prignano Dep. at 20:10-17, 179:11-13, 180:19-23, Jan. 15, 2003. He acknowledged that the always armed/always on-duty policy was important and that failure to follow it could lead to someone getting killed. Id. at 170:1-8. And even after Cornel's death, Prignano refused to allow a change to the always armed/always on-duty policy. Id. at 179:11-13, 180:19-23; Young Mem. at 28.

The Court of Appeals found that Young presented evidence regarding the training deficiency, evidence establishing the known risks of the always armed/always-on duty policy, and evidence of the critical need for training in light of this policy's high risks. While the Court of Appeals was reviewing evidence of PPD's training in the context of municipal liability (not individual supervisor liability), the Court's holding bears directly on whether Prignano was deliberately indifferent as the Chief of the PPD, as the official ultimately responsible for training. The Court of Appeals held that there were numerous factual disputes regarding the content of such training and whether or not the training even occurred. Young, 404 F.3d at 27-28. The Court noted, for example, that there was no documentation of the

training, id., and that Prignano's own testimony "could be understood to mean that there was no pertinent training because no training was needed, as identification issues were a matter of common sense." Id. at 18. Cohen, who was Training Academy Director for Solitro's class, "testified that he did not know one way or the other whether the training on on-duty/off-duty interactions existed." Id. at 18. The Court also noted that other PPD officers recalled "little or no training" on such interactions. Id. at 28.

The Court of Appeals found that Young introduced evidence that the always armed/always on-duty policy was "inherently dangerous" and that the risks associated with it are widely known. Young, 404 F.3d at 18. In addition, Young demonstrated that it was "well-recognized" in the police community that always armed/always on-duty policies required that officers be "carefully schooled by policy and training" in order to avoid accidental shootings of off-duty officers. Id. Young also introduced testimony that absent particularized training and specific protocols, "unnecessary blood will be shed by the public and by officers." Id. (quoting testimony). Given Prignano's role as the Chief of the PPD, it is reasonable to infer that he knew these things (or should have known them). These factual issues — whether there was training and how much Prignano knew (or should have known) about the need for such

training — all bear upon his claim of objectively reasonable behavior.

Prignano contends that he was not a moving force on training matters within the PPD because he did not actually teach at the Training Academy and he "justifiably relied upon" Ryan, a PPD Captain, who was in charge of the Training Academy "at all relevant times," to adequately train recruits.[9] Prignano & Sullivan Mem. at 18. He points to Ryan's law degree, extensive experience, and qualifications to lead the Academy to justify his reliance. Id. Although Prignano did not provide direct instruction of Solitro, he may nevertheless be liable as a supervisor. See Camilo-Robles, 151 F.3d at 6-7 (defining supervisor). Neither does his reliance on Ryan absolve him of responsibility. Prignano may be liable as a supervisor not only where he had actual knowledge of the absence of necessary training, but also where he would have known of the risk of harm but for his "willful blindness." See Camilo-Robles, 151 F.3d at 7 (quoting Maldonado-Denis, 23 F.3d 576, 582 (1st Cir. 1994)).

Prignano's reliance on Manarite v. City of Springfield, 957 F.2d 953 (1st Cir. 1992) is misplaced. Manarite involved a situation where the police chief took action: he promulgated a

---

[9] This is disputed, however, because Prignano also stated that he and Ryan, together, reviewed the entire curriculum for each class of recruits. Prignano Dep. 52:11-17, Jan 15, 2003.

policy; directed distribution of the policy to all officers; provided additional directives related to the policy; and provided in-service training.[10] Manarite, 957 F.2d at 957-958. The claim against Prignano is based on inaction, much like the case the Manarite court contrasted to its own, Simmons v. City of Philadelphia, 947 F.2d 1042, 1064-65, 1072-75 (3rd Cir. 1991). Prignano, aware of the inherent dangers associated with the always-armed/always on-duty policy, took little or no action to ensure that proper training and protocols were in place to prevent the known dangers associated with this policy.

Finally, Prignano asserts that some "training aimed at avoiding on-duty/off-duty misidentifications by fellow officers" was in part provided. Prignano & Sullivan Mem. at 18. This argument attempts to reverse the summary judgment rubric and would require this Court to draw all inferences in favor of the moving party, Prignano.

Young has met her burden of establishing genuine issues of material fact regarding Prignano's responsibility for training, his awareness of the life-threatening risks associated with the always armed/always on-duty policy, and his failure (although capable of

[10] In addition, as noted by Prignano, the Manarite court commented that cases finding supervisors deliberately indifferent did so with a "much fuller record" than the record before the Manarite court. Id. at 958. Here, the record before this Court includes an entire trial.

either changing that policy or ensuring that necessary protocols and training were in place) to ensure adequate training of PPD officers, including Solitro. Prignano's conduct, if proven, may well constitute deliberate indifference.

2. Ryan

Ryan was the Director of Administration for the PPD when Solitro attended the 58th Training Academy. Ryan and Cohen Mem. at 12-13. In this position, Ryan was responsible for oversight of a dozen units, including the training division. Ryan Aff. July 11, 2005. While Director of Administration, Ryan "still had some supervisory responsibility over the academy as well as being an instructor up there." Ryan Dep. 14:15-15:5, June 26, 2002. Moreover, Ryan stated that "most of the training remained fairly static once I put it together from the 55th" Academy. Ryan Dep. 244:19-21, July 21, 2003.

Ryan, however, maintains that his relevant conduct for this prong of the qualified immunity analysis is limited to the selection of instructors to teach tactics to the recruits because he relied on these instructors to do so effectively. Ryan & Cohen Mem. at 8. Ryan argues that this conduct does not rise to the level of deliberate indifference, and therefore he should be protected by qualified immunity.

Young presents evidence, some of which is relied upon by the Court of Appeals in connection with its municipal liability analysis, indicating that Ryan was more than a distant overseer of the Training Academy, but actually conducted training that was inconsistent with (or even directly contradicted) PPD policy. Young, 404 F.3d at 17-18. The Court noted that Ryan taught officers not to take off-duty action, in direct conflict with PPD policy.[11] Id. at 18. Ryan himself recognized this conflict, but believed his training "focused on liability concerns and did not discuss safety."[12] Id. Ryan also knew of no other training at the Academy regarding the always armed/always on-duty policy, and said that if such training was taking place there, he would know about it. Young, 404 F.3d at 18. Young points to evidence that Ryan was aware of the potential tragedies that could result from the lack of consistent training and protocols needed to address the always

---

[11] Ironically, at one of his depositions, Ryan stated that he was responsible for ensuring that training given at the Academy was consistent. Ryan Dep. 212:3-5, June 26, 2002. Yet, in spite of this, it appears that Cornel himself was previously reprimanded by PPD Sgt. Figueiredo, because, while off-duty, he failed to take action upon witnessing an incident where shots were fired. Figueiredo Dep. 25:9-22, Jan. 14, 2003.

[12] This distinction appears to be meaningless, however. If officers are told to take action for safety and law enforcement reasons, what does it mean to be told to not take action for "liability reasons"?

armed/always on-duty policy. Young Mem. at 23-24; Ryan Dep. 321:16-24, July 21, 2003.[13]

Ryan's attempt to separate himself from Solitro's training is further undermined by deposition testimony from PPD Chief Prignano. Prignano stated that Ryan's "power" over training was never reassigned or taken away. Prignano Dep. 251:12-17, Sept. 5, 2003. Prignano also said that Ryan was responsible for the selection of instructors for certain subjects and the substance of what was taught. Id. at 280:6-20. Finally, Prignano characterized Ryan as the "chief honcho" when it came to training. Prignano Dep. 39:18, Jan. 15, 2003.

There are disputed issues of material fact regarding Ryan's role in the training of Solitro. When viewed in the light most favorable to Young, the facts could support a verdict that Ryan was deliberately indifferent to the training deficiencies that led to the depravation of Cornel's constitutional rights.

---

[13] Ryan's contradictory instruction may have contributed to the Court of Appeals determination that the need for training on the always armed/always on-duty policy was "heightened by the fact that there was some evidence that officers were sometimes unclear what exactly the policy required." Young, 404 F. 3d at 19 (emphasis added).

3. Cohen

Cohen was the Director of the Training Academy attended by Solitro. Young maintains that Cohen's deliberate indifference is demonstrated by his total disregard for training concerning on-duty/off-duty interactions in light of the always armed/always on-duty policy. As noted by the Court of Appeals, Cohen himself "testified that he did not know one way or the other whether training on on-duty/off-duty interactions existed." Young, 404 F.3d at 18. Further, expert testimony at the first trial indicated that "minimally competent police administrators have long recognized that there is a great distinction between officers' capacity to act forcibly while on-duty and their ability to do so off-duty." Id. at 19 (quoting Fyfe Report).

Cohen contends that he merely supervised and administered a training program, in accordance with a specific curriculum and taught by certified instructors. Cohen & Ryan Mem. at 11. Cohen also emphasizes that the City had never had a friendly fire incident when he was the Training Academy Director. Id. Cohen's memorandum touches on many points, but distilled seems to make four discreet arguments relating to the objective reasonableness of his conduct.

Cohen maintains that since he didn't actually teach a course, he cannot be liable as a supervisor. To the contrary, as head of the Training Academy attended by Solitro, Cohen clearly can be liable as a supervisor in a § 1983 action for the failure to train.

See Camilo-Robles, 151 F.3d at 6-7. Moreover, a supervisor can be liable "for the foreseeable consequences of [his] conduct if he would have known of it but for his . . . willful blindness." Camilo-Robles, 151 F.3d at 7 (quoting Maldonado-Denis, 23 F.3d at 582).

Cohen next maintains that there was some training in place which dealt with on-duty/off-duty interactions. He points to Solitro's six months of training, including "instruction, computer simulators and scenario role play of which, off-duty and/or plain clothes/undercover officers were injected into the scenarios as potential suspects." Cohen and Ryan Mem. at 7. Cohen's claim that there was "some training," like Prignano's, is an attempt to reverse the summary judgment rubric and have this Court draw inferences in his favor. This, the Court will not do. As the Court of Appeals said, "[t]he jury could find that there was, at best, very minimal training on these issues, [or] no real program of training on them at all." Young, 404 F.3d at 28. Even Cohen himself "did not know one way or the other whether training on on-duty/off-duty interactions existed." Id. at 18.

Third, Cohen questions how a police officer can determine whether a training program is constitutionally inadequate if learned judges are not in agreement regarding the adequacy of the training. Cohen points to Judge Lisi's decision that Young could not, as a matter of law, show that the training program was constitutionally

deficient, a decision which was overturned by the Court of Appeals. Ryan & Cohen Mem. at 11. Cohen further points out that the First Circuit determined that a jury may - or may not - find the training constitutionally deficient. Id. at 11-12.

Cohen's argument here misses the point. First, the Court of Appeals ruled on municipal, not supervisory, liability. Thus the holding of Judge Lisi which the Court of Appeals reversed had to do with whether the facts (taken in the light most favorable to the plaintiff) could support a finding of deliberate indifference by the City. The fact that judges might disagree on this legal standard, or the fact that the Court of Appeals believed Judge Lisi erred, does not give Cohen a free pass to ignore dangers of which he presumably was aware.

Finally, Cohen maintains that Saraiva, who attended the 57th Training Academy, and Solitro, who attended the 58th, were taught the same curriculum by the same instructors, yet the jury found that Solitro, but not Saraiva, violated Cornel's constitutional rights. Id. at 12. This argument, as well, misses the mark. The question before the jury in phase one was whether Solitro and/or Saraiva violated Cornel's constitutional rights, not whether a supervisor's deliberate indifference caused that violation. The question of the adequacy of the training was never reached by the jury. Moreover, Saraiva could have received inadequate training but nevertheless not violated Cornel's constitutional rights, thereby never calling into

issue the training question or the issue of causation as to his conduct.

For all of the foregoing reasons, Young provides this Court with ample evidence from which a jury could conclude that Cohen, as the Training Academy Director, was deliberately indifferent to the known risks associated with the always armed/always on-duty policy by failing to provide training even though it would have been clear to a reasonable police supervisor that the failure to do so could jeopardize officers' lives.

Accordingly, because Young has met her burden on all three prongs of the qualified immunity test, Prignano, Ryan, and Cohen are not entitled protection under the doctrine of qualified immunity.

V. The Monell Claim Against Prignano[14]

Young asserts a Monell claim against Prignano, in his official capacity, as a final policymaker for the City on PPD training issues. Prignano maintains entitlement to summary judgment on this claim because he is not currently employed by the City and, even if he was still a City employee, as the Chief he was not a "final policymaker." Prignano & Sullivan Mem. at 19. Prignano further asserts "that the Mayor and the City Council are the only final

[14] Judge Lisi reviewed Young's Monell claim against Prignano, in his official capacity. She determined that Count IV of Young's complaint was subsumed into Count III. Young, 301 F. Supp. 2d 173 n.12. Since this determination was not raised on appeal, the Court of Appeals did not address it. Young, 404 F.3d at 10 n.1. Thus, this Court looks to Count III.

policy makers with respect to the relevant Police Department Policies." Id. at 20 (emphasis added). Young fails to address Prignano's first argument,[15] but responds to his second argument by maintaining that under Rhode Island law, the PPD Chief is in fact a "final policymaker" on PPD training for purposes of Monell liability under § 1983. Young Mem. at 27.

In Monell, the United States Supreme Court held that municipalities could be liable, for purposes of 42 U.S.C. § 1983, based upon the actions of their officials when those officials' "edicts or acts may fairly be said to represent official policy." Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978). "[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986)). Prignano and Young agree that the question of whether or not the Chief is a final policymaker is for this Court to decide, and further agree that this question is governed by state law. Pembaur, 475 U.S. at

[15] Prignano's first argument merits minimal discussion. "A suit against a public official in his official capacity is a suit against the governmental entity itself." Surprenant v. Rivas, 424 F.3d 5, 19 (1st Cir. 2005) (citing Wood v. Hancock County Sheriff's Dep't, 354 F.3d 57, 58 n.1 (1st Cir. 2003); Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 705 (1st Cir. 1993)). The claim against Prignano, therefore, is a claim against the City, and it is immaterial that he has since left the employment. See, e.g., Brandon v. Holt, 469 U.S. 464 (1985) (official capacity suit against former police director for incident occurring during his tenure as director).

483; Praprotnik, 485 U.S. at 124; Prignano & Sullivan Mem. at 19; Young Mem. at 27. In addition, Prignano and Young both rely on the Court of Appeals' decision in this matter, Young, 404 F.3d 4 (1st Cir. 2005), Sean Patrick, Inc. v. City of Providence, C.A. No. 96-689-L (D.R.I. April 24, 1998), and various sections of the Home Rule Charter of the City of Providence ("Charter") to support their respective arguments.

Because the Monell "policy" count of the Complaint (Count IV) was duplicative of the custom and practice claim against the City, (Count III), Judge Lisi found that Count IV was subsumed into Count III. Young, 404 F.3d at 10 n.1 (citing Young, 301 F. Supp. 2d at 173 n.2). No doubt, Young uses a belt and suspenders pleading strategy to assert the Canton training claim against the City. But whether the claimed non-action or non-training of Solitro is described as a "policy" or a "custom" makes little difference in the end. At the close of the evidence, the jury will be asked to determine the question of whether the City's actions (or inactions), whatever they may have been, and whatever they are called ("policy" or "custom"), were the legal cause of Solitro's violation of Cornel's constitutional rights. Nevertheless, even though this Court believes the policy/custom distinction has little practical meaning in this case (and in spite of the fact that Prignano remains in the case as an individual), this Court will undertake the task of determining whether Prignano possessed final policymaking

authority for the City concerning the PPD training issues. McMillian v. Monroe County, Alabama, 520 U.S. 781,784-85 (1997) (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989)). In Small v. Inhabitants of the City of Belfast, the First Circuit followed the "final authority" approach for determining municipal liability. Small, 796 F.2d 544, 552-53 (1st Cir. 1986). For example, in Bordanaro v. McLeod, the First Circuit found a police chief was a final policymaker where testimony "established that, in regard to law enforcement decisions, the Chief was one whose acts or edicts may fairly be said to represent official policy." Bordanaro, 871 F.2d 1151, 1157 (1st Cir. 1989) (internal quotations omitted).

Final policymakers come in more than one legal shape and size. First, there are "cases in which policymaking responsibility is shared among more than one official or body." Praprotnik, 485 U.S. at 126. Thus, this may be a case where more than one official spoke for the City on training issues. Second, a municipality's final policymakers cannot insulate the municipality "from liability simply by delegating their policymaking authority to others[.]" Id.[16] And third, a final policymaker "need not have 'official' authority to make final decisions, such authority can be 'implied from a

---

[16] "As the plurality in Pembaur recognized, special difficulties can arise when it is contended that a municipal policymaker has delegated his policymaking authority to another official." Id. at 126 (citing Pembaur, 475 U.S. at 482-83, and n.12).

continued course of knowing acquiescence by the governing body in the exercising of policymaking authority by an agency or official.'" Comfort v. Town of Pittsfield, 924 F. Supp. 1219, 1234 (D. Me. 1996) (quoting Spell v. McDaniel, 824 F.2d 1380, 1387 (4th Cir. 1987), cert. denied, City of Fayetteville, N.C. v. Spell, 484 U.S. 1027 (1988)).

In Young, the Court of Appeals provided some guidance for this Court regarding the final policymaker question. Young, 404 F.3d at 30 n.21. In discussing the City's "several confusing arguments" regarding Monell, the Court of Appeals stated that "although it is unclear whether Chief Prignano was a final policymaker for the municipality on PPD training issues, Commissioner Partington clearly was such a final policymaker: as Commissioner of Public Safety ("Commissioner") he had been delegated broad policymaking authority over PPD procedures by the municipality." Id. Thus, this Court begins its inquiry into state law with the job half done. The Court of Appeals made clear that Commissioner Partington was a final policymaker on PPD training issues, and his policymaking authority over these issues was broad.

This Court next looks to Rhode Island law. See Praprotnik, 485 U.S. at 124. While the United States Supreme Court expressed confidence that "state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any

given area of local government's business[,]" Id. at 125 (emphasis added), neither party has cited, nor has this Court located, any Rhode Island General Law[17] or Rhode Island Supreme Court[18] decision pertinent to this inquiry.

The Sean Patrick decision, cited by both Young and Prignano, concerned PPD Chief Prignano's decision to "have a group of officers stationed prominently at [a] nightclub." Sean Patrick, Tr. at 2. Senior Judge Ronald Lagueux of this Court, in a bench decision, noted that "the policy was framed in response to a particular circumstance" and found that there was no showing of a policy promulgated by the City of Providence's highest authorities, the Mayor and the City Council. Id. at 2-3.

Sean Patrick does not provide the cover Prignano suggests. First, the Court of Appeals has already determined that Partington is a final policymaker on PPD training issues.[19] And second, the

---

[17] Rhode Island statutes do address other facets of police chief's duties. See, e.g., R.I. Gen. Laws § 31-13-10 (2005) (police chief to authorize certain signs on highways); § 30-15.8-3 (police chief, subject to approval of city or town council, may enter into agreement with adjacent towns regarding mutual aid and assistance).

[18] Recently, a Rhode Island Superior Court Justice found that the Acting Director of the Department of Public Property for the City of Providence possessed final policymaking authority – regarding the selection of a school site – for purposes of Monell liability. Hartford Park Tenants Assoc. v. Rhode Island Dep't of Envtl. Mgmt., No. C.A. 99-3748, 2005 WL 2436227 (R.I. Super. Ct. Oct. 3, 2005).

[19] This remains so regardless of Sean Patrick's holding that the Mayor and City Council are the City's highest authorities.

"policy" alleged in Sean Patrick was in effect only "for a limited time." Sean Patrick, at 3. Thus, Judge Lagueux found that the Chief's single decision to place officers at a particular location for a short amount of time was not the type of action that could subject the City to liability under § 1983. Id. at 2-3. Of course, a single decision of a final policymaker can in some instances constitute a policy. Pembaur, 475 U.S. at 480. In contrast, however, the policy relevant to the present matter was in effect for several years, governed all PPD recruits and officers, and was reviewed at least annually.[20]

Prignano points out that according to the City Charter, the Mayor's powers and duties include supervising, directing, and controlling City departments, that legislative powers are vested in the City Council, and that the PPD is contained within the Department of Public Safety. Charter §§ 301, 401, 1001.

Section 1001 of the Charter states that "the head of the police department shall be the commissioner, who shall appoint a chief of police, who shall serve as the chief executive officer of the police department subject to the discretion of the commissioner." Section 1001 then enumerates specific areas of authority for the commissioner, including authority over PPD personnel and authority

---

[20] The Superior Court Justice in Hartford Park also found the holding of Sean Patrick to be not applicable. See Hartford Park, 2005 WL 2436227, at *39.

to "make all rules and regulations necessary for the efficiency, management and direction of the police department." Charter §§ 1001 (3), (4).

Speaking more generally on the duties of all City department heads, the Charter bestows each with the power "to appoint a deputy or deputies, without the necessity of any approval or confirmation by any other person or body." Id. at § 1201(b). At the request of a department head, "any such deputy or deputies shall perform such duties as shall be prescribed by said department head." Id. Thus, the Charter places no limitations upon the type of duties that may be delegated to deputies, nor is any approval of this deputization required.

However, subsection (c) specifies that each department head's power to supervise and control his or her respective department, and power to prescribe rules and regulations, "shall be exercised under and subject to the direction of the mayor," unless set forth otherwise. Similarly, subsection (d), entitled "Delegation of work," provides that "any department head may with the approval of the mayor, assign the functions vested in his or her department to such subordinate officers and employees as may seem desirable . . . ." Id. at (d) (emphasis added).

Thus the Charter itself implies that the Chief makes policy only with approval of the Mayor; yet the Court of Appeals has already determined that Partington was a final policymaker. And

while that conclusion is not free from doubt, this Court believes that Prignano at least shared Partington's authority and was also delegated such authority by him.

For example, Partington stated in his deposition that he "shared" PPD policymaking responsibility with the Chief. Partington Dep. 27:5-8, May 27, 2003. He further agreed that the mayor "had no responsibility to sign off on the rules and regulations, the polices and procedures, of the [PPD]." Id. at 27:9-13. Partington also said that he delegated authority for training on off-duty issues to the Chief. Id. at 32:13-23. Finally, Partington agreed with the description that the Chief's attitude was "an obstacle" regarding reforms needed within the PPD, Partington Dep. 200:12-19, May 28, 2003, implying that the Chief could make policy by non-action.

Prignano's own deposition confirms his final authority for training. When asked if he was "ultimately responsible for ensuring that all men in [his] chain of command were properly trained," he responded in the affirmative. Prignano Dep. 20:10-17, Jan. 15, 2003. Although he indicated that "[w]ith respect to training," he "justifiably relied upon" Ryan, Prignano & Sullivan Mem. at 18, when asked if one of his "primary responsibilities was to ensure that the policies and procedures, the rules and regulations were sufficiently clear and comprehensive so that officers knew how they're supposed

to act?," Prignano responded "Yes." Prignano Dep. 171:21-172:4, Jan. 15, 2003.

Finally, this Court believes that the change made in the always armed/always on-duty policy is revealing.[21] The order effectuating this change was issued by the PPD Chief of Police, on what appears to be PPD Police Chief letterhead, and signed by both the Commissioner and the Chief. General Order #22, Series of 2001 (Sept. 1, 2001). The role of the Chief in effectuating this policy change provides additional evidence that the Chief at least shared final policymaking authority for PPD policy issues related to the always armed/always on-duty policy.

This Court must view all facts and make all reasonable inferences in Young's favor at the summary judgment stage. Sheehy, 191 F.3d at 18-19. In light of the foregoing, this Court finds that Young has presented ample evidence demonstrating that as Chief, Prignano possessed final policymaking authority on training issues.[22] Accordingly, the Chief's actions on training issues may

---

[21] The discussion of this order in no way reflects that such order will be admissible at trial. As this Court noted during argument on Defendants' motions in limine, this ruling will be reserved for trial.

[22] This Court need not decide if such final policymaking authority was the Chief's own, or rather if it was shared with the commissioner. See Praprotnik, 485 U.S. at 126.

constitute policy and subject the City to Monell liability under § 1983.

VI. Ryan's Additional Argument for Summary Judgment

Ryan maintains that the First Circuit's affirmance of the jury's verdict that Saraiva did not violate Cornel's constitutional rights and his role as the head of Saraiva's Training Academy supports the entry of summary judgment in his favor. Simply put, he argues that he cannot be liable when Saraiva was not.

This motion is effectively redundant of his qualified immunity argument and requires little discussion. Ryan's supervisory role extended beyond his position as Academy Director for Saraiva's Academy. Ryan served as Director of Administration during Solitro's Academy, a position with supervisory responsibility for the training division.[23] Ryan Dep. 14:15-15:5, June 26, 2002. As discussed above, under the objective legal reasonableness prong, Ryan retained an active role in PPD's training program for Solitro's Academy. See Ryan, at 23-25. For example, Ryan taught PPD officers a training class on civil liability. Young, 404 F.3d at 17. There, Ryan apparently instructed officers not to take police action when they

---

[23] The First Circuit pointed out, albeit without expressing an opinion, that evidence of the training provided in the 57th Academy, attended by Saraiva and Cornel and headed by Ryan, "might be relevant to show that Solitro's lack of training was part of a policy of not training on on-duty/off-duty interactions, rather than simply an 'otherwise sound program [that] has occasionally been negligently administered.' Canton, 489 U.S. at 391, 109 S.Ct. 1197." Young, 404 F.3d at 27 n.19.

were off duty. Id. at 18. Ryan was aware that this instruction contradicted with written PPD policy. Id. A jury might conclude, based on this training, that Solitro believed Young could not be a police officer because he (Solitro) was trained to believe that an off-duty officer would not insert himself into a situation like the one which occurred on January 20, 2000.

Supervisory liability encompasses not only those responsible for direct instruction, but rather "a wide range of officials who are themselves removed from the perpetration of the rights-violating behavior." Camilo-Robles, 151 F.3d at 6-7. Therefore, Ryan's attempt to disconnect himself from Solitro's training must fail, and accordingly, Ryan's additional argument for summary judgment is denied.

## VI. Conclusion

For all of the foregoing reasons, Defendant Prignano's Motion for Summary Judgment is DENIED, Defendant Ryan's Motion for Summary Judgment is DENIED, and Defendant Cohen's Motion for Summary Judgment is DENIED.

William E. Smith
United States District Judge
Date: 11/2/05