UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LEISA YOUNG, In her Capacity as Administratrix of the Estate of Cornel Young, Jr. | ) | |
| v. | ) | No. C.A. No. 01-288 S |
| CITY OF PROVIDENCE by and through its treasurer, Stephen Napolitano | ) | |

## MOTION IN LIMINE TO RESTRICT TESTIMONY OF EXPERT FRED TAYLOR

The plaintiff files this motion to limit the testimony of the defense expert, Fred Taylor to the confines of his expert report. Even as the defense files this motion, the tentative nature of the motion is acknowledged. It is not a Daubert challenge. The issues raised in this motion may never even arise, depending upon the scope of the direct testimony the defense seeks to elicit from Mr. Taylor. In support of this motion, the defense submits the attached memorandum of law. The memorandum of law will also address the timeliness of the motion.

LEISA YOUNG, in her capacity as
Administratrix of the Estate of
Cornel Young Jr.,
By her Attorneys

Robert B. Mann #0153
Mann & Mitchell
One Turks Head Pl., Ste. 610
Providence, RI 02903
(401) 351-5770

Barry Scheck, Esq. #4612
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081

Nick Brustin, Esq. #0605
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081

## Certification

I hereby certify that a copy of the within document was mailed or delivered to the person or offices of Kevin McHugh, Esq., City Solicitors Office, 275 Westminster St., Suite 200, Providence, R.I. 02903 and Michael Colucci, Esq., Olenn & Penza, LLP, 530 Greenwich Ave., Warwick, RI 02886 on the 9 day of November, 2005.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| LEISA YOUNG, In her Capacity as Administratrix of the Estate of Cornel Young, Jr. | ) | |
| v. | ) | No. C.A. No. 01-288 S |
| CITY OF PROVIDENCE by and through its treasurer, Stephen Napolitano | ) | |

MEMORANDUM OF LAW IN SUPPORT OF MOTION IN LIMINE TO RESTRICT TESTIMONY OF EXPERT FRED TAYLOR

INTRODUCTION

The plaintiff has filed a motion in an abundance of caution to ensure that defendant's expert does not testify beyond the confines of his report. The motion is tentative in nature. It depends upon the scope of the testimony the defense will seek to elicit from Mr. Taylor. During the hearings/conferences on the motions in limine, plaintiff's counsel understood defense counsel to state that Mr. Taylor would opine upon the off duty policy in place in 2000 despite his clear testimony in his deposition that he was not even asked to review the policy. Finally, his testimony at trial should be limited to the core curriculum as he defines it. Counsel does not recollect the opening providing significant additional information about the testimony, if any, of Mr. Taylor. The plaintiff has filed this motion in light of the above in the belief that Mr. Taylor's report does not provide any support for such testimony about on duty/off duty confrontations.

Rule 26(a)(2) of the Federal Rules of Civil Procedure requires pretrial disclosure of expert reports. In this case, the first part of Mr. Taylor's report addressed hiring issues and is not relevant to the issues now before the Court. The second part of the report, starting on page 7, deals with training. Mr. Taylor makes clear on pages 7

through 9 of the report that what he examined was the Providence Police Recruit Training core curriculum. In Mr. Taylor's deposition, the limits of what he examined are established. The opinion offered in his report, as to training states:

> Based on my review of the Providence Police Recruit Training curriculum it is my opinion that the core curriculum meets CALEA standards 33.4.1 and 33.4.2. The core curriculum compares favorably in total hours and content to other police agencies, and; provides a full understanding of our legal system, the requirements and limitations of their authority to act and development of physical and mental skills in order to carry out their duties effectively and safely.

Report at 9.

The plaintiff's position, based on Mr. Taylor's deposition testimony, is essentially the following:

1) He should not be allowed to testify about the adequacy of the on duty off duty policy or the undocumented training concerning off duty confrontations;

2) He can testify about what the core curriculum is, noting the fact that it is limited to written materials;

3) He should not be allowed to testify about Dr. Fyfe's report or opinions.

The bases for these limitations are set forth below in the summary of Mr. Taylor's deposition testimony.

The defense has suggested that because the deposition of Mr. Taylor was taken, any omissions in his report are cured. This specific question is addressed in Moore's Federal Practice. The commentary states:

> If an expert discusses the omitted opinion in the course of the expert's deposition, that will often operate to satisfy Rule 26(e)(1) and prevent exclusion under Rule 37(c)(1), .... However, the mere fact that an expert's

> deposition is taken and the opposing party has the opportunity to inquire into opinions omitted from the expert's report – but does not in fact do so – will not cure the omission in the report. The omitted opinion will, in these circumstances, usually be excluded under Rule 37(c)(1) unless the proponent can show substantial justification or harmless error. [Footnote omitted]

6 Moore's Federal Practice §26.23 at p. 26-73 (Mathew Bender 3d ed.).

SUMMARY OF DEPOSITION TESTIMONY

In terms of training, Mr. Taylor testified that he was asked to look at training in terms of defensive tactics.[1] He was not asked to look at anything else in terms of training. Dep. of Taylor at 45-46. He was asked to look at the core curriculum in terms of defensive tactics.[2] When asked if he was looking at any other training processes than defensive tactics, Mr. Taylor said:

---

[1] 8 Q. what were you asked to do in this case?
9 A. I was asked to look at the selection and
10 recruitment process for the City of Providence,
11 and see how that compared with other selection and
12 recruitment processes, and to look at training in
13 terms of defensive tactics. Basically that was
14 it.
15 Q. That was it?
16 A. Yes.

Dep. at Pg 15 Lns 8 -16.

[2] 18 Q. And I take it that you were, in regard to
19 training, you were simply asked to look at the
20 policies and procedures, correct?
21 MR. McHUGH: Objection as to form.
22 A. I was asked to look at the curriculum in
23 terms of defensive tactics and whether it was
24 taught or not.

Dep. at Pg 32 Lns 18 -24.

A. Well, basically to look if there was a
training, a process itself, the core curriculum,
basically as it applied to defensive tactics;
that's the best way I can relate it.

Taylor dep. at 47. He was not asked to look at the training provided to Solitro, Saraiva, or Young.[3]

With respect to his consideration of Mr. Fyfe's report there was the following colloquy:

Q. And you reviewed his report in this case, is that
fair to say?
A. I looked at it, yes.
Q. So you looked at it, and I asked you if you
reviewed it; is there a difference in your mind?
A. Yes, I didn't go and try to make an analysis
of it, or go into what his references were, I just
kind of read it to see what his opinions were, but

15

I didn't look into what he referenced, no.
Q. Why is that?
A. It didn't have anything to do with what I was
asked to do.
Q. How much time would you say you spent reading it?
A. Well, it's lengthy. Probably 30 minutes or
so.
Q. What were you asked to do in this case?
A. I was asked to look at the selection and
recruitment process for the City of Providence,
and see how that compared with other selection and
recruitment processes, and to look at training in
terms of defensive tactics. Basically that was
it.
Q. That was it?

---

[3] Q. You were not asked, for example, to look at the
training provided to Officer Solitro, Officer
Saraiva, or Officer Young?
A. No.

Dep. at Pg 33 Lns 1 -4.

A. Yes.

. . .

Q. Withdrawn. Fair to say that in your report you
make no mention of Dr. Fife's report?
A. No, I don't

Taylor dep. at pp. 14-15. Clearly, Mr. Taylor spent only a small amount of time reviewing the Fyfe report and did not respond to it in his report.

Mr. Taylor also testified that he was not asked to look at the policy of the Providence Police Department in regard to off-duty action in January, 2000.[4] If Mr. Taylor was not asked to look at the policy for off duty training, there is no basis for him offering an opinion as to the adequacy or inadequacy of such a policy. This point is reaffirmed by his testimony as to his limited knowledge about the policy.[5] He also said that he did not consider the policy in reaching his opinions.[6]

---

[4] Q. In January of 2000, the time of the shooting, what
is your understanding as to the policy of the
Providence Police Department in regard to off-duty
action?
A. I was not asked to look at that.

Taylor dep. at 54.

[5] Q. Sure. At or about the time of the shooting in
January of 2000 what is your understanding as to
the department's policy in regard to off-duty
action?
A. From the materials that I read, there was a
55
general order on, I don't recall the number, but
there was one on, because I didn't do an analysis
of it, but there was an order that specified to
safeguard life and property, if I recall it
exactly right, off duty, in the City of
Providence, you're expected to take police action.
That's my best recollection.

Mr. Taylor was asked specifically about evaluating training with respect to avoiding friendly fire incidents and there was the following colloquy:

Q. And were you specifically asked to evaluate the
adequacy of the department's training on avoiding
49
friendly-fire incidents?
A. Avoiding friendly-fire incidents? Well, I
think avoiding friendly-fire incidents has to do
with defensive tactics in some sense, so I wasn't
asked to do that specifically, but that may come
up in the context of looking at defensive tactics.
Q. Let me be more specific. Were you specifically
tasked with evaluating whether or not the
department provided adequate training to its
officers and recruits in regard to avoiding
friendly-fire incidents?
MR. McHUGH: Objection as to form.
A. The best context that I can respond is that

---

Q. Anything else you know about it?
A. No.

Taylor dep. at 54-55.

6

Q. Fair to say, then, as you've testified I think
three times now, you weren't asked to consider
that, correct?
A. No.
Q. And I take it that the policy, whatever it may
have been, did not factor in any way into your
opinions in this case, is that fair to say?
A. No.
Q. It's not fair to say or -- let me rephrase it, I
think I used a double negative. Is it fair to say
that in reaching the opinions that you reached in
this case, you did not consider the policy that
you just described?
A. No, I did not, it was not part of my
reference materials for that, no.

Taylor dep. at 55.

> not specifically, but if it was part of defensive tactics, they should have taught that, then that would have been part.
>
> Q. But not specifically?
>
> A. No.
>
> Q. And you were not specifically tasked, I take it, with evaluating the adequacy of the department's rules and regulations concerning off-duty action?
>
> A. No.
>
> Q. And I take it you formed no opinion on that?
>
> A. No, I formed no opinion.

Taylor dep. at 48-49.

Mr. Taylor also made clear that the bases for his opinions were in his report. Dep. of Taylor at 40-41. The report speaks for itself. Mr. Taylor said he was not offering any opinions about the police investigation of Young shooting and that he was not offering any opinions about the specific training received by officers Solitro, Saraiva, or Young. Id. at 43-44. He also said he was not offering any opinions about the conduct of Prignano, Ryan, or Cohen. Id.

Finally, Mr. Taylor agreed that the term core curriculum meant the curriculum that is written down and that in the core curriculum that he looked at, the only documented training on off duty issues that he saw was in the police liability class. Taylor dep. at 230.

He said:

> Q. Is it your belief that that wasn't part of the core curriculum, his class?
>
> A. No. The core curriculum is a document in which you teach from, and you may give anecdotal types of information as you teach examples, films, and all those kinds of things. This was his anecdotal information. As far as I know, he taught from the directive and they knew what the rule was.

Q. In other words, the core curriculum means the
curriculum that's written down, correct?
A. That's the core, yes.
Q. And when you say "core curriculum" in your report,
230
you mean the written curriculum, correct?
A. Yes.

Deposition at 229-30. He also said:

Q. In the core curriculum that you looked at, did you
see any documented training on off-duty issues?
A. And you asked me that before and I said the
police liability class.
Q. Anything else?
A. No, not documented in the core curriculum,
no.

Deposition at 230. He further testified:

Q. Opinion 9 is limited to core curriculum, correct?
A. Core curriculum, yes.
Q. And, in fact, Opinion 9 is the only opinion that
you issue in regard to training, is that correct?
A. That's the only opinion I issued, correct.

Deposition at 231.

He was also asked about what he would say about training in light of the above discussion and said:

Q. The focus of your testimony at trial on training
is going to focus exclusively on your analysis of
the core curriculum, is that correct?
MR. PENZA: Objection.
MR. McHUGH: Objection. He didn't say
that, he already testified before.
A. It's going to the core curriculum as it
compares in all these situations.
Q. That's going to be the sum total of your testimony
in regard to training, is that correct?
MR. PENZA: Objection.
MR. COLUCCI: Objection.
232
MR. McHUGH: Objection.

A. Yes, as it is stated in my opinion, yes.

Taylor dep. at 231-232.

## ARGUMENT AND CONCLUSION

The plaintiff's argument is simply that the record does not provide a basis for any opinion by Mr. Taylor as to the training provided for on duty/off duty confrontations.

The plaintiff submits that the timing of this motion should not be an issue. Plaintiff has no obligation to file this motion, but could simply wait until the defense sought to elicit testimony from Mr. Taylor and then articulate objections.

For the reasons set forth above, plaintiff requests her motion be granted.

LEISA YOUNG, in her capacity as
Administratrix of the Estate of
Cornel Young Jr.,
By her Attorneys

Robert B. Mann #0153
Mann & Mitchell
One Turks Head Pl., Ste. 610
Providence, RI 02903
(401) 351-5770

Barry Scheck, Esq. #4612
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081

Nick Brustin, Esq. #0605
COCHRAN, NEUFELD, & SCHECK
99 Hudson Street, 8th Floor
New York, NY 10013
212-965-9081

**Certification**

I hereby certify that a copy of the within document was mailed or delivered to the person or offices of Kevin McHugh, Esq., City Solicitors Office, 275 Westminster St., Suite 200, Providence, R.I. 02903 and Michael Colucci, Esq., Olenn & Penza, LLP, 530 Greenwich Ave., Warwick, RI 02886 on the 9 day of November, 2005.

**FRED TAYLOR & ASSOCIATES, INC.**
7352 S.W. 120 Avenue
Miami, Fl 33183

March 25, 2003

# REPORT: Young v City of Providence, et al., Case no. 01-288 (ML)

I was retained (attachment A) to review the material provided (attachment B) and provide opinions reference the captioned case. My qualifications as an expert witness are detailed in attachment C and my opinions are based solely on the materials provided.

## ISSUES:

- Whether the City of Providence has appropriate procedures and processes regarding the hiring of Police Officers and whether those procedures and policies were followed in the captioned case.
- Whether Police Officers of the City of Providence Police Department were adequately trained regarding Officer Safety issues.

## OPINION:

*Background:*

It is important to fully understand the underlying basis and authority for police conduct in order to examine or compare the procedures and processes of hiring or training officers for their duties.

The United States Constitution is of course the foundation of our legal system. However, police powers not covered in the U.S. Constitution, federal laws and U.S. Supreme Court decisions are left to the States and are found in State Constitutions, state statutes and State Court decisions. Police officers, although employed by the State or local jurisdictions, must be fully versed in the mandates and restrictions not only of their local jurisdictions and state and federal statutes but also state and federal court decisions that limit their authority to act or detail permissible conduct.

PLAINTIFF'S EXHIBIT
27 Taylor
6/4/03 MMM

The basis for police training then is a full understanding of our legal systems, the requirements and limitations of their authority to act and development of mental and physical skills in order to carry out their duties effectively and safely.

Some states, due to their geographical size and diversity of population, enact statutes that detail qualifications for hiring and training police officers. For example, the State of Florida enacted legislation establishing a Police Standards and Training Commission responsible for developing basic training curriculums, establishing guidelines for police training academies, police officer certification and decertification and mandatory re-training for certified officers. When determining whether a police officer has been properly trained in the State of Florida one must only determine whether the officer received basic training, passed the state exam and was certified and has attended mandatory re-training classes. Such is not the case in Rhode Island. Police hiring, selection and training is left to the City of Providence.

*Police Hiring:*

The goal of any police selection process is to screen out candidates that do not obviously possess the mental acuity, physical agility or moral turpitude to perform the duties and responsibilities required of police officers and to identify and hire the best candidates possible.

The hiring process of the City of Providence consists of a position announcement detailing qualification standards, a recruitment process, written application, physical fitness assessment, written exam, oral board, background investigation, psychological screening and a medical examination.

When determining if the selection process is adequate it is necessary to determine whether the hiring process screens out candidates not possessing the skills necessary to understand and perform the duties of a police officer and how the process compares to professional standards in other jurisdictions.

The Commission on Accreditation for Law Enforcement Agencies (CALEA) was established by police professionals to develop standards for police policy and procedures and a voluntary accreditation process for those agencies desiring to do so. There are application and assessment fees charged for those agencies seeking accreditation in addition to costs associated with developing the extensive written directive and records keeping systems required for accreditation. Many states have chosen to develop their own process due to the costs of accreditation and to make the process more applicable to their local needs and requirements. Yet other agencies feel that their practices and policies are sufficient and choose not to participate. Regardless of whether accreditation is necessary or even needed by most police agencies C.A.L.E.A. has done the most extensive research and development of standards for police practices, therefore I have chosen to compare the recruitment and selection process for the City of Providence with the applicable

sections of CALEA standards, Chapter 31, Recruitment and Chapter 32, Selection.

*Chapter 31, Recruitment:*

31.1 Administrative Practices and Procedures

31.1.1 The agency actively conducts or participates in its recruitment program.

*Complies*

31.1.2 Individuals assigned to recruitment activities are knowledgeable in personnel matters, especially equal opportunity

*Complies*

31.2 Equal Employment Opportunity and Recruitment

31.2.1 The agency has ethnic and gender composition in the sworn law enforcement ranks in approximate proportion to the makeup of the available work force in the law enforcement's agency's service community, or a recruitment plan pursuant to standard 31.2.2.

*Complies: The Police Department has an Affirmative Action Plan that meets the standards of 31.2.2.*

*31.2.2* The agency has a recruitment plan for fulltime sworn personnel that includes the following elements:

a. statement of objectives
*b.* plan of action designed to achieve the objectives identified in (a) and
*c.* procedures to periodically evaluate the progress toward objectives and revise/reissue the plan.

*Complies.*

31.2.3 The agency has an equal opportunity plan.

*Complies*

31.3. Job Announcements and Publicity

31.3.1 The agency's job announcements and recruitment notices for sworn personnel:

a. provide a description of the duties, responsibilities, requisite skills, educational level and other qualifications or requirements;
b. advertise entry-level job vacancies through electronic, print, or other media
c. advertise the agency as an equal opportunity employer on all employment applications and recruitment advertisements; and
d. advertise official application filing deadlines

*Complies*

31.3.2 The agency posts job announcements for sworn personnel with community service organizations and/or seeks cooperative assistance from community organization key leaders.

*Complies*

31.3.3 The agency maintains contact with applicants for sworn positions from initial application to final employment disposition.

*Complies*

31.3.4 Applicants for sworn positions are not rejected because of minor omissions or deficiencies that can be corrected prior to the testing or interview process.

*Complies*

*OPINION: Based on a review of the available records and testimony the City of Providence recruitment process for police officer is consistent with CALEA standards.*

*Chapter 32, Selection:*

32.1 Professional and Legal Requirements

32.1.1 Written directives describe all elements and activities of the selection process for full-time personnel

*The Police Recruitment/Selection process is clearly outlined in proposal form.*

**32.1.2 All elements of the selection process for sworn personnel use only those rating criteria or minimum qualifications that are job related**

*All of the processes involved measure traits or characteristics that are job related*

**32.1.3 A written directive requires that all elements of the selection process for sworn personnel are administered, scored, evaluated, and interpreted in a uniform manner.**

*The Providence Police Department's written directive system does not have a specific directive meeting CALEA standards; however there is no information or testimony that scoring on any instrument was not done in a uniform manner.*

**32.1.4 At the time of their formal application, candidates for sworn positions are informed in writing of:**

a. all elements of the selection process
b. the expected duration of the selection process; and
c. the agency's policy on reapplication

*Complies.*

**32.1.5 Candidates for sworn positions determined to be ineligible for appointments are informed in writing.**

*There are no records available that indicate whether rejected candidates are formally notified in writing.*

**32.1.6 A written directive governs the disposition of the records of candidates for sworn positions determined to be ineligible for appointment.**

*This directive requirement addresses record keeping, not process.*

**32.1.7 A written directive requires that selection materials be stored in a secure area when not being used and are disposed of in a manner that prevents disclosure of the information within.**

*This directive requirement addresses record keeping, not process.*

32.2 Administrative Practices and Procedures

32.2.1 A background investigation of each candidate for a sworn position is conducted prior to appointment to probationary status, and includes:

a. verification of qualifying credentials;
b. a review of any criminal record; and
c. verification of at least three personal references

Commentary: It is more reliable to conduct the inquiry in person, though telephone and mail inquiries are appropriate in obtaining criminal history and driving records. The investigation should routinely involve a home visit with the candidate and his or family and interviews with neighbors. Background investigations are generally listed among the final stages in the selection process only to suggest that this is when they should be completed, they are likely to have commenced much earlier.

*Complies*

32.2.2 Personnel used to conduct background investigations are trained in collecting required information.

*Background investigations were assigned to detectives in the Police Department. Detectives are trained to interview people, gather information and write reports. There is testimony that the background investigator for Officer Solitro was not provided with the written procedures for Police Applicant Background Investigations to follow, although guides for this purpose were available. The investigator states later in his deposition after reviewing a guide that he would not have conducted his investigation any differently. A review of the forms on which the background information must be submitted indicates that it is structured in an instructional format requiring the investigator to answer the questions posed in each area, making it unlikely that any required information would be omitted.*

*It is obvious that the Providence Police Department does not continuously hire police officers and that it would be impractical to maintain a staff of trained background investigators for that purpose. The practice of using detectives to handle background investigations is quite appropriate.*

*Complies*

32.2.3 In the absence of controlling legislation the agency has a policy regarding the retention of each candidate's background information.

*This directive requirement addresses record keeping, not process*

32.2.1 through 32.2.6 Addresses polygraph examinations *if* used.

*Not applicable*

32.2.7 A medical examination is conducted, prior to appointment to probationary status, to certify the general health of each candidate for a sworn position.

*Complies*

32.2.8 An emotional stability and psychological fitness examination of each candidate for a sworn position is conducted and assessed by a qualified professional prior to appointment to probationary status.

*Complies*

32.2.9 In the absence of controlling legislation, the agency has a policy regarding the retention of the results of medical examinations, emotional stability and psychological fitness examinations.

*This directive requirement addresses record keeping, not process*

32.2.10 In the absence of controlling legislation, at least a six-month probationary period for sworn personnel following completion of entry-level classroom training is required before candidates are granted permanent status.

*Complies*

*OPINION: Based on a review of the available data and testimony it is my opinion that the Providence Police Department processes for Police Officer Selection are consistent with CALEA standards. Further, there is no indication that the process was deviated from during the selection and hiring of Officers Solitro and Saraiva.*

## *Police Training:*

CALEA standards require that all sworn officers complete a recruit-training program prior to any assignment by which the officer is allowed to carry a weapon or make an arrest (33.4.1). Also, that the curriculum be based on the most frequent assignment associated duties of officers who complete recruit training and use of evaluation techniques to measure competency in the required skills (33.4.2). CALEA does not recommend specific courses to be included in the basic curriculum. It is therefore necessary to compare the Providence Police Academy requirements to other police academies.

As commented on earlier, the State of Florida has a Training and Standards Commission that among other duties provides a mandatory core curriculum that is required as a minimum to be eligible for state certification as a police officer. I have chosen this comparison because the curriculum would be relevant to a police department the size of Providence since there are many agencies in the State of Florida the same size or larger than Providence.

The Providence Police Academy provides training with an aggregate total of 1000 training hours. Officer safety, which is the gist of this case, is approximately 8% of the total curriculum, with some additional hours of officer safety included in other subjects such as Police Officer liability, verbal judo and the Camp Varnum training experience. The State of Florida core curriculum provides for 680 hours of training with 11% of that training focused on officer safety/defensive tactics, with some additional hours included in other training blocks. In terms of total aggregate curriculum hours, the Miami-Dade Police Department (states largest) has 1040 total curriculum hours.

The main training concern in the instant case are officer safety issues regarding the use of force by either uniform or casually dressed off-duty officers. Actually, off-duty officers who deem it appropriate to take action required by the departments general orders revert to on-duty status and should act accordingly. Off-duty officers should carefully consider any action situation since they are required only to carry a firearm while in the City of Providence and therefore would not be in possession of other police tactical weapons or devices.

The Defensive Tactics/Officer Safety Course includes eleven topics including: *Use of Force Continuum, Introduction to DT/OS, and Firearms Training.* The use of force continuum depicts an escalation cycle, color codes of danger, principals of personal defense and body alarm reactions. Introduction to DT/OS includes topics including items to consider when using force dangerous to human life, such as physical positioning and awareness of your surrounding environment. Firearms training includes topics as the use and difference between cover and concealment and the use of dialogue.

Range 2000 is an state of the art interactive multimedia Force-Control computer driven training system that projects real life stressful situations on issues pertaining to the use of force faced by police officers onto a life-size screen which can be used in a classroom or on the firearms range. Included are verbalization, laser and use of force modules that can be created to suit local situations or training needs. Recruits are evaluated on their performance to measure competency.

Paint ball simunition training is scenario based training and focuses on the decision-making process regarding the use of deadly force.

Verbal Judo is a training course that stresses listening techniques, verbal and non-verbal communications including choice and use of words, tone, inflection and

emphasis on police commands. The Police Liability course has a Personal Safety/Fellow Officer Safety block that includes:

- Common sense compared to reckless action
- Discussion on how off-duty conduct has the greatest potential for legal liabilities as well as *personal safety*
- Application of the rules of defensive tactics and street survival to all actions.

The Camp Varnum training experience is a weeklong course scheduled following the completion of the core curriculum. It is conducted at a military camp with more than a dozen buildings spread over several streets that have the appearance of a typical dwelling in the city of Providence. Scenarios are developed which raise issues that have been taught throughout the core curriculum. Recruits respond to radio calls dispatched by communication operators to different locations where regular officers participate as actors in the scenarios. Recruits are then evaluated on each scenario based upon their application of the principles that have been taught throughout the recruit academy.

To summarize, recruits receive training on the use of deadly force through several training blocks including officer safety, firearms, paint ball simunition, verbal judo, police liability and the Camp Varnum scenario training experience and are evaluated on their performance. It should be noted here that scenario training, where scenarios are reality based, have long been considered the most effective form of training conducted.

*OPINION: Based on my review of the Providence Police Recruit Training curriculum it is my opinion that the core curriculum meets CALEA standards 33.4.1 and 33.4.2. The core curriculum compares favorably in total hours and content to other police agencies, and; provides a full understanding of our legal system, the requirements and limitations of their authority to act and development of physical and mental skills in order to carry out their duties effectively and safely.*

*By,*

Fred Taylor, President