MJC:jlb 95306 \pleading\95306designatefyfe

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

LEISA YOUNG :
:
VS. : C.A. NO. 01-288S
:
CITY OF PROVIDENCE, ET AL :

**DEFENDANT'S DESIGNATIONS OF FYFE'S TESTIMONY—RE-CROSS**

**June 9, 2003 Deposition**

P. 70, L. 6-25
P. 71, L 11 - P. 72, L13
[redacted] (already included in plaintiff's designations)
P. 127, L. 15 - P. 128, L. 12
[redacted] ( withdrawn )

**August 19, 2003 Deposition**

P. 351, L. 24 - P. 352, L. 21
P. 353, L. 23 - P. 354, L. 10
P. 356, L.24 - P. 358, L. 20
P. 371, L. 3 - P. 372, L.11 ( minus "the personnel file of Officer Solitro and"at p.371 L.12 )
P. 385, L. 23 - P. 386, L. 24
P. 407, L. 11-19
P. 409, L. 2-16
P. 410, L. 14 - P. 412, L. 15

DEFENDANT, CITY OF PROVIDENCE
By Its Attorneys,

Michael J. Colucci, Esq. #3302
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

Kevin F. McHugh, Esq. #3927
CITY SOLICITOR'S OFFICE
275 Westminster Street, Suite 200
Providence, RI 02903-1845
PHONE: (401) 421-7740, Ext. 333
FAX: (401) 351-7596

## CERTIFICATION

I certify that I sent a true copy of the within on 11-7-05 via FAX to:

Nick Brustin, Esq.
Cochran, Neufeld & Scheck, LP
99 Hudson Street, 8th Floor
New York, NY 10013

Robert B. Mann, Esq.
610 Turks Head Place
Providence, RI 02903

95306

FYFE 1

**Leisa Young V. City Of Providence, Et Al**

6/9/2003
James Fyfe

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:

RECEIVED
JUN 18 2003
LAW DEPARTMENT

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

Ellen Grauer National & International
Court Reporting Co.
133 East 58th Street, Suite 1201, New York, New York 10022
Phone: (212) 750-6434 Fax: (212) 750-1097
www.ellengrauer.com

FYFE - Extra Copy

Page 69

A Yeah, except that I think that FATS has limited utility. Largely because it doesn't allow for approaches to situations in which officers have to make decisions. It begins when the situation is already far along.
And in my view, an awful lot of the situations start with officers put into positions where they shouldn't be to begin with. So if you do a role -- a scenario involving off duty conduct for on duty officers, for example, ideally, you would like it to begin with the receipt, by those officers, of a radio call, that there's an altercation with a gun. What's very important at that point is for the officers to start planning their approach to the situation so that they structure the confrontation in ways that minimize the possibility that bloodshed will follow.
You can't do that with a computer. Instead, you wind up in a dark lot across the way from a guy who has a gun in his hand and have to figure out if he's a cop.
So it doesn't allow sufficiently for

Page 70

officers to develop tactics to approach these things.
Q Are you going to continue the Range training scenarios?
A Sure.
Q Do you know now what various scenarios you will have implemented?
MR. BREUSTON: Objection.
A No. I will guarantee you that there will be off duty scenarios. And I guarantee that because there are seven -- 168 hours a week and our officers are off duty for 120 of those hours. I am strongly of the opinion that you have to train off duty officers to know that what they do while they're in uniform and on duty, doesn't fly when they're off duty.
And you have to train them to be aware that, that at any time when they're working, they're surrounded by off duty cops. The City is full of off duty cops and plain clothes officers. We put 300 plain clothes officers a day on the subways. You really have to have a protocol to make sure everyone knows who the other person is.

Page 71

Q Are you going to recommend a specific number of hours for off duty training?
A I won't recommend it, I'll dictate it.
Q How many hours are you going to dictate for off duty?
A A couple of days.
Q How long is a day?
A A day is seven hours.
Q So approximately 14 hours total?
A That's correct.
Q So do you know what the total number of hours a recruit has to spend at -- withdrawn.
How many weeks is the New York City Police Training Academy?
A Well, it has varied from class to class. Depending in part of availability of Madison Square Garden for graduation day.
The last class entered here on July 1st and graduated on January 21st. So that was six months and three weeks. I made some changes so that the current class will receive basically the same number of hours, but they'll come in July 1 and probably graduate about December 23rd. And the way

Page 72

we've been able to do that is to reorganize firearms and driver training.
Q Well, you said they'll receive the same number of hours. Do you know what the total number of hours will be for the incoming class?
A Well, it will be 25 weeks, roughly, times 40. So a thousand hours followed by about a three-week field training program -- three-month, I'm sorry. Three-month field training program. The recruits we graduated in January are still in field training out on the street.
Q The 1999 Department of Justice study for the Montgomery County, Maryland, did you make recommendations for off duty policies in that also?
A No. That was an analysis of race profiling and traffic enforcement.
Q At Page 6, the top of Page 6 of your vitae. It says you've been involved as an expert in more than 300 police-related civil rights court actions. Can you tell me -- what is the difference between expert witness and consultant?

Page 117

was Officer Solitro poorly trained?
MR. BREUSTON: Objection.
A My recollection is he received no training that dealt with the possibility that he might confront off duty or plain clothes officers in situations like this.
Further, that the Department found nothing wrong with what he had done in this case. So that would tell me that he acted consistent with his training.
Boehm, the training officer, indicates that there was a half-day block on this, but he can't document it. And I saw no evidence in anything that Solitro had that he had participated in, even if it did exist.
Q Well, isn't it true that there are times that trainers provide training and they can't document it?
MR. BREUSTON: Objection.
A Yeah, but there has to be -- there may be anecdotal examples of that. But if you have a policy or procedure that is part of training, it should be documented.
Q Are you saying that you should have documented the talks you gave to the last

Page 118

class regarding the off duty issues?
MR. BREUSTON: Objection to the question.
Please answer.
A I can document the policies, procedures and training materials upon which it's based. I don't know of any trainer who videotapes everything he says to classes. I've never said anything to a class here or anyplace else that was inconsistent with written materials that I can produce and I think that I did produce in the case.
Q That's not my question.
You couldn't provide -- you can't provide any documents to me of any typed or written notes of your talks to the recruits in the last class regarding off duty conduct, can you?
MR. BREUSTON: Objection. Asked and answered. That was the same question you asked and he answered it.
Go ahead.
A No, I don't have any notes on that. I know that my lectures are based on the

Page 119

training materials that are already typed and in existence and that are the basis for all the training that goes on here.
Q Tell me how Officer Saraiva was poorly trained?
A The same comment is true, that Saraiva gave no evidence that he had been trained to deal with off duty situations at all.
Another thing with Solitro, he was being trained as a rookie in this case and he was basically allowed to operate on his own by Officer Saraiva, which is a violation of the procedures that are accepted among policing. If you're working with a rookie who has eight days on the street and you're responding to sensitive situations, you have to make sure you give him very careful direction. So that's obviously a cause of this.
On Solitro, merely the assignment of Saraiva to train him as a field trainer was inadequate. This is a guy whose prior history gives evidence that he was particularly unfit for this job.
Saraiva had previously been involved

Page 120

in a shooting three months earlier, that was, as far as I can tell, a violation of any reasonable police standard, but the Police Department didn't even investigate it or take any action against him. That sends him a message that it's permissible to behave as he did. Chief Prignano indicates that he believes strongly that officers should take -- well, this really goes to Young.
Go ahead.
Q Who did you understand did the investigation of the previous Saraiva shooting?
A My understanding is that the State Attorney investigated it.
Q So as far as you know, the Providence Police Department did no investigation of the previous Saraiva shooting?
MR. BREUSTON: Objection. That's not his testimony.
A Basically that's my understanding. There was no internal investigation as should be provided in cases like this.
Q And it was your understanding that

Page 125

correct?

MR. BREUSTON: Objection.

A Yes, sir, I think that. And I think also that you will find nothing in the literature of policing, the generally accepted and authoritative literature of policing that contradicts anything in any of those 23 items.

Q Let's turn to Page 7 of your report. You stated your first opinion up at the top of that page after Number 1. And I just wanted to ask you that your understanding of the off duty carry policy was that police have to carry a firearm 24 hours a day.

Is that your understanding of what the policy at the time of this incident?

MR. BREUSTON: Objection.

A Yes.

Q There are no exceptions to this policy?

A Mr -- Chief Prignano testified that he believed that there was some common sense exceptions. But there really is no such thing as common sense where this is concerned.

Page 126

What you really need to do is specify when officers should and shouldn't be carrying their weapons.

Q And you believe that the Providence Police Department policy, up until September 2001, required every officer to carry a gun 24 hours a day, right?

A That's right.

Q No exceptions, right?

A Well, there may have been officers who were injured, but I didn't see any room for any exceptions.

Q The last paragraph on Page 7, and read the whole paragraph, if you want, but I had a specific question.

If you look at the last paragraph and you go down to the fifth line, the first full sentence where it begins, "Chief Prignano stubbornly." Do you see that?

A That's the middle of a sentence.

Q Right. You're right. The sentence begins, "This was the case in Providence on the night of"?

MR. BREUSTON: Why don't you let him read the paragraph.

Page 127

MR. MCHUGH: Yeah, he can read the paragraph.

A Right.

Q What's your basis for saying in that paragraph, "a long discredited policy of requiring officers to intervene in police actions while off duty and to do so on the basis of their common sense rather than upon any systematically developed training"?

MR. BREUSTON: Objection.

A Basically, it is the general sense of the police and the very specific information contained in those 23 documents listed on Page 5 and 6.

Q But in this next class coming in, are you going to train those officers to intervene in actions when they're off duty at times?

MR. BREUSTON: Objection.

A There are some situations in which officers have to intervene. We follow basically the fireman's rule. The tradition in the fire department historically has been that if an off duty firefighter sees a fire, he should not rush into it unless there is

Page 128

no other way to save a life. Instead, what he should do is call for the on duty crew and monitor the situation so that he can direct them.

And that's basically what we teach cops too. If you're in a situation where you have to take immediate action because someone's life will be lost if you don't, you've gotta do it. But in other situations that require police action and where life is not in imminent danger, you should call for the real cops, call for the guys in uniform.

Q When you just said "take immediate action," what forms can that immediate action take?

A Well, it would depend on the situation. If you walked into a store and a robber was shooting people, you would have to take cover, draw your gun and tell him to stop or shoot him.

Q Take a look at Page 9 of your report.

A (Witness complies.)

Q Number 6 on Page 9, one of your opinions in the bold face. "Violations committed by the officers involved in this

306

FYFE #2

YOUNG VS. CITY OF PROVIDENCE

JAMES FYFE - 8/19/03

CONCORDANCE AND CONDENSED TRANSCRIPT
PREPARED BY:

Ellen Grauer National & International
Court Reporting Co.
133 East 58th Street, Suite 1201, New York, New York 10022
Phone: (212) 750-6434 Fax: (212) 750-1097
www.ellengrauer.com

Page 253

your conclusions with respect to the Providence Police Department's policies, etcetera. My question now is a bit more limited.

With respect to the reason why Cornel Young, Jr. was shot at the scene by Officer Saraiva and Solitro, what was it that they did or did not do at the scene that caused him to be shot?

MR. BREUSTON: Objection.

A. Well, obviously they pulled the trigger that caused him to be shot, but they put themselves in exposed situations.

Q. When you say "exposed situations," do you mean that Officer Solitro and Saraiva were in the open?

A. That's correct.

Q. And it's your testimony that had they not been in the open Young would not have been shot?

A. Had they not been in the open -- not in these circumstances, no. Had they not been in the open and had they followed standard police procedures, he would not have

Page 254

been shot.

Q. And that is because they had exposed themselves, so they were under the impression, or at least ostensibly under the impression, that Young was going to shoot and kill them?

MR. BREUSTON: Objection.

A. Arguably, they believed their lives were in danger. They did not identify themselves as police officers and they put themselves in a vulnerable position.

So if you take their accounts at face value and reject any other contrary evidence, their shooting occurred because they put themselves into a situation in which they perceived that there was no way out except to shoot.

Q. Okay.

A. But they created those circumstances themselves.

Q. They created those circumstances because they, A, didn't identify themselves as police officers, and B, expose themselves in the open?

Page 255

MR. BREUSTON: Objection. He only testified about Solitro. I think you should be clear on that.

MR. PENZA: That is not the question.

A. Solitro exposed himself.

Q. I had actually asked before if both of them had exposed themselves.

Is it your testimony only Solitro or Saraiva?

A. I don't recall whether Saraiva was also out in the open.

Q. So again getting back to the question, the reason that Young was shot was because they did not identify themselves as police officers and at least Solitro had exposed himself?

A. That's correct.

MR. BREUSTON: Let me object to the last question. I'm sorry.

Q. Now, the identification as a police officer, that's important if, and only if Young was not aware that they were police officers, correct?

Page 256

MR. BREUSTON: Objection.

A. No, it's not. It's important because it's important that other people know it.

And it's important because there is no way to know whether Young knew they were police officers.

Q. I understand that. In other words, them not identifying themselves as police officers is only an issue if Young was not aware that they were police officers?

MR. BREUSTON: Objection. Aware when?

A. I don't -- I can't answer the question, because first of all, there is no way to tell whether Young was aware.

It's important that they do this all the time to make sure that people are aware.

Q. I understand we do not know as we sit here today what Young knew or didn't know.

My question to you, let's assume for the time being, this is a hypothetical, that Cornel Young was aware that these were

Page 349

officer?

MR. BREUSTON: Objection.

Q. At least in the restaurant and perhaps outside of the restaurant?

MR. BREUSTON: Objection.

A. That's the testimony, yes.

Q. Is that something you assumed in the basis of your opinions?

A. Again I go back to the same thing. I think Mr. Breuston will ask me – I have assumed that, yes, and I expect I will be asked to assume both ways, that he did and he didn't.

MR. BREUSTON: Well, are you asking him if it would change his opinion if he did assume that? I object to the question. You can continue.

MR. COLUCCI: I just asked a very simple question.

MR. BREUSTON: I object.

MR. COLUCCI: You can ask him another question at a later time.

MR. BREUSTON: Fair enough.

Page 350

Q. Something you told us about back in June, you were chairman for the police science department for this organization, the New York police academy?

A. Yes.

Q. That was in the early 1970s?

A. Yes, sir.

Q. And police science involves police procedure?

A. Yes.

Q. You were involved in the training of recruits at that time?

A. Yes.

Q. What was your involvement?

A. Well, I wrote the – wrote most of the curriculum on police science, on police procedures, and I supervised the department. There were 22 or 23 instructors. I made up examinations. I made sure I got into the classroom several times a week. I evaluated the instructors, reviewed the curriculum.

Q. Outside of accidents, disabling accidents or deaths, what is the typical work

Page 351

life of a New York police officer who entered the force in the early 1970s?

A. You mean how long did he stay?

Q. Typically?

A. Most of them stayed until June 30, 1975, when they were laid off because of the fiscal crisis. And then over the next three or four years, probably about 80 percent of the laid off officers were rehired. And I suspect that most of them are by now retired, but most of them stayed 20, 22 years.

Q. So it would be fair to say that absent the layoff time, most of the guys you trained or supervised in the '70s stayed for 20 or 25 years?

MR. BREUSTON: Objection. Please don't speculate if you don't know.

A. I don't know, but those are basically the statistics. There are still some around.

Q. To your knowledge, were any of the men who you trained or whose training you

Page 352

supervised, have any of them ever committed violations in the rules and regulations of the New York Police Department?

MR. BREUSTON: Just men? You said men. You mean men and women?

MR. COLUCCI: Both.

A. Sure.

Q. Have any of them committed violations that related to use of force?

A. I would assume.

Q. How about use of lethal force?

A. I would also assume. Although that cohort had a very low rate of dismissals. It was interesting.

Q. The cohort?

A. That group, the group that came through the academy while I chaired the police science department, the rate at which they were dismissed from the department subsequent was very low.

Q. To your knowledge, did any of them – were any of them ever found to have committed unjustified shootings of civilians or other police officers?

Page 353

MR. BREUSTON: Objection.
If you have firsthand knowledge.
A. No, I don't.
MR. BREUSTON: Any knowledge you can answer.
A. No, I don't. I don't know of any who shot other police officers. No. There were 5800 of them, but I don't know of any who shot other police officers, and I would be surprised if -- when you say an "unjustifiable shooting," you mean a shooting where the officer used bad tactics?
Q. Anything which you would consider unjustified.
A. I would be surprised if no one was disciplined for shooting.
Q. If no one was disciplined?
A. Yes. I would expect out of 5800 who spent 22 years on the job probably someone was disciplined for something he did at a shooting, but I don't know of any firsthand.
Q. Would you say it was because of poor training or poor supervision of training on your part?

Page 354

MR. BREUSTON: Objection. He doesn't know of any incidents. How could he possibly know?
A. No, I think the training was great. The training reduced the number of shootings very dramatically.
I don't think you can conclude that even if it were the case, but I don't know of any cases.
Q. Is that because officers can commit violations even if they have been properly trained?
MR. BREUSTON: Objection.
A. They do, except the rate at which they commit violations is very low if they're disciplined.
If they commit violations and they're not disciplined, they just keep on doing it.
Q. You also back in June told us about various grants and studies that you were involved in relating to other cities, to study misconduct within those cities and their departments. I just want to talk briefly

Page 355

about this.
Do you know how it came about that certain cities were selected over others?
A. Well, in some cases the city self-selected, so I did some work out of Los Angeles on the recommendation of the city council, and subsequently I did work in Philadelphia in connection with a lot of civil suits, in Joilette, Illinois and in Chicago.
Subsequently the Justice Department took several jurisdictions to court and I looked at the disciplinary experiences in those places.
Q. Was it generally because there was some unidentified problem within those departments?
MR. BREUSTON: Objection.
Q. As opposed to just randomly picking departments within the country whether they had a problem or not?
MR. BREUSTON: Answer again.
A. I don't know how I can answer that.
Q. You participated in the studies,

Page 356

right?
MR. BREUSTON: It's not the question.
Q. Don't forget to put the question mark at the end.
MR. BREUSTON: It's a leading question. I take back my objection.
A. In some cases there was a civil suit. We looked at disciplinary action. At least the plaintiff felt there was an identified problem.
In other cases the Justice Department investigated to determine whether there was a problem. There was certainly a perception that there was a problem.
I studied the disciplinary system here, although there were allegations of discrimination in the system.
Q. The system here?
A. Yes.
Q. Meaning New York?
A. Right.
Q. Let me ask you about the carry policy off duty. And correct me if I'm wrong,

Page 357

but I believe your prior testimony last time was that your protocol is that the off duty officer should not intervene with forcible action unless there's an imminent threat to life.
Is that a fair characterization?
MR. BREUSTON: Objection.
**A. Yes, that's a general statement, sure.**
Q. You want to put it in better terms than I said it?
MR. BREUSTON: Do you want to ask him if there are any other parts of the policy or that portion of the policy?
Q. That portion of the policy.
**A. I think that's a good general statement.**
**There should be a serious threat to life before an off duty officer intervenes forcibly with his gun.**
Q. In your review of this Cornel Young case, is there anything that you saw in your review of the materials that led you to the conclusion that at the time Cornel Young,

Page 358

Jr. attempted to intervene, that there was a serious threat of life to anybody?
**A. Yes.**
Q. Did you narrow it down to anyone in particular or --
MR. BREUSTON: Objection.
Q. -- or just persons generally present in the area?
**A. Mr. Diaz was waving a gun around, and someone else apparently was in a position where it looked like he had a gun and was pointing it back toward Mr. Diaz.**
Q. So even under your protocol for off duty intervention, Cornel Young, Jr. should have intervened?
MR. BREUSTON: Objection. I guess that's a hypothetical?
**A. I would not criticize him for intervening.**
Q. You also testified in your earlier deposition that while you directed or supervised training academies here, you would typically rely upon the expertise of the instructors, and occasionally you would pop in

Page 359

and give lectures and see how things were going; is that fair?
MR. BREUSTON: I object. Would you mind referring him to pages?
MR. COLUCCI: He may not have to.
MR. BREUSTON: I object to your characterization of his prior testimony.
He can answer the question.
**A. I don't think that's the substance of my testimony at all.**
**We relied on a curriculum that was very clearly defined, and we put into the classroom instructors who were qualified by training and experience to teach it.**
**Occasionally I would drop in to see how the classes were going, to teach a class, and we regularly evaluated the instructors and the material they were teaching.**
Q. So you were not present at each and every class, true?
**A. True. But each recruit who went through here received examinations that tested how well they knew the material.**

Page 360

Q. If you would drop in occasionally on classes, I take it you were relying upon the expertise of the instructors who were teaching the classes to make sure things were being done right; is that right?
MR. BREUSTON: Objection. That's the exact opposite of his testimony.
**A. No. We wrote a curriculum complete with a statement of terminal performance objectives and an outlined lesson plan and a text for the students to read.**
**It included relevant departmental orders as attachments, legal bulletins, and the recruits were tested on that.**
**They received a test on justification for the use of deadly force where they had to score a hundred in order to graduate.**
**So we had checks on how the instructors were doing. We still do.**
Q. Did you have confidence in your instructors?
**A. Yes, sure. There were some I released. Yeah, generally. When I didn't, we**

Page 369

**conduct, and that officers had been given -- with their training -- and officers had been given no training on anticipating that they might encounter an off duty police officer when they responded to a potentially violent situation.**

Q. Back up a minute. I thought you identified two separate areas of deficiency in training, one being responding to situations that could potentially involve violent situations.

**A. Right.**

Q. That doesn't necessarily have to include on duty or plainclothes officers, right?

**MR. BREUSTON:** I want to object, because he identified six areas of deficient training.

Go ahead.

**A. That's one of them.**

**One of the potentially violent situations is an encounter with an off duty police officer.**

Q. When you said one of the areas

Page 370

that you thought was deficient regarding training was that area where responding to potentially violent situations, what types of situations are you talking about, those involving off duty officers or those that don't necessarily have to include off duty officers or plainclothes officers?

**A. A potentially violent situation is a situation in which the police anticipate that they will encounter someone under adversarial circumstances, so it's a car stop, a response to a dispute, a response to a disturbance, a gun run, a response to a fight on the street.**

Q. I understand. I thought that's what you meant, Mr. Fyfe.

**A. Right. And one of the things that officers have to take into account when they do that is that they may come upon off duty police officers, especially at night, because officers work funny hours, which means that they're quite often among the few people who are out and about late at night.**

Q. Maybe I'm assuming something that

Page 371

is not true, so let me ask you.

Did you review the training curriculum written materials that Officers Saraiva, Young and Solitro went through in their academies?

**MR. BREUSTON:** Objection. Are you asking if he reviewed it in total?

**MR. COLUCCI:** That's what I'm asking him, Nick.

**MR. BREUSTON:** I object.

**A. I reviewed the personnel file of Officer Solitro and some directives from the Providence Police Department, and I reviewed the testimony of the officers and of some trainers about what people were trained in.**

**And I reviewed the testimony of the former chief and other officials concerning these actions, the training that was related to them, and the conduct of the officers at the scene.**

**And what I concluded from that was that the officers were trained adequately and that no one in the Police Department found anything wrong with what they did because it**

Page 372

**was consistent with the department's training.**

Q. Therefore, by way of omission, it's fair for me to say, is it not, you have never to this day reviewed the training academy materials that were instructed or given to the academy class of Saraiva, Solitro and Young?

**A. That's correct, yeah. I am told there is no written material on much of the training that should be at issue in this case.**

Q. What independent investigation have you done to satisfy yourself whether that's true or not true?

**MR. BREUSTON:** Objection.

Q. If any. You may not have done any.

**A. I think what I'm doing is monitoring closely Mr. Breuston's discovery efforts and looking at the statements of the people who are defendants in this case about what goes on.**

**Do you think if I call the Providence Police Department and said "Hey, I'm an expert in the plaintiff's case that's**

Page 385

science and social science, we divided it into two components. One is knowledge and fitness, and the second is skills and abilities.

And the knowledge and fitness component is going on right now. That will last about 15 weeks. And we're providing officers generally with classroom lectures, some role plays, formal academic training and physical training.

They're in the classroom four-and-a-half hours a day. They're in the gym two-and-a-half hours a day.

The last ten weeks will be firearms and tactics training, driver training and scenario-based role play training here in the gym.

So that by the time each recruit graduates, we will have put him or her through 12 or 15 different role plays that will have been graded and critiqued by themselves and their instructors and other students.

Q. Each of those recruits will have actual participation in the role plays; is that correct?

Page 386

A. Yeah, each of them will have actual participation in the role play.

In the past recruits all have had participation in role plays, but they have not all had participation in every role play so that -- because of the numbers we train.

I have right now about 1500 recruits in the building. Until we restructured the curriculum it was impossible to provide every recruit with every role play. So when a recruit graduates now he will have participated in an off duty encounter, a domestic, a response to a stickup, a response to a burglary, a high risk vehicle stop, a stop and frisk of a pedestrian, a traffic stop.

In the past there might be 12 or 15 role play scenarios, and he might have participated in two or three and witnessed other ones while his classmates -- and sat by his classmates and sat in on role plays that involve off duty, plainclothes or undercover officers.

Q. How many of those scenarios

Page 387

involve that?

MR. BREUSTON: When, Michael?

Q. Now.

A. We will have two or three. The scenario is pretty much the same. One is when an off duty officer is put in a situation where he has to take police action, and another is a situation in which an off duty officer -- pardon me.

The first is a situation where an off duty officer has to decide whether to take police action, and the second is a scenario in which an off duty officer has to take police action and on duty officers respond.

So those are really the two major themes that play out here.

Q. Can you give us a description of those scenarios, of what happens in the scenario?

A. In the first one we will put an officer in a situation which he has to decide to take action at some event, so it will vary among the recruits.

Some will be fights on the street,

Page 388

a crime in progress. Some will be incidents in which an officer is confronted by someone who is assaulted, and the question then becomes how does the officer handle this.

As we put recruits through it, we will use them to critique the performance of their classmates who go through the same scenarios.

The second is an incident in which some officers will play uniform people who respond to a situation in which an off duty officer has taken some action. Other officers will portray the off duty officer.

(Recess taken.)

BY MR. COLUCCI:

Q. Mr. Fyfe, regarding we were talking about role play scenarios, there is a critiquing session that goes on as part of that training still, you still have a critique session?

A. Yes.

Q. Do you view that as an important part of that scenario training, to have the instructors critique with the recruits what

Page 405

absolutely still, not make any movement that might be misconstrued as a threat, and that he should identify himself with a standard response.

So here in New York it's "I'm on the job." And there is a protocol that continues from that point.

The on duty officer asks the off duty officer to slowly produce his shield and to holster his gun or put it on the ground.

But the important consideration is that everybody has to be trained to anticipate that such a confrontation will occur and to know instinctively what to do, and that's to freeze the situation so nobody moves quickly and nobody says anything unexpected.

Q. Is there a certain standard challenge that ought to be used, or should there just be a standard challenge?

MR. BREUSTON: Objection.

A. The one in New York is "Police, don't move." The one in Washington was "Police, raise your hands."

I recommended very strongly

Page 406

against that, because when an officer raises his hands in those situations he's liable to lead people to conclude he's raising his hands to level a gun at. So I think they have changed the protocol there too.

But the standard here is to freeze the situation. To make sure nobody moves.

Q. You mentioned the uniformed officers are to instruct the nonuniformed officer to slowly move his shield and place his gun in his holster or slowly on the ground?

A. Right.

Q. Is the ununiformed officer expected to follow those commands?

A. Absolutely.

Q. You mentioned back in June that you wrote a curriculum 28 or 30 years ago that included off duty action.

Did it include the type of protocol you just discussed?

A. Yes.

Q. Has it been the same over those years, or has it changed?

Page 407

A. I'm right in the process of writing it into the recruit curriculum now, so it will be revised.

This is the first revision of the recruit curriculum in many years, but it will say the same things. But I think I'm a better writer than I was then.

MR. BREUSTON: We're coming up on four hours, Mike.

Q. Dr. Fyfe, were you given any information about a training program by Providence called Camp Varnum, V-A-R-N-U-M?

A. I just learned over the last couple of days that it exists. I don't know much more about it than that.

Q. You don't know the substance of it?

A. No.

Q. On page 20 of your report you indicate you have reviewed 10,000 or more shootings.

A. Right.

Q. Are those nationwide, citywide, worldwide? Where are those?

Page 408

A. A couple from abroad, Canada, Australia, the United Kingdom, Jamaica, but most of them are here across the country, New York, Boston, LA, Chicago, Philadelphia, Miami, Miami Dade, LA sheriff, Oakland, San Francisco.

Q. These have all involved off duty officers in one way or another?

A. No.

MR. BREUSTON: Objection.

Q. I'm sorry. About a quarter of them?

A. That's correct.

Q. Other than this particular case have you -- have any of those involved the City of Providence, those shootings that you reviewed?

A. I had a couple of Rhode Island cases. I don't think any of them involved Providence. One in Foster, F-O-S-T-E-R. I think I had three cases, I have been retained in three cases in Rhode Island. I don't think any of them involved the Providence Police Department.

Page 409

Q. In your opinion do you have a preferred method for an off duty officer to display his credentials in a situation where there is crime in progress or potential for violence?

**A. Well, if he can hold a shield in his hand. In some cases officers are equipped with chains and put them around his neck. A cop has time to stick it in his pocket so it's displayed. As long as it's visible. And you really can't tell off duty officers how to carry the shields. Some of them don't carry.**

Q. Do you have a preferred method of displaying it?

**A. No. It should be visible.**

MR. COLUCCI: Okay.

BY MR. PENZA:

Q. I just want to understand your testimony with respect to the training with respect to off duty friendly fire incidents.

You testified from the late '70s to the mid '90s. Was there -- there were no such shootings, or you did refer to there were nine incidents during that period? And I'm

Page 410

not sure if you're talking about nine incidents before or during that period.

**A. During the early '70s there were nine. Then --**

Q. Then it seemed to stop until you had the 1994 incident with the Metro Transit police officer.

**A. Yes. They didn't go away completely. There might have been one or two, but I don't think anyone was hurt.**

**And the '94, '95 incident caused a furor and a reinvestigation of the topic.**

MR. PENZA: That's all I have.

BY MR. BREUSTON:

Q. Dr. Fyfe, since you wrote your report have you read Michael Figueirido's deposition?

**A. No, I don't believe so.**

Q. But you believe you read it before your report?

**A. Did I? I believe so.**

Q. At least just scanned it?

**A. Is that one I indicated I scanned?**

Q. I'm not sure.

Page 411

**A. I recall the name. If I testified to it in my earlier deposition --**

Q. I would ask you to read pages 22 to 29 of his deposition simply to see if it refreshes your recollection about the prior off duty incident that Mr. Young was involved in.

Have you had a chance to read that?

**A. Yes, I have.**

Q. Does reading that refresh your recollection about this incident, and I guess it's Lieutenants Figueirido's response to it?

MR. PENZA: Objection to form, to refresh recollection.

**A. Yes, it has.**

Q. How?

**A. I knew there was a prior incident in which Officer Young had been reprimanded by a supervisor for his actions at an event.**

**Apparently some young men driving by in a car fired some shots and he did nothing, and was told by his lieutenant in the future he had better take appropriate action**

Page 412

**in situations that occurred while he was off duty.**

**He was made to understand that clearly, and he was also put on a punishment detail for a short period of time as a result of that.**

MR. BREUSTON: That's all I have.

BY MR. COLUCCI:

Q. The reprimand by his superior officer, you would include that as part of training, would you not?

**A. Sure.**

Q. Whatever it was he told him?

**A. Right.**

**(Time noted: 4:00 p.m.)**